1              UNITED STATES DISTRICT COURT
               MIDDLE DISTRICT OF FLORIDA
2                     TAMPA DIVISION

3         CASE NO.:  8:17-cv-02447-T-02AAS

4

5   HILDA VAN HOEK,

6           Plaintiff,

7   vs.

8   McKESSON CORPORATION, a foreign corporation, PSS WORLD
    MEDICAL, INC., a Florida corporation, McKESSON
9   MEDICAL-SURGICAL, INC., a foreign corporation, McKESSON
    MEDICAL-SURGICAL TOP HOLDINGS, INC., a Florida
10  corporation,

11          Defendants.

12  *    *    *    *    *    *    *    *    *    *    *

13

14               DEPOSITION OF:  HILDA VAN HOEK

                 CORRECTED TRANSCRIPT
15

                      08/09/2019
16               10:01 a.m. - 4:19 p.m.
                 U.S. Legal Support
17                    Suite 1775
                 201 North Franklin Street
18                  Tampa, Florida

19

20

21

                      Volume 2
22               Pages 98 - 331

23

     Stenographically Reported by:  ELIZABETH W. CHORRUSHI,
24                    RPR, FPR
                 Registered Professional Reporter
25               Florida Professional Reporter

Page 99

```
 1              APPEARANCES
 2  On Behalf of the Plaintiff:
 3
        KATHRYN S. PISCITELLI, ESQUIRE
 4      Law Office of Kathryn S. Piscitelli
        P.O. Box 691166
 5      Orlando, Florida 32869
        Kpiscitelli@cfl.rr.com
 6
 7  On Behalf of the Defendant:
 8      SACHA DYSON, ESQUIRE
        GREGORY A. HEARING, ESQUIRE
 9      Gray-Robinson, P.A.
        Suite 2700
10      401 East Jackson Street
        Tampa, Florida 33602
11      Sacha.dyson@gray-robinson.com
        Gregory.hearing@gray-robinson.com
12
13  ALSO PRESENT:
        Paul Jensen
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 100

```
 1          INDEX OF PROCEEDINGS
 2
 3  Deposition of:  HILDA VAN HOEK
 4      CONTINUED EXAMINATION BY MS. DYSON      107
        CERTIFICATE OF REPORTER                327
 5      CERTIFICATE OF OATH                    328
        WITNESS REVIEW LETTER                  329
 6      ERRATA SHEET                           330
        COURT REPORTER'S CERTIFICATE OF CORRECTION  331
 7
 8
 9
10
11
12              EXHIBITS
13
    Exhibit 16
14      E-mail Chain, previously marked and
        not attached............................ 118
15
    Exhibit 17
16      Second Amended Complaint and Demand
        for Jury Trial.......................... 113
17
    Exhibit 18
18      E-mail Chain............................ 133
19  Exhibit 19
        E-mail Chain............................ 136
20
    Exhibit 20
21      E-mail Chain............................ 140
22  Exhibit 21
        E-mail Chain............................ 146
23
    Exhibit 22
24      E-mail Chain............................ 149
25
```

Page 101

```
 1  EXHIBITS, continued
 2  Exhibit 23
        E-mail Chain............................ 156
 3
    Exhibit 24
 4      E-mail.................................. 160
 5  Exhibit 25
        E-mail.................................. 163
 6
 7  Exhibit 26
        E-mail Chain............................ 165
 8  Exhibit 27
        E-mail Chain............................ 167
 9
    Exhibit 28
10      E-mail Chain............................ 168
11  Exhibit 29
        E-mail Chain............................ 170
12
    Exhibit 30
13      E-mail Chain............................ 171
14  Exhibit 31
        E-mail Chain............................ 175
15
    Exhibit 32
16      E-mail Chain............................ 182
17  Exhibit 33
        Models - Hilda K. VanHoek.............. 190
18
    Exhibit 34
19      Revenue Impact......................... 197
20  Exhibit 35
        E-mail Chain............................ 204
21
    Exhibit 36
22      E-mail.................................. 213
23  Exhibit 37
        E-mail Chain............................ 214
24
    Exhibit 38
25      E-mail Chain............................ 216
```

Page 102

```
 1  EXHIBITS, continued
 2  Exhibit 39
        E-mail Chain............................ 218
 3
    Exhibit 40
 4      E-mail Chain............................ 219
 5  Exhibit 41
        E-mail Chain............................ 222
 6
    Exhibit 42
 7      E-mail Chain............................ 227
 8  Exhibit 43
        E-mail Chain............................ 229
 9
    Exhibit 44
10      E-mail Chain............................ 230
11  Exhibit 45
        E-mail Chain............................ 234
12
    Exhibit 46
13      E-mail.................................. 236
14  Exhibit 47
        Text Message Exchange.................. 238
15
    Exhibit 48
16      E-mail Chain............................ 240
17  Exhibit 49
        E-mail Chain............................ 242
18
    Exhibit 50
19      E-mail Chain............................ 244
20  Exhibit 51
        E-mail.................................. 247
21
    Exhibit 52
22      E-mail Chain............................ 248
23  Exhibit 53
        E-mail Chain............................ 248
24
    Exhibit 54
25      E-mail Chain............................ 249
```

## Page 103

1    EXHIBITS, continued
2      Exhibit 55
           E-mail Chain................................ 251
3      Exhibit 56
4          E-mail Chain................................ 252
5      Exhibit 57
           E-mail..................................... 254
6      Exhibit 58
7          E-mail Chain................................ 255
8      Exhibit 59
           E-mail Chain................................ 256
9      Exhibit 60
10         E-mail Chain................................ 256
11     Exhibit 61
           E-mail Chain................................ 257
12     Exhibit 62
13         E-mail Chain................................ 258
14     Exhibit 63
           E-mail Chain................................ 259
15     Exhibit 64
16         Message.................................... 260
17     Exhibit 65
           E-mail..................................... 263
18     Exhibit 66
19         E-mail Chain................................ 266
20     Exhibit 67
           E-mail..................................... 268
21     Exhibit 68
22         E-mail..................................... 269
23     Exhibit 69
           E-mail Chain................................ 275
24     Exhibit 70
25         E-mail Chain................................ 277

## Page 104

1    EXHIBITS, continued
2      Exhibit 71
           E-mail Chain................................ 278
3      Exhibit 72
4          E-mail Chain................................ 283
5      Exhibit 73
           E-mail Chain................................ 284
6      Exhibit 74
7          E-mail Chain................................ 287
8      Exhibit 75
           E-mail Chain................................ 290
9      Exhibit 76
10         E-mail Chain................................ 294
11     Exhibit 77
           E-mail Chain................................ 295
12     Exhibit 78
13         E-mail Chain................................ 296
14     Exhibit 79
           E-mail..................................... 297
15     Exhibit 80
16         Message.................................... 303
17     Exhibit 81
           E-mail Chain................................ 305
18     Exhibit 82
19         E-mail Chain................................ 308
20     Exhibit 83
           E-mail..................................... 310
21     Exhibit 84
22         E-mail Chain................................ 314
23     Exhibit 85
           Appointment Invitation..................... 314
24
25

## Page 105

1    EXHIBITS, continued
2      Exhibit 86
           Fourth Amended Complaint and Demand
3          For Jury Trial............................. 319
4      Exhibit 87
           Plaintiff's Response to
5          "Defendant's First Set of
           Interrogatories to Plaintiff"............. 320
6      Exhibit 88
7          Plaintiff's Supplemental Response
           to "Defendant's First Set of
8          Interrogatories to Plaintiff"............. 320
9      Exhibit 89
           Plaintiff's Sixth Supplemental
10         Mandatory Disclosure...................... 321
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 106

1    Deposition taken before Elizabeth W. Chorrushi,
2    Registered Professional Reporter, Florida Professional
3    Reporter, Notary Public, State of Florida at Large.
4              - - - - - - -
5         THE REPORTER:  Do you solemnly swear or affirm
6    that the testimony you shall give will be the truth,
7    the whole truth and nothing but the truth?
8         THE WITNESS:  I do.
9    THEREUPON,
10             HILDA VAN HOEK,
11   having first duly sworn/affirmed, was examined and
12   testified as follows:
13        MS. DYSON:  Good morning, Ms. vanHoek.
14        MS. PISCITELLI:  I'd like to makes a brief
15   comment before we start.
16        MS. DYSON:  Sure.
17        MS. PISCITELLI:  Thank you.
18        The issue of whether Ms. vanHoek wanted to
19   review the transcript was not raised when the
20   deposition was interrupted by the court's order
21   staying the deposition, the first leg of the
22   deposition.
23        So I am now, on Ms. vanHoek's behalf, reserving
24   or invoking the right to read the transcript, the
25   entire transcript, once the deposition is completed

Page 107

1   and transcribed.
2           Thank you.
3           MS. DYSON:  Okay.  Can we get started?
4           THE WITNESS:  Yes.
5                   CONTINUED EXAMINATION
6   BY MS. DYSON:
7       Q    Okay.  Perfect.
8           So, Ms. vanHoek, I introduced myself last time.
9   I'm Sacha Dyson.  I represent McKesson and the other
10  defendants in this case.  Okay?
11      A    Okay.
12      Q    And we talked about, last time, that the
13  purpose of this deposition is to get a complete
14  understanding and accurate understanding of your claims.
15  Do you understand that?
16      A    Yes.
17      Q    Okay.  And do you remember the ground rules
18  that we covered last time, or would you like me to go
19  over them again?
20      A    Go over them again.
21      Q    Okay.  Sure.  So we need to try to make as
22  clear a record as we possibly can, using first and last
23  names, speaking one at a time and verbalizing our
24  answers.
25          Do you understand that?

Page 108

1       A    Yes.
2       Q    Okay.  And we can take a break at any time you
3   want to take a break.  Just let me know you want to take
4   a break.  And your attorney may assert objections through
5   this process.  Unless she instructs you not to answer,
6   you can go ahead and answer that question.
7           If you don't understand a question I've asked,
8   ask me to rephrase it.  I will be glad to do that.
9   Otherwise, if you answer it, I'm going to assume that
10  you've understood the question, you've heard the question
11  and you're providing your best recollection.
12          Do you understand these ground rules?
13      A    I do.
14      Q    Okay.  Perfect.
15          Is there anything about your physical or mental
16  conditions that prevents you from providing accurate,
17  reliable testimony today?
18      A    No.
19      Q    And your counsel made an announcement about the
20  transcript of your previous deposition.  Did you review
21  that transcript?
22      A    Yes.
23      Q    Okay.  Did you get a copy of that transcript?
24      A    Yes.
25      Q    Okay.  Is there anything that you feel like you

Page 109

1   need to correct from that transcript?
2       A    I just briefly went over it.  I didn't really
3   thoroughly go through it.
4       Q    Okay.  But is there anything, sitting here
5   today, that you believe you need to correct that you saw
6   in the deposition transcript?
7       A    Well, there were -- I know there was one part
8   when it was referring to the decisions that were being
9   made when McKesson and PSS merged -- the account
10  separation -- and McKesson did set some guidelines, and
11  the guidelines that I remember were the 70/30 rule.  If
12  you had 70 percent of the business, that you would retain
13  the entire account.  That was one of the things.
14          The other thing that stood out to me was in
15  reference to Florida Hospital Physician Group.  You asked
16  if -- it's like I did not know the conversations that
17  took place making the decision for a single rep, but it
18  was communicated to me that the customer did request to
19  have a single rep.
20      Q    And who communicated that to you?
21      A    I believe the person's name is Francis, and I
22  do not know the last name.
23      Q    And how was that communicated to you?
24      A    It was communicated -- I remember an e-mail,
25  mostly.

Page 110

1       Q    Did you have a conversation with this Francis
2   person?
3       A    Not that I remember.
4       Q    Okay.  And do you have the e-mail communication
5   that you're referencing?
6       A    Probably.
7       Q    Okay.
8       A    I'm not sure.
9       Q    And so you believe that there is an e-mail
10  communication that is directed to you telling you that
11  the customer made a request?
12      A    I don't think it was just to me.
13      Q    Okay.
14      A    It was part of a group message.
15      Q    Okay.  And what did this e-mail communication
16  say?
17      A    Well, the gist of it was that Brian Irish would
18  be taking over the Florida Hospital Physician Group in
19  its entirety.
20      Q    Okay.
21      A    Okay.
22      Q    And did it say anything else?
23      A    It said a lot of things, but that's what I
24  remember.
25      Q    Okay.  But you don't have any personal

Page 111

1  knowledge as to why the decision was made to assign the
2  account to Brian Irish, correct?
3      A    Because of it being Brian Irish, why they chose
4  him over someone else or -- I'm not understanding the
5  question.
6      Q    Sure.  Brian Irish, in 2016, received the
7  Florida Hospital Physician Group account.  Is that
8  correct?
9      A    I believe it was 2016.
10     Q    Okay.  And do you know why that decision was
11  made?  Were you party to it?
12         MS. PISCITELLI:  Asked and answered.
13         MS. DYSON:  Well, she's telling me a different
14     answer than she told me, so that's what I'm trying
15     to understand what it is that you're saying.
16     A    I'm only saying that it was communicated to us
17  that the customer requested to have --
18  BY MS. DYSON:
19     Q    Okay.
20     A    -- a single rep.
21     Q    Okay.  But you don't have any personal --
22     A    I wasn't part of the conversations.
23     Q    Okay.  And one of the things -- the ground
24  rules that I didn't cover again --
25     A    Yeah.

Page 112

1      Q    -- is that we can't interrupt each other.
2         So you didn't have any personal involvement in
3  the decision to reassign that account to Brian Irish.  Is
4  that correct?
5      A    Did I have any influence?
6      Q    Any involvement.
7      A    No.
8      Q    Okay.  So you said that you reviewed your
9  transcript and you wanted to correct something about the
10  guidelines for transitioning accounts at the acquisition.
11     A    Correct.
12     Q    And you said that you believed that there was a
13  70/30 rule?
14     A    Correct.
15     Q    Do you know who ultimately made the decision as
16  to which account should be assigned to which individuals
17  at the acquisition?
18     A    Well, it wasn't one person.  It was a team
19  between Paul Jensen and Carlos Xiques.
20     Q    That's what you believe?
21     A    That's what I believe.
22     Q    Okay.  But do you know who, in fact, made those
23  decisions?
24     A    That's what I believe.
25     Q    Okay.  And is there anything else in your

Page 113

1  deposition transcript that you believe you need to
2  correct?
3      A    Not that I know of.
4      Q    Okay.  And in preparation for today's
5  deposition, other than any conversation you had with
6  counsel, have you talked to anyone else?
7      A    No.
8      Q    And other than reviewing the transcript of your
9  previous deposition, have you reviewed any other
10  documents, other than those provided to you by counsel?
11     A    I think I mentioned that before.  I looked over
12  the third, fourth amended complaints.  I looked at your
13  interrogatory questions and my answers, and I looked over
14  the transcript briefly.
15     Q    Okay.  Any other documents that you can think
16  of that you reviewed in anticipation of your deposition
17  today?
18     A    Not that I can think of.
19     Q    Okay.
20         (Exhibit 17 marked for identification.)
21  BY MS. DYSON:
22     Q    I'm placing in front of you Exhibit 17 to your
23  deposition.
24     A    Okay.
25     Q    Do you recognize this document?

Page 114

1      A    This is not one that I reviewed.  I may have
2  seen it.
3      Q    Do you recognize this document as a -- the
4  second amended complaint that was filed on your behalf in
5  the Thirteenth Judicial Circuit?
6      A    That's what it says.
7      Q    You don't dispute that, correct?
8      A    No.
9      Q    And it is signed by Peter Helwig.  Do you see
10  that?
11     A    I do.
12     Q    And he is your counsel, correct?
13     A    He is.
14     Q    And so do you have anything to dispute this is
15  a true, correct copy of your second amended complaint?
16         MS. PISCITELLI:  Objection.  Compound question.
17         MS. DYSON:  You can keep your objections to the
18     form, please.  I would appreciate that,
19     Ms. Piscitelli.
20         MS. PISCITELLI:  I will make the objections
21     that I think are appropriate.  Thank you.
22         MS. DYSON:  And I would appreciate if you keep
23     your speaking objections out of the deposition.  You
24     can object to the form.
25         MS. PISCITELLI:  I will object as I find it

Page 115

1    appropriate.
2        MS. DYSON:  And hopefully in accordance with
3    the rule.
4        MS. PISCITELLI:  Yes, in accordance with the
5    rules.
6    A    I can say it looks like it.  I haven't reviewed
7    it in a while.  I haven't seen it.  I mean, it's gone
8    through a lot of hands, so I don't know.
9    BY MS. DYSON:
10   Q    What do you mean, "It's gone through a lot of
11   hands"?
12   A    Well, I mean, this is your copy you're
13   presenting to me.  It's not my original copy.
14   Q    Okay.  And do you see at the top of it, it has
15   an e-filing date on it?
16   A    I do.
17   Q    And in this complaint, in the first
18   paragraph -- or second sentence of the first paragraph,
19   do you see where it says, "This second amended complaint
20   is filed with the written consent of the defendants
21   pursuant to Rule 1.190(a) of Florida Rules of Civil
22   Procedure"?
23   A    Do I see that?  Yes.
24   Q    Now, you've been continuously employed since
25   1994 with either PSS or McKesson.  Is that correct?

Page 116

1    A    That's correct.
2    Q    And at either company, have you been suspended,
3    demoted or terminated?
4    A    No, not to my knowledge.
5    Q    And you previously testified, in your last
6    deposition, about some documents going to your personal
7    e-mail address -- I think you called them "Affects" --
8    that you had some work-related documents going to your
9    personal e-mail address, that were titled "Affects."
10       Do you know what that is?
11   A    "Affects"?  No.
12   Q    Okay.  And you also previously testified, in
13   your last deposition, about the distinction between wheel
14   reps and fully-commissioned reps.  Do you recall that?
15   A    Yes.
16   Q    Since you have reported to Mr. Jensen, do you
17   recall who are the wheel reps that were on your team?
18   A    Laura Capriati and Michelle Rooney, and to my
19   knowledge, those are the only two that we have.
20   Q    And before you started reporting to Mr. Jensen,
21   when you reported to Mr. Xiques -- excuse me -- did you
22   have wheel reps and fully-commissioned reps?
23   A    Not that I'm aware of.
24   Q    Okay.  And we left off in your last deposition
25   talking about your claims in this case.  Do you recall

Page 117

1    that?
2    A    Yes.
3    Q    And that you told me that you're making two
4    claims in this case, one based on gender discrimination
5    and one based on retaliation for engaging in protected
6    activity.  Do you recall that?
7    A    That there are only two claims?  Can you show
8    that to me?
9    Q    Oh, sure.
10   A    Is there something in writing?
11   Q    Sure.  Sure.
12   A    Okay.
13   Q    So if you want to look -- I can't remember if
14   we have the fourth amended complaint in here or not.  Let
15   me just look at that real quick.
16   A    I don't believe it was.
17   Q    No, I don't think it was either, but we
18   certainly have the third amended complaint.
19   A    Okay.
20   Q    And if you want to look at that to refresh your
21   recollection.
22   A    Okay.  So Count I is sex discrimination;
23   Count II, sexual discrimination; Count III, retaliation;
24   Count IV is sexual discrimination; V, sexual
25   discrimination, and again, retaliation.

Page 118

1    Q    Okay.
2    A    Is that what you wanted?
3    Q    So you're making two claims, one is a claim of
4    sex discrimination, and two, is a claim of retaliation?
5    A    Yes.
6    Q    Correct?
7    A    Correct.
8    Q    Okay.  And we had started talking about the
9    discrimination claim, and you had told me that one of the
10   bases for your discrimination claim is the assignment of
11   Florida Medical Clinic account.  Do you recall that?
12   A    I do recall that.
13   Q    Okay.  And I think that we left off talking
14   about Exhibit 16 to your deposition.  And do you recall
15   that document?
16   A    It looks like the e-mails between Carlos and
17   myself.
18   Q    And you recall talking about this document in
19   your last deposition, correct?
20   A    Yes.
21   Q    Okay.  So if we can start off with the first --
22   on the first page, that first e-mail, that's from you to
23   Mr. Xiques on December 1, 2012.  Do you see that?
24   A    I do.
25   Q    And in this e-mail that you sent to Mr. Xiques,

Page 119

1   you -- the -- in the second paragraph, you indicate that
2   "We spoke a few weeks ago about FMC and the fact that
3   they have taken over several PSS accounts affecting
4   Clint, Michelle and me, et cetera." Do you see that?
5        A   I do.
6        Q   So prior to the assignment of the Bill To to
7   Mr. Brady in December 2012, Mr. Brady was involved with
8   the Florida Medical Clinic account, correct?
9            MS. PISCITELLI: Object to the form.
10       A   At what point, you're asking me?
11  BY MS. DYSON:
12       Q   So prior to Mr. Brady being assigned to the
13  Bill To for the Florida Medical Clinic account, he was
14  involved with the Florida Medical Clinic account,
15  correct?
16       A   On a Ship To level, yes.
17       Q   And Michelle -- who is Michelle that's being
18  referenced in this e-mail?
19       A   Michelle Hosley.
20       Q   And so she was also involved on a Ship To
21  level?
22       A   It looks like at that particular time.
23       Q   So at the -- at that time, being prior to
24  December 1, 2012, Ms. Hosley was involved with the
25  Florida Medical Clinic account?

Page 120

1        A   Looks that -- yes.
2        Q   And then, in the next paragraph, you said that
3   you've been calling on Florida Medical Clinic for nearly
4   18 years and have done a substantial amount of business
5   in the past, correct?
6        A   Yes.
7        Q   And you did that business, even though you
8   weren't the sole rep on that account from PSS, correct?
9        A   Back when I first started, I think I was the
10  sole rep on that account --
11       Q   Okay.
12       A   -- to the best of my knowledge.
13       Q   And -- but prior to December 1, 2012, you were
14  not the sole rep on the account, correct?
15       A   That's correct.
16       Q   And Florida Medical Clinic still did a
17  substantial amount of business with you, even though you
18  weren't the sole rep on the account, correct?
19       A   They did a substantial amount of business, yes.
20       Q   Even though you weren't the sole rep on the
21  account, correct?
22       A   That's correct.
23       Q   Okay. Now, in this -- in this paragraph, you
24  say, "Wow. Lots of business just lost." Do you see
25  that?

Page 121

1        A   Mmm-hmm.
2        Q   What's that a reference to?
3        A   I did business in the laboratory section of
4   Florida Medical Clinic, and I had -- it says "AI," which
5   is immunoassay testing instrument -- from Abbott and the
6   government had recalled certain tests, which included
7   HbA1c, folate, ferritin and B12. So this caused us to
8   lose a lot of business, yes.
9        Q   Okay. And then in the next paragraph, you
10  reference Gary P, which I think is Gary Poekert?
11       A   Yes.
12       Q   Do you see that?
13       A   It's in there. Gary Poekert.
14       Q   And so the sentence says, "Gary P reminded me
15  of the relationship between Colleen and Henry Schein."
16  Do you see that?
17       A   Where are you showing Henry --
18       Q   Sure. It's in the fourth paragraph, in the
19  middle of the fourth paragraph?
20       A   Oh, fourth. Okay.
21           Okay.
22           Okay.
23       Q   And so you say, "Gary P reminded me of the
24  relationship between Colleen and Henry Schein." Do you
25  see that?

Page 122

1        A   I do.
2        Q   And Gary P is who?
3        A   Poekert. It's described in paragraph -- the
4   third paragraph. P-o-e-k-e-r-t.
5        Q   And what is his role?
6        A   He was the supervisor over the laboratory.
7        Q   Okay. And as it relates to -- how does he
8   relate to Gary Steele?
9        A   Well, all purchases, even for the laboratory,
10  need to go through Gary Steele in the Purchasing
11  department.
12       Q   Okay. And who was Colleen that's being
13  referenced in this sentence?
14       A   Colleen was the COF --
15       Q   Okay.
16       A   -- for FMC.
17       Q   And I think, last time, you told me that she
18  was let go --
19       A   She was.
20       Q   -- from FMC?
21       A   She was.
22       Q   And when was she let go?
23       A   I don't know. It's been quite a while ago.
24       Q   Was it -- was she still there at the time that
25  you sent this e-mail in December 2012?

Page 123

1    A    Yes.
2    Q    And why was Gary P reminding you of the
3 relationship between Colleen and Henry Schein?
4    A    Because of her being the CFO, she had a lot of
5 influence on who they bought from.
6    Q    And Henry Schein is a competitor?
7    A    They are a competitor.
8    Q    They were a competitor of PSS, and they are a
9 competitor of McKesson, correct?
10   A    That is correct.
11   Q    Okay.  Not a person?  It's a company?
12   A    It's a company.
13   Q    Okay.  Just for those not reading this -- not
14 familiar with your business.
15   A    Okay.
16   Q    So the end of this paragraph, you say, "Gary
17 has agreed to put us on the bid list for next year and
18 asked me to check back with him in January."  Do you see
19 that?
20   A    I do, and I remember that.  That's correct.
21   Q    Okay.  And did you check back with Gary in
22 January?
23   A    I did.
24   Q    And did he put you on the bid list?
25   A    He did not.

Page 124

1    Q    Since -- have you ever been on the bid list for
2 Florida Medical Clinic?
3    A    I've done lots of bids for them.
4    Q    Right.  But have you ever been on the bid list
5 for Florida Medical Clinic?
6    A    Depends on what you mean by bid list.
7    Q    Well, what you meant by bid list in this
8 e-mail.
9    A    For all the medical supplies, no.
10   Q    And on the next page, which you're still
11 continuing on this e-mail that you sent to Mr. Xiques,
12 you say, "I know that you are sincerely looking out for
13 the customer and have always been fair with decisions
14 involving sales reps."  Do you see that?
15   A    I do not.  Where is that?
16   Q    Sure.
17   A    Let's see.
18   Q    It's on the second page.
19   A    Start this over.
20   Q    If it helps, it's Bates Number 683 at the
21 bottom.
22   A    Okay.
23   Q    Do you see where I'm -- the top?
24   A    The top.  Okay.
25   Q    I do.

Page 125

1    Q    So you told Mr. Xiques that you know he's
2 sincerely looking out for the customer and has always
3 been fair in his decisions with sales reps, correct?
4    A    Up to that point, yes.
5    Q    And you say, "As the adage goes, is this the
6 hill I'm willing to die on?  Yes."
7    A    Yes.
8    Q    What does that mean?
9    A    It means what it means.  I mean, that's --
10 that's a phrase that you're willing to see it to the end.
11   Q    Well, what did you mean by it when you put it
12 in this e-mail?
13   A    That's what I meant.
14   Q    And what does that mean, to see it to the end?
15   A    This -- is this the -- this isn't the entire
16 e-mail that I can see.  It seems like something's
17 missing.  That's why I'm --
18   Q    Well, this is what you produced to us, so I
19 don't know how something could be missing from your
20 production.
21   A    Okay.  So this is -- this is all a part of it,
22 which I haven't read yet.
23   Q    We just went through that e-mail.
24   A    I know, but I need to read it thoroughly.
25   Q    Okay.  Go right ahead.

Page 126

1    A    Thanks.
2         MS. DYSON:  We can go ahead and go off the
3 record.
4         (Break taken from 10:26 a.m. to 10:30 a.m.)
5         THE WITNESS:  And the question?
6 BY MS. DYSON:
7    Q    Yeah.  The question was what did you mean when
8 you said, "As the adage goes, is this the hill I'm
9 willing to die on?  Yes"?
10   A    Well, there was a lot of underlying things
11 going on besides the e-mail.  They were wanting to take
12 the account away from me, and I was going to fight that.
13   Q    And who wanted to take the account away from
14 you?
15   A    Carlos.
16   Q    And why do you believe he wanted to take the
17 account away from you?
18   A    I don't know his motives most of the time.
19   Q    What led you to believe he wanted to take the
20 account away from you?
21   A    When he talked about they would try to start
22 working different avenues in order to penetrate the
23 account with different reps.  Paragraph 2.
24   Q    Paragraph 2 on Page 682, the first page of the
25 document?

Page 127

1    A    Yes.
2    Q    So when he said that, "The fact that Florida
3  Medical Clinic has taken over several PSS accounts
4  affecting Clint, Michelle and you," is that what you're
5  talking about?
6    A    Yes.
7    Q    Okay.  Now, during the time that Mr. Brady was
8  the Bill To owner of Florida Medical Clinic -- well, let
9  me back up.
10       How long was Mr. Brady the Bill To owner for
11  Florida Medical Clinic?
12    A    I don't exactly know how long it was.  Several
13  weeks, my guesstimate.
14    Q    And after that several-week period, then the
15  Bill To returned to you?
16    A    Yes.
17    Q    And you have continued to be the Bill To owner
18  since then?
19    A    Yes.
20    Q    And the lead sales representative on this
21  account, correct?
22    A    Yes.
23    Q    During the period of time that Mr. Brady was
24  the Bill To owner, were any commissions for sales paid to
25  him because of that Bill To ownership?

Page 128

1        MS. PISCITELLI:  Objection.  Calls for
2    speculation.
3    A    We don't get paid by the Bill To.
4  BY MS. DYSON:
5    Q    So for Florida Medical Clinic, there are no
6  sales under the Bill To?  They are all under the Ship To
7  locations?
8    A    That's correct.
9    Q    Okay.  And as part of this shift of the Bill To
10  from you to Mr. Brady, were any Ship To locations
11  transferred to Mr. Brady?
12    A    No, not that I'm aware of.
13    Q    Do you know why the Bill To ownership was moved
14  from Mr. Brady to you?
15    A    Yes.
16    Q    And why is that?
17    A    I was told that Clint Brady had traction with
18  one of the decision-makers.
19    Q    Okay.  So why -- that doesn't explain why it
20  was returned to you.
21    A    Oh, why it was returned?  Because he didn't
22  have traction with the decision-maker.
23    Q    Okay.  Now, Florida Medical Clinic continues to
24  do business with you, correct?
25    A    Yes.

Page 129

1    Q    And after the Bill To owner was -- the
2  ownership was returned to you, were there any Ship To
3  locations that were assigned to Mr. Brady?
4    A    The ones he always had.
5    Q    And do you know how many of those Ship To
6  locations there are?
7    A    Today?
8    Q    Mmm-hmm.
9    A    Maybe four.
10    Q    Do you know how many Ship To locations there
11  are, total, for Florida Medical Clinic?
12    A    Active?  Inactive?
13    Q    First, let's start with active.
14    A    I would think active, a guesstimate, maybe 60.
15    Q    And the four Ship To locations that you believe
16  that Mr. Brady has, are they active or inactive?
17    A    Some are active and some are inactive.
18    Q    Do you know how many are active?
19    A    I believe that, maybe, one now.
20    Q    And do you know how many Ship To locations --
21  total Ship To locations -- there are under Florida
22  Medical Clinic that are inactive?
23    A    I do not.
24    Q    And what does it mean to be active versus
25  inactive?

Page 130

1    A    Whether it's -- they're buying from us or not.
2    Q    Is there a certain period of time that is a
3  measurement period of time?
4    A    Our computers normally show a year's activity.
5    Q    So if there's any activity within a year, it's
6  considered an active account?
7    A    An active account if it's within a year,
8  correct.
9    Q    Okay.
10        MS. DYSON:  I realize I left the door open.
11        MR. HEARING:  Oh, I'll get it.
12        MS. DYSON:  Thank you, Greg.
13  BY MS. DYSON:
14    Q    And are there, today, other representatives who
15  have Ship To locations within Florida Medical Clinic?
16    A    Yes.
17    Q    And who have those -- which reps have those
18  locations, other than Mr. Brady because you told me about
19  him?
20    A    There's a lab rep.  Greg Rock.  I believe
21  that's it.  I'm not sure.
22    Q    Okay.  And when you say there's a lab rep, is
23  that -- is that the result of a lab rep by McKesson of a
24  laboratory company or a laboratory sales company?
25    A    McKesson acquired a couple of different

Page 131

1  companies.  I guess the answer is, yes.
2      Q   And who was the lab rep before Greg Rock?
3      A   There was another gentleman.  I can't remember
4  his name.
5      Q   And do you remember who it was before whoever
6  it was before that?
7      A   Cyndie Vigneau.
8      Q   Now, in this e-mail that's Exhibit 16 -- if you
9  could put that in front of you, please -- on Page 684 --
10 actually 683 -- go back one --
11     A   Okay.
12     Q   -- there's an e-mail from Mr. Xiques to you
13 dated November 27, 2012.  Do you see that, at the bottom
14 of the page?
15     A   November 27th?
16     Q   Yes.
17     A   Yes.
18     Q   And that e-mail goes from the bottom of that
19 page to the top of the next page.  Do you see that?
20     A   I do.
21     Q   Okay.  And at the top of the next page,
22 Mr. Xiques says to you, "I'm looking forward to working
23 with you on some large accounts as well, like Watson,
24 Suncoast, Florida Hospital/Adventist and helping you
25 continue to grow Access."  Do you see that?

Page 132

1      A   I do.
2      Q   And did he continue to work with you on those
3  accounts?
4          MS. PISCITELLI:  I object to the form.
5      A   I don't -- well, I don't --
6          MS. PISCITELLI:  Excuse me.
7          THE WITNESS:  Okay.
8          MS. PISCITELLI:  Object to the form.
9      A   I don't really remember him working with me on
10 those accounts.  Florida Hospital, maybe a little bit.
11 BY MS. DYSON:
12     Q   Anything else you remember about those accounts
13 and Mr. Xiques?
14     A   We may have visited Suncoast together, but I
15 don't believe we ever visited Watson Clinic together.
16     Q   And from the date that Mr. Xiques sent this
17 e-mail, on November 27, 2012, how much longer did you
18 continue to report to him?
19     A   That, I don't know.
20     Q   Okay.
21     A   There --
22     Q   I wasn't sure if you were done answering the
23 question.
24     A   Mmm-hmm.
25     Q   Yes, you were.  Okay.

Page 133

1          The Ship To accounts that Mr. Brady services,
2  have you ever been assigned or worked those particular
3  Ship To locations?
4          MS. PISCITELLI:  Object to the form.
5      A   I do work for those locations.
6  BY MS. DYSON:
7      Q   Have you ever been assigned to those Ship To
8  locations?
9      A   I'm not assigned as a rep to those locations,
10 no.
11     Q   Okay.  And have you ever been?
12     A   Not that I can recall.  I think there was a
13 short period where I was assigned to Dr. Murphy.
14     Q   And how did that come about?
15     A   Florida Medical Clinic asked me to set up a new
16 account for a physician they acquired -- and I did -- and
17 I visited the account.
18     Q   And was that an account that, while that
19 doctor -- well, let me rephrase the question.
20          Prior to Dr. Murphy joining Florida Medical
21 Clinic, was his account serviced by Mr. Brady?
22     A   That's what I understand.
23          (Exhibit 18 marked for identification.)
24 BY MS. DYSON:
25     Q   Let me show you what's marked as Exhibit 18 to

Page 134

1  your deposition.
2      A   Thank you.
3          MS. PISCITELLI:  Thank you.
4  BY MS. DYSON:
5      Q   Did you recognize this document?
6      A   It looks familiar.
7      Q   Is this an e-mail chain that you had sent to
8  Christina Capparelli on April 13, 2013?
9      A   That's what that looks like, yes.
10     Q   And who is Christina Capparelli?
11     A   I believe she was in HR.
12     Q   And on this e-mail, you didn't copy Mr. Xiques
13 or Mr. Sharp.  Is that correct?
14     A   It doesn't look like it.
15     Q   And in the second e-mail in this chain, which
16 is from you to Mr. Xiques, dated April 8, 2013 -- do you
17 see that?
18     A   I do.
19     Q   In this e-mail that you sent to Mr. Xiques
20 looks like you're pasting in other e-mails to this e-mail
21 you're sending to him.  Is that correct?
22     A   Let me look at that first.
23     Q   Sure.
24     A   How far are you referencing now?
25     Q   Sure.  So it looks like you sent the e-mail --

Page 135

1  it's on Page Number -- with Bates Number 313, 314, to the
2  top of 315.
3      A    Okay.
4           Okay.
5      Q    Okay.  So the question I asked you is, from
6  this e-mail that you sent to Mr. Xiques, it appears that
7  you're pasting in other e-mails that you sent to other
8  individuals.  Is that correct?
9      A    It could be.  I'm just not sure.
10     Q    Okay.  And in this e-mail, you say to
11 Mr. Xiques, "According to you and Darin, Gary is telling
12 you one thing and he is telling me another."  Do you see
13 that?
14     A    That's -- yes, I do see that.
15     Q    And do you know if, in fact, Mr. Steele was
16 telling Mr. Xiques something different than he was
17 telling you?
18     A    I don't have knowledge of that.
19     Q    And then, if you turn to Page 315 -- Bates
20 Number 315 of this e-mail?
21     A    Okay.
22     Q    Do you see the e-mail from Mr. Xiques to you
23 and Mr. Brady dated April 3, 2013?
24     A    Yes.
25     Q    And in this e-mail, Mr. Xiques references a

Page 136

1  meeting that he had with Mr. Steele.  Is that correct?
2      A    I have to read it.
3      Q    Go right ahead.
4      A    Thank you.
5           316 as well?
6      Q    Yes.  The e-mail goes from 315 to 316.
7           And my question to you was does this e-mail
8  reference a conversation Mr. Xiques had with Mr. Steele?
9      A    It looks that way.
10     Q    And did you participate in that meeting or
11 conversation between Mr. Xiques and Mr. Steele?
12     A    I did not.
13          (Exhibit 19 marked for identification.)
14 BY MS. DYSON:
15     Q    Let me show you what's marked as Exhibit 19 to
16 your deposition.  Do you recognize this document?
17     A    Okay.
18     Q    Do you recognize this document?
19     A    It looks familiar.
20     Q    And what is it?
21     A    It looks like an e-mail from -- there are
22 several e-mails here, but mostly from Carlos to
23 Gary Steele and myself.
24     Q    Okay.  And it starts at the top with an e-mail
25 from you to Ms. Piscitelli.  Is that correct?

Page 137

1      A    Well, there's no message on it.
2      Q    But you're forwarding this whole e-mail chain
3  to Ms. Piscitelli, correct?
4      A    Correct.
5      Q    So we start at the back, on Page 1513, Bates
6  Number 1513 --
7      A    Okay.
8      Q    -- and there starts with an e-mail from
9  Mr. Xiques to Mr. Steele.  Do you see that?
10     A    I do.
11     Q    And the date of that e-mail is December 12,
12 2012, correct?
13     A    The one from Gary to Carlos?
14     Q    Carlos to Mr. Steele.
15     A    Okay.  December 12th.  I see that.
16     Q    And so, on December 12, 2012, Mr. Xiques wrote
17 to Mr. Steele asking if having two reps on his team
18 currently working with them was confusing.  Do you see
19 that?
20     A    I do.
21     Q    And Mr. Steele didn't respond until May 30,
22 2013.  Do you see that?
23     A    Where do you see that he responded?
24     Q    Sure.  The next e-mail up.
25     A    Oh, up here.  Okay.

Page 138

1      A    Yes, I do.
2      Q    Okay.  And in that e-mail, Mr. Steele says to
3  Mr. Xiques, with a copy to you and Cyndie Vigneau that
4  "We will not entertain any other reps from your company
5  at this time."  Do you see that?
6      A    I do.
7      Q    And then that was on May 30, 2013.  Do you see
8  that?
9      A    I do see that.
10     Q    Okay.  And then the next e-mail, on June 1,
11 2013, from Mr. Xiques to Mr. Steele.
12     A    What page?
13     Q    Sure.  Going back to 151 -- 12, just following
14 the e-mail up?
15     A    Okay.
16     Q    So Mr. Xiques is responding to Mr. Steele's
17 e-mail of May 30th.  Do you see that?
18     A    I do.
19          MS. PISCITELLI:  Objection.  Assumes facts not
20     in evidence.
21 BY MS. DYSON:
22     Q    And that response was on June 21, 2013,
23 correct?
24     A    Yes.
25     Q    And in that response, Mr. Xiques is asking for

**Page 139**

1  clarification from Mr. Steele about the representation
2  that he's requesting.  Do you see that?
3     A   I do see that.
4     Q   Okay.  And he says, specifically, "Because you
5  are growing, it's not out of the question to think that
6  there will be practices acquired by FMC that are
7  currently being serviced by another PSS/McKesson
8  represent in the future."  Do you see that?
9     A   I see it.
10    Q   And he asks, "How would you like to address
11 those situations when they arise."  Do you see that?
12    A   I do see that.
13    Q   And the type of Ship To locations that have
14 been serviced by Mr. Brady, are they all out of an
15 acquisition by Florida Medical Clinic of a
16 currently-serviced account by Mr. Brady?
17    A   As far as I know.
18    Q   And then do you know if Mr. Steele responded to
19 this e-mail of June 1, 2013, from Mr. Xiques?
20    A   I don't think so.
21    Q   And then Mr. Xiques wrote Mr. Steele on
22 August 29, 2013.  Do you see that?
23    A   Which one now?
24    Q   Sure.  We're on the first page of the document
25 at Bates 1511.

**Page 140**

1     A   Okay.
2     Q   And do you see, on August 29, 2013, Mr. Xiques
3  is writing Mr. Steele?
4     A   I do.
5     Q   And he indicates that he never heard back on
6  the question that he posed about the representation,
7  correct?
8     A   Correct.
9     Q   And do you know if Mr. Steele ever responded to
10 this e-mail on August 29, 2013?
11    A   Not to my knowledge.
12        (Exhibit 20 marked for identification.)
13 BY MS. DYSON:
14    Q   Let me show you what's marked as Exhibit 20.
15        I think I might have given you two copies?
16        Do you recognize this document?
17    A   Vaguely, yes.
18    Q   Before we go into that document, go back to
19 Exhibit 18.
20    A   18?
21    Q   Mmm-hmm.
22    A   Okay.
23    Q   And if we go to the second page, Bates
24 Number 313 on that document?
25    A   Yes.

**Page 141**

1     Q   And, previously, we had talked about the
2  statement that Mr. Xiques makes that Gary is telling --
3  well, that you attribute to Mr. Xiques and Mr. Sharp that
4  Mr. Steele is telling them one thing and you another.  Do
5  you see that sentence in there?
6     A   It says, "According to you and Darin, Gary
7  is" -- I don't believe Gary was telling a different story
8  to them.
9     Q   But you didn't participate in the
10 conversations --
11    A   I did not.
12    Q   You have to let me finish asking my question.
13        You didn't participate in the conversations
14 between Mr. Sharp or Mr. Xiques and Mr. Steele, correct?
15    A   No.
16    Q   And did you participate in the conversations
17 between Mr. Steele and Mr. Jensen?
18    A   I don't believe so.
19    Q   I'm sorry.  I didn't hear that.
20    A   I don't believe so.
21    Q   Okay.  Do you know if Mr. Jensen held the same
22 belief, that Mr. Steele was telling you one thing and
23 telling him another?
24    A   I don't know.
25    Q   Okay.  Going to Exhibit 20, do you recognize

**Page 142**

1  this document that's Exhibit 20?
2     A   Yes.  It looks familiar.
3     Q   And what is it?
4     A   Okay.
5     Q   And what is this document?
6     A   It looks like an e-mail from Cyndie to myself,
7  Leisa Meredith and Wendy Martin.
8     Q   And who is Wendy Martin?
9     A   She was in customer service.
10    Q   Okay.  And Cyndie Vigneau was the
11 representative that was responsible for the lab portion
12 of the Florida Medical Clinic account?
13    A   Yes.
14    Q   And if you could turn to the second page of
15 this document, so starting with the first e-mail that
16 Ms. Vigneau sent to you on January 8, 2013, do you see
17 that?
18    A   I do.
19    Q   And in this e-mail, Ms. Vigneau is expressing a
20 concern about certain billing for the Florida Medical
21 Clinic account?
22    A   Yes.
23    Q   And she says that she spoke with Carleen.  Do
24 you know who Carleen is?
25    A   Yes.

Page 143

1    Q    Who is Carleen?
2    A    She is in the accounting department at Florida
3    Medical Clinic.
4    Q    Okay.  And do you know her last name?
5    A    I do not.
6    Q    Okay.  So -- and Carleen told Ms. Vigneau that
7    if she doesn't get these accounts straightened out,
8    they'll go with Henry Schein.  Do you see that?
9    A    Oh, you're down at the bottom.
10   Q    Yes.
11   A    I see that.
12   Q    Yes.
13   A    Yes.
14   Q    Do you see where I am on the e-mail?
15   A    In the middle --
16   Q    Yes.
17   A    -- where it is highlighted?
18   Q    Yes.
19   A    Okay.
20   Q    And what was it that Ms. Vigneau needed to get
21   straightened out with the account?
22   A    I don't know.
23   Q    Well, at the first sentence of the e-mail, she
24   says that she's having problems -- Ms. Vigneau says she's
25   having problems with the lab accounts and them being

Page 144

1    charged freight.  Do you see that?
2    A    I do see that.
3    Q    Was that the problem she was talking about
4    getting straightened out?
5    A    It looks like that was an issue, them being
6    charged freight.
7    Q    And Ms. Vigneau says, "I know that this will
8    affect you and me big time."  Do you see that?
9    A    Yes.
10   Q    And she doesn't reference Mr. Brady in there,
11   correct?
12   A    Correct.
13   Q    And there's no mention in here that the lack of
14   a single representative was going to cause them to go to
15   Henry Schein, correct?
16   A    I don't have a clue on that.
17   Q    Is there any reference in this e-mail to that?
18   A    There's no reference to that, no.
19   Q    And you respond to this e-mail by Ms. Vigneau
20   by saying that you understand that stopped, I assume
21   referencing the freight charges?
22   A    Where are you now?
23   Q    Sure.  The next e-mail up.
24   A    Okay.  January 8th?
25   Q    Yes.

Page 145

1    A    Okay.
2    Q    Your response to Ms. Vigneau?
3    A    That's correct.
4    Q    And then there are more discussions, right?
5    There's another e-mail from Ms. Meredith to you to
6    Ms. Vigneau and Ms. Martin about the freight charges.  Do
7    you see that?
8    A    From Ms. Meredith?
9    Q    Mmm-hmm.
10   A    Okay.  Which -- where is that?
11   Q    Sure.  It's the response, starts on the first
12   page and goes to the second page of the document?
13   A    Okay.  I do see that.
14   Q    Okay.  And then Ms. Vigneau responds to
15   Ms. Meredith's response on January 8, 2015.  Do you see
16   that?
17   A    And you are on the first page now?
18   Q    Sure.  Mmm-hmm.
19   A    And please repeat the question.
20   Q    Sure.  Ms. Vigneau responds to Ms. Meredith on
21   January 8, 2015, correct?
22   A    Correct.
23   Q    And in this e-mail, she's still talking about
24   the freight charges.  Is that correct?
25   A    That's what it looks like, yes.

Page 146

1    Q    Okay.  And then she also says, in this e-mail,
2    that Tiffany did release their orders today.  Do you see
3    that?
4    A    I do see that.
5    Q    What's that a reference to?
6    A    Obviously, the orders were being held and they
7    released the orders.
8    Q    Okay.  And Ms. Vigneau says, "We would have
9    lost the account if they had not shipped," correct?
10   A    Yes.
11   Q    And there's no contention that you would have
12   lost the account because there was no single rep assigned
13   to the account, correct?
14   A    I don't see that.
15        (Exhibit 21 marked for identification.)
16   BY MS. DYSON:
17   Q    I'll show you what's marked as Exhibit 21.  Do
18   you recognize this document?
19   A    Yes, I see it.
20   Q    Okay.  So the first e-mail on this document, I
21   don't believe that you were copied on, correct?
22   A    It doesn't look like it.
23   Q    Okay.  But the second e-mail you sent.  Is that
24   correct?
25   A    That's the way it looks, yes.

Page 147

1  Q   Okay.  And this is an e-mail that was sent on
2  March 24, 2015?
3  A   Yes.
4  Q   Now, do you know when the last time that
5  Mr. Steele had expressed a preference for a single
6  representative to Mr. Jensen or Mr. Xiques was?
7  A   Please say that again.
8  Q   Sure.  Do you know the date of when the last
9  time that Mr. Steele expressed a preference -- let me
10 rephrase that.
11     Do you know the last time that Mr. Steele
12 expressed a preference for a single representative?  Do
13 you know the date of that?
14 A   I do not.
15 Q   Okay.  Do you know if he had made that request
16 of Mr. Jensen or Mr. Xiques in 2015?
17 A   Not specifically.  I would have to see
18 something.
19 Q   Okay.  So in this e-mail, you indicate that
20 Mr. Steele is disappointed with a couple of things?
21 A   Mmm-hmm.
22 Q   And you say that Clint Brady is still being
23 shoved down his throat?
24 A   Mmm-hmm.
25 Q   How is Clint Brady being shoved down his

Page 148

1  throat?
2  A   That he is still attached to the account.
3  Q   Had Mr. Brady had any contact with Mr. Steele?
4  A   I have no idea.
5  Q   Well, how would Mr. Steele know that Mr. Brady
6  is still attached to the account?
7  A   Any time they pull it up in the computer, they
8  see which rep is assigned to which Ship To.
9  Q   Okay.  So because Mr. Brady's name was
10 reflected on a document in their ordering system, he was
11 upset about that?
12 A   That's what it looks like.
13 Q   Okay.  And then, two, "He is upset that he had
14 nine vials of flu vaccine that he wished to return and we
15 would not give him credit."
16 A   Yep.
17 Q   Okay.  And then, three, "He says he will not
18 book the next season's flu until we give him credit for
19 the nine vials."  Do you see that?
20 A   Yes.
21 Q   So he is not refusing to book the next season's
22 flu because Mr. Brady appears in the ordering system.  Is
23 that correct?
24 A   Doesn't appear that way.
25 Q   And do you know if Mr. Steele was given credit

Page 149

1  for those nine vials of flu vaccine?
2  A   I think, eventually.
3  Q   Do you know if an exception had to be created
4  in order to give him that credit?
5  A   In my opinion, it should have been a normal
6  deed.
7  Q   Do you know whether an exception had to be
8  created to give him that credit?
9  A   No, I do not.
10 Q   You don't know.  Is that correct?
11 A   I don't know.
12 Q   Okay.
13     (Exhibit 22 marked for identification.)
14 BY MS. DYSON:
15 Q   Showing you what's marked as Exhibit 22 to your
16 deposition.  Do you recognize this document?
17 A   It looks familiar.
18 Q   And what is it?
19 A   It looks like e-mails between Carlos Xiques and
20 Paul Jensen to me -- or from me.
21 Q   Okay.  So this is an e-mail chain -- right --
22 A   Yes.
23 Q   -- that starts with an e-mail from you to
24 Mr. Xiques on February 8, 2016.  Is that correct?
25     MS. PISCITELLI:  Object to the form.

Page 150

1  A   Okay.  You're -- e-mails go from the back to
2  the front and you're going from the front to the back and
3  that's when I get confused so -- yes.  The top page says
4  February 8, 2016.
5  BY MS. DYSON:
6  Q   Well, and you understand that, in this e-mail
7  that you sent to Mr. Xiques, it had, in this chain, all
8  of these e-mails that are in Bates Numbers 817 to 8121,
9  correct?
10 A   I see that that's -- that is all attached, yes.
11 Q   Okay.  So let's start with the e-mail on
12 February 8, 2016, which is the third e-mail on this page.
13 Do you see that?
14 A   Okay.
15 Q   And this is an e-mail from you to Mr. Xiques
16 and Mr. Jensen dated February 8, 2016, correct?
17 A   That's correct.
18 Q   Okay.  And in this e-mail, you reference a
19 meeting that you had with Mr. Steele, correct?
20 A   Going over it briefly, that's what it looks
21 like.  I need to read it completely to see what the
22 contents are.
23 Q   Okay.  So it says, in this second paragraph --
24 you write, "Feels no one listens to him and stated that
25 if we continue to charge a fuel SC, he will stop buying

Page 151

1  anything from McKesson." Do you see that?
2      A    I do.
3      Q    And what is that a reference to?
4      A    Fuel surcharge.
5      Q    Okay. And so in this statement, Mr. Steele is
6  not saying that he will stop buying anything from
7  McKesson because of Mr. Brady, but because of the fuel
8  surcharge. Is that what he told you?
9      A    In this e-mail, yes.
10     Q    And then the next paragraph says, "Paul, in
11 reference to the $300 credit he was shorted when
12 returning his leftover flu vaccine" -- do you see that?
13     A    I do.
14     Q    And you go on to say, "Another reason to stop
15 buying from us." Is that correct?
16     A    That's correct.
17     Q    Okay. So Mr. Steele was giving you another
18 reason he was going to stop buying from McKesson because
19 of the lack of a credit from the leftover flu vaccine,
20 correct?
21     A    Correct.
22     Q    And then, in the next paragraph, you say that
23 he would stop buying from any account linked to
24 Clint Brady, he especially didn't want Clint Brady, which
25 if you haven't noticed, Gary only buys the things he

Page 152

1  can't get elsewhere under the Castellano account. Is
2  that correct?
3      A    That's correct.
4      Q    So Mr. Steele was not telling you that he would
5  stop buying from you, but that he would only stop buying
6  from Mr. Brady's accounts as long as Mr. Brady was
7  assigned to those accounts. Is that correct?
8      A    That's not a yes-or-no answer.
9      Q    Well, he says -- you report to Mr. Xiques and
10 Mr. Jensen that he would stop buying from any account
11 linked to Mr. Brady, correct?
12     A    He would stop buying from any account linked to
13 Clint Brady.
14     Q    And he didn't say he would stop buying from all
15 McKesson --
16     A    He did not say that.
17     Q    -- on any -- you have to let me finish.
18     A    Okay.
19     Q    Mr. Steele did not tell you that he would stop
20 buying from every -- from every account because Mr. Brady
21 was linked to an account, correct?
22     A    Correct.
23     Q    And you say in here, that Dr. Castellano, an
24 account under Clint, is about $100 per month. Do you see
25 that?

Page 153

1      A    I do.
2      Q    So those were the sales that were being done on
3  the Dr. Castellano Ship To location at Florida Medical
4  Clinic?
5      A    Looks like it.
6      Q    And then the next paragraph, you reference Mary
7  Hagley. Do you see that?
8      A    Yes.
9      Q    And who is Mary Hagley?
10     A    She is a sales rep.
11     Q    On your team?
12     A    Account executive. She currently is on my
13 team.
14     Q    Was she on your team at the time you sent this
15 e-mail?
16     A    I don't remember.
17     Q    And did Mary Hagley have Ship To locations
18 within Florida Medical Clinic?
19     A    She did.
20     Q    And then at the end of this -- at the end of
21 this e-mail, you say, "Up to this point, despite
22 everything, I've taken the account from only buying
23 around $20,000 a year to 25- to $30,000 a month." Do you
24 see that?
25     A    I do.

Page 154

1      Q    And what period of time did you do that?
2      A    Well, I can only speculate it was from -- I
3  don't know exactly, no.
4      Q    Okay. So do you -- you don't know when you
5  were -- the account was only buying $20,000 a year?
6      A    No.
7      Q    At the time you sent this e-mail, were they
8  buying 25- to $30,000 per month?
9      A    Correct.
10     Q    So then Mr. Xiques responds to your e-mail on
11 February 8, 2016, saying that he's going to defer to you
12 and Mr. Jensen to manage the account locally, do you see
13 that?
14     A    Where are you reading from?
15     Q    Sure. The next e-mail in response to the
16 e-mail that you sent.
17     A    And say the question again.
18     Q    Sure. On February 8, 2016, Mr. Xiques is
19 responding to your e-mail of the same day, correct?
20          MS. PISCITELLI: Object to the form.
21     A    Looks like it.
22 BY MS. DYSON:
23     Q    And Mr. Xiques is telling you and Mr. Jensen
24 he's going to defer to you and Mr. Jensen to manage the
25 account, correct?

Page 155

1    A   Correct.
2    Q   And then you respond to Mr. Xiques and
3    Mr. Jensen on that same date, correct?
4    A   Looks like it, yes.  Same day.
5    Q   And you say, "At this point Gary doesn't know
6    that he's not getting the credit for the flu or the FSC."
7    Do you see that?
8    A   I do.
9    Q   And did Mr. Steele ultimately get the credit
10   for both the flu and the FSC?
11   A   Eventually, he did.
12   Q   And you go on to say that he just said, "If he
13   doesn't, then he would stop doing business with us."  Do
14   you see that?
15   A   I do.
16   Q   And so that's a reference to Mr. Steele saying
17   that if he doesn't get that credit, he would stop doing
18   business with McKesson?
19   A   That's correct.
20   Q   And then you, in the next paragraph, reference
21   a meeting that you had with Ms. Boyles.  Do you see that?
22   A   I do.
23   Q   And in that meeting, she made the comment that,
24   "As long as Gary gets those things, he will meet with
25   us."  Do you see that?

Page 156

1    A   Yes.
2    Q   And that's a reference to him getting the
3    credit for the flu and the FSC.  Is that correct?
4    A   That's what it looks like.
5    Q   And then he did get those -- Mr. Steele did get
6    those credits for Florida Medical Clinic?
7    A   Eventually.
8    Q   And did he meet with you?
9    A   No, not that I know of.
10       (Exhibit 23 marked for identification.)
11   BY MS. DYSON:
12   Q   Okay.  Let's show you what's marked as
13   Exhibit 23 to your deposition.
14       Oh, I think there's two there, too.
15   A   Okay.
16   Q   Do you recognize this document?
17   A   It looks familiar.
18   Q   And what is it?
19   A   E-mails from Clint Brady, Brian Nehr,
20   Ms. Boyes.
21   Q   Okay.  It starts with an e-mail from you to
22   Mr. Jensen and Mr. Nehr, correct?
23       MS. PISCITELLI:  Object to the form.
24   A   Okay.  The bottom page is where it started.
25   BY MS. DYSON:

Page 157

1    Q   Okay.  This document starts with an e-mail from
2    you --
3    A   Yes.
4    Q   -- to Mr. Jensen and --
5    A   Yes.
6    Q   -- Mr. -- you've got to let me finish my
7    question.  I know it's hard but -- it's hard when you're
8    having a conversation, but we've got to try to do that
9    for the record.
10       So in Exhibit 23, the document starts with an
11   e-mail from Ms. vanHoek -- you -- to Mr. Jensen and
12   Mr. Nehr on March 22, 2016.  Do you see that?
13   A   I do.
14   Q   Okay.  And then, if we look at the first e-mail
15   in this chain, which is on the second page, it's an
16   e-mail from Mr. Brady to Mr. Nehr on March 22, 2016.  Do
17   you see that?
18   A   I see it.
19   Q   Okay.  And who is Mr. Nehr?
20   A   He was an area sales manager for Clint Brady.
21   Q   Okay.  So was he Mr. Brady's supervisor at the
22   time this e-mail was sent?
23   A   That's right.
24   Q   So he held the same position that Mr. Jensen
25   held with respect to you.  Is that correct?

Page 158

1    A   That's correct.
2    Q   Okay.  So in this e-mail from Mr. Brady, he's
3    asking about the ability to keep one of his Ship To
4    accounts that's been acquired by Florida Medical Clinic.
5    Is that correct?
6    A   That's correct.
7    Q   And then Mr. Nehr reaches out to you and
8    Mr. Jensen.  Is that correct?
9    A   Yes.
10   Q   And in this e-mail, Mr. Nehr, says, "I know
11   Hilda is the lead rep on this account, but it's my
12   understanding that Clint has some Ship Tos under the
13   umbrella already and works with Hilda on them."  Do you
14   see that?
15   A   I see that.
16   Q   And is that accurate?
17   A   That's correct.
18   Q   So in response to this e-mail, you send it to
19   Ms. Boyles and Mr. Steele.  Is that correct?
20       MS. PISCITELLI:  Object to the form.
21   A   That's correct.
22   BY MS. DYSON:
23   Q   Now, why would you send an internal e-mail
24   about account assignments to Ms. Boyles and Mr. Steele?
25   A   I don't know.

Page 159

1    Q    Did you think it was appropriate to send an
2    internal e-mail about account assignments to a customer?
3    A    I don't know.
4    Q    So Ms. Boyles -- is Boyes or Boyles?
5    A    There's no L, so I'm thinking Boyes.
6    Q    Okay.  So it must have been in your last
7    e-mail, you just added an L.  So we're talking about the
8    same person though?  Amy Boyes?
9    A    Boyes.
10   Q    Okay.  So Ms. Boyes responds to your e-mail on
11   March 22, 2015.  Is that correct?
12   A    That's right.
13   Q    And she says, "The account is Dr. Murphy Ortho,
14   and we don't know anything about the urgent care that is
15   operated at that office as it is not with Florida Medical
16   Clinic."  Do you see that?
17   A    I do.
18   Q    So is this a Dr. Murphy account Ship To
19   location you were referencing earlier?
20   A    This is referring to the -- let's see.
21        There was an ortho account, and there was an
22   urgent care account.  The urgent care account remained
23   with Dr. Murphy.
24   Q    And was serviced by Mr. Brady, correct?
25   A    Correct.

Page 160

1    Q    Okay.  And the ortho account became -- was
2    acquired by Florida Medical Clinic?
3    A    That's right.
4    Q    And Mr. Brady had serviced the ortho account
5    before it was acquired by Florida Medical Clinic,
6    correct?
7    A    As far as I know.
8    Q    Okay.  And Ms. Boyes said, "We do not want
9    Clint on our accounts."  Do you see that?
10   A    I do.
11   Q    And then you respond to Mr. Jensen and Mr. Nehr
12   saying, "I don't know what to do.  See the message
13   below."
14   A    Mmm-hmm.
15        MS. PISCITELLI:  Object to the form.
16        (Exhibit 24 marked for identification.)
17   BY MS. DYSON:
18   Q    Let me show you what's marked as Exhibit 24.
19   Do you recognize this document?
20   A    That looks kind of crazy at the top.  I don't
21   know.
22   Q    Do you see Mr. Jensen's signature at the
23   bottom?
24   A    I do.
25   Q    Do you recall receiving this e-mail from

Page 161

1    Mr. Jensen:
2    A    Let me read it.
3    Q    Sure.  Go right ahead.
4    A    Thank you.  Okay.
5    Q    Do you recognize this e-mail?
6    A    It looks familiar.
7    Q    So this is an e-mail from Mr. Jensen to you
8    discussing the Florida Medical Clinic account, correct?
9    A    Correct.
10   Q    And Mr. Jensen is expressing to you that
11   McKesson has met the demands of Florida Medical Clinic
12   with an unfulfilled promise of increased business.  Do
13   you see that?
14   A    I see that.
15   Q    And he also references, in this e-mail, that
16   McKesson has not realized significant growth from Florida
17   Medical Clinic this past year.  Is that correct?
18   A    That's correct.
19   Q    And he -- in the fourth paragraph, he
20   references that you communicated, in Q4 of Fiscal
21   Year 2016, FMC was expanding and you were setting up?
22   A    I see that.
23   Q    And you weren't able to drive that into
24   business.  Is that correct?
25   A    Looks that way.

Page 162

1    Q    And he says that he wants to be clear that all
2    future FMC acquisitions of current McKesson accounts will
3    remain under the existing reps, correct?
4    A    Correct.
5    Q    And those were both male and female reps,
6    correct?
7        MS. PISCITELLI:  Object to the form.
8    A    I don't have a -- I don't know who he's
9    referring to.
10   BY MS. DYSON:
11   Q    Well, were there both male and female reps
12   assigned to Ship To locations at Florida Medical Clinic
13   in Fiscal Year 2016?
14   A    Where is the date on this?
15   Q    You can just answer my question.  My question
16   was were there male and female reps assigned to --
17   A    I need to know the date.
18   Q    Well, if you let me finish asking my question
19   that would be helpful.
20   A    Okay.
21   Q    Were there male and female representatives
22   assigned to the Florida Medical Clinic Ship To locations
23   in the Fiscal Year 2016?
24   A    I don't think so.
25   Q    You don't believe there were any male and

Page 163

1  female reps assigned to those locations?

2      A    Female reps, there weren't any left, as far as

3  I know, in 2016.

4      Q    Do you know --

5      A    Mary Hagley with the surgery centers -- you're

6  right.

7      Q    What about Michelle Hosley?

8      A    I don't think she -- in 2016, I'm not sure.

9      Q    Okay.  But Mary Hagley was a female

10  representative who was assigned to that account in 2016,

11  correct?

12     A    That's right.

13          (Exhibit 25 marked for identification.)

14  BY MS. DYSON:

15     Q    Let me show you what's marked as Exhibit 25 to

16  your deposition.  Do you recognize this document?

17     A    I do, yes.

18     Q    Okay.  And what is it?

19     A    It's an e-mail from me to Paul Jensen.

20     Q    And Mr. Jensen's response is on the top e-mail,

21  correct?

22     A    Yes.

23     Q    The e-mail that you sent to Mr. Jensen was on

24  July 18, 2016?

25     A    Yes.

Page 164

1      Q    And there was a change in terms of lab

2  representative for Florida Medical Clinic.  Is that

3  correct?

4      A    That's correct.

5      Q    And what's the purpose in you sending this

6  e-mail?

7      A    There -- to my knowledge, there was no

8  representation for the lab at the moment.

9      Q    Okay.  And you tell Mr. Jensen, "It just

10  doesn't make sense to have two people from McKesson

11  working with Gary Steele and Jim Stout.  Is that correct?

12     A    That's correct.

13     Q    And you're referencing to you and a lab person.

14  Is that correct?

15     A    And the lab person was gone.

16     Q    And so you were trying to take over all of that

17  business?

18     A    I was their go-to person when there wasn't

19  anybody available.

20     Q    Okay.  And were you trying to advocate to

21  Mr. Jensen that you take over all of that business?

22     A    Yes.

23     Q    And had the lab business always been split from

24  you?

25     A    No.

Page 165

1      Q    Okay.  When did the lab business become split

2  between you and another representative?

3      A    I believe it was when Cyndie came on board with

4  InfoLab.

5      Q    And since that time, you had -- you had split

6  the lab business with Florida Medical Clinic, correct?

7      A    Somewhat, yes.

8      Q    I'm sorry?

9      A    Somewhat.

10     Q    What does that mean, "somewhat"?

11     A    I believe there were accounts -- Ship Tos that

12  were still under my number for the lab.

13          (Exhibit 26 marked for identification.)

14  BY MS. DYSON:

15     Q    Okay.  Let me show you what's marked as

16  Exhibit 26 to your deposition.  Do you recognize this

17  document?

18     A    Looks familiar.

19     Q    Okay.  The top e-mail of this document is an

20  e-mail from you to Mr. Jensen on January 10, 2017 --

21     A    Yes.

22     Q    -- from Mr. Jensen to you on January 10, 2017.

23  Do you see that?

24     A    I do.

25     Q    Okay.  So it starts -- the e-mail chain starts

Page 166

1  with an e-mail from Mr. Jensen to you with a copy to

2  Mr. Xiques and to himself on January 10, 2017.  Do you

3  see that?

4      A    I see that.

5      Q    Now, Mr. Brady is not copied on this e-mail,

6  correct?

7      A    I don't see his name, no.

8      Q    And in this e-mail, Mr. Jensen says that he's

9  going to keep you involved with building a business case,

10  ROI and additional solutions that may be available for

11  Florida Medical Clinics.  Do you see that?

12     A    I see it.

13     Q    And then you respond to Mr. Jensen with a copy

14  to Mr. Xiques asking him if there was certain information

15  that he was looking for.  Is that correct?

16          MS. PISCITELLI:  Object to the form.

17     A    That's what it looks like, yes.

18  BY MS. DYSON:

19     Q    And you say, "I don't believe we can move

20  forward with any exclusive agreement until we meet Gary's

21  demands," all capitals letters, "as previously reported

22  to you and Carlos."

23     A    Yes.

24     Q    And did you understand that, unless Florida

25  Medical Clinic assigned an exclusive agreement, that

Page 167

1  McKesson or PSS would not assign one representative to
2  the account?
3      A    That's what they said.
4      Q    And Mr. Jensen responds to you saying, "We met
5  all of Gary's requests February 2016 with flu credits and
6  waiving fees." Do you see that?
7      A    I see that.
8          (Exhibit 27 marked for identification.)
9  BY MS. DYSON:
10     Q    Let me show you what's marked as Exhibit 27 to
11 your deposition. Do you recognize this document?
12     A    I do -- it just -- it looks a little funky.
13 That's all.
14     Q    Okay. And in this document, were you
15 conducting a business review for Florida Medical Clinic?
16     A    Yes.
17     Q    And Mr. Jensen, in the very first e-mail of
18 this document, says that he wants to attend that business
19 review meeting with you. Is that correct?
20     A    Where are you reading that from?
21     Q    Sure. Very top e-mail.
22     A    Yes.
23     Q    And did you have a business review meeting with
24 Florida Medical Clinic?
25     A    I don't remember.

Page 168

1          (Exhibit 28 marked for identification.)
2  BY MS. DYSON:
3      Q    Let me show you what's marked as Exhibit 28 to
4  your deposition.
5          Before we get into Exhibit 28, when we're
6  talking about the lab business for Florida Medical
7  Clinic, Info -- was it InfoLab? Is that the name of
8  that --
9      A    InfoLab.
10     Q    Okay. InfoLab was the company that was
11 acquired by McKesson?
12     A    (Shaking head.)
13     Q    It was acquired by PSS?
14     A    Correct.
15     Q    Okay. And came through the acquisition of PSS?
16     A    Yes.
17     Q    Is that correct?
18     A    As far as I know, yes.
19     Q    Okay. So the representatives under the lab
20 business, did they report to Mr. Jensen?
21     A    No, not that I -- no.
22     Q    They had their own sales manager that they
23 reported to, correct?
24     A    That's correct.
25     Q    Okay. And the InfoLab representatives who then

Page 169

1  become PSS and then McKesson representatives, they
2  were -- Cyndie Vigneau was one of them?
3      A    Correct.
4      Q    And then Jerry Arolsmeyer was the -- another
5  one?
6      A    He replaced Cyndie.
7      Q    Okay. And then Greg Rock replaced Jerry
8  Arolsmeyer?
9      A    As far as I know, that's the sequence.
10     Q    And Greg Rock, does he continue to be the lab
11 representative for Florida Medical Clinic today?
12     A    To my knowledge, yes.
13     Q    Okay. But you get some credit for that lab
14 business. Is that correct?
15     A    We have a new procedure where they ping us.
16     Q    What does that mean?
17     A    It means we are attached to the account, so we
18 are pinged to the account.
19     Q    Okay. And, therefore, you get credit for some
20 of those sales --
21     A    Correct.
22     Q    -- correct?
23     A    Mmm-hmm.
24     Q    Okay. And so, Exhibit 28, do you recognize
25 this document?

Page 170

1      A    I don't think I was included in on this.
2      Q    Okay. Did you understand that, from time to
3  time, Mr. Jensen would advocate to make sure you were
4  getting credit for certain lab sales that were being
5  completed on the Florida Medical Clinic account?
6      A    I think so.
7          (Exhibit 29 marked for identification.)
8  BY MS. DYSON:
9      Q    Let me show you what's marked Exhibit 29. Do
10 you recognize this document?
11     A    This is pretty recent, yes. It looks familiar.
12     Q    Okay. And in this document, the top e-mail in
13 this document is from Mr. Jensen to you on March 15,
14 2019?
15     A    Correct.
16     Q    And he indicates that he's still trying to
17 capture the reagents for the Florida Medical Clinic lab.
18 Do you see that?
19     A    Yes.
20     Q    And what does that mean?
21     A    We have programs that we have to -- for
22 instance there is a program called Drive and we -- it's
23 guidelines that McKesson puts on us that we have to
24 attain a certain amount of business under certain
25 categories, whether it be lab, medical supplies,

Page 171

1 et cetera. And this would fall into that category that
2 we were getting -- whether or not we were getting credit
3 for the lab supplies.
4      Q    Okay. And that would have been the lab
5 supplies that were assigned to Greg Rock?
6      A    Correct.
7      Q    Okay. So -- and this is part of your
8 compensation package?
9      A    That's right.
10          (Exhibit 30 marked for identification.)
11 BY MS. DYSON:
12     Q    I'll show you what's marked as Exhibit 30 to
13 your deposition. Do you recognize this document?
14     A    Looks familiar.
15     Q    The document starts with an e-mail from you to
16 Mr. Jensen. Is that correct?
17     A    That's correct.
18     Q    And this e-mail chain starts with an e-mail
19 from Mr. Jensen to you on July 27, 2017. Do you see
20 that?
21     A    I do.
22     Q    And Mr. Jensen references that "Our friends at
23 FMC are way down. Any reason?" Do you see that?
24     A    I do.
25     Q    When he says they are way down, what's that a

Page 172

1 reference to?
2      A    Sales numbers are down.
3      Q    Over what period of time?
4      A    It doesn't say.
5      Q    Did you understand what period of time
6 Mr. Jensen was referencing in this e-mail?
7      A    No.
8      Q    And then you respond to Mr. Jensen's e-mail on
9 July 31, 2017. Do you see that?
10     A    Yes.
11     Q    And you say, "FMC wants one rep on this.
12 Please don't push me on this one. Out of my control."
13 Do you see that?
14     A    Yes.
15     Q    And then Mr. Jensen responds to you on that
16 same day saying that "You own the majority of the FMC
17 business and the model has been the same for almost four
18 years." Do you see that?
19     A    I see that.
20     Q    And he also pastes in here some data about the
21 Florida Medical Clinic account. Do you see that?
22     A    I see it.
23     Q    And do you know -- does this refresh your
24 recollection over what period of time sales were down?
25     A    It doesn't say what period of time. I don't

Page 173

1 see a range.
2      Q    And you don't know that this represents a
3 one-year period of time?
4      A    It doesn't say.
5      Q    Okay. Looking at the numbers, does that
6 refresh your recollection?
7      A    No.
8      Q    Okay. And then Mr. Jensen says that he has
9 removed all obstacles, flu credits, surcharges, minimum
10 orders based on your information and request so you can
11 grow the business. Do you see that?
12     A    I do.
13     Q    And did he, in fact, do that?
14     A    Eventually.
15     Q    And then he says in here that "Sales are down
16 by $117,000. Do you see that?
17     A    Yes.
18     Q    Okay. And you don't know over what period of
19 time sales were down over $117,000?
20     A    There's no scale.
21     Q    I understand in this e-mail, but you don't have
22 any recollection, as being the lead account
23 representative for this account, over what period of time
24 sales were down $117,000?
25     A    It could have been a quarter. It could have

Page 174

1 been a year. I'm not sure. It looks like yearly, but
2 I'm not sure.
3      Q    And then you respond to Mr. Jensen on
4 January -- I'm sorry -- on July 31, 2017. Do you see
5 that?
6      A    Yes.
7      Q    And you indicate in here that he -- I assume
8 referencing to Gary Steele -- can't -- is not willing to
9 do a business review meeting?
10     A    Yes.
11     Q    Now, previously, though, Ms. Boyes had said
12 that Mr. Steele will do a business review meeting if they
13 are given credit for the fuel surcharge and the flu
14 vaccines, correct?
15     A    At the moment, yes, that she said it.
16     Q    Which was in 2016, correct?
17     A    Correct.
18     Q    And you don't say, in here, why he's refusing
19 to meet with Mr. Jensen. Is that correct?
20     A    No.
21     Q    That's not correct?
22     A    I don't see that I -- that it had that in
23 there, no.
24     Q    Okay. Now, Michelle Rooney, do you know if she
25 had any Ship To locations in the Florida Medical Clinic

Page 175

1  account?
2      A   I'm not sure.
3      Q   And Mary Hagley, do you know if she had any
4  communications with Mr. Steele?
5      A   Occasionally, I think, she does.
6          (Exhibit 31 marked for identification.)
7  BY MS. DYSON:
8      Q   And let me show you what's marked as Exhibit 31
9  to your deposition.  Do you recognize Exhibit 31 to your
10 deposition?
11     A   I'm not copied on any of this.
12     Q   Okay.  So in this -- and the first e-mail
13 that's in this document is from Mr. Brady to Greg Rock
14 and Amy Boyes.  Do you see that?
15     A   I do.
16     Q   And Mr. Brady says in this e-mail to Ms. Boyes
17 that he has not placed any orders, including standing
18 orders, for this account at all in the last few years and
19 he would never do so based on their protocols.  Do you
20 see that?
21     A   That's what he said.
22     Q   And do you disagree with his statement?
23     A   I know he's done differently.
24     Q   And what orders has he placed?
25     A   I don't have specifics.

Page 176

1      Q   Is there something that would refresh your
2  recollection as to those specifics?
3      A   Possibly.
4      Q   And what's that?
5      A   A conversation, an e-mail.
6      Q   A conversation with whom?
7      A   With Clint Brady.
8      Q   So a conversation with Clint Brady would tell
9  you whether he placed any orders on this account?
10     A   I don't know that he placed any orders for this
11 account.
12     Q   Okay.  Did you understand the protocol to be
13 that he would not place orders on this account?
14     A   He is not supposed to place orders for this
15 account.  That's correct.
16     Q   And who made that decision?
17     A   That's per Gary Steele.  Everything needs to go
18 through Purchasing.
19     Q   And to your knowledge, has he abided by that
20 protocol then?
21     A   Not always.
22     Q   And what instance has he not abided by that
23 protocol?
24     A   I just remember there was an instance where he
25 did not and Gary was upset about it.

Page 177

1      Q   Well, do you see in this e-mail there being an
2  instance where the client -- the customer thought that he
3  had placed the order but he, in fact, had not?
4      A   That's what he's saying.
5      Q   Do you know if Greg Rock confirmed that he had
6  not placed this order?
7      A   It doesn't say.
8      Q   Okay.  Well, can you turn to -- well, look at
9  the first page.  Mr. Brady says that he called customer
10 service and the order was placed on Supply Manager by
11 Ally Nolasco.  Do you see that?
12     A   I see that.
13     Q   Okay.  So is this the instance that Gary Steele
14 told you he was upset that Clint Brady had placed an
15 order?
16     A   Probably wasn't this one.
17     Q   But you don't have any recollection of what
18 that other instance was?
19     A   I don't.
20     Q   And there is no document that you can identify
21 that would refresh your recollection on that.  Is that
22 correct?
23     A   Not to my -- I mean, there might be.  I don't
24 know.
25     Q   Okay.  Now, prior to the change of the Bill To

Page 178

1  in December 2012 to Clint Brady, was PSS a secondary
2  supplier of Florida Medical Clinic?
3      A   We've always been a secondary.
4      Q   And that hasn't changed, no matter who the Bill
5  To owner has been, correct?
6      A   That's right.
7          MS. DYSON:  Let's take a break.
8          (Break taken from 11:46 a.m. to 11:55 a.m.)
9          MS. DYSON:  Okay.  Are we ready?
10 BY MS. DYSON:
11     Q   Okay.  So, Ms. vanHoek, the next account that I
12 believe your complaint alleges discrimination for is the
13 Access Healthcare account.  Is that correct?
14     A   That's correct.  That's one of the others.
15     Q   Okay.  And why do you believe the account
16 assignments for the Access Healthcare account was
17 discriminatory?
18         MS. PISCITELLI:  Object to the form.
19     A   I object to the form too.  Ask a specific
20 question --
21 BY MS. DYSON:
22     Q   Sure.
23     A   -- about the account.
24     Q   You allege that you believe that the account
25 assignment for the Access Healthcare account was the

Page 179

1  result of discrimination. Is that correct?
2      A   That's correct.
3      Q   Why do you believe that?
4          MS. PISCITELLI: Object to the form.
5      A   Oh, that opens a big can of worms. Because
6  the -- again, the customer's wishes are not respected.
7  BY MS. DYSON:
8      Q   And when do you believe that the discriminatory
9  decision was made?
10         MS. PISCITELLI: Object to the form.
11     A   That's a continuing -- continues.
12 BY MS. DYSON:
13     Q   Okay. When was it first made?
14     A   I don't know exactly when the date was.
15     Q   Do you have a year?
16     A   But I know there were some specific times, I
17 think, in 2016, 2014.
18     Q   Okay. What decision was made, in 2016, that
19 you contend is discriminatory?
20     A   I believe that's when the account asked to have
21 one representative and they did sign an exclusive
22 agreement, and according to what I had heard previously,
23 was when the customer signs an exclusive, that they could
24 request one representative.
25     Q   Okay.

Page 180

1      A   Okay.
2      Q   And then, in 2014, what is the discriminatory
3  decision that you believe was made?
4      A   Well, I believe that was -- well, it was two --
5  2012, '13, '14, in reference to the East Coast accounts
6  being taken away from me and given to a male.
7      Q   Okay. And is there any other basis on which
8  you contend the account assignment has been
9  discriminatory?
10     A   Because I do the majority -- or I do almost all
11 of the work for all the Ship Tos, and I don't get any
12 compensation for ones that are not under my rep number.
13     Q   And who gets that compensation?
14     A   The rep that is assigned.
15     Q   And who are those reps?
16     A   Okay. There's Todd Anderson. There is Laura
17 Capriati. Michelle Hosley. I think those are the three.
18 There might be another one, but I think that's the three.
19     Q   Okay. And Todd Anderson is a male, right?
20     A   That's right.
21     Q   And Laurie Capriati and Michelle Hosley are
22 female, correct?
23     A   Correct.
24     Q   And is there anything else about the account
25 assignments for the Access Healthcare account that you

Page 181

1  believe is discriminatory?
2          MS. PISCITELLI: Object to the form.
3      A   Well, the fact that the customer asked to have
4  a single representative, and it's always denied for me.
5  BY MS. DYSON:
6      Q   Okay. You told me about that already --
7      A   Okay.
8      Q   -- with Access.
9      A   That's right.
10     Q   So other than the single representative -- when
11 you told me the single representative, the assignment of
12 the East Coast accounts and the fact that other
13 representatives get compensation when you do work for the
14 Bill To on the account, is there anything else that --
15     A   At the moment, that's all I can think of right
16 now.
17     Q   Okay. And this exclusivity agreement with
18 Access Healthcare, do you know when that was entered?
19     A   Top of my head, like 2015, '16.
20     Q   So at the time that the decision was made with
21 respect to the East Coast accounts, Access Healthcare had
22 not signed an exclusivity agreement?
23     A   Not to my knowledge.
24     Q   And were you involved in the negotiation of the
25 exclusivity agreement?

Page 182

1      A   I was excluded a lot. I set up the meeting,
2  and then I was excluded.
3      Q   On the exclusivity agreement?
4      A   Yes.
5      Q   Okay. Do you know if there was any sales reps
6  involved in that meeting on the exclusivity agreement?
7      A   Just management, as far as I know.
8      Q   And do you know whether the exclusivity
9  agreement provided for a single representative or account
10 manager?
11     A   Say that again.
12     Q   Yes. Do you know if the exclusivity
13 agreement -- did it provide that there would only be one
14 representative for McKesson or PSS?
15     A   Within the agreement itself, I've never seen
16 the agreement. I've asked for it.
17         (Exhibit 32 marked for identification.)
18 BY MS. DYSON:
19     Q   Okay. Let me show you what's been marked as
20 Exhibit 32.
21         MS. DYSON: Oh, she needs that one, please.
22         THE WITNESS: Okay.
23 BY MS. DYSON:
24     Q   Do you recognize this document?
25     A   I don't see my name on this.

Page 183

1    Q   Okay.  So this -- this document is an e-mail
2  chain though, Exhibit 32, correct?
3    A   It looks like that, yeah.
4    Q   Okay.  And the e-mail chain starts with an
5  e-mail from Craig Williams on April 29, 2013, to
6  Mr. Jensen and Ms. Loisey.  Do you see that?
7    A   This isn't dated on the top.
8    Q   Okay.  But I'm talking about the e-mail that's
9  below it.  The first e-mail in this chain starts with an
10  e-mail from Mr. Williams to Mr. Jensen and Ms. Loisey,
11  correct?
12    A   I see it.
13    Q   And who is Alexandra Loisey?
14    A   She is an area sales manager.
15    Q   Okay.  And, by "she," I assume you mean she's a
16  female?
17    A   Correct.
18    Q   And Mr. Williams, in this e-mail to Mr. Jensen
19  and Ms. Loisey, references that Chris Barnabo was
20  requesting a conference call.  Do you see that?
21    A   I see that.
22    Q   And do you know who Chris Barnabo is?
23    A   I do.
24    Q   And who is she?
25    A   She was a buyer for Access Healthcare.

Page 184

1    Q   Okay.  Was she the buyer for
2  Access-2-Healthcare?
3    A   Well, that's -- Access-2 is -- it's very
4  complicated.  The IPA is referred to as Access
5  Healthcare 2.  Access Healthcare-owned has never been --
6  or not that I know -- referred to as Access-2.
7    Q   Okay.  So there are two types of entities for
8  Access?
9    A   That's right.
10    Q   And what's the difference between the two
11  entities?
12    A   One is owned and one is affiliates.
13    Q   Okay.  Can you explain what that means?
14    A   Access-owned are owned by the corporation,
15  which now happens to be HCA Hospital Group and Dr. Singh,
16  and they manage the Access-2 IPA, and any physician can
17  join that group.
18    Q   Okay.  So the Access IPA are not owned
19  physician offices of Access Healthcare.  Is that correct?
20    A   Some of them are.
21    Q   Okay.
22    A   I mean, they are owned -- can be a part of both
23  accounts.
24    Q   Oh, okay.  Okay.  The East Coast accounts, as
25  you were referring to earlier, are they affiliated

Page 185

1  accounts of Access, or are they owned Access accounts?
2    A   East Coast with Chris Barnabo, those were
3  bought and owned by Access Healthcare.
4    Q   Okay.  And Chris Barnabo, do you know where she
5  was located?
6    A   In Port St. Lucie, I believe.
7    Q   Okay.  And do you know where Craig Williams is
8  located?
9    A   I just know he's on the other coast.
10    Q   Being the East Coast of Florida?
11    A   East Coast of Florida.
12    Q   And you're here on the West Coast of Florida.
13  Is that correct?
14    A   That's correct.
15    Q   And in this e-mail from Mr. Williams, he
16  reflects that Chris is upset about the transition -- is
17  being delayed and her wishes to transition the account
18  are not being done as quickly as she needs it.  Do you
19  see that?
20    A   I do.
21    Q   And do you know if that's accurate?
22    A   I have not a clue.
23    Q   And then in response to this e-mail is an
24  e-mail from Mr. Jensen.  Do you see that?
25    A   Has this been copy and paste -- I don't know.

Page 186

1  I mean, you're wanting me to go from the top of the page?
2    Q   Yes.
3    A   Okay.  Because it doesn't say who it is from.
4    Q   Do you see it's Mr. Jensen's signature there at
5  the bottom?
6    A   I see it at the bottom, but this looks like it
7  came from Chris Barnabo.
8    Q   Okay.  Do you have anything to dispute that
9  Mr. Jensen authored this e-mail?
10    A   I don't know.
11    Q   Okay.  In this --
12    A   It looks funny.
13    Q   Sure.  I understand that.  But Mr. Jensen's
14  signature is at the bottom of the document, correct?
15        MS. PISCITELLI:  Objection to arguing with the
16    witness.
17        MS. DYSON:  Well, one -- Ms. Piscitelli, please
18    stop interrupting the deposition and trying to coach
19    the witness through your objection.
20        Please, in accordance with the rules, keep your
21    objections to the form.
22  BY MS. DYSON:
23    Q   I'm not arguing with you, Ms. vanHoek.  I'm
24  just trying to understand what you're testifying to.  And
25  what I want to know is do you see that Mr. Jensen's

Page 187

1  signature is at the bottom of this e-mail document?
2      A   That looks like Paul Jensen's signature.
3      Q   Okay.  Thank you.
4          So in this e-mail communication, it says,
5  "Hopefully, you both understand that due diligence is
6  needed when an existing account is requested to be
7  transferred when the only communications are coming from
8  the representatives with future interest."  Do you see
9  that?
10     A   I see that.
11     Q   And do you dispute that that statement was made
12 by Mr. Jensen?
13     A   Like I said, it looks funny.
14     Q   But do you have anything to dispute that that
15 statement was made by Mr. Jensen?
16     A   I do not.
17     Q   Okay.  And then the e-mail goes on to say, "I
18 am disappointed" with -- "that a courtesy call wasn't
19 given from the start of the developing relationship with
20 Access Healthcare personnel."  Do you see that?
21     A   I do.
22     Q   And then in this e-mail -- do you have anything
23 to dispute that Mr. Jensen made that statement?
24     A   No.
25     Q   And in this e-mail, do you understand that

Page 188

1  Mr. Jensen is pushing back on the request to transition
2  the Access account to Mr. Williams?
3      A   It seems that way, yes.
4      Q   And so you understand that he was advocating to
5  keep the account with you.  Is that correct?
6          MS. PISCITELLI:  Object to the form.
7      A   I can only go by what's written.
8  BY MS. DYSON:
9      Q   And do you see that -- do you understand that
10 that's what's being communicated?
11     A   That looks like what's being communicated, yes.
12     Q   Okay.  And do you understand that there was a
13 decision ultimately made about who would be responsible
14 for those Ship To locations on the East Coast of Florida?
15     A   It's saying "work with Carlos."  Is that what
16 you're referring to?
17     Q   No.  I'm actually not referring to this e-mail.
18 I was asking do you understand there was a decision made
19 as to who would be assigned to the Ship To locations on
20 the East Coast?
21     A   I heard there was a meeting to discuss it, yes.
22     Q   And do you know who was present at that
23 meeting?
24     A   I understand that Steve Tonnesen was there and
25 that Carlo Xiques was there and Alexandra Loisey and Paul

Page 189

1  Jensen, I believe.
2      Q   And do you know what the decision -- what
3  decision came out of that meeting?
4      A   I lost the accounts.
5      Q   Right.  So Mr. Williams was allowed to keep the
6  East Coast accounts?
7          MS. PISCITELLI:  Object to the form.
8      A   He never had the accounts --
9  BY MS. DYSON:
10     Q   Okay.
11     A   -- to my knowledge.  I mean, even Carlos, in
12 his deposition, said that I had 100 percent of the
13 business, so I don't know.
14     Q   You're referencing what Mr. Xiques said in his
15 deposition during this litigation?
16     A   Correct.
17     Q   Because you were present for that deposition?
18     A   I was.
19     Q   Okay.  The -- but my question to you, though,
20 is that, out of that meeting, came the decision that
21 Mr. Williams would have those East Coast Ship To
22 locations, correct?
23     A   Yes.
24     Q   Okay.  And Ms. -- she was probably known as
25 Ms. Carmen back then, but Ms. Capriati would also keep

Page 190

1  Ship To locations for Access Healthcare, correct?
2          MS. PISCITELLI:  Object to the form.
3      A   I'm -- some of them.
4  BY MS. DYSON:
5      Q   And did you understand that the decision also
6  required Mr. Williams to give up certain West Coast
7  accounts he had for Access?
8      A   I -- that was on the McKesson side.  I don't
9  know.
10         (Exhibit 33 marked for identification.)
11 BY MS. DYSON:
12     Q   I'll show you what's marked as Exhibit 33 to
13 your deposition.  Do you recognize this document?
14     A   That looks real familiar, yes.
15     Q   What is this document?
16     A   This was a document that was produced for --
17 after the merger between PSS and McKesson in reference to
18 splitting the accounts between the sales reps.
19     Q   Okay.  And so this document shows, for the
20 accounts that you had assigned to you, at the top -- at
21 the time of the acquisition, which accounts would come to
22 you and which accounts you would give up.  Is that
23 correct?
24     A   They set guidelines here -- that's what I was
25 talking about -- the business rules, 70/30.

Page 191

1    Q    But this document actually goes through all of
2 the --
3    A    It lists --
4    Q    You've got to let me finish.
5         MS. PISCITELLI:  Object to the form.
6         MR. HEARING:  Okay.
7         MS. DYSON:  You've both got to let me finish.
8    I don't think you can object to a question --
9         MS. PISCITELLI:  You paused.
10        MS. DYSON:  -- I haven't even asked yet.
11        MS. PISCITELLI:  You paused, so -- sorry.
12 BY MS. DYSON:
13   Q    This document that's marked as Exhibit 33 to
14 your deposition actually lists the Ship To locations for
15 your accounts and whether those accounts would stay with
16 you, whether you were acquiring new accounts or whether
17 you had to give up those accounts.  Is that correct?
18   A    That's what this report was, yes.
19   Q    Okay.  And so if the -- in the spreadsheet
20 that's attached here if there is an up arrow, that's an
21 account that you're acquiring, correct?
22        MS. PISCITELLI:  Object to the form.
23   A    I believe so, yes.
24 BY MS. DYSON:
25   Q    And if there's a down arrow, that's an account

Page 192

1 you are handing off.  Is that correct?
2    A    That's -- yes --
3         MS. PISCITELLI:  I have to --
4    A    As far as I remember, yes.
5 BY MS. DYSON:
6    Q    Okay.  So if we look on Bates Number 1519 --
7 actually, 1518 --
8    A    Okay.
9    Q    Okay -- and we look at -- let's look at the
10 bottom of that page, the last four accounts on the bottom
11 of that page.
12   A    Yes.
13   Q    Okay.  The -- the three accounts with up
14 arrows, do you see those?
15   A    I do.
16   Q    And so those were Ship To locations that you
17 were acquiring as a result of the acquisition.  Is that
18 correct?
19   A    Which ones are you referring to?
20   Q    Sure.  At the bottom of the page.
21   A    If you could, give me the account number.
22   Q    Oh, sure.  You want the Ship To number?  It
23 starts with 4270896.
24   A    Okay.  That's not me on the right-hand side.
25   Q    Right.  Do you see that these are accounts

Page 193

1 coming to you from Mr. Williams?
2    A    Yes.
3         Well, wait a second.  Transfer to -- no.
4         Okay.
5    Q    Okay.  So the -- let's start with the first
6 account there, which the Ship To name is
7 Access-2-Healthcare Physicians.  Do you see that?
8    A    And these are all IPA, by the way.
9    Q    Okay.  But if you could answer my question --
10   A    Okay.
11   Q    -- do you see where I'm referencing the
12 Access-2-Healthcare Physicians?  The Ship To number is
13 4270896?
14   A    Yes.
15   Q    Okay.  And this is a decision that was made to
16 transfer the account from Craig Williams to you, correct?
17   A    That's the way it looks.
18   Q    Okay.  And then the next one down is Sunkara
19 Dinavahi.  Do you see that?
20   A    I see that.
21   Q    And is that someone affiliated with Access
22 Healthcare?
23   A    The 996546, as I remember, was the Bill To for
24 Access.
25   Q    Okay.  You see that they -- all three of these

Page 194

1 have the same Bill To number, ending in 143?
2    A    I'm referring to the one at the very bottom.
3    Q    Okay.  No.  I'm talking about right under the
4 Ship To that we just talked about, so the Ship To number
5 is 4320050.  Do you see that?
6    A    Okay.  These accounts all have 4s, which is --
7 which are McKesson accounts.  They didn't transfer these
8 accounts over to us because we weren't on the same
9 platform.  So they couldn't transfer those accounts.
10 Those were previous sales, and that was part of the IPA.
11 It doesn't even have a specific doctor name on it.
12   Q    Okay.  So Sunkara Dinavahi is not a specific
13 doctor?
14   A    That is --
15   Q    Okay.
16   A    -- but the other two are not.
17   Q    Okay.  And then this shows -- is that Sunkara
18 Dinavahi -- Dr. Dinavahi, is he affiliated with Access
19 Healthcare?
20   A    It looks like it.
21   Q    Okay.  And this is a -- an account that's going
22 from Mr. Williams to you, correct?
23   A    I had an account for them, which is on the
24 bottom.
25   Q    And do you see that the account from

Page 195

1  Mr. Williams is being transferred to you?
2      A    Again, this is the IPA.  This was, like, for
3  specific items that they did not -- yes, I see that.
4      Q    So this account for Dr. Dinavahi was being
5  transferred from Mr. Williams to you.  Is that correct?
6      A    That's the way it looks.
7      Q    Okay.  And then the next one down,
8  Acess-2-Healthcare Physicians, was also being transferred
9  from Mr. Williams to you, correct?
10     A    It doesn't have a doctor's name.  It doesn't
11 make any sense.
12     Q    Okay.  Mr. Williams, after this decision was
13 made, was not allowed to get credit for any more sales
14 involving this Ship To location and this Bill To.  Is
15 that correct?
16     A    And I really need to see the address.  I don't
17 see an address or anything -- I don't know.
18     Q    Okay.  But you --
19     A    Okay.
20     Q    -- agree with me, don't you, Ms. vanHoek --
21     A    That's what the report says.
22     Q    You have to let me finish.  You have to let me
23 finish asking the question.
24         Do you agree with me that this report, which
25 shows which accounts were transferred as a result of the

Page 196

1  acquisition, reflects that an account was transferred
2  from Mr. Williams to you for Access Healthcare 2
3  Physicians with the Ship To number of 4270935 --
4         MS. PISCITELLI:  Object to the form.
5  BY MS. DYSON:
6      Q    -- is that correct?
7      A    That's what it says.
8      Q    Okay.  Then we look at the next page, and about
9  halfway down with a Ship To Number 4317588, do you see
10 that?
11     A    What's the name?
12     Q    Sure.  Singh.  Dr. Singh?
13     A    Singh.  Okay.
14     Q    And do you see that this entry is reflecting
15 that this account for Dr. Singh is being transferred from
16 Craig Williams to you?
17     A    That's what it looks like.
18     Q    And is there anything in this document that's
19 Exhibit 33 to your deposition where Mr. Williams is
20 transferring accounts to you -- or where you were
21 transferring accounts to Mr. Williams -- let me rephrase
22 that.
23         Is there anything in this document that's
24 Exhibit 33 to your deposition where you are transferring
25 accounts to Mr. Williams?

Page 197

1      A    Accounts didn't appear on here where there was
2  no business from the other rep.  If there wasn't a
3  conflict, it would not be on the report.
4      Q    And what I -- the question I asked you, though,
5  Ms. vanHoek, is there anything in Exhibit 33 --
6      A    No.
7      Q    You've got to let me finish asking the
8  question.
9         Is there anything in Exhibit 33 to your
10 deposition that reflects an account being transferred
11 from you to Mr. Williams?
12     A    I would have to look at it.  I'm sorry.
13     Q    Oh, please.  Go ahead.  Take your time.
14     A    I don't see any -- wait.
15         Okay.
16     Q    Have you had enough time?
17     A    I do.
18     Q    Okay.
19     A    I do not see anything.
20     Q    Okay.  Let's move to Exhibit Number 34 to your
21 deposition.
22         (Exhibit 34 marked for identification.)
23 BY MS. DYSON:
24     Q    Do you recognize this document?
25     A    Looks familiar.

Page 198

1      Q    And what is it?
2      A    It looks like a -- it doesn't show a time
3  period.  I -- I see the date on the bottom, 11/15, but I
4  don't see -- let's see.  FY13.  It looks like it could be
5  a yearly report.
6      Q    Do you recognize this document as the overall
7  view of the sales reps and what the impact of the
8  acquisition would have on their revenue and their gross
9  profit?
10     A    I do.  I see that.
11     Q    Okay.  So, for example, for your line where
12 you're listed as the sales representative, it shows that
13 in Fiscal Year 2013, you had 292 Ship Tos and after the
14 acquisition, you would have 296 Ship Tos?
15     A    Yes.
16     Q    And that your revenue impact as a result of the
17 acquisition was going to increase by 4 percent.  Do you
18 see that?
19     A    According to the records, yes.
20     Q    Do you have anything to dispute that?
21     A    I do not.
22     Q    Okay.  And that your gross profit impact would
23 increase by 5 percent.  Do you see that?
24     A    That's what it says.
25     Q    Okay.  And you don't have anything to dispute

Page 199

1  the accuracy of that document, do you?
2     A   No.
3     Q   Okay.  And then Todd Anderson is right below
4  you.  Do you see that?
5     A   I do.
6     Q   So Mr. Anderson was on Carlos Xiques's team?
7     A   Uh-huh.
8     Q   And you were on Mr. Jensen's team?
9     A   I think it -- I'm not sure when the transition
10 happened between Carlos and Paul Jensen.
11    Q   Okay.  But on this document, you see where
12 Mr. Jensen is reflected as your future ASM?
13    A   It looks like all of these reps -- well, I'm
14 not sure about that, because I don't ever remember being
15 on certain teams with all these people in one team.
16    Q   Okay.  But you don't disagree that this
17 document reflects that Mr. Jensen would be your future
18 ASM.  Is that correct?
19        MS. PISCITELLI:  Object to the form.
20    A   I don't know.
21 BY MS. DYSON:
22    Q   Okay.
23    A   I think this report was for Paul Jensen's team
24 and Carlos's team together.
25    Q   Right.  But, I mean, I'm saying do you see

Page 200

1  where it says "Future ASM" on this document?
2     A   Where?
3     Q   In the column, second column from the left?
4     A   Okay.  I see.
5     Q   And it reflects that Paul Jensen is your future
6  ASM.  Do you see that?
7     A   That's what it says, yes.
8     Q   And he, indeed, did become your future ASM,
9  right?
10    A   He had.
11    Q   Okay.  And then for Todd Anderson, it reflects
12 that his future ASM is Carlos Xiques.  Do you see that?
13    A   Yes.
14    Q   Okay.  And do you know whether Mr. Anderson
15 did, in fact, report to Mr. Xiques when he was a sales
16 manager?
17    A   Yes.
18    Q   Okay.  Now, Mr. Anderson, on this spreadsheet,
19 he reflects that in Fiscal Year '13, he had 393 Ship Tos.
20 Is that correct?
21        Do you see that?
22    A   Who are you referring to?
23    Q   Todd Anderson.
24    A   Okay.
25        He has how many Ship Tos?

Page 201

1     Q   393.
2     A   Yes.
3     Q   And that was for the fiscal year of 2013,
4  correct?
5     A   That's what it says, yes.
6     Q   And you don't have anything to dispute that?
7     A   No.
8     Q   And as a result of this acquisition,
9  Mr. Anderson was going to go down to 329 Ship Tos.  Is
10 that correct?
11    A   That is right.
12    Q   And his revenue was being to be impacted by
13 negative 8 percent.  Do you see that?
14    A   I do.
15    Q   And his gross profit was going to be affected
16 by negative 11 percent.  Do you see that?
17    A   I do.
18    Q   Now, Mr. Brady is also listed on this document.
19 Do you see that?
20    A   I do.
21    Q   And his future ASM is identify as Carlos
22 Xiques.  Do you see that?
23    A   I do.
24    Q   And Mr. Brady's Fiscal Year 2013 Ship Tos is
25 512.  Do you see that?

Page 202

1     A   I do.
2     Q   And his post-acquisition Ship Tos would be 520.
3  Do you see that?
4     A   I do.
5     Q   And his impact on revenue was plus 1 percent,
6  correct?
7     A   Correct.
8     Q   And his impact on gross profit was plus
9  1 percent, correct?
10    A   Correct.
11    Q   So both Mr. Anderson and Mr. Brady had a
12 less-desirable impact on their revenue and gross profit
13 than you did, correct?
14    A   These are all numbers.  They're speculating, so
15 I don't know whether it actually did or didn't.
16    Q   Okay.  But do you understand that, on this
17 spreadsheet, their post-model revenue -- post-model
18 revenue was that Mr. Anderson and Mr. Brady were going to
19 have less of an increase than you.  Is that correct?
20        MS. PISCITELLI:  Object to the form.
21    A   It says it on the report.
22 BY MS. DYSON:
23    Q   Okay.  And you don't have anything to dispute
24 that, correct?
25    A   No.

Page 203

1    Q    And that it also provides that the
2  post-modeling gross profit would impact -- negatively
3  impact Mr. Anderson and Mr. Brady, than it would impact
4  you, correct?
5    A    That's what it says.
6    Q    Okay.  And do you know if -- what Mr. Williams
7  impact was as a result of the acquisition?
8    A    I do not.
9    Q    Do you know why the decision was made for
10 Mr. Williams to have those East Coast Ship To locations
11 in 2013?
12   A    Because Chris Barnabo asked for it.
13   Q    Okay.  And how do you have that information?
14   A    It was communicated to me, and I'm not sure if
15 it was by e-mail or verbally or how it was communicated.
16   Q    Do you know who communicated it to you?
17   A    I think it came through Carlos.
18   Q    Okay.  But you don't remember how it was
19 communicated, whether verbally or by e-mail?
20   A    Not exactly, no.
21   Q    Okay.  And do you know when he communicated
22 that to you?
23   A    After the acquisition.
24   Q    But do you have any specifics as to the time
25 period?

Page 204

1    A    I don't have a specific date.
2    Q    Okay.  At that time that that decision was made
3  and Ms. Barnabo expressed her preference to work with
4  Mr. Williams, do you know if the client was making -- or
5  the customer was making a request to have a single
6  representative on the account?
7    A    Say that again.
8    Q    Sure.  At the time that Ms. Barnabo expressed
9  her preference to work with Mr. Williams, the client --
10 the customer was not asking for a single representative
11 on the account, were they?
12   A    I don't know.
13   Q    Okay.
14        (Exhibit 35 marked for identification.)
15 BY MS. DYSON:
16   Q    Let me show you what's marked as Exhibit 35 to
17 your deposition.  Do you recognize this document?
18   A    There's a lot of stuff here.  I mean -- let's
19 see.
20        Looks familiar.
21   Q    Okay.  So this is an e-mail -- this document
22 starts out with an e-mail from you to Mr. Jensen, dated
23 March 26, 2016.  Do you see that?
24   A    I do.
25   Q    And in this document, you're forwarding the

Page 205

1  e-mail chain that goes from Bates Number 422 to 434,
2  correct?
3    A    422?
4    Q    To 434.
5    A    I mean, it's a chain of events here.  I can
6  take one at a time, if you like.
7    Q    No.  What I'm asking you is your e-mail here
8  that's dated March 26, 2016, is -- contains this entire
9  e-mail chain --
10   A    It looks like.
11   Q    You have to let me finish asking the question.
12        This e-mail that's Exhibit 35 that starts with
13 your e-mail on March 26, 2016, contains this entire
14 e-mail chain.  Is that correct?
15   A    It looks like it.
16   Q    Okay.  Do you have anything to dispute that to
17 be inaccurate?
18   A    No.
19   Q    Okay.  So in this -- let's start with this
20 e-mail that is on the second page of this document.  So
21 it's an e-mail from Cary O'Donnell at the bottom of 423,
22 Bates Number 423.
23   A    Okay.
24   Q    Do you see that e-mail?
25   A    I do.

Page 206

1    Q    Okay.  And is this an e-mail from
2  Cary O'Donnell to you?
3    A    Again, this looks funny, the way this -- I
4  don't understand why the whole heading isn't here.
5    Q    Well, do you see the e-mail above it --
6    A    I do.
7    Q    -- that says, "Sent from my iPhone"?
8    A    Okay.
9    Q    Do you know if that's what happens when you
10 send something from your iPhone?
11   A    Could be possibly, yeah.
12   Q    Okay.  So this e-mail from Cary O'Donnell to
13 you, on March 25, 2016, do you recognize that document?
14   A    Yes, I do.
15   Q    Okay.  Who is Cary O'Donnell?
16   A    She's the controller, accounting controller for
17 Access Healthcare.
18   Q    Okay.  And what is she asking you in this
19 e-mail?
20   A    She -- Diane Knutson is one of our accounting
21 A/R people -- and she had a problem with Diane Knutson.
22   Q    Cary O'Donnell had a problem with Diane
23 Knutson?
24   A    Yeah.
25   Q    And so she's asking to have the accounts

Page 207

1  consolidated and not under Diane, right?
2      A    That's correct.
3      Q    And there's no reference to Mr. Williams in
4  this e-mail, correct?
5      A    This is all accounting, I believe.
6      Q    Okay.  So there is no reference to Mr. Williams
7  in this e-mail from Ms. O'Donnell, correct?
8      A    Not that I see, no.
9      Q    Is it Ms. O'Donnell or Mr. O'Donnell?  Is Cary
10 male or female?
11     A    I'm not sure.
12     Q    Okay.  Well, you respond on March 25th --
13 respond to Cary and copy Kim Boteilho -- I don't know if
14 that's how you say her name.  Do you see that?
15     A    Kimberly?
16     Q    Yes.
17     A    Yes.  She's still there.
18     Q    And how do you say her last name?
19     A    I don't know.
20     Q    Okay.
21     A    I call her Kim.
22     Q    Okay.  Well, then I'll do my best with that one
23 too.
24          Okay.  So you respond, copying Cary and Kim,
25 and say, "Let me see what we can do."

Page 208

1      A    Mmm-hmm.
2      Q    And then Mr. Jensen responds to this e-mail
3  that's March 25, 2016.  Do you see that?
4      A    I do.
5      Q    Okay.  And in his e-mail -- well, let me go
6  back.
7          So when you sent this e-mail to Kimberly
8  Boteilho, you also copied Mr. Jensen.  Do you see that?
9      A    I do.
10     Q    And so Mr. Jensen is now in this e-mail chain
11 and responding.  Do you see that?
12     A    I do.
13     Q    Okay.  And he indicates in this e-mail that all
14 of the accounts will be eligible for a discount which
15 started on March 1, 2016.  Do you see that?
16     A    I do.
17     Q    And do you know if that discount is related to
18 the exclusivity agreement?
19     A    That's what I understand, yes.
20     Q    Okay.  And that he indicates in here that all
21 sites will still have their local account manager for
22 day-to-day supplying operations.  Do you see that?
23     A    I do.
24     Q    And he indicates that there are three account
25 managers and two sales managers.

Page 209

1      A    Mmm-hmm.
2      Q    And the three account managers are you,
3  Ms. Carmen and Mr. Williams.  Is that correct?
4      A    That's right.
5      Q    And Mr. Williams reports to Alexandra Loisey
6  and so Mr. Jensen and Ms. Loisey are, then, the sales
7  managers that are responsible for this account?
8      A    That's right.
9      Q    And he also indicates that Alexandra and he,
10 Mr. Jensen, are co-championing the Bill To consolidation
11 process?
12     A    I do.
13     Q    And what's the Bill To consolidation process?
14     A    This was because we were on different platforms
15 on our computer systems and we couldn't -- that's why
16 they were all eventually assigned different account
17 numbers.
18     Q    Okay.  And to your knowledge, did Ms. -- I'll
19 say Ms. O'Donnell, because I don't know --
20     A    Okay.
21     Q    -- but I'm going to guess.  Okay?
22          Is Ms. Cary O'Donnell and Ms. Boteilho -- did
23 they complain about this assignment that Mr. Jensen is
24 reflecting in this e-mail of March 26, 2016?
25     A    No.

Page 210

1      Q    Okay.  Now, you respond just to Mr. Jensen on
2  March 26, 2016, correct?
3      A    Yes.
4      Q    Okay.  And in this e-mail, you're complaining
5  about Mr. Williams.  Is that correct?
6      A    Let me read it.
7      Q    Sure.  Please do.
8      A    Okay.
9      Q    Okay.  In this e-mail, you're complaining about
10 Mr. Williams, correct?
11     A    That's correct.
12     Q    Okay.  And in this e-mail you say, in the first
13 paragraph, "If their corporate office knew what Christine
14 did, they would have not stuck by her."  Do you see that?
15     A    I do.
16     Q    Okay.  And who is "their" that you're
17 referencing in that sentence?
18     A    Christine Barnabo was acquired by Access
19 Healthcare.  She was an employee.  She was not a
20 decision-maker.
21     Q    But who is "their" corporate office?  Who is
22 that a reference to?
23     A    That would be Maria Jimenez and Dr. Singh.
24     Q    And Maria Jimenez and Dr. Singh stuck by
25 Ms. Barnabo.  Is that correct?

Page 211

```
1      A    They did not.
2      Q    Well, why did you write in here, "If their
3  corporate office knew what she did, they would not have
4  stuck by her"?
5      A    That's what I said.  They would not have stuck
6  by her.
7      Q    If they knew what she did?
8      A    Right.
9      Q    They didn't know what she did?
10     A    No.
11     Q    Okay.  And what was it that she did?
12     A    That she requested to have Craig Williams
13 assigned to the accounts on the East Coast.
14     Q    Okay.  But, otherwise, they stuck by her
15 because they didn't know that.  Is that correct?
16     A    They did not stick by her at all.  They were
17 very upset about this.
18     Q    Okay.  When did Mr. -- did Mr. -- Dr. Singh
19 communicate that he was upset about the lack of a single
20 representative?
21     A    Dr. Singh never communicates directly with
22 anyone.  It all went through Maria Jimenez.
23     Q    Okay.  So Dr. Singh never communicated that, to
24 your knowledge, to anyone at McKesson.  Is that correct?
25     A    Directly to McKesson, no.
```

Page 212

```
1      Q    Okay.  Now, you also say, in the second
2  paragraph, that "Nobody fought for me."  Do you see that?
3      A    I do.
4      Q    Okay.  But now you know that's not true,
5  correct?
6      A    That's correct.
7      Q    Because Mr. Jensen fought for you in
8  Exhibit 32, correct?
9      A    Correct.
10     Q    And do you know who Karen Hayes is?
11     A    I do.
12     Q    And who is Karen Hayes?
13     A    She is the CFO for Access Healthcare.  She
14 is -- it's kind of complicated.  She is actually an
15 employee of, I believe, HCA Hospital Group and Access
16 Healthcare.
17     Q    Okay.  And when you said, a few minutes ago,
18 that Dr. Singh communicates to Maria Jimenez who then
19 communicates that information, how do you know that?
20     A    From Maria.
21     Q    Okay.  You've never seen Dr. Singh communicate
22 directly with Maria Jimenez regarding anything that it
23 relates to McKesson, have you?
24     A    I've not seen that.
25     Q    Okay.  And so Karen Hayes, is she -- did she
```

Page 213

```
1  supervise Ms. Jimenez?
2      A    Yes.
3      Q    And is Maria Jimenez still employed by Access
4  Healthcare?
5      A    No.
6      Q    And when did she leave Access Healthcare?
7      A    I don't exactly know, but over a year ago.
8      Q    Okay.  And Ms. Hayes, is she the one who
9  negotiated the exclusivity agreement?
10     A    Her and Maria.
11          (Exhibit 36 marked for identification.)
12 BY MS. DYSON:
13     Q    Okay.  Let me show you what's marked as
14 Exhibit 36 to your deposition.  Do you recognize this
15 document?
16     A    Parts of it.
17     Q    Okay.  The first e-mail on this document that's
18 on the first page is from you to Mr. Jensen.  Is that
19 correct?
20     A    That's correct.
21     Q    And when you say, "You'll need to ask Laura
22 that.  I don't have that information.  The account is
23 under her name," who is the Laura you're referring to?
24     A    Laura Carmen.
25     Q    Okay.  Now Laura Capriati?
```

Page 214

```
1      A    Yes.
2      Q    And she has ownership over some Ship To
3  locations for Access Healthcare?
4      A    For the IPA.
5      Q    So she has some ownership over some Ship To
6  locations for the Access Healthcare IPA.  Is that
7  correct?
8      A    Yes, both.  Both Access and the IPA.
9      Q    So both the owned and the affiliated.  Is that
10 correct?
11     A    That's what it looks like, yes.
12          (Exhibit 37 marked for identification.)
13 BY MS. DYSON:
14     Q    Okay.  Let me show you what's marked as
15 Exhibit 37 to your deposition.  Do you recognize this
16 document?
17     A    I do.
18     Q    And what is it?
19     A    It's a communication between Paul Jensen,
20 myself, in reference to Chris Barnabo no longer being
21 employed and an e-mail coming from Maria Jimenez for me
22 to reach out to Cynthia, who was the operations -- I
23 believe the operations manager on the East Coast.
24     Q    Okay.  So did you understand that this was the
25 first time that Ms. Jimenez had made a request to have a
```

Page 215

1   single representative on the Access-owned accounts or the
2   Access-affiliate accounts?
3       A    She always asked for it.
4       Q    And when did she previously ask for it?
5       A    I know she specifically asked for it at some of
6   the meetings that we had with her with Paul Jensen.
7       Q    And those were subsequent to this e-mail,
8   correct?
9       A    Yes, I believe so.
10      Q    Okay.  So -- but prior to this e-mail, prior to
11  Ms. Barnabo leaving Access, had she made a request -- had
12  she made a request to have a single sales representative?
13      A    Who are you referring to now?
14      Q    Sure.  Maria Jimenez.  So let me restate the
15  question once more again.
16      A    Okay.
17      Q    Sorry.  I was interrupted by the sighing over
18  there.
19           The -- this e-mail that was sent on July 20,
20  2016, was there any prior time that Ms. Jimenez made a
21  request to have a single sales representative on either
22  the Access-owned account or the affiliate account?
23      A    Yes.
24      Q    Okay.  And when did that happen?
25      A    I don't know exactly when that happened.  She

Page 216

1   always communicated that to me.
2       Q    While Christine Barnabo was at Access?
3       A    Yes.
4       Q    Okay.  And did she ever communicate that
5   message to Mr. Jensen?
6       A    Yes.
7       Q    While Christine Barnabo was at Access?
8       A    Yes.
9       Q    And when did that happen?
10      A    We had some business reviews with Maria, and
11  Maria, I think, even called him directly.  There was
12  communications.  I'm not sure -- e-mails, phone calls.
13      Q    When were those communications?
14      A    I don't know exactly.
15      Q    Okay.
16           (Exhibit 38 marked for identification.)
17  BY MS. DYSON:
18      Q    Show you what's marked as Exhibit 38 to your
19  deposition.  Do you recognize this document?
20      A    It's a continuation of 37.
21      Q    Right.  So the top e-mail is Mr. Jensen's
22  response to your e-mail forwarding Ms. Jimenez's request
23  to have a single sales representative.  Is that correct?
24      A    He's saying that there hasn't been any change
25  and that "Hilda will continue to be Maria's primary

Page 217

1   contact."
2       Q    Right.  So the question I asked you is is this
3   e-mail, the first e-mail on Exhibit 38, Mr. Jensen's
4   response to the e-mail that you sent that is Exhibit 37
5   to your deposition?
6       A    That's right.
7       Q    Okay.  And Mr. Jensen also copies Ms. Loisey
8   and Mr. Sharp on this e-mail response, correct?
9       A    Correct.
10      Q    And he notes that Ms. Loisey and Mr. Williams
11  are on vacation.  Is that correct?
12      A    That's correct.
13      Q    And he also notes that "We have both models,
14  single rep and lead rep with multiple representation in
15  place at McKesson."  Do you see that?
16      A    Yes.
17      Q    And is that true?
18      A    That there are different models, yes -- single
19  rep, lead rep, multiple reps.
20      Q    Okay.  And that Access Healthcare purchasing
21  model hadn't changed.  Is that correct?
22      A    That's what he's saying.
23      Q    And you would continue to be Ms. Jimenez's
24  primary contact.  Is that correct?
25      A    Yes.

Page 218

1       Q    And Mr. Jensen also says that he and Ms. Loisey
2   would discuss this situation once Ms. Loisey returns from
3   personal time?
4       A    Yes.
5       Q    And he thanks you for passing along the
6   information.  Is that correct?
7       A    That's correct.
8            (Exhibit 39 marked for identification.)
9   BY MS. DYSON:
10      Q    Let me show you what's marked as Exhibit 39 to
11  your deposition.
12           MS. DYSON:  Sorry.
13  BY MS. DYSON:
14      Q    Do you recognize this document?
15      A    Okay.  This is the continuation of 38.
16      Q    So this is your response to Mr. Jensen's e-mail
17  that is in Exhibit 38 to your deposition.  Is that
18  correct?
19      A    Looks like it.
20      Q    And you respond that Ms. Jimenez wants single
21  representation in place, "She has made that perfectly
22  clear and has made that request of you for the last two
23  or three years"?
24      A    That's correct.
25      Q    And so that was on July 20, 2015.  Is that

Page 219

1  correct?
2      A   Yes.
3          (Exhibit 40 marked for identification.)
4  BY MS. DYSON:
5      Q   Let me show you what's marked as Exhibit 40 to
6  your deposition.  Do you recognize this document?
7      A   I'm not on this, so I don't recognize it, no.
8      Q   Okay.  Do you have anything to dispute that
9  this is a document that reflects communications between
10 Ms. Hayes -- Karen Hayes -- and Mr. Jensen?
11     A   It looks like it.
12     Q   And Mr. Jensen reflects in this second
13 e-mail -- really, the third e-mail down, on July 28,
14 2016 --
15     A   Okay.
16     Q   -- Mr. Jensen sends an e-mail to Ms. Hayes that
17 reflects that you and Ms. Carmen are his West Coast reps
18 for the Access Health and Mr. Williams is the
19 representative for the East Coast Access Healthcare
20 accounts.  Do you see that?
21     A   Where are you referring to?
22     Q   Sure.  The third e-mail down, right at the top
23 one-third --
24     A   Okay.
25     Q   Mmm-hmm.

Page 220

1      A   Okay.
2      Q   Do you disputes that Mr. Jensen sent that
3  e-mail to Ms. Hayes?
4      A   It looks like it.
5      Q   And that was the correct assignment at that
6  time, on July 28, 2016.  Is that correct?
7      A   That's how it was assigned, yes.
8      Q   Okay.  And Ms. Hayes responds that, "Our West
9  Coast employees will be handling the supply orders for
10 the East Coast, so it may be that we don't require
11 Mr. Williams now."  Do you see that?
12     A   Where?
13     Q   Sure.  The e-mail that's right above the one
14 that Mr. Jensen sent to Ms. Hayes.
15     A   Yes, I do see that.
16     Q   Okay.  So she wasn't asking for a single
17 representative in this e-mail, correct?
18     A   She's saying she doesn't require Mr. Williams
19 now.
20     Q   Sure.  She says, "Maybe we don't require
21 Mr. Williams now," correct?
22     A   Correct.
23     Q   But she wasn't asking for one representative on
24 this account.  Is that correct?
25     A   No.

Page 221

1      Q   It's not correct?
2      A   This is the first time I've seen this, Sacha,
3  so give me a minute.
4      Q   Oh, please.  Take your time.
5      A   Thank you.
6          You know, I can't say what she was thinking,
7  but she's saying she doesn't require Mr. Williams now,
8  so.
9      Q   But she's not asking to get rid of Ms. Carmen,
10 correct?
11     A   Not in that e-mail, no.
12     Q   Okay.  And Ms. Hayes, at the time that she sent
13 this e-mail, was the chief financial officer of Access
14 Healthcare?
15     A   Yes.
16     Q   And Ms. Jimenez reported to her, correct?
17     A   Yes.
18     Q   Okay.  I just want to make sure I understood
19 that.
20         So Mr. Jensen responds back to Ms. Hayes asking
21 to set up a call to discuss this, correct?
22     A   Yes.
23     Q   Do you know who Regina Conner is?
24     A   I do.
25     Q   And who is she?

Page 222

1      A   She was Maria Jimenez's assistant.
2          (Exhibit 41 marked for identification.)
3  BY MS. DYSON:
4      Q   Let me show you what's marked as Exhibit 41 to
5  your deposition.
6      A   Okay.
7      Q   Do you recognize this document?
8      A   It looks familiar, yes.
9      Q   Okay.  And before we go to 41, I want to go
10 back to Exhibit 35, if we could.
11     A   Okay.
12     Q   So in the -- in that first e-mail that's
13 Exhibit 35 -- are you at 35?
14     A   35 is here.
15     Q   Yeah.  I'm going to talk about 35 first before
16 I go to 41.
17     A   Okay.
18     Q   So in the last paragraph of Exhibit 35, last
19 paragraph of the first e-mail in Exhibit 35, you
20 reference the Florida Hospital Physician Group account.
21 Do you see that?
22     A   Mmm-hmm.  Yes.
23     Q   FHPG is a reference to Florida Hospital
24 Physician Group?
25     A   Correct.

Page 223

1    Q    Okay.  And you say in here that "Customer
2    requests always come first and are respected."  Do you
3    see that?
4    A    Yes.
5    Q    Do you know if that's true?
6    A    That's not true.
7    Q    Okay.  And you were referencing the Florida
8    Hospital Physician Group account and you say that "This
9    represented a lot of my hard work, personally seeing each
10   account and setting them up with online order entry."  Do
11   you see that?
12   A    Yes.
13   Q    Do you know if -- Mr. Brady, he was also
14   assigned to the Florida Hospital Physician Group account,
15   correct?
16   A    He had Ship Tos.
17   Q    Okay.  And you had Ship Tos, correct?
18   A    Correct.
19   Q    And do you know if Mr. Brady also was involved
20   in setting them up with online order entry?
21   A    He was not.
22   Q    And how do you know that?
23   A    Because I was the one, exclusively, working
24   with Kim Teel -- Kim Teel.
25   Q    Okay.  But Mr. Brady was responsible for some

Page 224

1    portion of the Florida Hospital Physician Group account,
2    correct?
3    A    Most everything went through me.
4    Q    Okay.  And there were other reps, beyond
5    Mr. Brady, that were involved in the Florida Hospital
6    Physician Group account too, correct?
7    A    Correct.
8    Q    Jeanette Stack?
9    A    Yes.
10   Q    Was there anyone else?
11   A    Vaguely, I think maybe Michelle Hosley, but I'm
12   not real sure.
13   Q    Okay.  And Ms. Stack, Ms. Hosley, Mr. Brady and
14   you all lost your accounts when they were transferred to
15   Mr. Irish.  Is that correct?
16   A    Yes.
17   Q    And you say in this e-mail that "This is a
18   pretty big," all caps, "loss for you financially."  Do
19   you see that?
20   A    Yes.
21   Q    Do you know if it was a big loss for Ms. Stack?
22   A    She only, I think, had a few Ship To accounts.
23   I had the majority of the business.
24   Q    Do you know if Mr. Brady -- it was a big loss
25   for Mr. Brady?

Page 225

1    A    I do not.
2    Q    But you say in this e-mail, "But as I said, I
3    understand the business decision."  Do you see that?
4    A    I do.
5    Q    And you are referencing you understood the
6    business's decision to move the Florida Hospital
7    Physician Group account to Mr. Irish, correct?
8    A    Yes.
9    Q    Okay.  Now, back to Exhibit 41 -- do you have
10   that one in front of you?
11        Okay.  And if you could put 39 in front of you
12   as well.
13        Okay.  So is 41 -- the first e-mail on 41, your
14   response to the last e-mail you sent in December -- in
15   Defendant's Exhibit 39 to your deposition?
16   A    I don't know.  This is in August.  This is
17   July.
18   Q    Okay.  But do you see, in the Exhibit 41, the
19   e-mail right below the e-mail that you sent on August 2nd
20   is an e-mail of July 20, 2016, from you to Mr. Jensen?
21   A    I do.
22   Q    And that's the same e-mail that's the start of
23   Exhibit 39, correct?
24   A    That is, yes.
25   Q    Okay.

Page 226

1    A    39 away?
2    Q    Yeah.  Yeah.  I don't need 39 anymore.
3        So -- okay.  So 41 is you responding to the
4    e-mail that you had sent but now on August 2, 2016.  Do
5    you see that?
6    A    Yes.
7    Q    And when Ms. Jimenez made the request to have a
8    single representative, did she threaten to end the
9    business relationship if she wasn't granted a single
10   representative for the Access accounts?
11   A    No.
12   Q    Could Ms. Jimenez end the business relationship
13   between Access Healthcare and McKesson?
14   A    I'm sure she could.
15   Q    That wouldn't have been a decision that would
16   have been made by Karen Hayes?
17   A    Karen Hayes left most everything up to
18   Maria Jimenez to deal with.
19   Q    And Maria Jimenez never attempted to end that
20   relationship.  Is that correct?
21   A    No.
22   Q    And this request to have a single
23   representative, if that had been granted, then
24   Ms. Capriati would have lost her accounts for Access
25   Healthcare, correct?

Page 227

1    A    Yes.
2    Q    And the same impact would have happened to
3  Michelle Hosley, correct?
4    A    Same as what happened with Florida Hospital
5  Physician Group, yes.
6    Q    Well, that's not an answer to my question.
7         My question is, if -- if Access had gone to a
8  single representative, that would have required taking
9  accounts away from Michelle Hosley.  Is that correct?
10   A    That's right.
11   Q    And then at the -- in the second sentence --
12 the second paragraph, you, again, reference the Florida
13 Hospital Physician Group account.  Do you see that?
14   A    Yes, I do.
15   Q    And in this -- the end of this paragraph, the
16 last sentence you say, "I understand that this is a
17 reasonable and more efficient way to do business with
18 them going forward."  Do you see that?
19   A    I do.
20        (Exhibit 42 marked for identification.)
21 BY MS. DYSON:
22   Q    I'll show you what's marked as Exhibit 42 to
23 your deposition.
24        MS. DYSON:  Do you want to take a break?
25        THE WITNESS:  No.

Page 228

1         MS. DYSON:  Okay.
2  BY MS. DYSON:
3    Q    Do you recognize this document?
4    A    Yes.
5    Q    And what is it?
6    A    Communication between Paul, Regina, Maria.
7    Q    Okay.  The document that's Exhibit 42 starts
8  with an e-mail from you to Mr. Jensen --
9    A    Mmm-hmm.
10   Q    -- with a copy to Ms. Conner, Ms. Jimenez and
11 Felicia Bedford.  Do you see that?
12   A    I do.
13   Q    Okay.  And this is on August 4, 2016?
14   A    Yes.
15   Q    And you told me that Regina Conner was
16 Ms. Jimenez's assistant.  Is that correct?
17   A    That's right.
18   Q    Did you understand, at the time that you sent
19 this e-mail to Mr. Jensen, that there was a meeting that
20 was going to be set up with Ms. Hayes and Ms. Jimenez to
21 discuss the account representation?
22   A    Does it reference it in here?
23   Q    No.  I'm just asking you if you were aware of
24 that.
25   A    No.  I don't remember.

Page 229

1         (Exhibit 43 marked for identification.)
2  BY MS. DYSON:
3    Q    Okay.  Show you what's marked as Exhibit 43 to
4  your deposition.  Do you recognize Exhibit 43 to your
5  deposition?
6    A    It's a continuation of 42.
7    Q    Does this refresh your recollection as to your
8  knowledge regarding a call that was going to be set up to
9  discuss the account assignment?
10   A    Yes.
11   Q    Okay.  And in this e-mail, the top e-mail
12 that's on Exhibit 43, on August 4, 2016, Mr. Jensen asks
13 whether it would be possible for Karen Hayes to join the
14 call because the request alters the original agreement
15 from earlier this year.  Do you see that?
16   A    I don't see it, but I remember that.
17   Q    Okay.  Do you see that in this e-mail?
18   A    I see it here.
19   Q    Okay.
20   A    I do.
21   Q    And did you understand that this request did
22 alter the agreement that was previously entered into?
23   A    I understood that it had nothing -- the
24 agreement had nothing in reference to that.
25   Q    Did you understand that the agreement didn't

Page 230

1  provide for a single representative?
2    A    It -- the question was did this alter the
3  original agreement and that was having one rep, and it
4  did not alter the agreement that we had with Karen Hayes
5  and Access Healthcare.
6    Q    Did the agreement require one representative?
7    A    It doesn't -- I never saw the agreement, so I'm
8  not certain.
9    Q    Okay.
10        (Exhibit 44 marked for identification.)
11 BY MS. DYSON:
12   Q    Let me show you what's marked as Exhibit 44.
13 Do you recognize this document?
14   A    No.
15   Q    Do you know who Rachel Strong is?
16   A    I do.
17   Q    And who is she?
18   A    She is the representative for -- it's called
19 AdvantageTrust, now referred to as HealthTrust.  It's a
20 GPO.
21   Q    And what is a GPO?
22   A    Group purchasing organization.
23   Q    And what does -- how does that relate to Access
24 Healthcare?
25   A    They belong to that group through the HCA

Page 231

1  Hospital.
2      Q   So it gives them pricing?
3      A   It gives them better pricing, yes.
4      Q   Okay.  And in this document that's Exhibit 44,
5  do you see that Mr. Jensen is asking Ms. Strong whether
6  there has been any discussion about Bill To consolidation
7  or a single rep assignment?
8      A   Say your question again, please.
9      Q   Sure.  In this e-mail in the document
10 Number 44 -- Exhibit Number 44 -- is Mr. Jensen asking
11 Ms. Strong whether she's heard about any request by the
12 customer, being Access Healthcare, for a single
13 representative assignment?
14     A   It says, "a single Bill To consolidation."
15     Q   Okay.  Do you see, on August 4th, where
16 Mr. Jensen writes, "Was there any discussion regarding
17 Bill To consolidation or single rep assignment?"
18     A   Which one is that?
19     Q   Sure.  It's the third e-mail down from the top.
20     A   Okay.
21     Q   You don't dispute then, do you, that Mr. Jensen
22 asked Ms. Strong whether the customer, being Access
23 Healthcare, had ever asked for a single rep assignment,
24 correct?
25     A   He asked that, yes.

Page 232

1      Q   And Ms. Strong said that she never heard a word
2  from anyone about that.  Is that correct?
3      A   Yes.
4      Q   And you were aware, though, that there was a
5  call set up with Ms. Hayes, Ms. Jimenez and Ms. Conner to
6  talk about the Access Healthcare account?
7      A   Yes.
8      Q   Do you recall that conversation occurring on
9  August 5, 2016?
10     A   Do I?
11     Q   Mmm-hmm.
12     A   Say that again.
13     Q   Do you recall that conversation occurring on
14 August 5, 2016?
15     A   What conversation?
16     Q   The conversation with Ms. Hayes, Ms. Conner and
17 Ms. Jimenez and Mr. Jensen?
18     A   I wasn't there.
19     Q   Okay.  So you don't know what occurred during
20 that conversation?
21     A   No.
22     Q   Do you know -- do you know, then, whether
23 Ms. Hayes agreed that there would be no single rep
24 assignment for Access Healthcare?
25     A   I wasn't there.

Page 233

1      Q   Okay.  Do you know from any other way that --
2  whether there was an agreement about how this account
3  would be staffed going forward?
4      A   I know that Maria Jimenez requested it and she
5  asked Karen Hayes if she would support her and Karen
6  Hayes said she would support her --
7      Q   And do you know if --
8      A   -- in having a single rep --
9      Q   Okay.
10     A   -- sorry.
11     Q   No.  No, that's no problem.
12         So do you know if, on that call on August 5,
13 2016, Karen Hayes did, in fact, support Ms. Jimenez?
14     A   I understand that, yes.
15     Q   And how do you understand that?
16     A   Through Maria Jimenez, and I saw the e-mail
17 that she forwarded to me.
18     Q   Okay.  But you don't know whether Ms. Hayes, in
19 fact, did make that request for a single representative
20 during that call, correct?
21     A   Maria Jimenez asked Karen Hayes and Karen Hayes
22 left it up to Maria to make that decision because she was
23 the one that would be work -- she was the one actually
24 doing the work and communicating with the supplier.
25     Q   Okay.  But on that call with Mr. Jensen, you

Page 234

1  don't know what Ms. Hayes said during that call, correct?
2      A   I don't.
3      Q   Okay.  And were there any other
4  representatives, any sales representatives that
5  participated in that call?
6      A   No.
7      Q   Do you recall Mr. Jensen trying to reach out to
8  you prior to that call with the Access Healthcare folks?
9      A   I don't know.
10         (Exhibit 45 marked for identification.)
11 BY MS. DYSON:
12     Q   I'll show you what's marked as Exhibit 45 to
13 your deposition.  Do you recognize this document?
14     A   I recognize -- yes.  Pretty much, yeah.
15     Q   Is there any part of this document you don't
16 recognize?
17     A   I recognize it.
18     Q   Okay.  And so Document 45 -- Exhibit 45 starts
19 with an e-mail from Mr. Jensen to you on August 5, 2016.
20 Do you see that?
21     A   I do.
22     Q   And Mr. Jensen indicates that he left you a
23 message last evening, being August 4, 2016, and one a few
24 minutes ago asking you to call to discuss Access.  Do you
25 see that?

Page 235

1    A    I see that.
2    Q    And did you return his call?
3    A    I would assume so.
4    Q    Do you know if you returned his call?
5    A    I always returned his phone calls, but.
6    Q    Did you return his phone call before he --
7  before he had that call with the Access Healthcare
8  people?
9    A    I don't know.
10   Q    And he is sending this e-mail in response to an
11 e-mail that you sent him on August 5, 2016, at 1:35 p.m.?
12   A    Correct.
13   Q    So you didn't call him; you e-mailed him?
14   A    It looks like I e-mailed him and then he said
15 he wanted to have a call.
16   Q    Right.  And you, in the e-mail from August 5,
17 2016, at 1:35 p.m., you said to him that you were not
18 invited to the meeting and the customer didn't understand
19 why?
20   A    That's right.
21   Q    Why was the customer asking for you to be
22 invited to the meeting?
23   A    Because I was the lead sales rep on that
24 account.
25   Q    Okay.

Page 236

1    A    That's highly unusual.
2    Q    And did you understand that that call was just
3  going to be the leaders of the business?
4    A    It was highly unusual.
5    Q    Do you understand that that call was just going
6  to be the leaders of the business?
7    A    Yes.
8         (Exhibit 46 marked for identification.)
9  BY MS. DYSON:
10   Q    Let me show you what's marked as Exhibit 46 to
11 your deposition.
12   A    Mmm-hmm.
13   Q    Did you recognize this document?
14   A    No.
15   Q    Do you dispute that this is a calendar
16 invitation for the Access Healthcare call?
17   A    Looks like it.
18   Q    And Ms. Jimenez was not copied -- no.  She was
19 copied on this particular e-mail, wasn't she?
20   A    Yes.
21   Q    And in that call invitation, Mr. Jensen
22 specifically said that the call is intended only for the
23 leaders of both businesses.  Do you see that?
24   A    Yes.
25   Q    And the purpose of the call was to understand

Page 237

1  the service model to best meet needs for Access
2  Healthcare.  Do you see that?
3    A    Yes.
4    Q    So Ms. Jimenez was told why you wouldn't be on
5  that call, correct?
6    A    That's what it says.
7    Q    And in this e-mail that's in Defendants'
8  Exhibit 45 to your deposition that's dated August 5,
9  2016 -- excuse me -- you say, in the second paragraph,
10 "After arranging the meeting, I was excluded from all
11 future meetings."  Do you see that?
12   A    Yes.
13   Q    What is that a reference to?
14   A    Well, I put Paul Jensen and Karen Hayes
15 together.
16   Q    Okay.  And what meeting were you excluded from?
17   A    The meeting -- this one, Exhibit 46.
18   Q    Okay.  That was just going to be the leaders of
19 the business?
20   A    Right.
21   Q    Okay.  Any other meetings that you were
22 excluded from?
23   A    I think I was excluded from lots of calls
24 and -- I don't know if I was excluded from other
25 meetings.

Page 238

1    Q    Which calls do you believe you were excluded
2  from?
3    A    I don't know.
4    Q    Who were the calls with?
5    A    I don't know.
6    Q    What were they about?
7    A    Don't know.
8    Q    Okay.  In this e-mail that's dated
9  August 5th -- sorry -- 2016, in the third paragraph,
10 there is a reference to Fana Medical.  Do you see that?
11   A    Mmm-hmm.  Yes.
12   Q    And in this third paragraph, you're complaining
13 about Michelle Hosley in this e-mail, correct?
14   A    Yes.
15        (Exhibit 47 marked for identification.)
16 BY MS. DYSON:
17   Q    Okay.  Let me show you what's marked as
18 Exhibit 47 to your deposition.  Do you recognize this
19 document?
20   A    It looks familiar.
21   Q    And this is a text message exchange that you
22 had with Mr. Jensen?
23   A    Yes, looks like it.
24   Q    In the first text message on that page, is that
25 from Mr. Jensen?

Page 239

1     A    It looks like it.
2     Q    And the second text message on that page, is
3  that from you?
4     A    It looks like it.
5     Q    And Mr. Jensen is saying to you that he was
6  hoping you would have returned his call before the Access
7  call?
8     A    Okay.
9     Q    And that no McKesson reps were included in the
10  invite for the call.  Do you see that?
11     A    I do.
12     Q    And do you dispute that to be accurate?
13     A    No.
14     Q    And you responded that you're not in a good
15  frame of mind right now?
16     A    Mmm-hmm.
17     Q    Why is that?
18     A    To my knowledge, no lead sales rep has ever
19  been excluded from a meeting like this.  I set up the
20  meeting.  I'm the one that has the relationship with
21  Access Healthcare.  Yes, I was very upset.
22     Q    Okay.  And you said "to your knowledge," so are
23  you aware of every meeting that's been set up on a shared
24  account?
25     A    I don't know.

Page 240

1     Q    Okay.  So you don't know whether it's possible
2  that there are other meetings like this where the reps
3  have been excluded?
4     A    I don't.
5     Q    In this text message, you say, "In the 32 years
6  I've been a sales rep, I've never experienced this type
7  of exclusion"?
8     A    That's right.
9     Q    And that was being excluded from the meeting on
10  August 5, 2016?
11     A    I believe that's the meeting, yes.
12     Q    And do you know what the reason was for
13  excluding sales representatives from that meeting?
14     A    I do not.
15         (Exhibit 48 marked for identification.)
16  BY MS. DYSON:
17     Q    Let me show you what's marked as Exhibit 48 to
18  your deposition.  Do you recognize this document?
19     A    Okay.  Yeah.
20     Q    What is this document?
21     A    Okay.  I recognize -- let's see.  This was in
22  reference to Maria questioning whether or not asking for
23  a single representative would alter the agreement they
24  had signed.
25     Q    Okay.  So it starts -- the e-mail chain starts

Page 241

1  with an e-mail from Mr. Jensen to you communicating that
2  he wished that he would have been able to speak to you
3  before the call with Access.  Is that correct?
4     A    Yes.
5     Q    And that he looks forward to speaking to you
6  about it on Monday?
7     A    Okay.  Yeah.
8     Q    And then you respond to him that Maria was
9  upset, saying she came late to the meeting.  Is that
10  correct?
11     A    Where are you?
12     Q    Sure.  The e-mail from you to Mr. Jensen on
13  August 5, 2016.  I see that, yes.
14     Q    Okay.  So Ms. Jimenez came late to that
15  meeting, based on what she told you?
16     A    That's what it looks like, yes.
17     Q    Okay.  And she says that she wanted a copy of
18  the signed contract between Access Healthcare and
19  McKesson.  Do you see that?
20     A    I do.
21     Q    You say, "I would assume this is something that
22  Dr. Singh asked for"?
23     A    Yes.
24     Q    Do you see that?
25

Page 242

1     A    Mmm-hmm.
2     Q    Do you know whether it's something Dr. Singh
3  asked for?
4     A    According to Maria.
5     Q    She said Dr. Singh asked for that?
6     A    I'm assuming by -- I don't know.
7     Q    Okay.
8     A    Okay.
9     Q    Then do you know if Karen Hayes had a copy of
10  the agreement?
11     A    I'm assuming, again, she does.
12     Q    But Ms. Jimenez didn't go to Ms. Hayes for a
13  copy of the agreement to your knowledge.  Is that
14  correct?
15     A    I don't know if Karen Hayes has a copy of the
16  agreement.  Maybe they signed the agreement and took the
17  original and didn't give a copy.  I don't know.
18     Q    Okay.
19         (Exhibit 49 marked for identification.)
20  BY MS. DYSON:
21     Q    Show you what's marked as Exhibit 49 to your
22  deposition.  Do you recognize this document?
23     A    Yes.
24     Q    And in this e-mail from Ms. Conner to you, copy
25  with -- with a copy to Maria Jimenez, on August 8, 2016,

Page 243

1  is there any request in this e-mail for a single
2  representative?
3      A    Second paragraph?
4      Q    Sure.  What does it say in the second
5  paragraph, that she wants a single representative?
6      A    Let me read it.
7      Q    Oh, sure.  Go ahead.
8      A    Thanks.
9           Not in this e-mail.
10     Q    And are you aware of any instance after Oct- --
11  August -- let me restate that.
12          Are you aware of any instance after August 5,
13  2016, of Ms. Conner requesting a single sales
14  representative?
15     A    It was all -- as far as I know, it always came
16  from Maria.
17     Q    Okay.  So are you aware of any instance of
18  Ms. Conner, after August 5, 2016, asking for a single
19  sales representative?
20     A    I don't recall that.
21     Q    Are you aware of any instance after August 5,
22  2016, where Karen Hayes asked for a single sales
23  representative?
24     A    I didn't speak to Karen Hayes.
25     Q    Okay.  So are you aware of any instance after

Page 244

1  August 5, 2016, where Karen Hayes asked for a single
2  sales representative?
3      A    Karen Hayes asked that Maria Jimenez's request
4  be respected.
5      Q    When was that?
6      A    That was all around the same time.
7      Q    And what I'm asking you is are you aware of any
8  instance after August 5, 2016, where Ms. Hayes asked for
9  a single sales representative at Access Healthcare?
10     A    Not directly from Karen Hayes.
11          (Exhibit 50 marked for identification.)
12  BY MS. DYSON:
13     Q    Let me show you what's marked as Exhibit 50 to
14  your deposition.  Do you recognize this document?
15     A    Yes.
16     Q    And what is it?
17     A    It's an e-mail, I believe, that Maria -- well,
18  it's an e-mail from Maria to Karen Hayes, and obviously,
19  it was forwarded to me then.
20     Q    From Ms. Jimenez?
21     A    I believe so.
22     Q    Do you know if Ms. Hayes responded to this
23  e-mail in any way?
24     A    I don't know, probably to Maria.
25     Q    But you don't know, correct?

Page 245

1      A    No.
2      Q    And you didn't forward this e-mail to
3  Mr. Jensen, correct?
4      A    I don't know.
5      Q    Well, the e-mail above it is a forward from you
6  to you.  Do you see that?
7      A    Yeah.
8      Q    And the e-mail above that is another forward
9  from you to you.
10     A    Okay.
11     Q    Is that right?
12     A    Yeah.
13     Q    Okay.  And in this e-mail from Ms. Jimenez, she
14  is referencing Michelle Hosley and Laura Capriati.  Do
15  you see that?
16     A    I do.
17     Q    And there's no reference to Craig Williams at
18  all in this e-mail, is there?
19     A    Not in this particular instance, no.
20     Q    And she -- in this -- in the second page of
21  this e-mail says, "Will you agree to this, please, so I
22  can inform Mr. Jensen?"  Do you see that?
23     A    I do.
24     Q    Do you know if Ms. Hayes agreed to that?
25     A    I understand she did.

Page 246

1      Q    And how is it that you understand that?
2      A    From Maria.
3      Q    Are you aware of any e-mail from Maria Jimenez
4  to Mr. Jensen informing him that Karen Hayes had
5  requested a single representative?
6      A    I don't know.
7      Q    Did Ms. Jimenez know how you were compensated
8  for the Access Healthcare account?
9      A    No.
10     Q    You didn't share that with her?
11     A    No.
12     Q    Now, the Bill To consolidation for Access
13  Healthcare did occur, correct?
14     A    Eventually, yeah.
15     Q    And what impact did that have on you, if any?
16     A    It didn't, other than the pricing was more
17  consecutive.
18     Q    So the -- what was the -- what was the reason
19  for the Bill To consolidation then?
20     A    For their accounting department, it was easier.
21     Q    And so you had several Bill Tos for this one
22  account.  Is that what was going on?
23     A    We had Bill Tos on platforms of McKesson and of
24  PSS.
25     Q    Okay.  And so the purpose of the Bill To

Page 247

1  consolidation was to put them all under one Bill To?
2      A   Mmm-hmm.
3      Q   Okay.
4      A   So they would only get one bill.
5      Q   And you were the owner of all those different
6  Bill Tos, correct?
7      A   Not all, no.
8      Q   Were you the owner of the one Bill To after the
9  consolidation?
10     A   Yes.
11         (Exhibit 51 marked for identification.)
12  BY MS. DYSON:
13     Q   Let me show you what's marked as Exhibit 51 to
14  your deposition.  Do you recognize this document?
15     A   I don't believe so.
16     Q   Do you dispute that Ms. Jimenez sent this
17  document to Ms. Serrano and with a copy to Mr. Jensen,
18  Ms. Conner and Ms. Hayes?
19     A   I don't dispute that.
20     Q   And there's no mention in this e-mail from
21  Ms. Jimenez about requesting a single representative,
22  correct?
23     A   Let me read it.
24         That's correct.
25     Q   Okay.  And then this e-mail that's Exhibit 51

Page 248

1  to your deposition was sent after Exhibit 50 to your
2  deposition, correct?
3      A   Yes.
4      Q   Okay.  So after Ms. Jimenez sent that e-mail to
5  Ms. Hayes, which is 50, on August 11th, she sent this
6  e-mail to Mr. Jensen on August 23rd and didn't mention
7  any request for a single sales representative, correct?
8      A   Correct.
9          (Exhibit 52 marked for identification.)
10  BY MS. DYSON:
11     Q   Show you what's marked as Exhibit 52 to your
12  deposition.  Do you recognize this document?
13     A   Yes.
14     Q   And in this document that's Exhibit 52 to your
15  deposition, it reflects that Craig Williams was
16  performing some personal training and other work on the
17  Ship To locations that he was assigned on the East Coast.
18  Is that correct?
19     A   It says they were asking him to.  I don't know
20  if he did.
21     Q   Do you know that he didn't?
22     A   No.
23         (Exhibit 53 marked for identification.)
24  BY MS. DYSON:
25     Q   Show you what's marked as Exhibit 53 to your

Page 249

1  deposition.  Do you recognize this document?
2      A   Yes.
3      Q   And what is this document?
4      A   It's an e-mail in reference to their COO at the
5  time, Carlos A-r-i-a-s.
6      Q   Okay.  And he was upset about the flu vaccines?
7      A   That's what it looks like, yeah.
8      Q   And you indicate that he's just making all kind
9  of threats that he would find other GPO, a distributor,
10  et cetera, et cetera, correct?
11     A   That's right.
12     Q   And he was making those threats because of the
13  flu vaccine, not related to a lack of single
14  representative, correct?
15     A   That's right.
16         (Exhibit 54 marked for identification.)
17  BY MS. DYSON:
18     Q   Show you what's marked as Exhibit 54.  Do you
19  recognize this document?
20     A   Yes.
21     Q   And what is this document?
22     A   It is in reference to orders going through
23  without approval from the Purchasing department.  Our
24  orders go pending the super user, which is the Purchasing
25  department.  So each site can place their own orders, but

Page 250

1  they can't actually place their -- send them through.
2      Q   Okay.  And so that was an issue that was going
3  on internally within Access Healthcare that Maria and
4  Regina wanted to control the orders leaving Access
5  Healthcare.  Is that -- do I have that right?
6      A   That's right.
7      Q   Okay.
8      A   Actually, being consummated.
9      Q   Okay.  And Mr. Jensen responds that he's not
10  pulling back or delaying the request; he just wants to
11  make sure it's the right choice.  Is that correct?
12     A   Yes.
13     Q   And then he asks you to set up a business
14  review with Maria or asks you if he should reach out to
15  Karen Hayes directly to actually set up that business
16  review.  Is that correct?
17     A   Which e-mail?
18     Q   Sure.  The first e-mail.
19     A   First.  That's from me, right -- no.
20     Q   It's from --
21     A   Gotcha.
22     Q   -- Mr. Jensen to you.  Do you see that?
23     A   I do.
24     Q   Okay.
25     A   They reverse the order.

Page 251

```
 1       Yes.
 2       Q    And did you set up that business review for
 3  Access Healthcare?
 4       A    I don't remember.
 5            (Exhibit 55 marked for identification.)
 6  BY MS. DYSON:
 7       Q    Let me show you what's marked as Exhibit 55 to
 8  your deposition.  Do you recognize this document?
 9       A    Yes.
10       Q    And is this an e-mail -- one of these e-mails
11  are from Craig Williams, correct?
12       A    Yes.
13       Q    To one of the East Coast customers for Access
14  Healthcare?
15       A    Let me see how it goes.
16            Okay.  It's from the Accounting department of
17  Access to Craig Williams.  It looks like orders were
18  being placed under the wrong accounts, under the IPA when
19  they should have been under the owned accounts and vice
20  versa.
21       Q    And Mr. Williams responds to Michelle Corso
22  that orders don't go through him anymore?
23       A    Right, because I handled everything.
24       Q    And that was because of the customer's request?
25       A    Yes.
```

Page 252

```
 1       Q    Which was granted?
 2       A    Oh, yeah.  They dealt with me, totally.
 3            (Exhibit 56 marked for identification.)
 4  BY MS. DYSON:
 5       Q    Show you what's marked Exhibit 56.
 6            Before we get into 56, who is Michelle Corso?
 7       A    She was in the Accounting department for Access
 8  Healthcare, Accounts Payable department.
 9       Q    Okay.
10            MS. PISCITELLI:  If there's no question
11       pending, can we take a break?
12            MS. DYSON:  Sure.
13            (Break taken from 1:41 p.m. to 2:26 p.m., and
14  proceedings continued without Mr. Hearing.)
15  BY MS. DYSON:
16       Q    Okay.  So going to Exhibit 55, do you have that
17  in front of you?
18       A    55.
19       Q    I think it's right over there.
20       A    Okay.
21       Q    So the first e-mail in this exhibit is an
22  e-mail from you to Craig Williams, correct?
23       A    Mmm-hmm.
24       Q    Is that "yes"?
25       A    Yes.
```

Page 253

```
 1       Q    And you asked him to do a credit and a rebill
 2  and send you and Michelle a copy of the credit.  Do you
 3  see that?
 4       A    Yes.
 5       Q    And did he, in fact, do that work?
 6       A    I don't think he did.
 7       Q    Do you know one way or the other?
 8       A    I don't know for sure, but there have been so
 9  many instances where he turns it around and gives it back
10  to me.
11       Q    Was this one of them?
12       A    Possibly.
13       Q    But you don't know for sure sitting here,
14  correct?
15       A    Right.
16       Q    Go to Exhibit 56.  Do you recognize this
17  document?
18       A    Some of the correspondences, yeah.
19       Q    And do you --
20       A    The ones that I was included in on.
21       Q    Okay.  And the beginning e-mail in this
22  document -- the one that's on the first page -- is from
23  Ms. Conner to Mr. Jensen.  Do you see that?
24       A    Yes.
25       Q    And so the first couple of e-mails on -- the
```

Page 254

```
 1  first three e-mails are communications between Mr. Jensen
 2  and -- Mr. Jensen and Ms. Conner, correct?
 3       A    Yes.
 4       Q    You don't have anything to dispute the contents
 5  of these communications, do you?
 6       A    I don't know.
 7       Q    Okay.  And in this communication that's the
 8  second e-mail that Mr. Jensen says to Ms. O'Conner -- he
 9  thanks her for the words of support that Ms. Conner
10  provided for you recording Access Medical, correct?
11       A    Yes.
12       Q    And in this e-mail communication, Ms. Conner
13  does not ask for a single representative on the Access
14  account, correct?
15       A    Correct.
16       Q    Show you what's marked as Exhibit 57 -- or 58?
17            MS. DYSON:  Did I skip 57?
18            Here's 57.
19            (Exhibit 57 marked for identification.)
20  BY MS. DYSON:
21       Q    Do you recognize Exhibit 57 to your deposition?
22       A    I do not.
23            Oh, wait a second.  I mean, I'm reading it.  I
24  don't remember it.
25       Q    Okay.  In this e-mail, is Mr. Jensen following
```

Page 255

1   up with you on a request that he made to set up a
2   business review?
3        A    Yes.
4        Q    And to include Karen Hayes in that business
5   review, correct?
6        A    Yes.
7        Q    And did you set up that business review?
8        A    I don't know.
9        Q    And Mr. Jensen, in this e-mail, is expressing
10  that you haven't -- you don't have any funnel activity
11  for Florida Medical Clinic.  Do you see that?
12       A    Yes.
13       Q    And what's a funnel?
14       A    It's a report that we're required to fill out
15  monthly showing what we've got in the funnel and going
16  forward with business.
17       Q    And you didn't have anything for Florida
18  Medical Clinic?
19       A    I don't know.
20            (Exhibit 58 marked for identification.)
21  BY MS. DYSON:
22       Q    Okay.  Let me show you what's marked as
23  Exhibit 58 to your deposition.
24       A    Okay.
25       Q    Do you recognize this document?

Page 256

1        A    I do.
2        Q    And is this document confirmation that
3   Mr. Jensen is assigning certain accounts to you under the
4   Access account Bill To?
5        A    I don't understand your question.
6        Q    Sure.  Is this document that's Exhibit 58 to
7   your deposition -- does it reflect Mr. Jensen assigning
8   accounts to be placed under your territory for Access
9   Healthcare?
10       A    Yes.
11       Q    So that you would receive credit for the sales
12  on those accounts, correct?
13       A    Yes.
14            (Exhibit 59 marked for identification.)
15  BY MS. DYSON:
16       Q    Show you what's marked as Exhibit 59 to your
17  deposition.  Do you recognize this document?
18       A    Yes.
19       Q    And is this Mr. Jensen following up with you
20  again about the business review for Access Healthcare?
21       A    It looks like it.
22            (Exhibit 60 marked for identification.)
23  BY MS. DYSON:
24       Q    Let me show you what's marked Exhibit 60 to
25  your deposition.

Page 257

1        A    Okay.
2        Q    Do you recognize this document?
3        A    Yes.
4        Q    And in this e-mail communication, you and
5   Mr. Jensen are discussing a piece of refurbished
6   equipment that was provided to Access Healthcare,
7   correct?
8        A    It didn't say it was refurbished on the
9   description, but it ended up being a refurbished piece of
10  equipment.
11       Q    Okay.  And Mr. Jensen is specifically saying
12  it's not your fault or McKesson's fault, correct?
13       A    Correct.
14       Q    Okay.  And he's coaching you on how to deepen
15  your relationship with the customer, correct?
16       A    Which particular e-mail are you referring to?
17       Q    Sure.  The second e-mail down.
18       A    Yes.
19            (Exhibit 61 marked for identification.)
20  BY MS. DYSON:
21       Q    I'll show you what's marked as Exhibit 61 to
22  your deposition.  Do you recognize this document?
23       A    Yes.
24       Q    In this document, Mr. Jensen is affirming the
25  information you provided to the customer as being

Page 258

1   correct?
2        A    Yes.
3        Q    Is that right?
4        A    Yes.
5        Q    And recommending to call you before they place
6   any orders in the future, correct?
7        A    Correct.
8        Q    And that's Access Healthcare, correct?
9        A    Yes.
10            (Exhibit 62 marked for identification.)
11  BY MS. DYSON:
12       Q    Let me show you Exhibit 62 to your deposition.
13  Do you recognize this document?
14       A    Yes.
15       Q    And in this document, does Ms. Conner of Access
16  Healthcare indicate that Access has acquired three
17  medical offices?
18       A    Yes.
19       Q    And did you obtain the sales as it relates to
20  those offices?
21       A    I don't know without seeing which offices those
22  are.  It doesn't reference specific offices.
23       Q    And you don't recall that in March of last
24  year?
25       A    I recall, but I don't know exactly which

Page 259

1  accounts they are.
2      Q.  Okay.  So do you recall, in March of last year,
3  receiving three new Ship To locations in the Access
4  Healthcare account?
5      A.  Only by reading this.
6      Q.  Okay.  Well, if they weren't -- if the Ship To
7  locations weren't assigned to you, who would they have
8  been assigned to?
9      A.  Well, if they were another rep's accounts, then
10 I will still set them up but they would be set up under
11 those reps.
12     Q.  Okay.  And you don't have a recollection,
13 sitting here, to as to who they are?
14     A.  Not totally, no.
15     Q.  What does it mean, "not totally"?
16     A.  I don't.
17         (Exhibit 63 marked for identification.)
18 BY MS. DYSON:
19     Q.  Okay.  Let me show you what's marked
20 Exhibit 63 -- oh, knocking everything over.
21         Show you what's marked as Exhibit 63 to your
22 deposition.  Do you recognize this document?
23     A.  Yes.
24     Q.  And do you recall, in April 2018, there being
25 an instance where you were on vacation?

Page 260

1      A.  It could be.
2      Q.  And Ms. Capriati serviced the Access Healthcare
3  account while you were on vacation?
4      A.  I didn't know.  I don't recognize this at all.
5      Q.  Okay.  You don't dispute that this e-mail is a
6  true and correct copy of e-mail communication?
7      A.  I don't know.  I mean, I don't know.  I've
8  never seen it before.
9      Q.  Okay.  What I'm asking you is do you have any
10 information to dispute that it's a true and accurate
11 copy --
12     A.  Not that I --
13     Q.  You have to let me finish asking the question.
14         Is this a -- do you have anything to dispute
15 that this is a true and accurate copy of an e-mail
16 communication between Ms. Conner and Ms. Capriati?
17     A.  Not that I know.
18     Q.  And in this e-mail communication, Ms. Conner
19 thanked Ms. Capriati for her help, correct?
20     A.  Yes.
21     Q.  And she wasn't asking for a single
22 representative in that e-mail, correct?
23     A.  No.
24         (Exhibit 64 marked for identification.)
25 BY MS. DYSON:

Page 261

1      Q.  Let me show you what's been marked as
2  Exhibit 64 to your deposition.  Do you recognize this
3  document?
4      A.  Yes.
5      Q.  And what is it?
6      A.  It's a text to me from Paul Jensen wanting to
7  make sure that Craig Williams was getting credit for the
8  flu vaccine sales.
9      Q.  For 98 units to those five locations that he
10 has?
11     A.  Yes.
12     Q.  And how many units of flu vaccine did you sell
13 to Access that same year?
14     A.  I have not a clue.
15     Q.  You can't guess?
16     A.  What year was this?
17     Q.  Well, you produced this e-mail to us, so I'm
18 not sure what year you're referring to.
19     A.  I don't know if I don't see the year.
20     Q.  Okay.  So if you turn to the second page, it
21 has an item description that has 2018 in it?
22     A.  Okay.
23     Q.  So I'm assuming that's referencing a 2018
24 vaccine, correct?
25     A.  Mmm-hmm.

Page 262

1      Q.  So in 2018, how many units of flu vaccine did
2  you sell to Access Healthcare?
3      A.  Totally?
4      Q.  Yes, that you got credit for.
5      A.  I mean, we don't get paid on flu vaccine.
6      Q.  Okay.
7      A.  It's --
8      Q.  How many units of --
9      A.  I would assume maybe 1500.
10     Q.  Okay.  So you -- you sold about 1500 units of
11 flu vaccine to the Ship To locations that you have for
12 Access Healthcare.  Is that correct?
13     A.  As a whole?
14     Q.  Yes.
15     A.  Yes.
16     Q.  Okay.  And in here, it's just referencing
17 98 units to Mr. William, correct?
18     A.  Right.
19     Q.  And you said you don't get paid on those units?
20     A.  We do not get commission on those sales.
21     Q.  Okay.  So going back to your claim of
22 discrimination, is another one of the account assignments
23 that you claim was discrimination the Florida Hospital
24 Physician Group account?
25     A.  Mmm-hmm.

Page 263

1     Q    And why is it that you believe that account
2  assignment was discriminatory?
3     A    Because, again, the customer asked to have a
4  single rep.
5     Q    And when did that -- when did that action
6  occur?
7     A    Well, there are e-mails referring to that, and
8  I'm not exactly sure on the dates.
9     Q    Okay.  Is that the --
10    A    Cheryl Schmidt sent an e-mail that tells the
11  date.
12    Q    You're looking at the documents that are in
13  front of me?
14    A    Well, I'm just saying that there is an e-mail
15  that shows the date --
16    Q    Is that the --
17    A    -- that she requested.
18    Q    Okay.  And that's what you're asking -- that's
19  what you're complaining about?
20    A    That's right.
21    Q    Okay.
22         (Exhibit 65 marked for identification.)
23  BY MS. DYSON:
24    Q    So since you're looking at the e-mail, we'll
25  just put it in front of you.  Let me show you

Page 264

1  Exhibit 65 --
2     A    Okay.
3     Q    -- to your deposition.  And do you recognize
4  this document?
5     A    Okay.
6     Q    Do you recognize this document?
7     A    I do.
8     Q    Is this an e-mail -- well, there's two e-mail
9  communications here.  The first e-mail communication is
10  from you to Mr. Helwig on February 24, 2014.  Do you see
11  that?
12    A    I do.
13    Q    But there's no content to that communication.
14  Is that correct?
15    A    That's right.
16    Q    Okay.  And then there is an e-mail
17  communication from Ms. Schmidt to Mr. Jensen with a copy
18  to you on February 24, 2014?
19    A    Right.
20    Q    And in this communication, Ms. Schmidt
21  indicates that her preference is to have one
22  representative for all the practices that are part of her
23  medical group.  Is that correct?
24    A    That's correct.
25    Q    And this is the decision that you contend was

Page 265

1  an account assignment?
2     A    Well, there was another e-mail that I was
3  referring to, but this is part of the -- yes, around the
4  same time.
5     Q    What's the e-mail that you are referring to?
6     A    There was an e-mail where she said that she
7  only -- would prefer to have only one rep.
8     Q    That's in this e-mail, isn't it?
9     A    Is it?  Let's see.
10         Yes.  Okay.
11    Q    And is this the decision that you're referring
12  to as discriminatory?
13    A    Yes.
14    Q    Is there any other decision that you contend
15  was discriminatory as it relates to the Florida
16  Physicians Healthcare Group --
17    A    Well.
18    Q    -- or Florida Hospital Physician Group?
19    A    Even before -- before this, I worked with Kim
20  Teel and she exclusively worked with me and we had a lot
21  of setups during that period of time.  And I did -- I was
22  the sole contact for her.  I did all the work.
23    Q    Okay.  And is there any other decision that you
24  believe was discriminatory as it relates to the Florida
25  Hospital Physician Group?

Page 266

1     A    In reference to having one rep?
2     Q    However you contend that, in this case, that
3  you have been discriminated against as it relates to that
4  account.
5     A    At the moment, yes.
6     Q    Now, with respect to Ms. Schmidt's e-mail on
7  February 24, 2014, do you recall that there was a meeting
8  with Mr. Jensen and Mr. Xiques and Ms. Schmidt regarding
9  the account representation?
10    A    That's what I was referring to, yeah.
11    Q    You do recall that?
12    A    Mmm-hmm.
13    Q    Okay.
14         (Exhibit 66 marked for identification.)
15  BY MS. DYSON:
16    Q    Let me show you what's marked as Exhibit 66 to
17  your deposition.
18    A    I don't know if that's the one you have, but --
19  is that this -- okay.
20         Okay.
21    Q    Do you recognize this document?
22    A    Yes.
23    Q    And so the e-mail from Ms. Schmidt on March 7,
24  2014, to Mr. Jensen and Mr. Xiques reflects the agreement
25  that Ms. Schmidt reached with them, correct?

Page 267

1    A    I don't know.
2    Q    Okay.  Well, do you see, in the second sentence
3  of the e-mail that's at the bottom of the first page,
4  Ms. Schmidt says, "To summarize what we discussed, we
5  agreed that there would only be two service reps for
6  Florida Hospital, Hilda and Clint, and that the
7  territories would be split geographically.  The
8  geographic split will be Hilda covering Hillsborough and
9  Pasco counties and Clint covering Pinellas County."  Do
10  you see that?
11    A    I do.
12    Q    And so that's the agreement that Mr. Jensen and
13  Mr. Xiques reached with Ms. Schmidt.
14        MS. PISCITELLI:  Object to the form.
15    A    I need to read this a little better because I'm
16  not even included on these.
17  BY MS. DYSON:
18    Q    Sure.  Take your time.
19    A    Thank you.
20        Okay.
21    Q    Okay.  So this e-mail from Ms. Schmidt
22  establishes what the agreement was between Ms. Schmidt,
23  the customer, and Mr. Jensen and Mr. Xiques as it relates
24  to account representation for the Florida Hospital
25  Physician Group, correct?

Page 268

1    A    That's what it says.  I don't --
2    Q    And the geographic split that's referenced
3  here, that is, in fact, how the account was split up,
4  correct?
5    A    I don't know.
6        (Exhibit 67 marked for identification.)
7  BY MS. DYSON:
8    Q    Let me show you what's marked as Exhibit 67 to
9  your deposition.  Do you recognize this document?
10    A    Yes.
11    Q    And this is an e-mail from Mr. Jensen to you on
12  March 7, 2014, explaining how the account would be
13  assigned going forward.  Is that correct?
14    A    That's correct.
15    Q    And Mr. Jensen informed you that, going
16  forward, all new practices under the Florida Hospital
17  Physician Group umbrella would be assigned to one of two
18  reps, either you or Mr. Brady, correct?
19    A    Correct.
20    Q    And that you would have any account sites in
21  Hillsborough and Pasco County and Mr. Brady would have
22  those in Pinellas County, correct?
23    A    That's what it says.
24    Q    Okay.  And the exception would be, if the
25  physician has a relationship, then that business would

Page 269

1  remain with either you or Clint, if you had a
2  relationship with that physician, correct?
3    A    That's what it says.
4    Q    Okay.  And that -- but that no business,
5  current business was being transitioned away from any
6  representatives, correct?
7    A    That's correct.
8    Q    With the one exception being Dr. Kristen
9  Marsonek, which was going to be reassigned from Mr. Brady
10  to you, correct?
11    A    Correct.
12    Q    And then earlier, a few minutes ago, you
13  mentioned Kim Teel.  Was she the account representative
14  or the customer representative after Ms. Schmidt?
15    A    No.  She -- they never assigned her as being,
16  like, under or that Cheryl Schmidt was her boss, but
17  she's the one that I worked with directly.
18        (Exhibit 68 marked for identification.)
19  BY MS. DYSON:
20    Q    Okay.  Let me show you what's marked as
21  Exhibit 68 to your deposition.
22        And I think what you said previously is the
23  that the communication with Ms. Teel was before the
24  communication with Ms. Schmidt?
25    A    I don't know.

Page 270

1    Q    Okay.  Perhaps this e-mail will refresh your
2  recollection as to the timing of that.
3    A    Sure.  Okay.
4        Okay.
5    Q    Do you recognize this e-mail?
6    A    I do not.
7    Q    Do you dispute that this e-mail was sent by
8  Mr. Jensen to Ms. Teel?
9    A    I have no way of knowing, but I guess so.
10  That's what it says.
11    Q    So you don't dispute it, correct?
12    A    I'm not going to dispute it, no.
13    Q    Now, this e-mail was sent on November 2014.  Do
14  you see that?
15        Do you see at the top --
16    A    December or November?
17    Q    November --
18    A    November, yes.
19    Q    -- 12, 2014.
20    A    Yeah.
21    Q    Do you see that?
22    A    I do.
23    Q    Now, the agreement on account representation
24  was reached with Ms. Schmidt on March 7, 2014.  Do you
25  recall that from Defendants' Exhibit 66?

Page 271

1    A    Okay, yeah.
2    Q    So this communication with Ms. Teel was
3  subsequent to the communication with Ms. Schmidt,
4  correct?
5    A    Yes.  Correct.
6    Q    And in this e-mail, Mr. Jensen relates to
7  Ms. Teel -- it is Ms. Teel, right?
8    A    Yes.
9    Q    Okay -- Ms. Teel that they are going to follow
10  the same guidelines that have been in place between
11  Florida Hospital Physician Group and McKesson, correct?
12    A    Correct.
13    Q    And that's the same split between you and Clint
14  Brady on the geographic lines of the Tampa Bay area,
15  correct?
16    A    Correct.
17    Q    And that Mr. Jensen further explains that if
18  there are any accounts with current sales that those
19  accounts will be grandfathered in and assigned to the
20  other McKesson reps and will remain serviced by them,
21  correct?
22    A    Yes.
23    Q    So this assignment between you and Mr. Brady
24  would only relate to new business, assuming that there
25  was no rep that already had a relationship with the

Page 272

1  account, correct?
2        MS. PISCITELLI:  Object to the form.
3    A    Well, I'm a little confused because Jan and
4  Michelle, from what I understood, got taken off of all
5  the accounts.
6  BY MS. DYSON:
7    Q    And how is it that you understood that?
8    A    That's what I understood from Jan Stack.
9    Q    Okay.  Do you know when that occurred?
10    A    At this same time period.
11    Q    Okay.  Do you have any documentation that
12  reflects her being taken off the account at
13  November 2014?
14    A    Just verbal.
15    Q    Okay.  This document reflects that any of those
16  reps with already current sales will continue to maintain
17  those accounts, correct?
18        MS. PISCITELLI:  Object to the form.
19    A    But it didn't happen.
20  BY MS. DYSON:
21    Q    But how do you know that?
22    A    Because Jan told me.
23    Q    Okay.  So you're relying on just the
24  information --
25    A    That's correct.

Page 273

1    Q    -- that Ms. Stack provided to you?
2    A    That's right.
3    Q    But what did happen is that you continued to
4  receive any new business for the Hillsborough and Pasco
5  areas, correct?
6    A    Correct.
7    Q    And you didn't lose any business as a result of
8  this e-mail that's sent on November 12, 2014, correct?
9    A    Correct.
10    Q    And Mr. Jensen also reflects in here that he is
11  pleased to hear that Ms. Teel has developed a working
12  relationship with Clint Brady.  Do you see that?
13    A    I dispute that.
14    Q    How do you dispute that?
15    A    Because she only dealt with me directly.
16    Q    And how do you know that?
17    A    Because of communications that I had with her.
18    Q    Okay.
19    A    And I would do the work for Clint Brady's
20  Ship To accounts.
21    Q    And do you know whether Mr. Brady did any work
22  for those accounts?
23    A    To my knowledge, no.
24    Q    Okay.  But is it possible that he did, that you
25  don't know about?

Page 274

1    A    I don't --
2        MS. PISCITELLI:  Object to the form.
3    A    Not according to Tim Keel -- Kim Teel.
4  BY MS. DYSON:
5    Q    Okay.  So you are relying on information that
6  Ms. Teel has provided to you?
7    A    And I know I worked on his accounts.
8    Q    Okay.  What did you do on his accounts?
9    A    Whenever there was a setup, I would be present
10  and helping -- I would help with the ordering of the
11  supplies and the setup, and I would actually be there
12  receiving them and helping them put them on the shelves
13  and setting the tables up and do whatever is necessary.
14    Q    And for what accounts did you do that?
15    A    Specifically, I don't know.  It was all of the
16  Ship To accounts.
17    Q    And which Ship To accounts had new setups
18  during this period of time?
19    A    I don't know right off the hand.
20    Q    Is there a document that would refresh your
21  recollection?
22    A    Could.
23    Q    And what document would that be?
24    A    I said it could.  I don't have one.
25    Q    Okay.  Is there some document that you're

Page 275

1   thinking of that could refresh your recollection?
2       A   If I saw a list of the accounts that were being
3   set up during this period of time.
4       Q   Okay.  And do you know if a shared account
5   worked that way for any other shared account where the
6   Bill To representative would be the one that set up that
7   account?
8       A   Not to my knowledge.
9       Q   But you would only have knowledge of the
10  accounts that you're directly involved in, correct?
11      A   That's right.
12      Q   Okay.  Now, you and Mr. Brady and Jan Stack and
13  Ms. Hosley all lost the Florida Hospital Physician Group
14  account when it was transferred to Mr. Irish, correct?
15      A   Correct.
16          (Exhibit 69 marked for identification.)
17  BY MS. DYSON:
18      Q   Let me show you what's marked as Exhibit 68 to
19  your deposition -- did I do 68 already?
20          Yeah.  69.  I'm on 69.
21          Do you recognize this document?
22      A   I do.
23      Q   And earlier in your deposition you told me that
24  there was a document e-mail from Francis D'Avanza that
25  relate -- that told you that the transition to

Page 276

1   Brian Irish of the Florida Hospital Physician Group
2   account was because of a customer request?
3       A   Okay.  Let me check.
4       MS. PISCITELLI:  Object to the form.
5       A   Okay.  Yes, I recognize it.
6   BY MS. DYSON:
7       Q   And is this the e-mail that you were referring
8   to earlier in your testimony today --
9       A   I was --
10      Q   -- that -- you've got to let me finish
11  answering -- asking my question.
12          Is this the e-mail that you were referring to
13  earlier today that gave you the information about why the
14  account was transitioned?
15      A   Yes.
16      Q   Okay.  And where does it say in this account
17  that there was a customer request?
18      A   It says a collaborative effort between HSS --
19  AHS and McKesson Medical/Surgical.
20      Q   Okay.  Do you know what AHS is?
21      A   That's the hospital group, and I don't know
22  what those abbreviations stand for.
23      Q   Okay.  And do you know if Mr. Irish was already
24  serving AHS?
25      A   I do not.

Page 277

1       Q   And do you know if Florida Hospital Physician
2   Group became part of AHS?
3       A   That's what I understand.
4       Q   And do you know if, because of that acquisition
5   or other corporate restructuring, that this account was
6   then reassigned to Mr. Irish?
7       A   Say that again.  I'm sorry.
8       Q   Sure.  Do you know if because of the
9   acquisition of AHS of Florida Hospital Physician Group
10  that that caused the account assignment decision?
11          MS. PISCITELLI:  Objection.
12      A   I do not -- sorry.  I do not.
13  BY MS. DYSON:
14      Q   Okay.  The -- do you know if Mr. Irish is still
15  assigned to this account?
16      A   As far as I know.
17      Q   You don't know whether he lost the entire
18  account?
19      A   I have not -- I don't know.  McKesson has made
20  a lot of changes lately.
21          (Exhibit 70 marked for identification.)
22  BY MS. DYSON:
23      Q   Let me show you what's marked as Exhibit 70 --
24  71 -- 70 -- sorry.
25          70.  Do you recognize this document?

Page 278

1       A   I do not.
2       Q   Did you understand that your sales goal went
3   down because of the removal of the Florida Hospital
4   Physician Group account?
5       A   That's what I was told.
6       Q   And you don't dispute this e-mail that reflects
7   that information, do you?
8       A   I didn't see that my forecast went down, but.
9           (Exhibit 71 marked for identification.)
10  BY MS. DYSON:
11      Q   Okay.  I'll show you what's marked as
12  Exhibit 71.
13          Okay.
14      Q   Do you recognize this document?
15      A   Yes.
16      Q   And what does this document reflect?
17      A   It is saying that they took this off of my
18  forecast.
19      Q   They took what off your forecast?
20      A   The numbers.
21      Q   For the Florida Hospital Physician Group?
22      A   That's what they said, yeah.
23      Q   Do you have some reason to dispute that to be
24  the case?
25      A   Yeah.

Page 279

1    Q    And what is that?

2    A    I just don't believe that they were, but I
3    would have to look at the numbers.

4    Q    And what would you look at to make that
5    determination?

6    A    Previous sales to the sales the following year.

7    Q    Okay.

8    A    Forecast.

9    Q    So do you have any specific information,
10   sitting here today, that would dispute the information
11   reflected in Exhibit 71 to your deposition that your
12   sales goal was reduced because of the Florida Hospital
13   Physician Group account?

14   A    I don't.

15   Q    Do you know of any instance where Mr. Brady's
16   sales goal was impacted differently than yours was as to
17   the Florida Hospital Physician Group?

18   A    I have no clue.

19   Q    And going back to Exhibit 69, if we could --

20   A    Sure.

21   Q    -- the -- do you know who made this decision to
22   move the account to Mr. Irish?

23   A    The message came from Francis, but I don't
24   know, when they're talking collaborative, who they're
25   referring to.

Page 280

1    Q    So you don't know who made the decision to move
2    this account, the Florida Hospital Physician Group
3    account.  Is that correct?

4    A    That's correct.

5    Q    Now, there's an account involving Dr. Randolph
6    Knight.

7    A    Mmm-hmm.

8    Q    Do you recall that account?

9    A    I do.

10   Q    Is that one of the accounts that you contend
11   the assignment was discrimination based on your gender?

12   A    Yes.

13   Q    And why do you believe the account assignment
14   was based on discrimination?

15   A    It was taken away from me and given to a male.

16   Q    And when did that happen?

17   A    I don't have the exact dates, but I'm sure you
18   have that on the e-mail.

19   Q    Okay.  Do you know the year that it happened?

20   A    I'm thinking, maybe -- I don't know.

21   Q    Okay.  And we can go through e-mails.  Is it
22   just one decision then that was made then as it relates
23   to Dr. Knight that you are complaining about?

24   A    Well, there were a lot of moving parts.

25   Q    When -- what moving parts are you referring to?

Page 281

1    A    Well, the account was first given to me.  It
2    was under -- it was left -- he left Florida Hospital
3    Physician Group and the account was originally set up
4    under me and then somehow someone closed it and reopened
5    it under Clint Brady.

6    Q    Okay.  Is there any other decision that you're
7    complaining about as it relates to Dr. Knight?

8    A    That I don't have the account.

9    Q    Is there any other decision?

10   A    No.

11   Q    Okay.  Now, do you know when Dr. Knight left
12   Florida Hospital Physician Group and opened up his own
13   practice whether he contacted McKesson directly for
14   medical supplies?

15   A    I don't know.

16   Q    Do you know whether he -- when he contacted
17   McKesson directly, if he put any note that you had --

18        MS. DYSON:  I'm sorry.  What is your hand up
19   for?

20        MS. PISCITELLI:  Because I would like to make
21   an objection, so I'm waiting for you to finish.

22        MS. DYSON:  Okay.  It's very distracting that
23   your hand is up.

24        MS. PISCITELLI:  I'm sorry.  It's not up.  It's
25   up a little bit.

Page 282

1    BY MS. DYSON:

2    Q    Okay.  So do you have any information that --
3    well, let me ask it a different way.

4         When Dr. Knight contacted McKesson, do you know
5    if he put your name down as his sales representative?

6    A    I don't think Dr. Knight filled it out at all.
7    It got filled out by his office manager.

8    Q    And who was his office manager?

9    A    Lisa DeLong.

10   Q    And do you know if she put your name down as a
11   sales representative?

12   A    I don't know.

13   Q    Okay.  And do you know -- Ms. DeLong, is she
14   still his office manager?

15   A    Not that I know of.

16   Q    And do you know when she left?

17   A    I do not.

18   Q    And before Dr. Knight moved to his own
19   practice, when was the last time that you sold anything
20   to him?

21   A    I sold something to him up and to the point
22   that he left Florida Hospital Physician Group.

23   Q    What did you sell to him?

24   A    Orthopedic supplies.

25   Q    Do you remember specifically what supplies you

Page 283

1  sold to him?
2      A    No.  Casting.
3      Q    Are you guessing?
4      A    Well, I know he is an orthopedic doctor, and I
5  know he bought casting material from me.
6      Q    Okay.  Do you have a recollection, sitting here
7  today, of actually selling him something before he left
8  the practice to open up his own business?
9      A    Yes.
10     Q    Okay.  And when did that sale go through?
11     A    I don't know exactly.
12     Q    And is there some document that would refresh
13 your recollection as to that?
14     A    There might be.
15     Q    And what document would that be?
16     A    I don't have one.
17     Q    Okay.  So let's look at some documents related
18 to Dr. Knight.
19          MS. DYSON:  I think I'm on 72?
20          (Exhibit 72 marked for identification.)
21 BY MS. DYSON:
22     Q    There you go.  Showing you what's marked
23 Exhibit 72.  Do you recognize this document?
24     A    I do.
25     Q    And do you know when Dr. Knight opened up his

Page 284

1  own practice?
2      A    He opened up his own -- he still owns the
3  building that he's in right now, and he's probably been
4  there for 20-plus years.
5      Q    Do you know when he opened his own practice?
6      A    I do not know exactly when, no.
7      Q    Okay.  In looking at this e-mail that's dated
8  August 20, 2014, do you know how long before this e-mail
9  was sent by Ms. DeLong that Dr. Knight opened up his own
10 practice and requested supplies from McKesson?
11     A    You mean reopened his own practice?
12     Q    Sure --
13     A    Okay.
14     Q    -- reopened his practice.
15     A    Okay.  No.
16     Q    Okay.  You don't know when that was?
17     A    Well, there's an e-mail reflecting that, but I
18 don't know exactly when it was.
19     Q    Okay.  Let me see if I have that e-mail.
20     A    There was one from Leisa Meredith that had --
21 when my account was closed and when the other one was
22 reopened and that had to be right at that time period.
23          (Exhibit 73 marked for identification.)
24 BY MS. DYSON:
25     Q    Okay.  Let's look at Exhibit 73.

Page 285

1      A    Okay.
2      Q    And you tell me if that refreshes your
3  recollection.
4      A    Okay.  It looks like it was in March.  March,
5  April 2014.
6      Q    Okay.  And so Ms. DeLong, however, didn't raise
7  an issue related to this until August 2014, correct?
8      A    There is no place on our credit applications
9  that asks what representative.
10     Q    I don't know what question you're answering.
11     A    Okay.  I don't understand the question.
12     Q    Okay.  The question was that you told me that
13 Dr. Knight opened up his own practice in April 2014,
14 correct?
15     A    He reopened his practice between March and
16 April 2014.
17     Q    Okay.  And Ms. DeLong didn't send you this
18 e-mail until August 20, 2014, correct?
19     A    She was told I was no longer in the area.
20     Q    Okay.  That still doesn't answer my question.
21          Ms. DeLong didn't send you this e-mail --
22     A    That's right.
23     Q    -- until August 20, 2014?
24     A    That's correct.
25     Q    Correct?

Page 286

1      A    That's correct.
2      Q    Okay.  Now -- and you didn't raise any issue of
3  Dr. Knight's office until you received this e-mail from
4  Ms. DeLong, correct?
5      A    That's correct.
6      Q    And do you know how quickly after this e-mail
7  Ms. DeLong left Dr. Knight's practice?
8      A    I do not.
9      Q    And are you aware of any communication that
10 Dr. Knight made directly to McKesson asking to have you
11 assigned as his representative?
12     A    I do not.
13     Q    And do you know who the office manager was that
14 replaced Ms. DeLong?
15     A    I was told to stay out of the account.  I do
16 not.
17     Q    So you don't know who the office manager is?
18     A    I do not know.
19     Q    Okay.  So after you received this e-mail from
20 Ms. DeLong, on the same day, you sent an e-mail to
21 Mr. Xiques, correct?
22     A    Yes.
23     Q    And that was Mr. Xiques and Mr. Jensen,
24 correct?
25     A    Yes.

Page 287

1    Q    And that was the first time that you complained
2  about the assignment of this account, correct?
3    A    I don't think so.
4    Q    When did you complain about the assignment of
5  this account prior to that date?
6    A    It looks like this has August on it.
7    Q    Yes.  And when did you complain to Mr. Jensen
8  or Mr. Xiques --
9    A    I don't know the exact --
10   Q    -- about -- you have to let me finish asking my
11 question.
12        When did you complain to Mr. Jensen or
13 Mr. Xiques, prior to August 20, 2014, about the
14 assignment of Dr. Knight's account?
15   A    I don't know.
16        (Exhibit 74 marked for identification.)
17 BY MS. DYSON:
18   Q    Okay.  Let's look at Exhibit 74.  Do you
19 recognize this document?
20   A    Parts of it.
21   Q    Okay.  And in these e-mail -- the first page
22 relates to e-mail communications between Mr. Jensen and
23 Mr. Xiques, correct?
24   A    Correct.
25   Q    Now, at the time that the account assignment

Page 288

1  decision was made in April 2014, Mr. Brady didn't report
2  to Mr. Jensen.  Is that correct?
3    A    That's correct.
4    Q    He reported to Mr. Xiques?
5    A    Yes.
6    Q    And do you know, when this account request came
7  in to customer service, if Mr. Xiques was the sales
8  manager who was responsible for assigning that?
9    A    Say that again.
10   Q    Sure.  When the request came in from customer
11 service to assign an account representative, do you know
12 if it was assigned to Mr. Xiques to make that assignment?
13   A    I do not.
14   Q    Okay.  So now, in this communication between
15 Mr. Xiques and Mr. Jensen, Mr. Jensen and Mr. Xiques
16 agreed that Mr. Xiques should reach out to Lisa DeLong to
17 discuss her concern, correct?
18   A    You're talking about this first e-mail here on
19 the top?
20   Q    On the second page, first e-mail.
21   A    And what part of it are you asking me a
22 question about?
23   Q    Sure.  The question I asked you is did you
24 understand that Mr. Jensen asked Mr. Xiques to reach out
25 to Ms. DeLong to talk about the account assignment?

Page 289

1    A    Yes.
2    Q    And in the first e-mail here, Defendants'
3  Exhibit 74, that was dated September 5, 2014, Mr. Jensen
4  is communicating with Mr. Xiques about this particular
5  account assignment, correct?
6    A    You're on the first page now?
7    Q    Yep.
8    A    The first e-mail?
9    Q    Yep.
10   A    Okay.  I need to read it.
11   Q    Please do.
12   A    Okay.
13   Q    And do you understand, in this e-mail from
14 Mr. Jensen to Mr. Xiques, Mr. Jensen is advocating for
15 you to keep this account.  Is that correct?
16   A    Yes.
17   Q    But he says that it was a matter of talking to
18 the customer, correct?
19   A    Yes.
20   Q    And Mr. Xiques was going to have that
21 communication with the customer, correct?
22   A    Yes.
23   Q    Okay.  And Mr. Jensen refers to this as a small
24 account.  Would you agree that it was a small account?
25   A    Yes.

Page 290

1    Q    And do you know how much in sales this account
2  represents annually?
3    A    No.
4    Q    And so Mr. Jensen ends this e-mail with the
5  agreement that Mr. Xiques is going to have a live
6  dialogue with Lisa DeLong, correct?
7    A    Yes.
8        (Exhibit 75 marked for identification.)
9  BY MS. DYSON:
10   Q    As a result of that agreement, Mr. Jensen then
11 sends you an e-mail.  Do you remember this?
12        I'll show you what's marked as Exhibit 75 to
13 your deposition.
14   A    Yes.
15   Q    Okay.  And, now, in this e-mail on November --
16 sorry -- on September 11, 2014, then Mr. Jensen says to
17 you -- he notifies you that Mr. Xiques is going to be
18 calling Dr. Knight's office, correct?
19   A    Yes.
20   Q    And asks you not to have any contact until that
21 conversation is held, correct?
22   A    Yes.
23   Q    And that he said that he understood your
24 position, correct?
25   A    Yes.

Page 291

1   Q   Now, the time that -- he also tells that
2   Dr. Knight is back on his own and he set up a new account
3   within PSS customer service, correct?
4   A   Say that again.  I'm sorry.
5   Q   Sure.  In this e-mail, Mr. Jensen explains that
6   when Dr. Knight went back on his own, he set up a new
7   account with PSS customer service, correct?
8   A   Yes.
9   Q   And it was presented to Carlos and assigned to
10  Clint, correct?
11  A   Yes.
12  Q   At the time that it was presented to
13  Mr. Xiques, you were not on Mr. Xiques's team, correct?
14  A   Correct.
15  Q   Now, going back to Exhibit 73 -- and if we
16  could start with the first e-mail in this chain --
17  A   Okay.
18  Q   -- on November 6, 2014, Mr. Jensen sends
19  Mr. Xiques an e-mail with a copy to you.  Do you see
20  that?
21  A   I do.
22  Q   Okay.  And in this e-mail, he says that --
23  A   Wait a minute.  Which one are you looking at?
24  Q   Sure.  The first e-mail on the chain.
25  A   Okay.

Page 292

1   Q   Do you see the e-mail from Mr. Jensen on
2   November 6, 2014?
3   A   I do.
4   Q   And in this e-mail, he's relaying a
5   conversation that he had with you regarding the
6   assignment of this account, correct?
7   A   Yes.
8   Q   And that this was going to stay under
9   Clint Brady, correct?
10  A   Yes.
11  Q   And that it was -- Mr. Jensen said it was a
12  unique situation in that a long-term customer of yours
13  left the Florida Hospital network to branch out on his
14  own, correct?
15  A   Yes.
16  Q   And, Mr. Jensen then says, "Unfortunately,
17  recognition of this doctor's practice was not caught
18  internally and the lead was given to Clint Brady and
19  Carlos."  Do you see that?
20  A   Yes.
21  Q   And that this was a customer relationship
22  established for 90-plus days and so it continues for
23  today, correct?
24  A   90 days, yes.
25  Q   Okay.  And the conversation that Mr. Xiques had

Page 293

1   with Ms. DeLong, do you know what occurred in that
2   conversation?
3   A   I do not.
4   Q   Now, Mr. Jensen goes on to say that he's made a
5   commitment to you in terms of double-checking both
6   platforms going forward on these issues, correct?
7   A   Yes.
8   Q   And Mr. Xiques responds to Mr. Jensen saying,
9   "You got it.  And thank you-all," correct?
10  A   Yes.
11  Q   And then you respond to Mr. Xiques and
12  Mr. Jensen, continuing to complain about the account,
13  correct?
14  A   Yes.
15  Q   And at the end of this e-mail, you say that the
16  account, obviously, doesn't want Clint as the
17  representative?
18  A   Mmm-hmm.
19  Q   Do you know --
20  A   Yes.
21  Q   -- if that was communicated to Mr. Xiques?
22  A   He saw it in the e-mail.
23  Q   And when he had a conversation with Ms. DeLong
24  or Dr. Knight about this, do you know what they
25  communicated to him?

Page 294

1   A   I wasn't there.
2   Q   So you don't know whether they actually
3   continued to complain about him, correct?
4   A   No.
5   Q   That's correct?  You don't know?
6   A   I don't know.
7       MS. DYSON:  Okay.  Let's take a brief break.
8       (Break taken from 3:24 p.m. to 3:31 p.m.)
9       MS. DYSON:  Okay.  Ready to go back on.
10      (Exhibit 76 marked for identification.)
11  BY MS. DYSON:
12  Q   Show you what's marked Exhibit 76 to your
13  deposition.  Do you recognize this document?
14  A   Other than the one here with -- or two here
15  with my name on it.
16  Q   Well, the top e-mail you recognize as being
17  from Mr. Jensen to you?
18  A   Yes.
19  Q   And this e-mail has this entire e-mail chain in
20  it, correct?
21  A   I don't know that for sure.
22  Q   Do you have anything to dispute that?
23  A   It doesn't look familiar.
24  Q   Did you understand, in this e-mail, that
25  Mr. Jensen was communicating to you that business was

Page 295

1   going to be moved from Mr. Williams to you?
2       A    Let's see. This is very confusing. I don't
3   know.
4       Q    Do you see the e-mail that Mr. Jensen sent to
5   you and Ms. Loisey on September 29, 2017, where he's
6   directing you to take the lead and follow up with him on
7   results?
8       A    Where?
9       Q    In the middle of the page, the third e-mail
10  down.
11      A    Okay. I see it.
12      Q    And this account was actually moved to you. Do
13  you recall that?
14      A    I don't.
15      Q    Do you have anything to dispute that?
16      A    No.
17      Q    Okay. Let me show you what's marked as
18  Exhibit 77 to your deposition.
19           (Exhibit 77 marked for identification.)
20  BY MS. DYSON:
21      Q    Do you recognize Exhibit 77 to your deposition?
22      A    Yes.
23      Q    And do these e-mails reflect that an account, a
24  doctor's account is being moved from Mr. Brady to you?
25      A    Which was originally my account.

Page 296

1       Q    Do they reflect that the account is being moved
2   from Mr. Brady to you?
3       A    Yes.
4            (Exhibit 78 marked for identification.)
5   BY MS. DYSON:
6       Q    Show you what's being marked Exhibit 78 to your
7   deposition. Do you recognize these e-mails?
8       A    Vaguely.
9       Q    Now, this e-mail on December 18, 2014, from
10  Mr. Jensen to you, relates to the margin that you were
11  setting?
12      A    Yes.
13      Q    And that was for the Florida Medical Clinic
14  account?
15      A    Yes.
16      Q    And as the lead representative on that account,
17  that was your prerogative to set the pricing for that
18  account, correct?
19      A    Yes.
20      Q    Okay. And Mr. Jensen is encouraging you to
21  increase the pricing on that account, correct?
22      A    Correct.
23      Q    And specifically he says that "We're not the
24  primary go to supplier" and that Mr. Steele is
25  cherry-picking you, correct?

Page 297

1            MS. PISCITELLI:  Object to the form.
2       A    That's what he says.
3   BY MS. DYSON:
4       Q    And Mr. Jensen also said that you were worth
5   more than he is paying for all the work you do for Gary.
6   Do you see that?
7       A    I do.
8       Q    And Mr. Jensen continues to say, "We clearly
9   can save him money if he would be willing to work with
10  you (McKesson). If you don't hold pace with the cost
11  increases, you will make less money." Do you see that?
12      A    Okay. This looks funny. I mean, I'm not
13  attached to this e-mail here with this information here.
14      Q    Do you dispute that this e-mail was sent by
15  Mr. Jensen to you?
16      A    I have not a clue. I don't.
17      Q    Okay. And do you dispute in this e-mail that
18  it says that Mr. Jensen says to you, "Take one more look
19  at the report. Get what you deserve, a pay increase"?
20      A    That's what it says.
21      Q    And you don't have any evidence to dispute that
22  Mr. Jensen -- that Mr. Jensen sent this e-mail, correct?
23           MS. PISCITELLI:  Object to the form.
24      A    I don't know.
25           (Exhibit 79 marked for identification.)

Page 298

1   BY MS. DYSON:
2       Q    Show you what's marked as Exhibit 79.
3            MS. DYSON:  You get to have the one that I
4   wrote "Exhibit 79" on so I'm not making it up for my
5   own exhibit. Thank you.
6   BY MS. DYSON:
7       Q    Do you recognize this e-mail?
8       A    Yes.
9       Q    And in this e-mail, Mr. Jensen is telling you
10  you did a good job?
11      A    Yes.
12      Q    Is that correct?
13      A    Yes.
14      Q    As it relates to your claim of discrimination,
15  are there any other acts that form the basis for your
16  claim of discrimination?
17      A    That's too broad a question for me.
18      Q    Is there any other basis for your claim of
19  discrimination?
20           MS. PISCITELLI:  Object to the form.
21      A    I don't have an answer.
22  BY MS. DYSON:
23      Q    Okay. Is there any other evidence that you
24  would rely on to support your claim of discrimination?
25           MS. PISCITELLI:  Object to the form.

Page 299

1    A    Not at the moment.
2  BY MS. DYSON:
3    Q    Now, you've also brought a claim of
4  retaliation?
5    A    Mmm-hmm.
6    Q    Correct.  And you contend that you engaged in
7  activity protected by law, correct?
8    A    Yes.
9    Q    And what's the activity you contend was
10  protected by law?
11    A    Retaliation.
12    Q    Okay.  What's the activity that you contend
13  that you engaged in that's protected by law?
14    A    That I engaged in.
15        Retaliation means someone else --
16    Q    Do you want to take a break?
17    A    No.
18        MS. PISCITELLI:  She's trying to stop her
19    phone.  Apparently, it's ringing.
20        THE WITNESS:  I'll put it on Airplane.
21    A    PrimeCare is a perfect example, I feel, of
22  retaliation.
23  BY MS. DYSON:
24    Q    Okay.  And do you understand that your
25  retaliation claim -- at least as you've told me, is that

Page 300

1  you believe that some action was taken against you
2  because you engaged in activity protected by law?
3    A    Say that again.
4    Q    Sure.  Sure.  Your claim of retaliation that
5  you've told me is that you were -- some action was taken
6  against you because of some act you took to protect
7  yourself under the law.
8    A    I don't quite understand the question.
9    Q    Okay.  Sure.
10    A    Sorry.
11    Q    I'll be happy to rephrase it.
12        So you said PrimeCare is a perfect example.
13  What is PrimeCare a perfect example of?
14    A    Where an account was given to someone else when
15  I had done all the work -- and it was a customer of mine.
16    Q    And why is that retaliation?
17    A    I feel it's -- I don't have any other answer
18  for it than it is retaliation.
19    Q    What is it retaliation for?
20    A    For me filing a lawsuit.
21    Q    Okay.  Is there any other activity that you
22  believe it's retaliation for?
23    A    I can't read people's minds.  I don't know why
24  people do what they do.
25    Q    Okay.  So then let's talk about the PrimeCare

Page 301

1  account.
2    A    Okay.
3    Q    Do you know how the PrimeCare account came into
4  McKesson?
5    A    I do.
6    Q    And how is that?
7    A    E-mailed -- or -- I don't know if it was
8  electronic, but somehow a credit application was sent
9  into the office.
10    Q    And did that credit application have your name
11  as the representative on it?
12    A    There's no place on the application that
13  showed -- that even has a space for a customer to put the
14  name of the representative.
15    Q    So you're saying, that when a customer sends in
16  the credit application, there's no way that they can note
17  that it relates to a particular sales representative?
18    A    I was surprised when I really looked and read
19  the application because our old applications did have a
20  part where it says "Sales Rep."
21    Q    Okay.  So then if you go out there and sell an
22  account and the customer sends in and you send in a
23  credit application, then how do they know to assign it to
24  you?
25    A    I ask to send it in for them.

Page 302

1    Q    Okay.  And so when a customer sends in a credit
2  application on their own, you say there's no way to know,
3  "I've worked with Hilda on this"?
4    A    Not that I know of.
5    Q    Okay.  So you understand that the PrimeCare
6  account came into the customer service center though,
7  correct?
8    A    I do.
9    Q    Okay.  So they didn't go to you directly and
10  ask you to submit the credit application, correct?
11    A    No.
12    Q    That's not correct?
13    A    That's -- that's correct that -- do you want to
14  know how it happened?
15    Q    No.  What I want to know is did they come to
16  you -- did someone from PrimeCare come to you and say,
17  "Here's my credit application --
18    A    No.
19    Q    -- can you submit that"?
20    A    No.
21    Q    Okay.  Did they contact you and say, "Here's
22  all my -- the supplies I need, go ahead and submit that
23  order"?
24    A    Yes.
25    Q    Okay.  And when did that happen?

Page 303

1       A    I don't know exactly, but Maria e-mailed me the
2   list or told me to create the list for setting up a --
3   let's say, a three- or four-room practice.
4           (Exhibit 80 marked for identification.)
5   BY MS. DYSON:
6       Q    Okay.  So let me show you what's marked as
7   Exhibit 80 to your deposition.
8           MS. DYSON:  I did it again, but there you go.
9           MS. PISCITELLI:  Thank you.
10  BY MS. DYSON:
11      Q    Okay.  Thank you.  Let me show you Exhibit 80.
12  Do you recognize this document?
13      A    It looks familiar.
14      Q    Okay.  And this is a document you provided to
15  the Florida Commission on Human Relations?
16      A    Okay.
17      Q    That's why there's -- this is just what we
18  received --
19      A    Okay.
20      Q    -- so there's no other indication on this.  But
21  it appears to be an e-mail that Mr. Jensen sent you.  Is
22  that correct?
23      A    That's what it appears to be, yes.
24      Q    Is this a document you created, you took a
25  screen shot of?

Page 304

1       A    Must have been.
2       Q    And in this --
3       A    I just remember seeing it.
4       Q    And in this e-mail, Mr. Jensen says that
5   PrimeCare sent in an application for a new account to
6   McKesson on December 16th.  Do you see that?
7       A    I do.
8       Q    Do you know what year that was?
9       A    It was the year my father died, so I think it
10  was 2015.
11      Q    Okay.  And you don't dispute that that's, in
12  fact, what happened, correct?
13      A    Correct.
14      Q    Okay.  Now, Mr. Jensen says he assigned it to
15  Laura Carmen on December 16, 2015, and the account was
16  assigned -- was in the system on December 18, 2018,
17  correct?
18      A    Correct.
19      Q    Okay.  And you don't dispute that that
20  happened?
21      A    No.
22      Q    Okay.  Now, Laura -- he says that Laura made
23  contact with the customer.  Do you dispute she made
24  contact with the customer?
25      A    I do.

Page 305

1       Q    And what do you dispute about her making
2   contact with the customer?
3       A    Because I asked Maria and Cynthia if they had
4   heard from Laura, and they said, no.
5       Q    Okay.  Do you dispute that Mr. Jensen believed
6   that Laura had made contact with the customer?
7       A    I -- I don't know what he believed.
8       Q    Okay.  And then Mr. Jensen reports that, on
9   December 23rd, he received an e-mail from MMS, new
10  customer setup, that you requested to set up a customer
11  already in the system.  Do you see that?
12      A    Sounds about right, yeah.
13      Q    And that Mr. Jensen says he made the decision
14  the account would stay with Laura Carmen based on Laura
15  making contact with the customer.  Do you see that?
16      A    I see that.
17      Q    And do you dispute that was the reason that he
18  decided to keep the account with Ms. Capriati?
19      A    I don't know.
20           (Exhibit 81 marked for identification.)
21  BY MS. DYSON:
22      Q    Now, let me show you what's marked as
23  Exhibit 81.  Do you recognize this document?
24      A    It's a piece of an e-mail.
25      Q    Again, a document you provided to the Florida

Page 306

1   Commission on Human Relations --
2           MS. PISCITELLI:  Objet to the form.
3   BY MS. DYSON:
4       Q    -- correct?
5           MS. PISCITELLI:  Object to the form.
6       A    I didn't present it like this, so it's kind of
7   hard to say.
8   BY MS. DYSON:
9       Q    You don't believe you presented it like this?
10      A    In this format?
11      Q    Mmm-hmm.
12      A    I mean, there's --
13      Q    You believe you presented it in a different --
14      A    There's a part missing.
15      Q    Do you have a different version of this e-mail?
16      A    I don't know.  I turned everything over.
17      Q    Okay.
18      A    Go ahead.
19      Q    So in this e-mail, the top e-mail is from you
20  to Maria Jimenez, correct?
21      A    Yes.
22      Q    And this is the first e-mail response that you
23  made on the PrimeCare account, correct?
24      A    I don't know if this was the first.
25      Q    Do you have an earlier e-mail that you have

Page 307

1   with Ms. Jimenez?
2       A    Not that I know of.  I don't know.
3       Q    Okay.  Well, you see the e-mail below was on
4   December 17th at 9:02 p.m.  Do you see that?
5       A    Yes.
6       Q    And it says, "Hilda, can you please reach out
7   to Cindy?  This is a PrimeCare office, and they are
8   needing to order supplies, et cetera.  I've included
9   Cindy on this e-mail."
10      A    Yes.
11      Q    Do you see that?
12      A    Yes.
13      Q    So was that the first e-mail communication you
14  received from Ms. Jimenez?
15      A    It seems like it.
16      Q    Okay.  So the first communication you received
17  on the PrimeCare account, correct?
18      A    Correct.
19      Q    And then your response was at 1:01 p.m. on
20  December 18th, correct?
21      A    That's what it says.
22      Q    Okay.  By the time Ms. Jimenez sent you this
23  e-mail, PrimeCare had already communicated to McKesson
24  and Mr. Jensen had assigned it to Laura Carmen before you
25  each received this e-mail, correct?

Page 308

1       A    So what's your question?
2       Q    The question is before you received this e-mail
3   from Maria Jimenez, Mr. Jensen had already assigned the
4   account to Ms. Carmen, correct?
5       A    That's right.
6            (Exhibit 82 marked for identification.)
7   BY MS. DYSON:
8       Q    Let me show you what's marked as Exhibit 82.
9   Do you recognize this document?
10      A    I do.
11      Q    Okay.  And the bottom e-mail, Defendants'
12  Exhibit 82, is dated December 21, 2017.  Do you see that?
13           (Mr. Hearing returned to the room.)
14      A    I do.
15  BY MS. DYSON:
16      Q    And this -- is this the first time that you
17  provided an attached list of medical supplies for
18  PrimeCare?
19      A    It looks like it.  I'm asking her to review the
20  list.
21      Q    Is this list made in particular as it relates
22  to PrimeCare?
23      A    Yes.  There's a lot of work there.
24      Q    And do you know if, by December 21, 2011,
25  Ms. Capriati, formerly Ms. Carmen, had already reached

Page 309

1   out to PrimeCare?
2       A    Yes, but she didn't do any work.
3       Q    And how do you know that?
4       A    Because I know that.  I was asked to turn over
5   my records.
6       Q    How do you know Ms. Capriati didn't do any
7   work?
8       A    I believe she didn't have any -- she hadn't
9   even reached out to the account.
10      Q    And how is it that you know she hadn't reached
11  out to the account?
12      A    Because Cindy told me she hadn't.
13      Q    So you are relying on -- who is Cindy?
14      A    Cindy is the person I was working with.  She is
15  the one that filled out the credit application.
16      Q    What's her last name?
17      A    B-o-r-g-n-i-s.
18      Q    How do you say that?
19      A    Borgnis.
20      Q    Okay.  So Ms. Borgnis told you that
21  Ms. Capriati had not reached out?
22      A    That's right.
23      Q    And you weren't a witness to whether
24  Ms. Capriati had reached out or not, correct?
25      A    No.

Page 310

1       Q    And do you know if Ms. Capriati told Mr. Jensen
2   that she had reached out?
3       A    I don't know.  I think one of the documents
4   said something.
5       Q    Okay.  Now, this account was ultimately
6   assigned to you, though, correct?
7       A    Correct.
8       Q    Okay.  And do you know what date it became your
9   account?
10      A    When I got back from Holland.
11      Q    Which was when?
12      A    Had to be in 2000- -- beginning of 2016, I
13  would think.  This was all through Christmas.
14           (Exhibit 83 marked for identification.)
15  BY MS. DYSON:
16      Q    I'll show you what's marked as Exhibit 83.
17           MS. PISCITELLI:  I believe you are just at the
18  seven hours.
19           MS. DYSON:  Okay.  Well, I'm not done with the
20  deposition yet.
21           MS. PISCITELLI:  I can allow you to go another
22  five minutes.
23           MS. DYSON:  Well, I need to complete this
24  deposition.  I've moved as fast as I could through
25  the amount of documents.  This claim alleges case --

Page 311

1  the case allegation actions over a six-year period
2  of time. I don't think I've been slow in any way.
3       I have allowed your client in numerous
4  opportunities to review the documents at issue. I
5  haven't pushed through any of that, and so I would
6  like the time that's necessary to complete this
7  deposition so that I can understand the basis for
8  the claim in this case.
9  BY MS. DYSON:
10      Q   Did you recognize that document?
11      MS. PISCITELLI: I will give you -- okay. It's
12 now 3:56 p.m. I'll let you do -- go over the one
13 further exhibit you have, and then we're off.
14      Unless I -- you know, that's my computation, is
15 that it was at 4 -- excuse me -- 3:55 is where we
16 hit the seven hours --
17      MS. DYSON: Well, I haven't been running a
18 clock on this. I've been trying to get through this
19 deposition, so I'm going to continue to ask
20 questions.
21      If you feel you want to file a motion for
22 protective order, then you go right ahead and do
23 that.
24 BY MS. DYSON:
25      Q   Okay. So, Ms. vanHoek, do you recognize what I

Page 312

1  put in front of you which is Exhibit 83 to this
2  deposition?
3       A   Yes.
4       Q   Okay. And so by January 8, 2016, was the
5  PrimeCare account assigned to you?
6       A   I am not -- I wouldn't know. I would assume
7  sometime in January, but I don't know.
8       Q   Okay. Well, this e-mail -- this e-mail
9  calendar invite for January 8, 2016, is giving you the
10 address for the location of PrimeCare, correct?
11      A   That's correct.
12      Q   And so does that refresh your recollection as
13 to whether this account was assigned to you by January 8,
14 2016?
15      A   I don't know exactly when they reassigned it to
16 me.
17      Q   Okay. And --
18      MS. PISCITELLI: Ms. Dyson, let me just
19 interrupt.
20      How much time did you determine was remaining
21 for today's deposition?
22      MS. DYSON: What do you mean?
23      MS. PISCITELLI: After the last one, how much
24 time did you determine that you had?
25      MS. DYSON: I didn't determine any amount of

Page 313

1  time.
2       MS. PISCITELLI: Okay. Well, the rules are the
3  rules, so if you want to -- I'll give you another --
4  I'll allow you to go another 15 minutes, or to 4:15
5  and then -- and that's it.
6       MS. DYSON: Okay. And I need to be able to
7  inquire of your client as to the basis of her
8  claims, and I have done it as fast I could possibly
9  get through the mountain of documents that we have
10 to get through in this case.
11      And I think it's utterly unreasonable for you
12 to have me on a stopwatch in the middle of this
13 deposition when the first deposition, which I was
14 prepared to complete, was interrupted and therefore
15 I had to go over at the beginning of this deposition
16 things that I wouldn't have had to go over if we had
17 been able to continue the deposition, but for the
18 motion that you filed to end the first deposition.
19      So, therefore, I think it is a reasonable
20 interpretation of the rules to allow me to complete
21 this deposition today, which I don't anticipate is
22 going to go on for any great length of time unless
23 your client --
24      MS. PISCITELLI: How much longer do you
25 anticipate?

Page 314

1       MS. DYSON: Probably an hour.
2       MS. PISCITELLI: Okay. I will allow you to go
3  to -- okay. It's going on 4:00 now. I'll allow you
4  to 4:30, and that's it.
5       (Exhibit 84 marked for identification.)
6  BY MS. DYSON:
7       Q   Ms. vanHoek, so let me go to Exhibit 84.
8       A   Okay.
9       Q   Does this document refresh your recollection as
10 to when you had been assigned the PrimeCare account?
11      A   It doesn't definitively say that this is under
12 my rep number.
13      Q   Okay. What document would refresh your
14 recollection as to when you were assigned the PrimeCare
15 account?
16      A   To see a document that had my name on it as the
17 sales rep.
18      Q   Okay. Let's try this one then.
19      A   Okay.
20      (Exhibit 85 marked for identification.)
21      THE WITNESS: This is 2017. This isn't in
22 reference to PrimeCare, the set-up account.
23 BY MS. DYSON:
24      Q   Okay. So by October 2017, it certainly was
25 your account, correct?

Page 315

1     A    It seems that way, yes.
2     Q    Okay.  And you received credit for all the
3  sales in the PrimeCare account after it was transferred
4  to you?
5     A    After the setup was all done, yeah.
6     Q    Okay.  Well, I'm not sure why you're making a
7  noise as it relates to that --
8     A    Well, because I did all the work for the setup
9  and I did not get credit for it, and there's a lot of
10 work that goes into doing a setup.
11    Q    What work did you do for the setup?
12    A    Did you -- the three pages of the documents
13 that you had attached with the e-mail with all the items.
14    Q    So you sent a list of supplies --
15    A    Right.
16    Q    -- with prices to the client?
17    A    Right.
18    Q    Did you do anything else as it relates to the
19 setup?
20    A    I was actually there for the setup.
21    Q    Okay.  And when was that?
22    A    I don't remember exactly.
23    Q    And were you there for the setup because it was
24 now transferred to you?
25    A    Yes, but I didn't get credit for it -- did not

Page 316

1  get credit for the setup.
2     Q    Okay.  If you look at Exhibit 85 that's in
3  front of you, does that refresh your recollection as to
4  when this account became your account?
5     A    It looks like it was my account the 20th.
6     Q    So by January 20, 2016?
7     A    Right.
8     Q    And so your complaint with the PrimeCare
9  account is that you didn't get credit for the setup of
10 the account?
11    A    That's right.
12    Q    Okay.  And why is it that you believe that's
13 retaliation?
14    A    I can't think of it any other reason why
15 someone would do something like that.
16    Q    Okay.  Is there any other basis of why you
17 believe that's retaliation?
18    A    Not at the moment.
19    Q    Okay.  What other acts do you believe are the
20 basis for your claim of retaliation?
21         MS. PISCITELLI:  Object to the form.
22    A    The fact that I have to fight for everything.
23 BY MS. DYSON:
24    Q    What does that mean?
25    A    I had to fight to get that account back that

Page 317

1  was rightfully mine.
2     Q    Okay.  What else did you have to fight for?
3     A    I had to fight for getting credit for the
4  setup.
5     Q    And did you get credit for the setup?
6     A    Not the setup.
7     Q    Okay.  And you believe that the PrimeCare
8  account was rightfully yours because you had a
9  communication with the customer?
10    A    Because it was Dr. Singh's account and
11 Dr. Singh is Access Healthcare, which -- Maria was doing
12 the setup.  I mean, she was my customer.
13    Q    Okay.
14    A    Okay.
15    Q    And do you know that Mr. Jensen believed that
16 Ms. Capriati had had contact with that customer?
17    A    At that particular moment, but he knew right
18 away afterwards that it wasn't.
19    Q    And how is it that he knew that?
20    A    Because I told him.
21    Q    And when did you tell him?
22    A    Through e-mails.
23    Q    And when are those e-mails?
24    A    It was in December 2015.
25    Q    Okay.  And you told him that this was the

Page 318

1  Access Healthcare account?
2     A    Yes.
3     Q    But it wasn't opened under an Access Healthcare
4  Bill To number, correct?
5     A    No.
6     Q    It wasn't opened up as an Access Healthcare
7  Ship To number, correct?
8         Is that correct?
9     A    That's correct.
10    Q    Okay.  And so what other acts, other than the
11 PrimeCare account, do you contend are the basis for your
12 claim of retaliation?
13    A    There are a lot of things that happened.  I --
14 at the moment, I just can't think of them.
15    Q    You can't tell me what they are?
16    A    I can't think of them right now.
17    Q    Okay.
18    A    Okay.
19    Q    So if you think of them later, then you're
20 going to tell your attorney, correct, so she can tell me
21 that you've thought of those things?
22    A    Absolutely.
23    Q    Okay.  And is there any other evidence that you
24 contend is the basis for your claim of retaliation?
25         MS. PISCITELLI:  Object to the form.

Page 319

1    A    Same answer.
2  BY MS. DYSON:
3    Q    What does the "same answer" mean?
4    A    I'll get back with you.
5    Q    You'll get back to me on what you think is the
6  evidence that forms -- for the basis of your claim of
7  retaliation?
8    A    Yes.
9    Q    Okay.
10        (Exhibit 86 marked for identification.)
11  BY MS. DYSON:
12    Q    I'm going to show you what's marked as
13  Exhibit 86 to your deposition.  Do you recognize this
14  document?
15    A    Yes.
16    Q    And is this a true, correct and accurate and
17  complete copy of your fourth amended complaint in this
18  case?
19    A    As far as I can tell.
20    Q    Okay.
21        MS. PISCITELLI:  It's got pages on the back
22  so --
23        THE WITNESS:  Yeah, I see that.
24        MS. PISCITELLI:  -- review the whole thing.
25        MS. DYSON:  Are you instructing the witness

Page 320

1  during this deposition?
2        MS. PISCITELLI:  I just -- I'm sorry.  It's
3  got -- this has got -- it's printed.  It's two-sided
4  pages.  That's all.
5        THE WITNESS:  Okay.
6  BY MS. DYSON:
7    Q    Okay.  Does the fact that it's a double-sided
8  document -- does that change your testimony on whether
9  it's a true, accurate and complete copy of your fourth
10  amended complaint, Ms. vanHoek?
11    A    No, ma'am.
12        (Exhibit 87 marked for identification.)
13  BY MS. DYSON:
14    Q    Show you what's marked as Exhibit 87 to your
15  deposition.  Do you recognize this document?
16    A    I do.
17    Q    And is Defendant's Exhibit 87 a true accurate
18  and complete copy of your answers to interrogatories?
19    A    To the best of my knowledge, yes.
20        (Exhibit 88 marked for identification.)
21  BY MS. DYSON:
22    Q    Show you what's marked as Exhibit 88.  Do you
23  recognize Exhibit 88?
24    A    Yes.
25    Q    And is Exhibit 88 a true, accurate and complete

Page 321

1  copy of the supplemental response to defendant's first
2  set of interrogatories?
3    A    To the best of my knowledge, yes.
4        (Exhibit 89 marked for identification.)
5  BY MS. DYSON:
6    Q    Show you what's marked as Exhibit 89.  Is -- do
7  you recognize Exhibit Number 89?
8    A    It looks -- looks like it.
9    Q    Is Exhibit Number 89 a true, accurate and
10  complete copy of your sixth supplemental mandatory
11  disclosure?
12    A    To the best of my knowledge, yes.
13    Q    Have you identified every individual that you
14  believe has knowledge related to your claims in this
15  document?
16        MS. PISCITELLI:  Object to the form.
17    A    Say that again.
18  BY MS. DYSON:
19    Q    Sure.  Have you identified every individual
20  that you believe has knowledge -- that has knowledge
21  related to the claims that you're bringing in this case?
22        MS. PISCITELLI:  Object to the form.
23    A    At the moment.
24  BY MS. DYSON:
25    Q    What does that mean, "at the moment"?

Page 322

1    A    For what I can see right now, yes.
2    Q    Okay.  And you identified Danielle Galvin in
3  this --
4    A    Mmm-hmm.
5    Q    -- in this Defendants' exhibit 89.  Is that
6  correct?
7    A    That's correct.
8    Q    And you say that Danielle Galvin's subjects of
9  information are sex discrimination by defendants and Paul
10  Jensen.  Is that correct?
11    A    Yes.
12    Q    And what does that mean?
13    A    She was treated the same way I was.
14    Q    And how is that that you know that?
15    A    She's a friend of mine.
16    Q    So how is it that you know how she was treated?
17    A    She told me.
18    Q    Do you have any other information --
19    A    Nothing --
20    Q    -- any other basis for that conclusion, other
21  than your conversations with Ms. Galvin?
22    A    No.
23    Q    And was Ms. Galvin terminated from her
24  employment?
25    A    She was.

Page 323

1    Q    And have you been terminated from your
2  employment?
3    A    No.
4         MS. DYSON:  Let me take a break.
5         (Break taken from 4:11 p.m. to 4:14 p.m.)
6  BY MS. DYSON:
7    Q    So, Ms. vanHoek, we took a break.  Is there --
8  during that break, did anything else come to mind on your
9  claims of retaliation?
10   A    Yes.  I mean, if you look at my interrogatory
11 answers, it has everything in there.
12   Q    Okay.  Well, what else are you referring to in
13 your interrogatory answers?
14   A    Almost everything that happened after I filed
15 my EEOC, there was retaliation.
16   Q    Well, tell me about what those acts are.
17   A    Well, I'm sorry.  It's in there.
18   Q    No.  That's -- that's not an answer to my
19 question.  I asked you what the basis is for your
20 retaliation claim, and I'm entitled to that answer.
21        So what other acts do you contend have been
22 acts of retaliation?
23   A    Just the way I've been treated.
24   Q    And what way is that that you've been treated?
25   A    Unfairly.

Page 324

1    Q    And how have you been treated unfairly?
2    A    It continues to go on, Sacha.
3    Q    How have you been treated unfairly?
4    A    Specifically on the retaliation.
5    Q    Retaliation or discrimination, either one.
6  I've asked for both of them.
7    A    Okay.  I don't understand why, when a customer
8  asks for me specifically to be in charge of the account
9  and that request isn't granted and I'm given an answer
10 of -- for Florida Medical Clinic is because they don't
11 sign an exclusive contract with us -- I mean, think about
12 it.  You have to prove yourself to a customer before you
13 sign an exclusive.
14        And every step of the way, I've had to fight
15 for the customer to get what they want.  I mean, like
16 when you talk about the flu vaccine and the credit for
17 shipping and for fuel surcharges, I mean, that didn't
18 happen, like, right away.  I had to fight.
19        There were several e-mails.  There was a large
20 amount of time that went by.  And then the customer gets
21 upset, and they are, like, you know, "We just really
22 don't want to deal with this.  We don't have to deal with
23 this."
24   Q    And the customers that you're talking about are
25 Florida Medical Clinic and Access Healthcare?

Page 325

1    A    That's right.
2    Q    And we've already gone through those today?
3    A    And PrimeCare.
4    Q    And PrimeCare.  We've already gone through
5  PrimeCare?
6    A    Okay.  Well, then --
7    Q    So what else --
8    A    -- to the best of my knowledge, that -- we've
9  covered most everything.
10   Q    Okay.  So you can't identify any other basis
11 for your claim of discrimination, correct?
12   A    At the moment, no.
13   Q    Any other evidence that supports your claim of
14 discrimination?
15   A    Not at the moment.
16   Q    And you can't provide any other basis for your
17 claim of retaliation, correct?
18   A    Not at the moment.
19   Q    And you can't tell me any other evidence
20 provide that supports your claim of retaliation, correct?
21   A    Not at the moment.
22   Q    And have you provided accurate and complete
23 testimony today?
24   A    To the best of my ability, yes.
25   Q    Is there anything that you believe you need to

Page 326

1  change?
2    A    Not at the moment.
3         MS. DYSON:  I have no further questions.
4         THE WITNESS:  Thank you.
5         (Proceedings concluded at 4:19 p.m.)

| Page 327 | Page 329 |
|---|---|

**Page 327**

```
 1              CERTIFICATE OF REPORTER
 2
 3    STATE OF FLORIDA
 4    COUNTY OF HILLSBOROUGH
 5
 6         I, ELIZABETH W. CHORRUSHI, Registered
 7    Professional Reporter, Florida Professional Reporter,
 8    certify that I was authorized to and did stenographically
 9    report the deposition of HILDA VAN HOEK; that a review of
10    the transcript was requested, and that the foregoing
11    transcript, Pages 98 through 331, is a true record of the
12    testimony given by the witness.
13
14         I further certify that I am not a relative,
15    employee, attorney, or counsel of any of the parties, nor
16    am I a relative or employee of any of the parties'
17    attorney or counsel connected with the action, nor am I
18    financially interested in the action.
19
20         Dated:  09/10/2019.
21
22
23                      ELIZABETH W. CHORRUSHI
                        Registered Professional Reporter
24                      Florida Professional Reporter
25
```

**Page 329**

```
 1    09/10/2019
 2
 3    KATHRYN S. PISCITELLI, ESQUIRE
      Law Office of Kathryn S. Piscitelli
 4    P.O. Box 691166
      Orlando, Florida 32869
 5    Kpiscitelli@cfl.rr.com
 6    In Re:  HILDA VAN HOEK vs McKESSON CORPORATION, a foreign
      corporation, PSS WORLD MEDICAL, INC., a Florida
 7    corporation, McKESSON MEDICAL-SURGICAL, INC., a foreign
      corporation, McKESSON MEDICAL-SURGICAL TOP HOLDINGS,
 8    INC., a Florida corporation
           Deposition taken on 08/09/2019
 9         U.S. Legal Support Job Number 1983207
10    The transcript of the above proceeding is now available
      for your client's review.
11
      Please call to schedule an appointment between the hours
12    of 9 a.m. and 4 p.m., Monday through Friday, at a
      U.S. Legal Support office located nearest you.
13
      Please complete the review within 30 days.
14
      Sincerely,
15
16    ELIZABETH W. CHORRUSHI, RPR, FPR
      U.S. Legal Support, Inc.
17    First Floor
      700 East Dania Beach Boulevard
18    Dania Beach, Florida 33004
      (813) 876-4722
19
20    I do hereby waive my right to sign.
21
22    HILDA VAN HOEK
23    cc via transcript:  SACHA DYSON, ESQUIRE
24
25
```

| Page 328 | Page 330 |
|---|---|

**Page 328**

```
 1              CERTIFICATE OF OATH
 2
 3    STATE OF FLORIDA
 4    COUNTY OF HILLSBOROUGH
 5
 6         I, ELIZABETH W. CHORRUSHI, Registered
 7    Professional Reporter, Florida Professional Reporter,
 8    Notary Public, State of Florida, certify that HILDA VAN
 9    HOEK personally appeared before me on August 9, 2019, and
10    was duly sworn.
11
12         WITNESS my hand and official seal this date:
13    September 10, 2019.
14
      Identification:
15
16    HILDA VAN HOEK produced Florida Driver License.
17
18
      ELIZABETH W. CHORRUSHI
19    Registered Professional Reporter
      Florida Professional Reporter
20    Notary Public
      State of Florida
21    Commission No. GG-229717
22    My Commission Expires 10/17/22
23
24
25
```

**Page 330**

```
 1              ERRATA SHEET
 2    DO NOT WRITE ON TRANSCRIPT -- ENTER CHANGES HERE
 3    IN RE:  HILDA VAN HOEK vs McKESSON CORPORATION, a foreign
      corporation, PSS WORLD MEDICAL, INC., a Florida
 4    corporation, McKESSON MEDICAL-SURGICAL, INC., a foreign
      corporation, McKESSON MEDICAL-SURGICAL TOP HOLDINGS,
 5    INC., a Florida corporation
           DEPOSITION OF:  HILDA VAN HOEK
 6         TAKEN: 08/09/2019
      U.S. Legal Job Number:  1983207
 7
      PAGE LINE CHANGE                    REASON
 8
      _____
 9
      _____
10
      _____
11
      _____
12
      _____
13
      _____
14
      _____
15
      _____
16
      _____
17
      _____
18
      _____
19
      _____
20
      _____
21
      Under penalty of perjury, I declare that I have read my
22    deposition and that it is true and correct, subject to
      any changes in form or substance entered here.
23
24    SIGNATURE OF DEPONENT:  _____
25    DATE:  _____
```



Page 331

```
1                UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF FLORIDA
2                     TAMPA DIVISION
3            CASE NO.:  8:17-cv-02447-T-02AAS
4  HILDA VAN HOEK,
5          Plaintiff,
6  vs.
7  McKESSON CORPORATION, a foreign corporation, PSS WORLD
   MEDICAL, INC., a Florida corporation, McKESSON
8  MEDICAL-SURGICAL, INC., a foreign corporation, McKESSON
   MEDICAL-SURGICAL TOP HOLDINGS, INC., a Florida
9  corporation,
10         Defendants.
11  *   *   *   *   *   *   *   *   *   *   *
12    COURT REPORTER'S CERTIFICATE OF CORRECTION TO THE
       DEPOSITION OF HILDA VAN HOEK TAKEN ON 8/9/2019
13
    STATE OF FLORIDA      )
14  COUNTY OF HILLSBOROUGH )
15      Under penalties of perjury, I declare that I,
    Elizabeth W. Chorrushi, RPR, FPR, have reviewed the
16  transcript and found the following error:
17      Throughout the transcript, the address of Kathryn S.
    Piscitelli, Esquire, should be listed as P.O. Box 691166,
18  Orlando, Florida 32869.
19      I hereby certify that copies have been mailed to
    SACHA DYSON, ESQUIRE and KATHRYN S. PISCITELLI, ESQUIRE.
20
      DATED THIS 08/09/19
21
22                    ELIZABETH W. CHORRUSHI, RPR, FPR
                      U.S. Legal Support, Inc.
23                    First Floor
                      700 East Dania Beach Boulevard
24                    Dania Beach, Florida 33004
                      (813) 876-4722
25
```

---

**$**

---

**$100**  152:24
**$117,000**
 173:16,19,24
**$20,000**
 153:23 154:5
**$30,000**
 153:23 154:8
**$300**  151:11

---

**0**

---

**09/10/2019**
 327:20

---

**1**

---

**1**  118:23
 119:24 120:13
 138:10 139:19
 202:5,9
 208:15
**1.190(a)**
 115:21
**10**  165:20,22
 166:2
**100**  189:12
**10:26**  126:4
**10:30**  126:4
**11**  201:16
 290:16
**11/15**  198:3
**11:46**  178:8
**11:55**  178:8
**11th**  248:5
**12**  137:11,16
 138:13 270:19
 273:8
**12th**  137:15
**13**  134:8
 180:5 200:19
**14**  180:5
**143**  194:1

**15**  170:13
 313:4
**1500**  262:9,10
**151**  138:13
**1511**  139:25
**1513**  137:5,6
**1518**  192:7
**1519**  192:6
**16**  118:14
 131:8 181:19
 304:15
**16th**  304:6
**17**  113:20,22
**17th**  307:4
**18**  120:4
 133:23,25
 140:19,20
 163:24 296:9
 304:16
**18th**  307:20
**19**  136:13,15
**1994**  115:25
**1:01**  307:19
**1:35**  235:11,
 17
**1:41**  252:13

---

**2**

---

**2**  126:23,24
 184:5 196:2
 226:4
**20**  140:12,14
 141:25 142:1
 215:19 218:25
 225:20 284:8
 285:18,23
 287:13 316:6
**20-plus**  284:4
**2000-**  310:12
**2011**  308:24
**2012**  118:23
 119:7,24
 120:13 122:25
 131:13 132:17
 137:12,16
 178:1 180:5

**2013**  134:8,16
 135:23 137:22
 138:7,11,22
 139:19,22
 140:2,10
 142:16 183:5
 198:13 201:3,
 24 203:11
**2014**  179:17
 180:2 264:10,
 18 266:7,24
 268:12
 270:13,19,24
 272:13 273:8
 284:8 285:5,
 7,13,16,18,23
 287:13 288:1
 289:3 290:16
 291:18 292:2
 296:9
**2015**  145:15,
 21 147:2,16
 159:11 181:19
 218:25
 304:10,15
 317:24
**2016**  111:6,9
 149:24 150:4,
 12,16 154:11,
 18 157:12,16
 161:21
 162:13,23
 163:3,8,10,24
 167:5 174:16
 179:17,18
 204:23 205:8,
 13 206:13
 208:3,15
 209:24 210:2
 215:20 219:14
 220:6 225:20
 226:4 228:13
 229:12 232:9,
 14 233:13
 234:19,23
 235:11,17
 237:9 238:9
 240:10 241:13
 242:25

 243:13,18,22
 244:1,8
 310:12 312:4,
 9,14 316:6
**2017**  165:20,
 22 166:2
 171:19 172:9
 174:4 295:5
 308:12
 314:21,24
**2018**  259:24
 261:21,23
 262:1 304:16
**2019**  170:14
**20th**  316:5
**21**  138:22
 146:15,17
 308:12,24
**22**  149:13,15
 157:12,16
 159:11
**23**  156:10,13
 157:10
**23rd**  248:6
 305:9
**24**  147:2
 160:16,18
 264:10,18
 266:7
**25**  163:13,15
 206:13 208:3
**25-**  153:23
 154:8
**25th**  207:12
**26**  165:13,16
 204:23 205:8,
 13 209:24
 210:2
**27**  131:13
 132:17 167:8,
 10 171:19
**27th**  131:15
**28**  168:1,3,5
 169:24 219:13
 220:6
**29**  139:22
 140:2,10
 170:7,9 183:5

295:5
**292**   198:13
**296**   198:14
**2:26**   252:13
**2nd**   225:19

---

### 3

**3**   135:23
**30**   137:21
168:7 171:10,
12
**30th**   138:17
**31**   172:9
174:4 175:6,
8,9
**313**   135:1
140:24
**314**   135:1
**315**   135:2,19,
20 136:6
**316**   136:5,6
**32**   182:17,20
183:2 212:8
240:5
**329**   201:9
**33**   190:10,12
191:13
196:19,24
197:5,9
**331**   327:11
**34**   197:20,22
**35**   204:14,16
205:12
222:10,13,14,
15,18,19
**36**   213:11,14
**37**   214:12,15
216:20 217:4
**38**   216:16,18
217:3 218:15,
17
**39**   218:8,10
225:11,15,23
226:1,2
**393**   200:19
201:1

---

**3:24**   294:8
**3:31**   294:8
**3:55**   311:15
**3:56**   311:12

---

### 4

**4**   198:17
228:13 229:12
234:23 311:15
**40**   219:3,5
**41**   222:2,4,9,
16 225:9,13,
18 226:3
**42**   227:20,22
228:7 229:6
**422**   205:1,3
**423**   205:21,22
**4270896**
192:23 193:13
**4270935**   196:3
**43**   229:1,3,4,
12
**4317588**   196:9
**4320050**   194:5
**434**   205:1,4
**44**   230:10,12
231:4,10
**45**   234:10,12,
18 237:8
**46**   236:8,10
237:17
**47**   238:15,18
**48**   240:15,17
**49**   242:19,21
**4:00**   314:3
**4:11**   323:5
**4:14**   323:5
**4:15**   313:4
**4:19**   326:5
**4:30**   314:4
**4s**   194:6
**4th**   231:15

---

### 5

**5**   198:23
232:9,14
233:12 234:19
235:11,16
237:8 240:10
241:13
243:12,18,21
244:1,8 289:3
**50**   244:11,13
248:1,5
**51**   247:11,13,
25
**512**   201:25
**52**   248:9,11,
14
**520**   202:2
**53**   248:23,25
**54**   249:16,18
**55**   251:5,7
252:16,18
**56**   252:3,5,6
253:16
**57**   254:16,17,
18,19,21
**58**   254:16
255:20,23
256:6
**59**   256:14,16
**5th**   238:9

---

### 6

**6**   291:18
292:2
**60**   129:14
256:22,24
**61**   257:19,21
**62**   258:10,12
**63**   259:17,20,
21
**64**   260:24
261:2
**65**   263:22
264:1

---

**66**   266:14,16
270:25
**67**   268:6,8
**68**   269:18,21
275:18,19
**682**   126:24
**683**   124:20
131:10
**684**   131:9
**69**   275:16,20
279:19

---

### 7

**7**   266:23
268:12 270:24
**70**   109:12
277:21,23,24,
25
**70/30**   109:11
112:13 190:25
**71**   277:24
278:9,12
279:11
**72**   283:19,20,
23
**73**   284:23,25
291:15
**74**   287:16,18
289:3
**75**   290:8,12
**76**   294:10,12
**77**   295:18,19,
21
**78**   296:4,6
**79**   297:25
298:2,4

---

### 8

**8**   134:16
142:16
145:15,21
149:24 150:4,
12,16 154:11,
18 201:13
242:25 312:4,

9,13
**80** 303:4,7,11
**81** 305:20,23
**8121** 150:8
**817** 150:8
**82** 308:6,8,12
**83** 310:14,16
312:1
**84** 314:5,7
**85** 314:20
316:2
**86** 319:10,13
**87** 320:12,14,
17
**88** 320:20,22,
23,25
**89** 321:4,6,7,
9 322:5
**8th** 144:24

---

**9**

**90** 292:24
**90-plus**
292:22
**98** 261:9
262:17 327:11
**996546** 193:23
**9:02** 307:4

---

**A**

**A-R-I-A-S**
249:5
**a.m.** 126:4
178:8
**A/r** 206:21
**Abbott** 121:5
**abbreviations**
276:22
**abided**
176:19,22
**ability** 158:3
325:24
**Absolutely**
318:22

**Access** 131:25
178:13,16,25
180:25 181:8,
18,21 183:25
184:4,5,8,18,
19 185:1,3
187:20 188:2
190:1,7
193:21,24
194:18 196:2
206:17 210:18
212:13,15
213:3,6
214:3,6,8
215:11 216:2,
7 217:20
219:18,19
221:13
226:10,13,24
227:7 230:5,
23 231:12,22
232:6,24
234:8,24
235:7 236:16
237:1 239:6,
21 241:3,19
244:9 246:8,
12 250:3,4
251:3,13,17
252:7 254:10,
13 256:4,8,20
257:6 258:8,
15,16 259:3
260:2 261:13
262:2,12
317:11 318:1,
3,6 324:25
**Access-2**
184:3,6,16
**Access-2-
healthcare**
184:2 193:7,
12
**Access-
affiliate**
215:2
**Access-owned**
184:14 215:1,
22

**accordance**
115:2,4
186:20
**account**
109:9,13
111:2,7
112:3,16
118:11 119:8,
13,14,25
120:8,10,14,
18,21 126:12,
13,17,20,23
127:21 130:6,
7 133:16,17,
18,21 139:16
142:12,21
143:21 146:9,
12,13 148:2,6
151:23 152:1,
10,12,20,21,
24 153:12,22
154:5,12,25
158:11,24
159:2,13,18,
21,22 160:1,4
161:8 163:10
167:2 169:17,
18 170:5
172:21
173:22,23
175:1,18
176:9,11,13,
15 178:11,13,
15,16,23,24,
25 179:20
180:8,24,25
181:14 182:9
185:17 187:6
188:2,5
191:21,25
192:21 193:6,
16 194:21,23,
25 195:4
196:1,15
197:10 204:6,
11 208:21,24
209:2,7,16
213:22 215:22
220:24 222:20

223:8,10,14
224:1,6 225:7
227:13 228:21
229:9 232:6
233:2 235:24
239:24 246:8,
22 254:14
256:4 259:4
260:3 262:22,
24 263:1
265:1 266:4,9
267:24 268:3,
12,20 269:13
270:23 272:1,
12 275:4,5,7,
14 276:2,14,
16 277:5,10,
15,18 278:4
279:13,22
280:2,3,5,8,
13 281:1,3,8
284:21 286:15
287:2,5,14,25
288:6,11,25
289:5,15,24
290:1 291:2,7
292:6 293:12,
16 295:12,23,
24,25 296:1,
14,16,18,21
300:14 301:1,
3,22 302:6
304:5,15
305:14,18
306:23 307:17
308:4 309:9,
11 310:5,9
312:5,13
314:10,15,22,
25 315:3
316:4,5,9,10,
25 317:8,10
318:1,11
324:8
**accounting**
143:2 206:16,
20 207:5
246:20 251:16
252:7

accounts
112:10 119:3
127:3 131:23
132:3,10,12
133:1 143:7,
25 152:6,7
158:4 160:9
162:2 165:11
180:5 181:12,
21 184:23,24
185:1 189:4,
6,8 190:7,18,
20,21,22
191:15,16,17
192:10,13,25
194:6,7,8,9
195:25
196:20,21,25
197:1 206:25
208:14 211:13
215:1,2
219:20
224:14,22
226:10,24
227:9 251:18,
19 252:8
256:3,8,12
259:1,9
271:18,19
272:5,17
273:20,22
274:7,8,14,
16,17 275:2,
10 280:10
accuracy
199:1
accurate
107:14 108:16
158:16 185:21
239:12
260:10,15
319:16 320:9,
17,25 321:9
325:22
Acess-2-
healthcare
195:8
acquired
130:25 133:16

139:6 158:4
160:2,5
168:11,13
210:18 258:16
acquiring
191:16,21
192:17
acquisition
112:10,17
139:15 168:15
190:21 192:17
196:1 198:8,
14,17 201:8
203:7,23
277:4,9
acquisitions
162:2
act 300:6
action 263:5
300:1,5
327:17,18
actions 311:1
active
129:12,13,14,
16,17,18,24
130:6,7
activity
117:6 130:4,5
255:10 299:7,
9,12 300:2,21
acts 298:15
316:19 318:10
323:16,21,22
adage 125:5
126:8
added 159:7
additional
166:10
address
116:7,9
139:10
195:16,17
312:10
Advantagetrust
230:19
advocate
164:20 170:3

advocating
188:4 289:14
affect 144:8
affected
201:15
affecting
119:3 127:4
Affects
116:7,9,11
affiliate
215:22
affiliated
184:25 193:21
194:18 214:9
affiliates
184:12
affirm 106:5
affirming
257:24
agree 195:20,
24 245:21
289:24
agreed 123:17
232:23 245:24
267:5 288:16
agreement
166:20,25
179:22
181:17,22,25
182:3,6,9,13,
15,16 208:18
213:9 229:14,
22,24,25
230:3,4,6,7
233:2 240:23
242:10,13,16
266:24
267:12,22
270:23 290:5,
10
ahead 108:6
125:25 126:2
136:3 161:3
197:13 243:7
302:22 306:18
311:22
AHS 276:19,
20,24 277:2,9

AI 121:4
Airplane
299:20
Alexandra
183:13 188:25
209:5,9
allegation
311:1
allege 178:24
alleges
178:12 310:25
allowed 189:5
195:13 311:3
Ally 177:11
alter 229:22
230:2,4
240:23
alters 229:14
amended
113:12 114:4,
15 115:19
117:14,18
319:17 320:10
amount 120:4,
17,19 170:24
310:25 312:25
324:20
Amy 159:8
175:14
Anderson
180:16,19
199:3,6
200:11,14,18,
23 201:9
202:11,18
203:3
announcement
108:19
annually
290:2
answering
132:22 276:11
285:10
answers
107:24 113:13
320:18
323:11,13

anticipate
  313:21,25
anticipation
  113:16
anymore   226:2
  251:22
Apparently
  299:19
appears   135:6
  148:22
  303:21,23
application
  301:8,10,12,
  16,19,23
  302:2,10,17
  304:5 309:15
applications
  285:8 301:19
approval
  249:23
April   134:8,
  16 135:23
  183:5 259:24
  285:5,13,16
  288:1
area   157:20
  183:14 271:14
  285:19
areas   273:5
arguing
  186:15,23
arise   139:11
Arolsmeyer
  169:4,8
arranging
  237:10
arrow   191:20,
  25
arrows   192:14
asks   139:10
  229:12
  250:13,14
  285:9 290:20
  324:8
ASM   199:12,18
  200:1,6,8,12
  201:21

assert   108:4
assign   111:1
  167:1 288:11
  301:23
assigned
  112:16 119:12
  129:3 133:2,
  7,9,13 146:12
  148:8 152:7
  162:12,16,22
  163:1,10
  166:25 171:5
  180:14 188:19
  190:20 209:16
  211:13 220:7
  223:14 248:17
  259:7,8
  268:13,17
  269:15 271:19
  277:15 286:11
  288:12 291:9
  304:14,16
  307:24 308:3
  310:6 312:5,
  13 314:10,14
assigning
  256:3,7 288:8
assignment
  118:10 119:6
  178:25 180:8
  181:11 209:23
  220:5 229:9
  231:7,13,17,
  23 232:24
  263:2 265:1
  271:23 277:10
  280:11,13
  287:2,4,14,25
  288:12,25
  289:5 292:6
assignments
  158:24 159:2
  178:16 180:25
  262:22
assistant
  222:1 228:16
assume   108:9
  144:20 174:7
  183:15 235:3

241:22 262:9
  312:6
Assumes
  138:19
assuming
  242:6,11
  261:23 271:24
attached
  148:2,6
  150:10 169:17
  191:20 297:13
  308:17 315:13
attain   170:24
attempted
  226:19
attend   167:18
attorney
  108:4 318:20
  327:15,17
attribute
  141:3
August   139:22
  140:2,10
  225:16,19
  226:4 228:13
  229:12 231:15
  232:9,14
  233:12
  234:19,23
  235:11,16
  237:8 238:9
  240:10 241:13
  242:25
  243:11,12,18,
  21 244:1,8
  248:5,6 284:8
  285:7,18,23
  287:6,13
authored
  186:9
authorized
  327:8
avenues
  126:22
aware   116:23
  128:12 228:23
  232:4 239:23
  243:10,12,17,

21,25 244:7
  246:3 286:9

_____

B

B-O-R-G-N-I-S
  309:17
B12   121:7
back   120:9
  123:18,21
  127:9 131:10
  137:5 138:13
  140:5,18
  150:1,2 188:1
  189:25 208:6
  221:20 222:10
  225:9 250:10
  253:9 262:21
  279:19 291:2,
  6,15 294:9
  310:10 316:25
  319:4,5,21
Barnabo
  183:19,22
  185:2,4 186:7
  203:12 204:3,
  8 210:18,25
  214:20 215:11
  216:2,7
based   117:4,5
  173:10 175:19
  241:16
  280:11,14
  305:14
bases   118:10
basis   180:7
  298:15,18
  311:7 313:7
  316:16,20
  318:11,24
  319:6 322:20
  323:19
  325:10,16
Bates   124:20
  135:1,19
  137:5 139:25
  140:23 150:8
  192:6 205:1,

22
**Bay** 271:14
**Bedford**
228:11
**beginning**
253:21 310:12
313:15
**behalf** 106:23
114:4
**belief** 141:22
**believed**
112:12 305:5,
7 317:15
**belong** 230:25
**bid** 123:17,24
124:1,4,6,7
**bids** 124:3
**big** 144:8
179:5 224:18,
21,24
**bill** 119:6,13
127:8,10,15,
17,24,25
128:3,6,9,13
129:1 177:25
178:4 181:14
193:23 194:1
195:14
209:10,13
231:6,14,17
246:12,19,21,
23,25 247:1,
4,6,8 256:4
275:6 318:4
**billing**
142:20
**bit** 132:10
281:25
**board** 165:3
**book** 148:18,
21
**Borgnis**
309:19,20
**boss** 269:16
**Boteilho**
207:13 208:8
209:22

**bottom** 124:21
131:13,18
143:9 156:24
160:23 186:5,
6,14 187:1
192:10,20
194:2,24
198:3 205:21
267:3 308:11
**bought** 123:5
185:3 283:5
**Boyes** 156:20
159:4,5,8,9,
10 160:8
174:11
175:14,16
**Boyles** 155:21
158:19,24
159:4
**Brady** 119:7,
12 127:7,10,
23 128:10,11,
14,17 129:3,
16 130:18
133:1,21
135:23
139:14,16
144:10
147:22,25
148:3,5,22
151:7,24
152:6,11,13,
20 156:19
157:16,20
158:2 159:24
160:4 166:5
175:13,16
176:7,8
177:9,14
178:1 201:18
202:11,18
203:3 223:13,
19,25 224:5,
13,24,25
268:18,21
269:9 271:14,
23 273:12,21
275:12 281:5
288:1 292:9,

18 295:24
296:2
**Brady's** 148:9
152:6 157:21
201:24 273:19
279:15
**branch** 292:13
**break** 108:2,
3,4 126:4
178:7,8
227:24
252:11,13
294:7,8
299:16 323:4,
5,7,8
**Brian** 110:17
111:2,3,6
112:3 156:19
276:1
**briefly** 109:2
113:14 150:20
**bringing**
321:21
**broad** 298:17
**brought** 299:3
**building**
166:9 284:3
**business**
109:12 120:4,
7,17,19,24
121:3,8
123:14 128:24
155:13,18
161:12,24
164:17,21,23
165:1,6 166:9
167:15,18,23
168:6,20
169:14 170:24
172:17 173:11
174:9,12
189:13 190:25
197:2 216:10
224:23 225:3
226:9,12
227:17 236:3,
6 237:19
250:13,15

251:2 255:2,
4,7,16 256:20
268:25 269:4,
5 271:24
273:4,7 283:8
294:25
**business's**
225:6
**businesses**
236:23
**buyer** 183:25
184:1
**buying** 130:1
150:25 151:6,
15,18,23
152:5,10,12,
14,20 153:22
154:5,8
**buys** 151:25

---

C

**calendar**
236:15 312:9
**call** 183:20
187:18 207:21
221:21 229:8,
14 232:5
233:12,20,25
234:1,5,8,24
235:2,4,6,7,
13,15 236:2,
5,16,21,22,25
237:5 239:6,
7,10 241:3
258:5
**called** 116:7
170:22 177:9
216:11 230:18
**calling** 120:3
290:18
**calls** 128:1
216:12 235:5
237:23 238:1,
4
**capitals**
166:21

Capparelli
134:8,10
Capriati
116:18
180:17,21
189:25 213:25
226:24 245:14
260:2,16,19
305:18 308:25
309:6,21,24
310:1 317:16
caps 224:18
capture
170:17
care 159:14,
22
Carleen
142:23,24
143:1,6
Carlo 188:25
Carlos 112:19
118:16 126:15
136:22
137:13,14
149:19 166:22
188:15 189:11
199:6,10
200:12 201:21
203:17 249:5
291:9 292:19
Carlos's
199:24
Carmen 189:25
209:3 213:24
219:17 221:9
304:15 305:14
307:24 308:4,
25
Cary 205:21
206:2,12,15,
22 207:9,13,
24 209:22
case 107:10
116:25 117:4
166:9 266:2
278:24 310:25
311:1,8
313:10 319:18

321:21
Castellano
152:1,23
153:3
casting
283:2,5
categories
170:25
category
171:1
caught 292:17
caused 121:7
277:10
center 302:6
centers 163:5
CERTIFICATE
327:1
certify
327:8,14
cetera 119:4
171:1 249:10
307:8
CFO 123:4
212:13
chain 134:7,
15 137:2
149:21 150:7
157:15 165:25
171:18 183:2,
4,9 205:1,5,
9,14 208:10
240:25
291:16,24
294:19
change 164:1
177:25 216:24
320:8 326:1
changed 178:4
217:21
charge 150:25
324:8
charged
144:1,6
charges
144:21 145:6,
24

check 123:18,
21 276:3
cherry-picking
296:25
Cheryl 263:10
269:16
chief 221:13
choice 250:11
Chorrushi
106:1 327:6,
23
chose 111:3
Chris 183:19,
22 185:2,4,16
186:7 203:12
214:20
Christina
134:8,10
Christine
210:13,18
216:2,7
Christmas
310:13
Cindy 307:7,9
309:12,13,14
Circuit 114:5
Civil 115:21
claim 118:3,
4,9,10
262:21,23
298:14,16,18,
24 299:3,25
300:4 310:25
311:8 316:20
318:12,24
319:6 323:20
325:11,13,17,
20
claims 107:14
116:25 117:4,
7 118:3 313:8
321:14,21
323:9
clarification
139:1
clear 107:22
162:1 218:22

client 177:2
204:4,9 311:3
313:7,23
315:16
Clinic 118:11
119:8,13,14,
25 120:3,16
121:4 124:2,5
127:3,8,11
128:5,23
129:11,22
130:15 132:15
133:15,21
139:15
142:12,21
143:3 153:4,
18 156:6
158:4 159:16
160:2,5
161:8,11,17
162:12,22
164:2 165:6
166:25
167:15,24
168:7 169:11
170:5,17
172:21 174:25
178:2 255:11,
18 296:13
324:10,25
Clinics
166:11
Clint 119:4
127:4 128:17
147:22,25
151:24
152:13,24
156:19 157:20
158:12 160:9
176:7,8
177:14 178:1
267:6,9 269:1
271:13
273:12,19
281:5 291:10
292:9,18
293:16
clock 311:18

closed  281:4
  284:21
clue  144:16
  185:22 261:14
  279:18 297:16
co-championing
  209:10
coach  186:18
coaching
  257:14
coast  180:5
  181:12,21
  184:24 185:2,
  9,10,11,12
  188:14,20
  189:6,21
  190:6 203:10
  211:13 214:23
  219:17,19
  220:9,10
  248:17 251:13
COF  122:14
collaborative
  276:18 279:24
Colleen
  121:15,24
  122:12,14
  123:3
column  200:3
comment
  106:15 155:23
commission
  262:20 303:15
  306:1
commissions
  127:24
commitment
  293:5
communicate
  211:19 212:21
  216:4
communicated
  109:18,20,23,
  24 111:16
  161:20
  188:10,11
  203:14,15,16,
  19,21 211:23

216:1 293:21,
  25 307:23
communicates
  211:21
  212:18,19
communicating
  233:24 241:1
  289:4 294:25
communication
  110:4,10,15
  187:4 214:19
  228:6 254:7,
  12 257:4
  260:6,16,18
  264:9,13,17,
  20 269:23,24
  271:2,3 286:9
  288:14 289:21
  307:13,16
  317:9
communications
  175:4 187:7
  216:12,13
  219:9 254:1,5
  264:9 273:17
  287:22
companies
  131:1
company  116:2
  123:11,12
  130:24 138:4
  168:10
compensated
  246:7
compensation
  171:8 180:12,
  13 181:13
competitor
  123:6,7,8,9
complain
  209:23 287:4,
  7,12 293:12
  294:3
complained
  287:1
complaining
  210:4,9
  238:12 263:19

280:23 281:7
complaint
  114:4,15
  115:17,19
  117:14,18
  178:12 316:8
  319:17 320:10
complaints
  113:12
complete
  107:13 310:23
  311:6 313:14,
  20 319:17
  320:9,18,25
  321:10 325:22
completed
  106:25 170:5
completely
  150:21
complicated
  184:4 212:14
Compound
  114:16
computation
  311:14
computer
  148:7 209:15
computers
  130:4
concern
  142:20 288:17
concluded
  326:5
conclusion
  322:20
conditions
  108:16
conducting
  167:15
conference
  183:20
confirmation
  256:2
confirmed
  177:5
conflict
  197:3

confused
  150:3 272:3
confusing
  137:18 295:2
connected
  327:17
Conner  221:23
  228:10,15
  232:5,16
  242:24
  243:13,18
  247:18 253:23
  254:2,9,12
  258:15
  260:16,18
consecutive
  246:17
consent
  115:20
considered
  130:6
consolidated
  207:1
consolidation
  209:10,13
  231:6,14,17
  246:12,19
  247:1,9
consummated
  250:8
contact  148:3
  217:1,24
  265:22 290:20
  302:21
  304:23,24
  305:2,6,15
  317:16
contacted
  281:13,16
  282:4
contend
  179:19 180:8
  264:25 265:14
  266:2 280:10
  299:6,9,12
  318:11,24
  323:21

content
  264:13
contention
  146:11
contents
  150:22 254:4
continuation
  216:20 218:15
  229:6
continue
  131:25 132:2,
  18 150:25
  169:10 216:25
  217:23 272:16
  311:19 313:17
continued
  107:5 127:17
  252:14 273:3
  294:3
continues
  128:23 179:11
  292:22 297:8
  324:2
continuing
  124:11 179:11
  293:12
continuously
  115:24
contract
  241:19 324:11
control
  172:12 250:4
controller
  206:16
conversation
  110:1 113:5
  136:8,11
  157:8 176:5,
  6,8 232:8,13,
  15,16,20
  290:21 292:5,
  25 293:2,23
conversations
  109:16 111:22
  141:10,13,16
  322:21
COO  249:4

copied  146:21
  166:5 175:11
  208:8 236:18,
  19
copies  140:15
  217:7
copy  108:23
  114:15
  115:12,13
  134:12 138:3
  166:1,13
  185:25 207:13
  228:10 241:18
  242:9,13,15,
  17,24,25
  247:17 253:2
  260:6,11,15
  264:17 291:19
  319:17 320:9,
  18 321:1,10
copying
  207:24
corporate
  210:13,21
  211:3 277:5
corporation
  184:14
correct
  109:1,5
  111:2,8
  112:4,9,11,14
  113:2 114:7,
  12,15 115:25
  116:1 118:6,
  7,19 119:8,15
  120:5,8,14,
  15,18,21,22
  123:9,10,20
  125:3 127:21
  128:8,24
  130:8 134:13,
  21 135:8
  136:1,25
  137:3,4,12
  138:23 140:7,
  8 141:14
  144:11,12,15
  145:3,21,22,
  24 146:9,13,

21,24 148:23
149:10,24
150:9,16,17,
19 151:15,16,
20,21 152:2,
3,7,11,21,22
154:9,19,25
155:1,3,19
156:3,22
157:25 158:1,
5,6,8,17,19,
21 159:11,24,
25 160:6
161:8,9,17,
18,24 162:3,
4,6 163:11,21
164:3,4,11,
12,14 165:6
166:6,15
167:19
168:14,17,23,
24 169:3,14,
21,22 170:15
171:6,16,17
174:14,16,17,
19,21 176:15
177:22 178:5,
13,14 179:1,2
180:22,23
183:2,11,17
184:19
185:13,14
186:14 188:5
189:16,22
190:1,23
191:17,21
192:1,18
193:16 194:22
195:5,9,15
196:6 199:18
200:20 201:4,
10 202:6,7,9,
10,13,19,24
203:4 205:2,
14 207:2,4,7
209:3 210:2,
5,10,11,25
211:15,24
212:5,6,8,9

213:19,20
214:7,10
215:8 216:23
217:8,9,11,
12,21,24
218:6,7,18,24
219:1 220:5,
6,17,21,22,24
221:1,10,16,
21 222:25
223:15,17,18
224:2,6,7,15
225:7,23
226:20,25
227:3,9
228:16 231:24
232:2 233:20
234:1 235:12
237:5 238:13
241:3,10
242:14 244:25
245:3 246:13
247:6,22,24
248:2,7,8,18
249:10,14
250:11,16
251:11 252:22
253:14 254:2,
10,14,15
255:5 256:12
257:7,12,13,
15 258:1,6,7,
8 260:6,19,22
261:24
262:12,17
264:14,23,24
266:25 267:25
268:4,13,14,
18,19,22
269:2,6,7,10,
11 270:11
271:4,5,11,
12,15,16,21
272:1,17,25
273:5,6,8,9
275:10,14,15
280:3,4
285:7,14,18,
24,25 286:1,

4,5,21,24
287:2,23,24
288:2,3,17
289:5,15,18,
21 290:6,18,
21,24 291:3,
7,10,13,14
292:6,9,14,23
293:6,9,13
294:3,5,20
296:18,21,22,
25 297:22
298:12 299:6,
7 302:7,10,
12,13 303:22
304:12,13,17,
18 306:4,20,
23 307:17,18,
20,25 308:4
309:24 310:6,
7 312:10,11
314:25 318:4,
7,8,9,20
319:16 322:6,
7,10 325:11,
17,20
**correspondence
s** 253:18
**Corso** 251:21
252:6
**cost** 297:10
**counsel**
108:19 113:6,
10 114:12
327:15,17
**Count** 117:22,
23,24
**counties**
267:9
**County** 267:9
268:21,22
327:4
**couple** 130:25
147:20 253:25
**court's**
106:20
**courtesy**
187:18

**cover** 111:24
**covered**
107:18 325:9
**covering**
267:8,9
**Craig** 183:5
185:7 193:16
196:16 211:12
245:17 248:15
251:11,17
252:22 261:7
**crazy** 160:20
**create** 303:2
**created**
149:3,8
303:24
**credit**
148:15,18,25
149:4,8
151:11,19
155:6,9,17
156:3 169:13,
19 170:4
171:2 174:13
195:13 253:1,
2 256:11
261:7 262:4
285:8 301:8,
10,16,23
302:1,10,17
309:15 315:2,
9,25 316:1,9
317:3,5
324:16
**credits** 156:6
167:5 173:9
**current** 162:2
269:5 271:18
272:16
**currently-
serviced**
139:16
**customer**
109:18 110:11
111:17 124:13
125:2 142:9
159:2 177:2,9
179:23 181:3

204:5,10
223:1 231:12,
22 235:18,21
257:15,25
263:3 267:23
269:14 276:2,
17 288:7,10
289:18,21
291:3,7
292:12,21
300:15
301:13,15,22
302:1,6
304:23,24
305:2,6,10,15
317:9,12,16
324:7,12,15,
20
**customer's**
179:6 251:24
**customers**
251:13 324:24
**Cyndie** 131:7
138:3 142:6,
10 165:3
169:2,6
**Cynthia**
214:22 305:3

─────────────

### D
─────────────

**D'AVANZA**
275:24
**Danielle**
322:2,8
**Darin** 135:11
141:6
**data** 172:20
**date** 115:15
132:16 137:11
147:8,13
155:3 162:14,
17 179:14
198:3 204:1
263:11,15
287:5 310:8
**dated** 131:13
134:16 135:23

150:16 183:7
204:22 205:8
237:8 238:8
284:7 289:3
308:12 327:20
**dates** 263:8
280:17
**day** 154:19
155:4 172:16
286:20
**day-to-day**
208:22
**days** 292:22,
24
**deal** 226:18
324:22
**dealt** 252:2
273:15
**December**
118:23 119:7,
24 120:13
122:25
137:11,15,16
178:1 225:14
270:16 296:9
304:6,15,16
305:9 307:4,
20 308:12,24
317:24
**decided**
305:18
**decision**
109:17 111:1,
10 112:3,15
176:16 179:9,
18 180:3
181:20
188:13,18
189:2,3,20
190:5 193:15
195:12 203:9
204:2 225:3,6
226:15 233:22
264:25
265:11,14,23
277:10 279:21
280:1,22
281:6,9 288:1

305:13
**decision-maker**
128:22 210:20
**decision-makers** 128:18
**decisions**
109:8 112:23
124:13 125:3
**deed** 149:6
**deepen** 257:14
**defendant's**
225:15 320:17
321:1
**defendants**
107:10 115:20
322:9
**Defendants'**
237:7 270:25
289:2 308:11
322:5
**defer** 154:11,
24
**definitively**
314:11
**delayed**
185:17
**delaying**
250:10
**Delong** 282:9,
13 284:9
285:6,17,21
286:4,7,14,20
288:16,25
290:6 293:1,
23
**demands**
161:11 166:21
**demoted** 116:3
**denied** 181:4
**department**
122:11 143:2
246:20
249:23,25
251:16 252:7,
8
**Depends** 124:6

**deposition**
106:1,20,21,
22,25 107:13
108:20 109:6
113:1,5,9,16,
23 114:23
116:6,13,24
118:14,19
134:1 136:16
149:16 156:13
163:16 165:16
167:11 168:4
171:13 175:9,
10 186:18
189:12,15,17
190:13 191:14
196:19,24
197:10,21
204:17 213:14
214:15 216:19
217:5 218:11,
17 219:6
222:5 225:15
227:23 229:4,
5 234:13
236:11 237:8
238:18 240:18
242:22 244:14
247:14 248:1,
2,12,15 249:1
251:8 254:21
255:23 256:7,
17,25 257:22
258:12 259:22
261:2 264:3
266:17 268:9
269:21
275:19,23
279:11 290:13
294:13
295:18,21
296:7 303:7
310:20,24
311:7,19
312:2,21
313:13,15,17,
18,21 319:13
320:1,15
327:9

**description**
257:9 261:21
**deserve**
297:19
**determination**
279:5
**determine**
312:20,24,25
**developed**
273:11
**developing**
187:19
**dialogue**
290:6
**Diane** 206:20,
21,22 207:1
**die** 125:6
126:9
**died** 304:9
**difference**
184:10
**differently**
175:23 279:16
**diligence**
187:5
**Dinavahi**
193:19
194:12,18
195:4
**directed**
110:10
**directing**
295:6
**directly**
211:21,25
212:22 216:11
244:10 250:15
269:17 273:15
275:10
281:13,17
286:10 302:9
**disagree**
175:22 199:16
**disappointed**
147:20 187:18
**disclosure**
321:11

**discount**
208:14,17
**discriminated**
266:3
**discrimination**
117:4,22,23,
24,25 118:4,
9,10 178:12
179:1 262:22,
23 280:11,14
298:14,16,19,
24 322:9
324:5 325:11,
14
**discriminatory**
178:17 179:8,
19 180:2,9
181:1 263:2
265:12,15,24
**discuss**
188:21 218:2
221:21 228:21
229:9 234:24
288:17
**discussed**
267:4
**discussing**
161:8 257:5
**discussion**
231:6,16
**discussions**
145:4
**dispute**
114:7,14
186:8 187:11,
14,23 198:20,
25 201:6
202:23 205:16
219:8 231:21
236:15 239:12
247:16,19
254:4 260:5,
10,14 270:7,
11,12 273:13,
14 278:6,23
279:10 294:22
295:15
297:14,17,21

304:11,19,23
305:1,5,17
**disputes**
  220:2
**distinction**
  116:13
**distracting**
  281:22
**distributor**
  249:9
**doctor** 133:19
  194:11,13
  283:4
**doctor's**
  195:10 292:17
  295:24
**document**
  113:25 114:3
  118:15,18
  126:25 134:5
  136:16,18
  139:24
  140:16,18,24
  142:1,5,15
  145:12
  146:18,20
  148:10 149:16
  156:16 157:1,
  10 160:19
  163:16
  165:17,19
  167:11,14,18
  169:25
  170:10,12,13
  171:13,15
  175:13 177:20
  182:24 183:1
  186:14 187:1
  190:13,15,16,
  19 191:1,13
  196:18,23
  197:24 198:6
  199:1,11,17
  200:1 201:18
  204:17,21,25
  205:20 206:13
  213:15,17
  214:16 216:19
  218:14 219:6,

9 222:7
228:3,7
230:13 231:4,
9 234:13,15,
18 236:13
238:19
240:18,20
242:22 244:14
247:14,17
248:12,14
249:1,3,19,21
251:8 253:17,
22 255:25
256:2,6,17
257:2,22,24
258:13,15
259:22 261:3
264:4,6
266:21 268:9
272:15
274:20,23,25
275:21,24
277:25
278:14,16
283:12,15,23
287:19 294:13
303:12,14,24
305:23,25
308:9 311:10
314:9,13,16
319:14 320:8,
15 321:15
**documentation**
  272:11
**documents**
  113:10,15
  116:6,8
  263:12 283:17
  310:3,25
  311:4 313:9
  315:12
**door** 130:10
**double-**
**checking**
  293:5
**double-sided**
  320:7
**drive** 161:23
  170:22

**due** 187:5
**duly** 106:11
**Dyson** 106:13,
  16 107:3,6,9
  111:13,18
  113:21
  114:17,22
  115:2,9
  119:11 126:2,
  6 128:4
  130:10,12,13
  132:11 133:6,
  24 134:4
  136:14 138:21
  140:13 146:16
  149:14 150:5
  154:22
  156:11,25
  158:22 160:17
  162:10 163:14
  165:14 166:18
  167:9 168:2
  170:8 171:11
  175:7 178:7,
  9,10,21
  179:7,12
  181:5 182:18,
  21,23 186:17,
  22 188:8
  189:9 190:4,
  11 191:7,10,
  12,24 192:5
  196:5 197:23
  199:21 202:22
  204:15 213:12
  214:13 216:17
  218:9,12,13
  219:4 222:3
  227:21,24
  228:1,2 229:2
  230:11 234:11
  236:9 238:16
  240:16 242:20
  244:12 247:12
  248:10,24
  249:17 251:6
  252:4,12,15
  254:17,20
  255:21

256:15,23
257:20 258:11
259:18 260:25
263:23 266:15
267:17 268:7
269:19 272:6,
20 274:4
275:17 276:6
277:13,22
278:10
281:18,22
282:1 283:19,
21 284:24
287:17 290:9
294:7,9,11
295:20 296:5
297:3 298:1,
3,6,22 299:2,
23 303:5,8,10
305:21 306:3,
8 308:7,15
310:15,19,23
311:9,17,24
312:18,22,25
313:6 314:1,
6,23 316:23
319:2,11,25
320:6,13,21
321:5,18,24
323:4,6 326:3

---

**E**

---

**e-filing**
  115:15
**e-mail** 109:24
  110:4,9,15
  116:7,9
  118:22,25
  119:18 122:25
  124:8,11
  125:12,16,23
  126:11 131:8,
  12,18 132:17
  134:7,12,15,
  19,20,25
  135:6,10,20,
  22,25 136:6,
  7,21,24

137:2,8,11,24
138:2,10,14,
17 139:19
140:10 142:6,
15,19 143:14,
23 144:17,19,
23 145:5,23
146:1,20,23
147:1,19
149:21,23
150:6,11,12,
15,18 151:9
153:15,21
154:7,10,15,
16,19 156:21
157:1,11,14,
16,22 158:2,
10,18,23
159:2,7,10
160:25 161:5,
7,15 163:19,
20,23 164:6
165:19,20,25
166:1,5,8
167:17,21
170:12
171:15,18
172:6,8
173:21
175:12,16
176:5 177:1
183:1,4,5,8,
9,10,18
185:15,23,24
186:9 187:1,
4,17,22,25
188:17
203:15,19
204:21,22
205:1,7,9,12,
13,14,20,21,
24 206:1,5,
12,19 207:4,7
208:2,5,7,10,
13 209:24
210:4,9,12
213:17 214:21
215:7,10,19
216:21,22

217:3,4,8
218:16
219:13,16,22
220:3,13,17
221:11,13
222:12,19
224:17 225:2,
13,14,19,20,
22 226:4
228:8,19
229:11,17
231:9,19
233:16 234:19
235:10,11,16
236:19 237:7
238:8,13
240:25 241:1,
12 242:24
243:1,9
244:17,18,23
245:2,5,8,13,
18,21 246:3
247:20,25
248:4,6 249:4
250:17,18
251:10
252:21,22
253:21 254:8,
12,25 255:9
257:4,16,17
260:5,6,15,
18,22 261:17
263:10,14,24
264:8,9,16
265:2,5,6,8
266:6,23
267:3,21
268:11 270:1,
5,7,13 271:6
273:8 275:24
276:7,12
278:6 280:18
284:7,8,17,19
285:18,21
286:3,6,19,20
287:21,22
288:18,20
289:2,8,13
290:4,11,15

291:5,16,19,
22,24 292:1,4
293:15,22
294:16,19,24
295:4,9 296:9
297:13,14,17,
22 298:7,9
303:21 304:4
305:9,24
306:15,19,22,
25 307:3,9,
13,23,25
308:2,11
312:8 315:13
**e-mailed**
235:13,14
301:7 303:1
**e-mails**
118:16 134:20
135:7 136:22
149:19 150:1,
8 156:19
216:12 251:10
253:25 254:1
263:7 280:21
295:23 296:7
317:22,23
324:19
**earlier**
159:19 184:25
229:15 269:12
275:23 276:8,
13 306:25
**easier**  246:20
**East**  180:5
181:12,21
184:24 185:2,
10,11 188:14,
20 189:6,21
203:10 211:13
214:23 219:19
220:10 248:17
251:13
**EEOC**  323:15
**efficient**
227:17
**effort**  276:18
**electronic**

301:8
**eligible**
208:14
**Elizabeth**
106:1 327:6,
23
**employed**
115:24 213:3
214:21
**employee**
210:19 212:15
327:15,16
**employees**
220:9
**employment**
322:24 323:2
**encouraging**
296:20
**end**  123:16
125:10,14
153:20 226:8,
12,19 227:15
293:15 313:18
**ended**  257:9
**ending**  194:1
**ends**  290:4
**engaged**
299:6,13,14
300:2
**engaging**
117:5
**entered**
181:18 229:22
**entertain**
138:4
**entire**  106:25
109:13 125:15
205:8,13
277:17 294:19
**entirety**
110:19
**entities**
184:7,11
**entitled**
323:20
**entry**  196:14
223:10,20

equipment
  257:6,10
established
  292:22
establishes
  267:22
evening
  234:23
events  205:5
eventually
  149:2 155:11
  156:7 173:14
  209:16 246:14
evidence
  138:20 297:21
  298:23 318:23
  319:6 325:13,
  19
exact  280:17
  287:9
EXAMINATION
  107:5
examined
  106:11
exception
  149:3,7
  268:24 269:8
exchange
  238:21
excluded
  182:1,2
  237:10,16,22,
  23,24 238:1
  239:19 240:3,
  9
excluding
  240:13
exclusion
  240:7
exclusive
  166:20,25
  179:21,23
  324:11,13
exclusively
  223:23 265:20
exclusivity
  181:17,22,25
  182:3,6,8,12

208:18 213:9
excuse  116:21
  132:6 237:9
  311:15
executive
  153:12
exhibit
  113:20,22
  118:14 131:8
  133:23,25
  136:13,15
  140:12,14,19
  141:25 142:1
  146:15,17
  149:13,15
  156:10,13
  157:10
  160:16,18
  163:13,15
  165:13,16
  167:8,10
  168:1,3,5
  169:24 170:7,
  9 171:10,12
  175:6,8,9
  182:17,20
  183:2 190:10,
  12 191:13
  196:19,24
  197:5,9,20,22
  204:14,16
  205:12 212:8
  213:11,14
  214:12,15
  216:16,18
  217:3,4
  218:8,10,17
  219:3,5
  222:2,4,10,
  13,18,19
  225:9,15,18,
  23 227:20,22
  228:7 229:1,
  3,4,12
  230:10,12
  231:4,10
  234:10,12,18
  236:8,10
  237:8,17

238:15,18
  240:15,17
  242:19,21
  244:11,13
  247:11,13,25
  248:1,9,11,
  14,23,25
  249:16,18
  251:5,7
  252:3,5,16,21
  253:16
  254:16,19,21
  255:20,23
  256:6,14,16,
  22,24 257:19,
  21 258:10,12
  259:17,20,21
  260:24 261:2
  263:22 264:1
  266:14,16
  268:6,8
  269:18,21
  270:25
  275:16,18
  277:21,23
  278:9,12
  279:11,19
  283:20,23
  284:23,25
  287:16,18
  289:3 290:8,
  12 291:15
  294:10,12
  295:18,19,21
  296:4,6
  297:25 298:2,
  4,5 303:4,7,
  11 305:20,23
  308:6,8,12
  310:14,16
  311:13 312:1
  314:5,7,20
  316:2 319:10,
  13 320:12,14,
  17,20,22,23,
  25 321:4,6,7,
  9 322:5
existing
  162:3 187:6

expending
  161:21
experienced
  240:6
explain
  128:19 184:13
explaining
  268:12
explains
  271:17 291:5
expressed
  147:5,9,12
  204:3,8
expressing
  142:19 161:10
  255:9

_____

**F**

_____

fact  112:22
  119:2 127:2
  135:15 173:13
  177:3 181:3,
  12 200:15
  233:13,19
  253:5 268:3
  304:12 316:22
  320:7
facts  138:19
fair  124:13
  125:3
fall  171:1
familiar
  123:14 134:6
  136:19 142:2
  149:17 156:17
  161:6 165:18
  170:11 171:14
  190:14 197:25
  204:20 222:8
  238:20 294:23
  303:13
Fana  238:10
fast  310:24
  313:8
father  304:9
fault  257:12

February
  149:24 150:4,
  12,16 154:11,
  18 167:5
  264:10,18
  266:7
feel  108:25
  299:21 300:17
  311:21
Feels  150:24
fees  167:6
Felicia
  228:11
female  162:5,
  11,16,21
  163:1,2,9
  180:22 183:16
  207:10
ferritin
  121:7
FHPG  222:23
fight  126:12
  316:22,25
  317:2,3
  324:14,18
file  311:21
filed  114:4
  115:20 313:18
  323:14
filing  300:20
fill  255:14
filled  282:6,
  7 309:15
financial
  221:13
financially
  224:18 327:18
find  114:25
  249:9
finish  141:12
  152:17 157:6
  162:18 191:4,
  7 195:22,23
  197:7 205:11
  260:13 276:10
  281:21 287:10
fiscal  161:20

162:13,23
198:13 200:19
201:3,24
Florida
  106:2,3
  109:15 110:18
  111:7 115:21
  118:11 119:8,
  13,14,25
  120:3,16
  121:4 124:2,5
  127:2,8,11
  128:5,23
  129:11,21
  130:15 131:24
  132:10
  133:15,20
  139:15
  142:12,20
  143:2 153:3,
  18 156:6
  158:4 159:15
  160:2,5
  161:8,11,16
  162:12,22
  164:2 165:6
  166:11,24
  167:15,24
  168:6 169:11
  170:5,17
  172:21 174:25
  178:2 185:10,
  11,12 188:14
  222:20,23
  223:7,14
  224:1,5 225:6
  227:4,12
  255:11,17
  262:23
  265:15,18,24
  267:6,24
  268:16 271:11
  275:13 276:1
  277:1,9
  278:3,21
  279:12,17
  280:2 281:2,
  12 282:22
  292:13 296:13

303:15 305:25
324:10,25
327:3,7,24
flu  148:14,
  18,22 149:1
  151:12,19
  155:6,10
  156:3 167:5
  173:9 174:13
  249:6,13
  261:8,12
  262:1,5,11
  324:16
FMC  119:2
  122:16,20
  139:6 161:21
  162:2 171:23
  172:11,16
folate  121:7
folks  234:8
follow  271:9
  295:6
forecast
  278:8,18,19
  279:8
foregoing
  327:10
form  114:18,
  24 119:9
  132:4,8 133:4
  149:25 154:20
  156:23 158:20
  160:15 162:7
  166:16
  178:18,19
  179:4,10
  181:2 186:21
  188:6 189:7
  190:2 191:5,
  22 196:4
  199:19 202:20
  267:14 272:2,
  18 274:2
  276:4 297:1,
  23 298:15,20,
  25 306:2,5
  316:21 318:25
  321:16,22

format  306:10
forms  319:6
forward
  131:22 166:20
  227:18 233:3
  241:5 245:2,
  5,8 255:16
  268:13,16
  293:6
forwarded
  233:17 244:19
forwarding
  137:2 204:25
  216:22
fought  212:2,
  7
four-room
  303:3
fourth  113:12
  117:14
  121:18,19,20
  161:19 319:17
  320:9
frame  239:15
Francis
  109:21 110:1
  275:24 279:23
freight
  144:1,6,21
  145:6,24
friend  322:15
friends
  171:22
front  113:22
  131:9 150:2
  225:10,11
  252:17
  263:13,25
  312:1 316:3
FSC  155:6,10
  156:3
fuel  150:25
  151:4,7
  174:13 324:17
fully-
commissioned
  116:14,22

funky   167:12
funnel
   255:10,13,15
funny   186:12
   187:13 206:3
   297:12
future   139:8
   162:2 187:8
   199:12,17
   200:1,5,8,12
   201:21 237:11
   258:6
FY13   198:4

---

**G**

Galvin   322:2,
   21,23
Galvin's
   322:8
Gary   121:10,
   13,14,23
   122:2,8,10
   123:2,16,21
   135:11 136:23
   137:13 141:2,
   6,7 151:25
   155:5,24
   164:11 174:8
   176:17,25
   177:13 297:5
Gary's   166:20
   167:5
gave   276:13
gender   117:4
   280:11
gentleman
   131:3
geographic
   267:8 268:2
   271:14
geographically
   267:7
gist   110:17
give   106:6
   148:15,18
   149:4,8
   190:6,22

191:17 192:21
   221:3 242:17
   311:11 313:3
giving   151:17
   312:9
glad   108:8
go-to   164:18
goal   278:2
   279:12,16
good   106:13
   239:14 298:10
Gotcha   250:21
government
   121:6
GPO   230:20,21
   249:9
grandfathered
   271:19
granted
   226:9,23
   252:1 324:9
great   313:22
Greg   130:12,
   20 131:2
   169:7,10
   171:5 175:13
   177:5
gross   198:8,
   22 201:15
   202:8,12
   203:2
ground   107:17
   108:12 111:23
group   109:15
   110:14,18
   111:7 184:15,
   17 212:15
   222:20,24
   223:8,14
   224:1,6 225:7
   227:5,13
   230:22,25
   262:24 264:23
   265:16,18,25
   267:25 268:17
   271:11 275:13
   276:1,21
   277:2,9

278:4,21
   279:13,17
   280:2 281:3,
   12 282:22
grow   131:25
   173:11
growing   139:5
growth   161:16
guess   131:1
   209:21 261:15
   270:9
guessing
   283:3
guesstimate
   127:13 129:14
guidelines
   109:10,11
   112:10 170:23
   190:24 271:10

---

**H**

Hagley   153:7,
   9,17 163:5,9
   175:3
halfway   196:9
hand   274:19
   281:18,23
handing   192:1
handled
   251:23
handling
   220:9
hands   115:8,
   11
happen   215:24
   216:9 272:19
   273:3 280:16
   302:25 324:18
happened
   199:10 215:25
   227:2,4
   280:19 302:14
   304:12,20
   318:13 323:14
happy   300:11

hard   157:7
   223:9 306:7
Hayes   212:10,
   12,25 213:8
   219:10,16
   220:3,8,14
   221:12,20
   226:16,17
   228:20 229:13
   230:4 232:5,
   16,23 233:5,
   6,13,18,21
   234:1 237:14
   242:9,12,15
   243:22,24
   244:1,3,8,10,
   18,22 245:24
   246:4 247:18
   248:5 250:15
   255:4
Hba1c   121:7
HCA   184:15
   212:15 230:25
head   168:12
   181:19
heading   206:4
Health   219:18
Healthcare
   178:13,16,25
   180:25
   181:18,21
   183:25 184:5,
   19 185:3
   187:20 190:1
   193:22 194:19
   196:2 206:17
   210:19
   212:13,16
   213:4,6
   214:3,6
   217:20 219:19
   221:14
   226:13,25
   230:5,24
   231:12,23
   232:6,24
   234:8 235:7
   236:16 237:2
   239:21 241:19

244:9 246:8,
13 250:3,5
251:3,14
252:8 256:9,
20 257:6
258:8,16
259:4 260:2
262:2,12
265:16 317:11
318:1,3,6
324:25
**Healthcare-**
**owned** 184:5
**Healthtrust**
230:19
**hear** 141:19
273:11
**heard** 108:10
140:5 179:22
188:21 231:11
232:1 305:4
**Hearing**
130:11 191:6
252:14 308:13
**held** 141:21
146:6 157:24,
25 290:21
**helpful**
162:19
**helping**
131:24
274:10,12
**helps** 124:20
**Helwig** 114:9
264:10
**Henry** 121:15,
17,24 123:3,6
143:8 144:15
**highlighted**
143:17
**highly** 236:1,
4
**Hilda** 106:10
158:11,13
216:25 267:6,
8 302:3 307:6
327:9

**hill** 125:6
126:8
**Hillsborough**
267:8 268:21
273:4 327:4
**hit** 311:16
**HOEK** 106:10
327:9
**hold** 297:10
**Holland**
310:10
**hoping** 239:6
**Hosley**
119:19,24
163:7 180:17,
21 224:11,13
227:3,9
238:13 245:14
275:13
**hospital**
109:15 110:18
111:7 132:10
184:15 212:15
222:20,23
223:8,14
224:1,5 225:6
227:4,13
231:1 262:23
265:18,25
267:6,24
268:16 271:11
275:13 276:1,
21 277:1,9
278:3,21
279:12,17
280:2 281:2,
12 282:22
292:13
**Hospital/**
**adventist**
131:24
**hour** 314:1
**hours** 310:18
311:16
**HR** 134:11
**HSS** 276:18
**Human** 303:15
306:1

_____

**I**

_____

**idea** 148:4
**identification**
113:20 133:23
136:13 140:12
146:15 149:13
156:10 160:16
163:13 165:13
167:8 168:1
170:7 171:10
175:6 182:17
190:10 197:22
204:14 213:11
214:12 216:16
218:8 219:3
222:2 227:20
229:1 230:10
234:10 236:8
238:15 240:15
242:19 244:11
247:11 248:9,
23 249:16
251:5 252:3
254:19 255:20
256:14,22
257:19 258:10
259:17 260:24
263:22 266:14
268:6 269:18
275:16 277:21
278:9 283:20
284:23 287:16
290:8 294:10
295:19 296:4
297:25 303:4
305:20 308:6
310:14 314:5,
20 319:10
320:12,20
321:4
**identified**
321:13,19
322:2
**identify**
177:20 201:21
325:10

**II** 117:23
**III** 117:23
**immunoassay**
121:5
**impact** 198:7,
16,22 202:5,
8,12 203:2,3,
7 227:2
246:15
**impacted**
201:12 279:16
**inaccurate**
205:17
**inactive**
129:12,16,17,
22,25
**include** 255:4
**included**
121:6 170:1
239:9 253:20
267:16 307:8
**including**
175:17
**increase**
198:17,23
202:19 296:21
297:19
**increased**
161:12
**increases**
297:11
**indication**
303:20
**individual**
321:13,19
**individuals**
112:16 135:8
**influence**
112:5 123:5
**Info** 168:7
**Infolab** 165:4
168:7,9,10,25
**inform** 245:22
**information**
166:14 173:10
203:13 212:19
213:22 218:6

257:25 260:10
272:24 274:5
276:13 278:7
279:9,10
282:2 297:13
322:9,18
**informed**
268:15
**informing**
246:4
**inquire** 313:7
**instance**
170:22
176:22,24
177:2,13,18
243:10,12,17,
21,25 244:8
245:19 259:25
279:15
**instances**
253:9
**instructing**
319:25
**instructs**
108:5
**instrument**
121:5
**intended**
236:22
**interest**
187:8
**interested**
327:18
**internal**
158:23 159:2
**internally**
250:3 292:18
**interpretation**
313:20
**interrogatorie
s** 320:18
321:2
**interrogatory**
113:13
323:10,13
**interrupt**
112:1 312:19

**interrupted**
106:20 215:17
313:14
**interrupting**
186:18
**introduced**
107:8
**invitation**
236:16,21
**invite** 239:10
312:9
**invited**
235:18,22
**invoking**
106:24
**involved**
119:7,14,20,
24 166:9
181:24 182:6
223:19 224:5
275:10
**involvement**
112:2,6
**involving**
124:14 195:14
280:5
**IPA** 184:4,16,
18 193:8
194:10 195:2
214:4,6,8
251:18
**iphone** 206:7,
10
**Irish** 110:17
111:2,3,6
112:3 224:15
225:7 275:14
276:1,23
277:6,14
279:22
**issue** 106:18
144:5 250:2
285:7 286:2
311:4
**issues** 293:6
**item** 261:21
**items** 195:3
315:13

**IV** 117:24

---

**J**

---

**Jan** 272:3,8,
22 275:12
**January**
123:18,22
142:16 144:24
145:15,21
165:20,22
166:2 174:4
312:4,7,9,13
316:6
**Jeanette**
224:8
**Jensen** 112:19
116:16,20
141:17,21
147:6,16
149:20 150:16
152:10
154:12,23,24
155:3 156:22
157:4,11,24
158:8 160:11
161:1,7,10
163:19,23
164:9,21
165:20,22
166:1,8,13
167:4,17
168:20 170:3,
13 171:16,19,
22 172:6,15
173:8 174:3,
19 183:6,10,
18 185:24
186:9 187:12,
15,23 188:1
189:1 199:10,
12,17 200:5
204:22 208:2,
8,10 209:6,
10,23 210:1
212:7 213:18
214:19 215:6
216:5 217:7
218:1 219:10,

12,16 220:2,
14 221:20
225:20 228:8,
19 229:12
231:5,10,16,
21 232:17
233:25 234:7,
19,22 236:21
237:14
238:22,25
239:5 241:1,
12 245:3,22
246:4 247:17
248:6 250:9,
22 253:23
254:1,2,8,25
255:9 256:3,
7,19 257:5,
11,24 261:6
264:17 266:8,
24 267:12,23
268:11,15
270:8 271:6,
17 273:10
286:23 287:7,
12,22 288:2,
15,24 289:3,
14,23 290:4,
10,16 291:5,
18 292:1,11,
16 293:4,8,12
294:17,25
295:4 296:10,
20 297:4,8,
15,18,22
298:9 303:21
304:4,14
305:5,8,13
307:24 308:3
310:1 317:15
322:10
**Jensen's**
160:22 163:20
172:8 186:4,
13,25 187:2
199:8,23
216:21 217:3
218:16

Jerry   169:4,7
Jim   164:11
Jimenez
  210:23,24
  211:22
  212:18,22
  213:1,3
  214:21,25
  215:14,20
  218:20 221:16
  226:7,12,18,
  19 228:10,20
  232:5,17
  233:4,13,16,
  21 236:18
  237:4 241:15
  242:12,25
  244:20 245:13
  246:3,7
  247:16,21
  248:4 306:20
  307:1,14,22
  308:3
Jimenez's
  216:22 217:23
  222:1 228:16
  244:3
job   298:10
join   184:17
  229:13
joining
  133:20
Judicial
  114:5
July   163:24
  171:19 172:9
  174:4 215:19
  218:25 219:13
  220:6 225:17,
  20
June   138:10,
  22 139:19

K

Karen   212:10,
  12,25 219:10
  226:16,17

229:13 230:4
233:5,13,21
237:14 242:9,
15 243:22,24
244:1,3,10,18
246:4 250:15
255:4
Keel   274:3
Kim   207:13,
  21,24 223:24
  265:19 269:13
  274:3
Kimberly
  207:15 208:7
kind   160:20
  212:14 249:8
  306:6
knew   210:13
  211:3,7
  317:17,19
Knight   280:6,
  23 281:7,11
  282:4,6,18
  283:18,25
  284:9 285:13
  286:10 291:2,
  6 293:24
Knight's
  286:3,7
  287:14 290:18
knocking
  259:20
knowing   270:9
knowledge
  111:1 116:4,
  19 120:12
  135:18 140:11
  164:7 169:12
  176:19 181:23
  189:11 209:18
  211:24 229:8
  239:18,22
  242:13 273:23
  275:8,9
  320:19 321:3,
  12,14,20
  325:8

Knutson
  206:20,21,23
Kristen   269:8

L

lab   130:20,
  22,23 131:2
  142:11 143:25
  164:1,8,13,
  15,23 165:1,
  6,12 168:6,19
  169:10,13
  170:4,17,25
  171:3,4
laboratory
  121:3 122:6,9
  130:24
lack   144:13
  151:19 211:19
  249:13
large   106:3
  131:23 324:19
late   241:9,15
Laura   116:18
  180:16
  213:21,23,24,
  25 245:14
  304:15,22
  305:4,6,14
  307:24
Laurie   180:21
law   299:7,10,
  13 300:2,7
lawsuit
  300:20
lead   127:20
  158:11 173:22
  217:14,19
  235:23 239:18
  292:18 295:6
  296:16
leaders
  236:3,6,23
  237:18
leave   213:6
leaving
  215:11 250:4

led   126:19
left   116:24
  118:13 130:10
  163:2 200:3
  226:17 233:22
  234:22 281:2,
  11 282:16,22
  283:7 286:7
  292:13
leftover
  151:12,19
leg   106:21
Leisa   142:7
  284:20
length   313:22
less-desirable
  202:12
letters
  166:21
level   119:16,
  21
lines   271:14
linked   151:23
  152:11,12,21
Lisa   282:9
  288:16 290:6
list   123:17,
  24 124:1,4,6,
  7 275:2 303:2
  308:17,20,21
  315:14
listed   198:12
  201:18
listens
  150:24
lists   191:3,
  14
litigation
  189:15
live   290:5
local   208:21
locally
  154:12
located
  185:5,8
location
  153:3 159:19

locations
  128:7,10
  129:3,6,10,
  15,20,21
  130:15,18
  133:3,5,8,9
  139:13 153:17
  162:12,22
  163:1 174:25
  188:14,19
  189:22 190:1
  191:14 192:16
  203:10 214:3,
  6 248:17
  259:3,7 261:9
  262:11
Loisey 183:6,
  10,13,19
  188:25 209:5,
  6 217:7,10
  218:1,2 295:5
long 127:10,
  12 152:6
  155:24 284:8
long-term
  292:12
longer 132:17
  214:20 285:19
  313:24
looked
  113:11,12,13
  301:18
lose 121:8
  273:7
loss 224:18,
  21,24
lost 120:24
  146:9,12
  189:4 224:14
  226:24 275:13
  277:17
lot 110:23
  115:8,10
  121:8 123:4
  126:10 182:1
  204:18 223:9
  265:20 277:20

280:24 308:23
315:9 318:13
lots 120:24
  124:3 237:23
Lucie 185:6

_____

M

made 108:19
  109:9 110:11
  111:1,11
  112:15,22
  147:15 155:23
  176:16 179:9,
  13,18 180:3
  181:20
  187:11,15,23
  188:13,18
  193:15 195:13
  203:9 204:2
  214:25
  215:11,12,20
  218:21,22
  226:7,16
  255:1 277:19
  279:21 280:1,
  22 286:10
  288:1 293:4
  304:22,23
  305:6,13
  306:23 308:21
maintain
  272:16
majority
  172:16 180:10
  224:23
make 107:21
  114:20 164:10
  170:3 195:11
  221:18
  233:19,22
  250:11 261:7
  279:4 281:20
  288:12 297:11
makes 106:14
  141:2
making 109:17
  117:3 118:3

204:4,5
249:8,12
298:4 305:1,
15 315:6
male 162:5,
  11,16,21,25
  180:6,19
  207:10 280:15
manage
  154:12,24
  184:16
management
  182:7
manager
  157:20 168:22
  177:10 182:10
  183:14 200:16
  208:21 214:23
  282:7,8,14
  286:13,17
  288:8
managers
  208:25 209:2,
  7
mandatory
  321:10
March 147:2
  157:12,16
  159:11 170:13
  204:23 205:8,
  13 206:13
  207:12 208:3,
  15 209:24
  210:2 258:23
  259:2 266:23
  268:12 270:24
  285:4,15
margin 296:10
Maria 210:23,
  24 211:22
  212:18,20,22
  213:3,10
  214:21 215:14
  216:10,11
  222:1 226:18,
  19 228:6
  233:4,16,21,
  22 240:22

241:8 242:4,
25 243:16
244:3,17,18,
24 246:2,3
250:3,14
303:1 305:3
306:20 308:3
317:11
Maria's
  216:25
marked 113:20
  133:23,25
  136:13,15
  140:12,14
  146:15,17
  149:13,15
  156:10,12
  160:16,18
  163:13,15
  165:13,15
  167:8,10
  168:1,3
  170:7,9
  171:10,12
  175:6,8
  182:17,19
  190:10,12
  191:13 197:22
  204:14,16
  213:11,13
  214:12,14
  216:16,18
  218:8,10
  219:3,5
  222:2,4
  227:20,22
  229:1,3
  230:10,12
  234:10,12
  236:8,10
  238:15,17
  240:15,17
  242:19,21
  244:11,13
  247:11,13
  248:9,11,23,
  25 249:16,18
  251:5,7
  252:3,5

254:16,19
255:20,22
256:14,16,22,
24 257:19,21
258:10
259:17,19,21
260:24 261:1
263:22
266:14,16
268:6,8
269:18,20
275:16,18
277:21,23
278:9,11
283:20,22
284:23 287:16
290:8,12
294:10,12
295:17,19
296:4,6
297:25 298:2
303:4,6
305:20,22
308:6,8
310:14,16
314:5,20
319:10,12
320:12,14,20,
22 321:4,6
**Marsonek**
269:9
**Martin** 142:7,
8 145:6
**Mary** 153:6,9,
17 163:5,9
175:3
**material**
283:5
**matter** 178:4
289:17
**Mckesson**
107:9 109:9,
10 115:25
123:9 130:23,
25 151:1,7,18
152:15 155:18
161:11,16
162:2 164:10
167:1 168:11

169:1 170:23
182:14 190:8,
17 194:7
211:24,25
212:23 217:15
226:13 239:9
241:20 246:23
271:11,20
276:19 277:19
281:13,17
282:4 284:10
286:10 297:10
301:4 304:6
307:23
**Mckesson's**
257:12
**means** 125:9
169:17 184:13
299:15
**meant** 124:7
125:13
**measurement**
130:3
**medical**
118:11 119:8,
13,14,25
120:3,16
121:4 124:2,
5,9 127:3,8,
11 128:5,23
129:11,22
130:15
133:15,20
139:15
142:12,20
143:3 153:3,
18 156:6
158:4 159:15
160:2,5
161:8,11,17
162:12,22
164:2 165:6
166:11,25
167:15,24
168:6 169:11
170:5,17,25
172:21 174:25
178:2 238:10
254:10

255:11,18
258:17 264:23
281:14 296:13
308:17
324:10,25
**Medical/
surgical**
276:19
**meet** 155:24
156:8 166:20
174:19 237:1
**meeting**
136:1,10
150:19
155:21,23
167:19,23
174:9,12
182:1,6
188:21,23
189:3,20
228:19
235:18,22
237:10,16,17
239:19,20,23
240:9,11,13
241:9,16
266:7
**meetings**
215:6 237:11,
21,25 240:2
**mental** 108:15
**mention**
144:13 247:20
248:6
**mentioned**
113:11 269:13
**Meredith**
142:7 145:5,
8,20 284:20
**Meredith's**
145:15
**merged** 109:9
**merger** 190:17
**message**
110:14 137:1
160:12 216:5
234:23
238:21,24

239:2 240:5
279:23
**met** 161:11
167:4
**Michelle**
116:18 119:4,
17,19 127:4
163:7 174:24
180:17,21
224:11 227:3,
9 238:13
245:14 251:21
252:6 253:2
272:4
**middle** 121:19
143:15 295:9
313:12
**mind** 239:15
323:8
**minds** 300:23
**mine** 300:15
317:1 322:15
**minimum** 173:9
**minute** 221:3
291:23
**minutes**
212:17 234:24
269:12 310:22
313:4
**missing**
125:17,19
306:14
**Mmm-hmm** 121:1
129:8 132:24
140:21 145:9,
18 147:21,24
160:14 169:23
208:1 209:1
219:25 222:22
228:9 232:11
236:12 238:11
239:16 242:1
247:2 252:23
261:25 262:25
266:12 280:7
293:18 299:5
306:11 322:4

**MMS** 305:9
**model** 172:17
  217:21 237:1
**models**
  217:13,18
**moment** 164:8
  174:15 181:15
  266:5 299:1
  316:18 317:17
  318:14
  321:23,25
  325:12,15,18,
  21 326:2
**Monday** 241:6
**money** 297:9,
  11
**month** 152:24
  153:23 154:8
**monthly**
  255:15
**morning**
  106:13
**motion** 311:21
  313:18
**motives**
  126:18
**mountain**
  313:9
**move** 166:19
  197:20 225:6
  279:22 280:1
**moved** 128:13
  282:18 295:1,
  12,24 296:1
  310:24
**moving**
  280:24,25
**multiple**
  217:14,19
**Murphy**
  133:13,20
  159:13,18,23

_____

          **N**

_____

**names** 107:23

**needed** 143:20
  187:6
**needing** 307:8
**negative**
  201:13,16
**negatively**
  203:2
**negotiated**
  213:9
**negotiation**
  181:24
**Nehr** 156:19,
  22 157:12,16,
  19 158:7,10
  160:11
**network**
  292:13
**noise** 315:7
**Nolasco**
  177:11
**normal** 149:5
**Notary** 106:3
**note** 281:17
  301:16
**notes** 217:10,
  13
**noticed**
  151:25
**notifies**
  290:17
**November**
  131:13,15
  132:17
  270:13,16,17,
  18 272:13
  273:8 290:15
  291:18 292:2
**number** 124:20
  135:1,20
  137:6 140:24
  165:12 180:12
  192:6,21,22
  193:12 194:1,
  4 196:3,9
  197:20 205:1,
  22 231:10
  314:12 318:4,
  7 321:7,9

**numbers** 150:8
  172:2 173:5
  202:14 209:17
  278:20 279:3
**numerous**
  311:3

_____

          **O**

_____

**O'CONNER**
  254:8
**O'DONNELL**
  205:21 206:2,
  12,15,22
  207:7,9
  209:19,22
**object**
  114:24,25
  119:9 132:4,8
  133:4 149:25
  154:20 156:23
  158:20 160:15
  162:7 166:16
  178:18,19
  179:4,10
  181:2 188:6
  189:7 190:2
  191:5,8,22
  196:4 199:19
  202:20 267:14
  272:2,18
  274:2 276:4
  297:1,23
  298:20,25
  306:5 316:21
  318:25
  321:16,22
**objection**
  114:16 128:1
  138:19
  186:15,19
  277:11 281:21
**objections**
  108:4 114:17,
  20,23 186:21
**Objet** 306:2
**obstacles**
  173:9

**obtain** 258:19
**Occasionally**
  175:5
**occur** 246:13
  263:6
**occurred**
  232:19 272:9
  293:1
**occurring**
  232:8,13
**Oct-** 243:10
**October**
  314:24
**office** 159:15
  210:13,21
  211:3 282:7,
  8,14 286:3,
  13,17 290:18
  301:9 307:7
**officer**
  221:13
**offices**
  184:19
  258:17,20,21,
  22
**one-third**
  219:23
**one-year**
  173:3
**online**
  223:10,20
**open** 130:10
  283:8
**opened** 281:12
  283:25 284:2,
  5,9 285:13
  318:3,6
**opens** 179:5
**operated**
  159:15
**operations**
  208:22
  214:22,23
**opinion** 149:5
**opportunities**
  311:4

order  106:20
  126:22 149:4
  177:3,6,10,15
  223:10,20
  250:25 302:23
  307:8 311:22
ordering
  148:10,22
  274:10
orders  146:2,
  6,7 173:10
  175:17,18,24
  176:9,10,13,
  14 220:9
  249:22,24,25
  250:4 251:17,
  22 258:6
organization
  230:22
original
  115:13 229:14
  230:3 242:17
originally
  281:3 295:25
ortho  159:13,
  21 160:1,4
orthopedic
  282:24 283:4
owned  184:12,
  14,18,22
  185:1,3 214:9
  251:19
owner  127:8,
  10,17,24
  129:1 178:5
  247:5,8
ownership
  127:25 128:13
  129:2 214:2,5
owns  284:2

—————————

          P

P-O-E-K-E-R-T
  122:4
p.m.  235:11,
  17 252:13
  294:8 307:4,

19 311:12
  323:5 326:5
pace  297:10
package  171:8
pages  315:12
  319:21 320:4
  327:11
paid  127:24
  128:3 262:5,
  19
paragraph
  115:18 119:1
  120:2,23
  121:9,18,19
  122:3,4
  123:16
  126:23,24
  150:23
  151:10,22
  153:6 155:20
  161:19 210:13
  212:2 222:18,
  19 227:12,15
  237:9 238:9,
  12 243:3,5
part  109:7
  110:14 111:22
  125:21 128:9
  171:7 184:22
  194:10 234:15
  264:22 265:3
  277:2 288:21
  301:20 306:14
participate
  136:10 141:9,
  13,16
participated
  234:5
parties
  327:15
parties'
  327:16
parts  213:16
  280:24,25
  287:20
party  111:11
Pasco  267:9
  268:21 273:4

passing  218:5
past  120:5
  161:17
paste  185:25
pastes  172:20
pasting
  134:20 135:7
Paul  112:19
  149:20 151:10
  163:19 187:2
  188:25
  199:10,23
  200:5 214:19
  215:6 228:6
  237:14 261:6
  322:9
paused  191:9,
  11
pay  297:19
Payable  252:8
paying  297:5
pending
  249:24 252:11
penetrate
  126:22
people  164:10
  199:15 206:21
  235:8 300:24
people's
  300:23
percent
  109:12 189:12
  198:17,23
  201:13,16
  202:5,9
perfect  107:7
  108:14 299:21
  300:12,13
perfectly
  218:21
performing
  248:16
period
  127:14,23
  130:2,3
  133:13 154:1
  172:3,5,24,25

173:3,18,23
  198:3 203:25
  265:21 272:10
  274:18 275:3
  284:22 311:1
person  110:2
  112:18 123:11
  159:8 164:13,
  15,18 309:14
person's
  109:21
personal
  110:25 111:21
  112:2 116:6,9
  218:3 248:16
personally
  223:9
personnel
  187:20
Peter  114:9
phone  216:12
  235:5,6
  299:19
phrase  125:10
physical
  108:15
physician
  109:15 110:18
  111:7 133:16
  184:16,19
  222:20,24
  223:8,14
  224:1,6 225:7
  227:5,13
  262:24
  265:18,25
  267:25
  268:17,25
  269:2 271:11
  275:13 276:1
  277:1,9
  278:4,21
  279:13,17
  280:2 281:3,
  12 282:22
Physicians
  193:7,12
  195:8 196:3

265:16
piece   257:5,9
305:24
Pinellas
267:9 268:22
ping   169:15
pinged   169:18
Piscitelli
106:14,17
111:12
114:16,19,20,
25 115:4
119:9 128:1
132:4,6,8
133:4 134:3
136:25 137:3
138:19 149:25
154:20 156:23
158:20 160:15
162:7 166:16
178:18 179:4,
10 181:2
186:15,17
188:6 189:7
190:2 191:5,
9,11,22 192:3
196:4 199:19
202:20 252:10
267:14 272:2,
18 274:2
276:4 277:11
281:20,24
297:1,23
298:20,25
299:18 303:9
306:2,5
310:17,21
311:11
312:18,23
313:2,24
314:2 316:21
318:25
319:21,24
320:2 321:16,
22
place   109:17
176:13,14
217:15 218:21
249:25 250:1

258:5 271:10
285:8 301:12
placing
113:22
platform
194:9
platforms
209:14 246:23
293:6
pleased
273:11
Poekert
121:10,13
122:3
point   119:10
125:4 153:21
155:5 282:21
Port   185:6
portion
142:11 224:1
posed   140:6
position
157:24 290:24
possibly
107:22 176:3
206:11 253:12
313:8
post-
acquisition
202:2
post-model
202:17
post-modeling
203:2
practice
281:13 282:19
283:8 284:1,
5,10,11,14
285:13,15
286:7 292:17
303:3
practices
139:6 264:22
268:16
prefer   265:7
preference
147:5,9,12

204:3,9
264:21
preparation
113:4
prepared
313:14
prerogative
296:17
present
188:22 189:17
274:9 306:6
presented
291:9,12
306:9,13
presenting
115:13
pretty   170:11
224:18 234:14
prevents
108:16
previous
108:20 113:9
194:10 279:6
previously
116:5,12
141:1 166:21
174:11 179:22
215:4 229:22
269:22
prices   315:16
pricing
231:2,3
246:16
296:17,21
primary
216:25 217:24
296:24
Primecare
299:21
300:12,13,25
301:3 302:5,
16 304:5
306:23 307:7,
17,23 308:18,
22 309:1
312:5,10
314:10,14,22
315:3 316:8

317:7 318:11
325:3,4,5
printed   320:3
prior   119:6,
12,23 120:13
133:20 177:25
215:10,20
234:8 287:5,
13
problem   144:3
206:21,22
233:11
problems
143:24,25
procedure
115:22 169:15
proceedings
252:14 326:5
process   108:5
209:11,13
produced
125:18 190:16
261:17
production
125:20
Professional
106:2 327:7,
23,24
profit   198:9,
22 201:15
202:8,12
203:2
program
170:22
programs
170:21
promise
161:12
protect   300:6
protected
117:5 299:7,
10,13 300:2
protective
311:22
protocol
176:12,20,23

protocols
  175:19
prove   324:12
provide
  182:13 230:1
  325:16,20
provided
  113:10 182:9
  254:10 257:6,
  25 273:1
  274:6 303:14
  305:25 308:17
  325:22
providing
  108:11,16
PSS   109:9
  115:25 119:3
  120:8 123:8
  127:3 167:1
  168:13,15
  169:1 178:1
  182:14 190:17
  246:24 291:3,
  7
PSS/MCKESSON
  139:7
Public   106:3
pull   148:7
pulling
  250:10
purchases
  122:9
purchasing
  122:10 176:18
  217:20 230:22
  249:23,24
purpose
  107:13 164:5
  236:25 246:25
pursuant
  115:21
push   172:12
pushed   311:5
pushing   188:1
put   123:17,24
  125:11 131:9
  225:11 237:14
  247:1 263:25

274:12 281:17
282:5,10
299:20 301:13
312:1
puts   170:23

─────────────

          Q

Q4   161:20
quarter
  173:25
question
  108:6,7,10
  111:5 114:16
  126:5,7
  132:23 133:19
  135:5 136:7
  139:5 140:6
  141:12 145:19
  154:17 157:7
  162:15,18
  178:20 189:19
  191:8 193:9
  195:23 197:4,
  8 205:11
  215:15 217:2
  227:6,7 230:2
  231:8 252:10
  256:5 260:13
  276:11
  285:10,11,12,
  20 287:11
  288:22,23
  298:17 300:8
  308:1,2
  323:19
questioning
  240:22
questions
  113:13 311:20
  326:3
quick   117:15
quickly
  185:18 286:6

─────────────

          R

Rachel   230:15
raise   285:6
  286:2
raised   106:19
Randolph
  280:5
range   173:1
reach   214:22
  234:7 250:14
  288:16,24
  307:6
reached
  266:25 267:13
  270:24 308:25
  309:9,10,21,
  24 310:2
reaches   158:7
read   106:24
  125:22,24
  136:2 150:21
  161:2 210:6
  243:6 247:23
  267:15 289:10
  300:23 301:18
reading
  123:13 154:14
  167:20 254:23
  259:5
ready   178:9
  294:9
reagents
  170:17
real   117:15
  190:14 224:12
realize
  130:10
realized
  161:16
reason
  151:14,18
  171:23 240:12
  246:18 278:23
  305:17 316:14
reasonable

227:17 313:19
reassign
  112:3
reassigned
  269:9 277:6
  312:15
rebill   253:1
recall
  116:14,17,25
  117:6 118:11,
  12,14,18
  133:12 160:25
  232:8,13
  234:7 243:20
  258:23,25
  259:2,24
  266:7,11
  270:25 280:8
  295:13
recalled
  121:6
receive
  256:11 273:4
received
  111:6 286:3,
  19 303:18
  305:9 307:14,
  16,25 308:2
  315:2
receiving
  160:25 259:3
  274:12
recent   170:11
recognition
  292:17
recognize
  113:25 114:3
  134:5 136:16,
  18 140:16
  141:25 146:18
  149:16 156:16
  160:19 161:5
  163:16 165:16
  167:11 169:24
  170:10 171:13
  175:9 182:24
  190:13 197:24
  198:6 204:17

206:13 213:14
214:15 216:19
218:14 219:6,
7 222:7 228:3
229:4 230:13
234:13,14,16,
17 236:13
238:18
240:18,21
242:22 244:14
247:14 248:12
249:1,19
251:8 253:16
254:21 255:25
256:17 257:2,
22 258:13
259:22 260:4
261:2 264:3,6
266:21 268:9
270:5 275:21
276:5 277:25
278:14 283:23
287:19
294:13,16
295:21 296:7
298:7 303:12
305:23 308:9
311:10,25
319:13
320:15,23
321:7

**recollection**
108:11 117:21
172:24 173:6,
22 176:2
177:17,21
229:7 259:12
270:2 274:21
275:1 283:6,
13 285:3
312:12 314:9,
14 316:3

**recommending**
258:5

**record** 107:22
126:3 157:9
327:11

**recording**
254:10

**records**
198:19 309:5

**reduced**
279:12

**reference**
109:15 121:2,
10 136:8
144:10,17,18
146:5 150:18
151:3,11
153:6 155:16,
20 156:2
172:1 180:5
190:17 207:3,
6 210:22
214:20
222:20,23
227:12 228:22
229:24 237:13
238:10 240:22
245:17 249:4,
22 258:22
266:1 314:22

**referenced**
119:18 122:13
268:2

**references**
135:25
161:15,20
171:22 183:19

**referencing**
110:5 134:24
144:21 159:19
164:13 172:6
174:8 189:14
193:11 210:17
223:7 225:5
245:14 261:23
262:16

**referred**
184:4,6
230:19

**referring**
109:8 159:20
162:9 184:25
188:16,17
192:19 194:2
200:22 213:23
215:13 219:21

257:16 261:18
263:7 265:3,
5,11 266:10
276:7,12
279:25 280:25
323:12

**refers** 289:23

**reflect** 256:7
278:16 295:23
296:1

**reflected**
148:10 199:12
279:11

**reflecting**
196:14 209:24
284:17

**reflects**
185:16 196:1
197:10 199:17
200:5,11,19
219:9,12,17
248:15 266:24
272:12,15
273:10 278:6

**refresh**
117:20 172:23
173:6 176:1
177:21 229:7
270:1 274:20
275:1 283:12
312:12 314:9,
13 316:3

**refreshes**
285:2

**refurbished**
257:5,8,9

**refusing**
148:21 174:18

**Regina** 221:23
228:6,15
250:4

**Registered**
106:2 327:6,
23

**relate** 122:8
230:23 271:24
275:25

**related**
208:17 249:13
283:17 285:7
321:14,21

**relates** 122:7
212:23 258:19
265:15,24
266:3 267:23
271:6 280:22
281:7 287:22
296:10 298:14
301:17 308:21
315:7,18

**Relations**
303:15 306:1

**relationship**
121:15,24
123:3 187:19
226:9,12,20
239:20 257:15
268:25 269:2
271:25 273:12
292:21

**relative**
327:14,16

**relaying**
292:4

**release** 146:2

**released**
146:7

**reliable**
108:17

**rely** 298:24

**relying**
272:23 274:5
309:13

**remain** 162:3
269:1 271:20

**remained**
159:22

**remaining**
312:20

**remember**
107:17
109:11,24
110:3,24
117:13 123:20
131:3,5

132:9,12
153:16 167:25
176:24 192:4
193:23 199:14
203:18 228:25
229:16 251:4
254:24 282:25
290:11 304:3
315:22

**reminded**
121:14,23

**reminding**
123:2

**removal**   278:3

**removed**   173:9

**reopened**
281:4 284:11,
14,22 285:15

**rep**  109:17,19
111:20 120:8,
10,14,18,20
130:20,22,23
131:2 133:9
146:12 148:8
153:10 158:11
172:11
180:12,14
197:2 217:14,
19 230:3
231:7,17,23
232:23 233:8
235:23 239:18
240:6 263:4
265:7 266:1
271:25 301:20
314:12,17

**rep's**   259:9

**repeat**   145:19

**rephrase**
108:8 133:19
147:10 196:21
300:11

**replaced**
169:6,7
286:14

**report**   132:18
152:9 168:20
191:18

195:21,24
197:3 198:5
199:23 200:15
202:21 255:14
288:1 297:19
327:9

**reported**
116:16,21
166:21 168:23
221:16 288:4

**Reporter**
106:2,3,5
327:1,7,23,24

**reporting**
116:20

**reports**   209:5
305:8

**represent**
107:9 139:8

**representation**
139:1 140:6
164:8 217:14
218:21 228:21
266:9 267:24
270:23

**representative**
127:20 142:11
144:14 147:6,
12 163:10
164:2 165:2
167:1 169:11
173:23
179:21,24
181:4,10,11
182:9,14
198:12 204:6,
10 211:20
215:1,12,21
216:23 219:19
220:17,23
226:8,10,23
227:8 230:1,
6,18 231:13
233:19 240:23
243:2,5,14,
19,23 244:2,9
246:5 247:21
248:7 249:14
254:13 260:22

264:22
269:13,14
275:6 282:5,
11 285:9
286:11 288:11
293:17 296:16
301:11,14,17

**representative
s**  130:14
162:21
168:19,25
169:1 181:13
187:8 234:4
240:13 269:6

**represented**
223:9

**represents**
173:2 290:2

**reps**   116:14,
17,22 124:14
125:3 126:23
130:17 137:17
138:4 162:3,
5,11,16
163:1,2
180:15 182:5
190:18 198:7
199:13 217:19
219:17 224:4
239:9 240:2
259:11 267:5
268:18 271:20
272:16

**request**
109:18 110:11
147:15 173:10
179:24 188:1
204:5 214:25
215:11,12,21
216:22 218:22
226:7,22
229:14,21
231:11 233:19
243:1 244:3
248:7 250:10
251:24 255:1
276:2,17
288:6,10
324:9

**requested**
111:17 187:6
211:12 233:4
246:5 263:17
284:10 305:10
327:10

**requesting**
139:2 183:20
243:13 247:21

**requests**
167:5 223:2

**require**
220:10,18,20
221:7 230:6

**required**
190:6 227:8
255:14

**reserving**
106:23

**respect**
157:25 181:21
266:6

**respected**
179:6 223:2
244:4

**respond**
137:21 144:19
155:2 160:11
166:13 172:8
174:3 207:12,
13,24 210:1
218:20 241:8
293:11

**responded**
137:23 139:18
140:9 239:14
244:22

**responding**
138:16 154:19
208:11 226:3

**responds**
145:14,20
154:10 159:10
167:4 172:15
208:2 220:8
221:20 250:9
251:21 293:8

response
138:22,25
145:2,11,15
154:15 158:18
163:20 185:23
216:22 217:4,
8 218:16
225:14 235:10
306:22 307:19
321:1
responsible
142:11 188:13
209:7 223:25
288:8
restate
215:14 243:11
restructuring
277:5
result 130:23
179:1 192:17
195:25 198:16
201:8 203:7
273:7 290:10
results 295:7
retain 109:12
retaliation
117:5,23,25
118:4 299:4,
11,15,22,25
300:4,16,18,
19,22 316:13,
17,20 318:12,
24 319:7
323:9,15,20,
22 324:4,5
325:17,20
return 148:14
235:2,6
returned
127:15
128:20,21
129:2 235:4,5
239:6 308:13
returning
151:12
returns 218:2
revenue
198:8,16

201:12 202:5,
12,17,18
reverse
250:25
review 106:19
108:20
167:15,19,23
174:9,12
250:14,16
251:2 255:2,
5,7 256:20
308:19 311:4
319:24 327:9
reviewed
112:8 113:9,
16 114:1
115:6
reviewing
113:8
reviews
216:10
rid 221:9
right-hand
192:24
rightfully
317:1,8
ringing
299:19
Rock 130:20
131:2 169:7,
10 171:5
175:13 177:5
ROI 166:10
role 122:5
room 308:13
Rooney 116:18
174:24
rule 109:11
112:13 115:3,
21
rules 107:17
108:12 111:24
115:5,21
186:20 190:25
313:2,3,20
running
311:17

S

Sacha 107:9
221:2 324:2
sale 283:10
sales 124:14
125:3 127:20,
24 128:6
130:24 153:2,
10 157:20
168:22 169:20
170:4 172:2,
24 173:15,19,
24 182:5
183:14 190:18
194:10 195:13
198:7,12
200:15 208:25
209:6 215:12,
21 216:23
234:4 235:23
239:18 240:6,
13 243:13,19,
22 244:2,9
248:7 256:11
258:19 261:8
262:20 271:18
272:16 278:2
279:6,12,16
282:5,11
288:7 290:1
301:17,20
314:17 315:3
save 297:9
SC 150:25
scale 173:20
Schein
121:15,24
123:3,6 143:8
144:15
Schmidt
263:10
264:17,20
266:8,23,25
267:4,13,21,
22 269:14,16,
24 270:24

271:3
Schmidt's
266:6
screen 303:25
season's
148:18,21
secondary
178:1,3
section 121:3
sell 261:12
262:2 282:23
301:21
selling 283:7
send 158:18,
23 159:1
206:10 250:1
253:2 285:17,
21 301:22,25
sending
134:21 164:5
235:10
sends 219:16
290:11 291:18
301:15,22
302:1
sense 164:10
195:11
sentence
115:18 121:14
122:13 141:5
143:23 210:17
227:11,16
267:2
separation
109:10
September
289:3 290:16
295:5
sequence
169:9
Serrano
247:17
service 142:9
177:10 237:1
267:5 288:7,
11 291:3,7
302:6

serviced
  133:21 139:7,
  14 159:24
  160:4 260:2
  271:20
services
  133:1
serving
  276:24
set  109:10
  133:15 182:1
  190:24 221:21
  228:20 229:8
  232:5 239:19,
  23 250:13,15
  251:2 255:1,7
  259:10 275:3,
  6 281:3
  291:2,6
  296:17 305:10
  321:2
set-up  314:22
setting
  161:21
  223:10,20
  274:13 296:11
  303:2
setup  274:9,
  11 305:10
  315:5,8,10,
  11,19,20,23
  316:1,9
  317:4,5,6,12
setups  265:21
  274:17
several-week
  127:14
sex  117:22
  118:4 322:9
sexual
  117:23,24
shaking
  168:12
share  246:10
shared  239:23
  275:4,5
Sharp  134:13
  141:3,14

217:8
shelves
  274:12
shift  128:9
Ship  119:16,
  20 128:6,10
  129:2,5,10,
  15,20,21
  130:15 133:1,
  3,7 139:13
  148:8 153:3,
  17 158:3,12
  159:18
  162:12,22
  165:11 174:25
  180:11
  188:14,19
  189:21 190:1
  191:14
  192:16,22
  193:6,12
  194:4 195:14
  196:3,9
  198:13,14
  200:19,25
  201:9,24
  202:2 203:10
  214:2,5
  223:16,17
  224:22 248:17
  259:3,6
  262:11 273:20
  274:16,17
  318:7
shipped  146:9
shipping
  324:17
short  133:13
shorted
  151:11
shot  303:25
shoved
  147:23,25
show  117:7
  130:4 133:25
  136:15 140:14
  146:17 156:12
  160:18 163:15

165:15 167:10
168:3 170:9
171:12 175:8
182:19 190:12
198:2 204:16
213:13 214:14
216:18 218:10
219:5 222:4
227:22 229:3
230:12 234:12
236:10 238:17
240:17 242:21
244:13 247:13
248:11,25
249:18 251:7
252:5 254:16
255:22
256:16,24
257:21 258:12
259:19,21
261:1 263:25
266:16 268:8
269:20 275:18
277:23 278:11
290:12 294:12
295:17 296:6
298:2 303:6,
11 305:22
308:8 310:16
319:12
320:14,22
321:6
showed  301:13
showing
  121:17 149:15
  255:15 283:22
shows  190:19
  194:17 195:25
  198:12 263:15
side  190:8
  192:24
sighing
  215:17
sign  179:21
  324:11,13
signature
  160:22 186:4,
  14 187:1,2

signed  114:9
  181:22 240:24
  241:19 242:16
significant
  161:16
signs  179:23
sincerely
  124:12 125:2
Singh  184:15
  196:12,13,15
  210:23,24
  211:18,21,23
  212:18,21
  241:23 242:2,
  5 317:11
Singh's
  317:10
single
  109:17,19
  111:20 144:14
  146:12 147:5,
  12 181:4,10,
  11 182:9
  204:5,10
  211:19 215:1,
  12,21 216:23
  217:14,18
  218:20 220:16
  226:8,9,22
  227:8 230:1
  231:7,12,14,
  17,23 232:23
  233:8,19
  240:23 243:1,
  5,13,18,22
  244:1,9 246:5
  247:21 248:7
  249:13 254:13
  260:21 263:4
site  249:25
sites  208:21
  268:20
sitting  109:4
  253:13 259:13
  279:10 283:6
situation
  218:2 292:12

situations
139:11

six-year
311:1

sixth 321:10

skip 254:17

slow 311:2

small 289:23,
24

sold 262:10
282:19,21
283:1

sole 120:8,
10,14,18,20
265:22

solemnly
106:5

solutions
166:10

something's
125:16

Sounds 305:12

space 301:13

speak 241:2
243:24

speaking
107:23 114:23
241:5

specific
178:19 179:16
194:11,12
195:3 204:1
258:22 279:9

specifically
139:4 147:17
215:5 236:22
257:11 274:15
282:25 296:23
324:4,8

specifics
175:25 176:2
203:24

speculate
154:2

speculating
202:14

speculation
128:2

split 164:23
165:1,5
267:7,8
268:2,3
271:13

splitting
190:18

spoke 119:2
142:23

spreadsheet
191:19 200:18
202:17

St 185:6

Stack 224:8,
13,21 272:8
273:1 275:12

staffed 233:3

stand 276:22

standing
175:17

start 106:15
118:21 124:19
126:21 129:13
137:5 150:11
187:19 193:5
205:19 225:22
291:16

started 107:3
116:20 118:8
120:9 156:24
208:15

starting
142:15

starts 136:24
137:8 145:11
149:23 156:21
157:1,10
165:25
171:15,18
183:4,9
192:23 204:22
205:12 228:7
234:18 240:25

State 106:3
327:3

stated 150:24

statement
141:2 151:5
175:22
187:11,15,23

stay 191:15
286:15 292:8
305:14

staying
106:21

Steele 122:8,
10 135:15
136:1,8,11,23
137:9,14,17,
21 138:2,11
139:1,18,21
140:3,9
141:4,14,17,
22 147:5,9,
11,20 148:3,
5,25 150:19
151:5,17
152:4,19
155:9,16
156:5 158:19,
24 164:11
174:8,12
175:4 176:17
177:13 296:24

Steele's
138:16

stenographical
ly 327:8

step 324:14

Steve 188:24

stick 211:16

stood 109:14

stop 150:25
151:6,14,18,
23 152:5,10,
12,14,19
155:13,17
186:18 299:18

stopped
144:20

stopwatch
313:12

story 141:7

Stout 164:11

straightened
143:7,21
144:4

Strong 230:15
231:5,11,22
232:1

stuck 210:14,
24 211:4,5,14

stuff 204:18

subjects
322:8

submit
302:10,19,22

subsequent
215:7 271:3

substantial
120:4,17,19

summarize
267:4

Suncoast
131:24 132:14

Sunkara
193:18
194:12,17

super 249:24

supervise
213:1

supervisor
122:6 157:21

supplemental
321:1,10

supplier
178:2 233:24
296:24

supplies
124:9 170:25
171:3,5
274:11 281:14
282:24,25
284:10 302:22
307:8 308:17
315:14

supply 177:10
220:9

Case 8:17-cv-02447-WFJ-AAS Document 48 Filed 10/18/19 CORRECTED FILED TO DISPLAY PAGE ID PROPERLY Page 91 of 93 PageID 1503

August 09, 2019                                                    31

supplying
  208:22
support
  233:5,6,13
  254:9 298:24
supports
  325:13,20
supposed
  176:14
surcharge
  151:4,8
  174:13
surcharges
  173:9 324:17
surgery  163:5
surprised
  301:18
suspended
  116:2
swear  106:5
sworn/affirmed
  106:11
system
  148:10,22
  304:16 305:11
systems
  209:15

———————
     T
———————

tables  274:13
taking  110:18
  227:8
talk  222:15
  232:6 288:25
  300:25 324:16
talked  107:12
  113:6 126:21
  141:1 194:4
talking
  116:25 118:8,
  13,18 127:5
  144:3 145:23
  159:7 168:6
  183:8 190:25
  194:3 279:24
  288:18 289:17

324:24
Tampa  271:14
team  112:18
  116:17 137:17
  153:11,13,14
  199:6,8,15,
  23,24 291:13
teams  199:15
Teel  223:24
  265:20
  269:13,23
  270:8 271:2,
  7,9 273:11
  274:3,6
telling
  110:10 111:13
  135:11,12,16,
  17 141:2,4,7,
  22,23 152:4
  154:23 298:9
tells  263:10
  291:1
terminated
  116:3 322:23
  323:1
terms  164:1
  293:5
territories
  267:7
territory
  256:8
testified
  106:12 116:5,
  12
testifying
  186:24
testimony
  106:6 108:17
  276:8 320:8
  325:23 327:12
testing  121:5
tests  121:6
text  238:21,
  24 239:2
  240:5 261:6
thanked
  260:19

thing  109:14
  135:12 141:4,
  22 319:24
things  109:13
  110:23 111:23
  126:10 147:20
  151:25 155:24
  313:16
  318:13,21
thinking
  159:5 221:6
  275:1 280:20
Thirteenth
  114:5
thought  177:2
  318:21
threaten
  226:8
threats
  249:9,12
three-  303:3
throat  147:23
  148:1
Tiffany  146:2
Tim  274:3
time  107:8,
  12,18,23
  108:2 119:22,
  23 122:17,24
  126:18 127:7,
  23 130:2,3
  138:5 144:8
  147:4,9,11
  148:7 153:14
  154:1,7
  157:22 165:5
  170:2,3
  172:3,5,24,25
  173:3,19,23
  181:20 190:21
  197:13,16
  198:2 203:24
  204:2,8 205:6
  214:25 215:20
  218:3 220:6
  221:2,4,12
  228:18 244:6
  249:5 265:4,

21 267:18
  272:10 274:18
  275:3 282:19
  284:22 287:1,
  25 291:1,12
  307:22 308:16
  311:2,6
  312:20,24
  313:1,22
  324:20
times  179:16
timing  270:2
titled  116:9
today  108:17
  109:5 113:17
  129:7 130:14
  146:2 169:11
  276:8,13
  279:10 283:7
  292:23 313:21
  325:2,23
today's  113:4
  312:21
Todd  180:16,
  19 199:3
  200:11,23
told  111:14
  117:3 118:9
  122:17 125:1
  128:17 130:18
  143:6 151:8
  177:14 181:6,
  11 228:15
  237:4 241:16
  272:22
  275:23,25
  278:5 285:12,
  19 286:15
  299:25 300:5
  303:2 309:12,
  20 310:1
  317:20,25
  322:17
Tonnesen
  188:24
top  115:14
  124:23,24
  131:19,21

135:2 136:24
150:3 160:20
163:20 165:19
167:21 170:12
181:19 183:7
186:1 190:20
216:21 219:22
229:11 231:19
270:15 288:19
294:16 306:19
**Tos**  158:12
165:11 180:11
198:13,14
200:19,25
201:9,24
202:2 223:16,
17 246:21,23
247:6
**total**  129:11,
21
**totally**  252:2
259:14,15
262:3
**traction**
128:17,22
**training**
248:16
**transcribed**
107:1
**transcript**
106:19,24,25
108:20,21,23
109:1,6 112:9
113:1,8,14
327:10,11
**transfer**
193:3,16
194:7,9
**transferred**
128:11 187:7
195:1,5,8,25
196:1,15
197:10 224:14
275:14 315:3,
24
**transferring**
196:20,21,24

**transition**
185:16,17
188:1 199:9
275:25
**transitioned**
269:5 276:14
**transitioning**
112:10
**treated**
322:13,16
323:23,24
324:1,3
**true**  114:15
212:4 217:17
223:5,6
260:6,10,15
319:16 320:9,
17,25 321:9
327:11
**truth**  106:6,7
**turn**  135:19
142:14 177:8
261:20 309:4
**turned**  306:16
**turns**  253:9
**two-sided**
320:3
**type**  139:13
240:6
**types**  184:7

_____

**U**

**Uh-huh**  199:7
**ultimately**
112:15 155:9
188:13 310:5
**umbrella**
158:13 268:17
**underlying**
126:10
**understand**
107:15,25
108:7,12
111:15 133:22
144:20 150:6
166:24 170:2

172:5 173:21
176:12
186:13,24
187:5,25
188:4,9,12,
18,24 190:5
202:16 206:4
208:19 214:24
225:3 227:16
228:18
229:21,25
233:14,15
235:18 236:2,
5,25 245:25
246:1 256:5
277:3 278:2
285:11 288:24
289:13 294:24
299:24 300:8
302:5 311:7
324:7
**understanding**
107:14 111:4
158:12
**understood**
108:10 221:18
225:5 229:23
272:4,7,8
290:23
**unfairly**
323:25 324:1,
3
**unfulfilled**
161:12
**unique**  292:12
**units**  261:9,
12 262:1,8,
10,17,19
**unreasonable**
313:11
**unusual**
236:1,4
**upset**  148:11,
13 176:25
177:14 185:16
211:17,19
239:21 241:9
249:6 324:21

**urgent**
159:14,22
**user**  249:24
**utterly**
313:11

_____

**V**

_____

**vacation**
217:11 259:25
260:3
**vaccine**
148:14 149:1
151:12,19
249:13 261:8,
12,24 262:1,
5,11 324:16
**vaccines**
174:14 249:6
**Vaguely**
140:17 224:11
296:8
**VAN**  106:10
327:9
**vanhoek**
106:13,18
107:8 157:11
178:11 186:23
195:20 197:5
311:25 314:7
320:10 323:7
**vanhoek's**
106:23
**verbal**  272:14
**verbalizing**
107:23
**verbally**
203:15,19
**versa**  251:20
**version**
306:15
**versus**  129:24
**vials**  148:14,
19 149:1
**vice**  251:19
**view**  198:7

**Vigneau**   131:7
138:3 142:10,
16,19 143:6,
20,24 144:7,
19 145:2,6,
14,20 146:8
169:2
**visited**
132:14,15
133:17

---

**W**

---

**wait**   193:3
197:14 254:23
291:23
**waiting**
281:21
**waiving**   167:6
**wanted**   106:18
112:9 118:2
126:13,16,19
235:15 241:18
250:4
**wanting**
126:11 186:1
261:6
**Watson**   131:23
132:15
**weeks**   119:2
127:13
**Wendy**   142:7,8
**West**   185:12
190:6 219:17
220:8
**wheel**   116:13,
17,22
**William**
262:17
**Williams**
183:5,10,18
185:7,15
188:2 189:5,
21 190:6
193:1,16
194:22 195:1,
5,9,12 196:2,
16,19,21,25

197:11 203:6,
10 204:4,9
207:3,6
209:3,5
210:5,10
211:12 217:10
219:18
220:11,18,21
221:7 245:17
248:15
251:11,17,21
252:22 261:7
295:1
**wished**   148:14
241:2
**wishes**   179:6
185:17
**word**   232:1
**words**   254:9
**work**   132:2
133:5 180:11
181:13 188:15
204:3,9 223:9
233:23,24
248:16 253:5
265:22
273:19,21
297:5,9
300:15 308:23
309:2,7
315:8,10,11
**work-related**
116:8
**worked**   133:2
265:19,20
269:17 274:7
275:5 302:3
**working**
126:22 131:22
132:9 137:18
164:11 223:23
273:11 309:14
**works**   158:13
**worms**   179:5
**worth**   297:4
**Wow**   120:24
**write**   150:24
211:2

**writes**   231:16
**writing**
117:10 140:3
**written**
115:20 188:7
**wrong**   251:18
**wrote**   137:16
139:21 298:4

---

**X**

---

**Xiques**   112:19
116:21
118:23,25
124:11 125:1
131:12,22
132:13,16
134:12,16,19
135:6,11,16,
22,25 136:8,
11 137:9,16
138:3,11,16,
25 139:19,21
140:2 141:2,
3,14 147:6,16
149:19,24
150:7,15
152:9 154:10,
18,23 155:2
166:2,14
188:25 189:14
200:12,15
201:22 266:8,
24 267:13,23
286:21,23
287:8,13,23
288:4,7,12,
15,16,24
289:4,14,20
290:5,17
291:13,19
292:25 293:8,
11,21
**Xiques's**
199:6 291:13

---

**Y**

---

**year**   123:17
130:5,7
153:23 154:5
161:17,21
162:13,23
174:1 179:15
198:13 200:19
201:3,24
213:7 229:15
258:24 259:2
261:13,16,18,
19 279:6
280:19 304:8,
9
**year's**   130:4
**yearly**   174:1
198:5
**years**   120:4
172:18 175:18
218:23 240:5
284:4
**yes-or-no**
152:8
**you-all**   293:9