# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

**HILDA VAN HOEK,**

**Plaintiff,**

vs.                                                 **Case No. 8:17-cv-2447-T-36AAS**

**MCKESSON CORPORATION; PSS
WORLD MEDICAL, INC.; MCKESSON
MEDICAL-SURGICAL INC.; and MCKESSON
MEDICAL-SURGICAL TOP HOLDINGS
INC.,**



**Defendants.**                          /

## PLAINTIFF'S RESPONSE TO "DEFENDANT'S FIRST SET OF INTERROGATORIES
## TO PLAINTIFF"

Plaintiff Hilda van Hoek hereby submits her response to "Defendant's First Set of Interrogatories to Plaintiff."

1.      Please set forth the factual and legal basis for your claim that each Defendant violated the Florida Civil Rights Act ("FCRA") as alleged in Count I of your Fourth Amended Complaint and Demand for Jury Trial (Dkt. No. 21; Fourth Amended Complaint). In responding to this interrogatory, please identify each alleged act in violation of the FCRA, when the act occurred or was taken, where the act occurred or was taken, how you learned of the act, what specific damage or harm you claim to have incurred from each specific act, when the specific damage or harm occurred from each specific act, the past or present employees of Defendant involved in such alleged act, the reason given for such act, any witnesses to the alleged act, why you believe the act to be in violation of the FCRA, and any discussion, comment, statement, writing, or communication that you contend is the basis for your claim in Count I of your Fourth Amended Complaint.

**Objection:** Plaintiff objects to the first sentence of this interrogatory on grounds of oppressiveness and burdensomeness in requiring a detailed narrative response and being an improper contention interrogatory. Defendant's definitions for "setting forth" and stating "the factual basis" that are incorporated into this part of the interrogatory render the request for setting forth the factual basis of the claim in Count 1 unduly burdensome and oppressive. They require an extensive narrative response that would provide "in full detail" "each and every fact, name, item of information, inference, conclusion, argument, or other thing which you contend supports, or tends to indicate the trust of, the contention, answer, or allegation that is the subject of the inquiry, and as to such fact, etc., set forth each and every source thereof and/or other basis for asserting its

truth or existence, and the date of each such fact, etc." The request to "set forth" the "legal basis" of the claim "in full detail" essentially requires an exhaustive legal brief on Count 1, which has numerous paragraphs. This intrudes on counsel's mental impressions and work product, and far exceeds the limited scope permitted by Rule 33 for contention interrogatories. The intrusiveness is heightened by the fact that discovery is ongoing. Accordingly, Plaintiff will not answer the first sentence of this interrogatory. She provides below her answer to the second sentence.

**Answer**: To the best of my knowledge, belief, and recollection, I am providing here my answer to the second sentence of Interrogatory 1.

Count 1 concerns the taking away from me of the Florida Medical Clinic billing ("bill-to" or "main") account and giving it to Clint Brady. This action was taken on or about December 1, 2012. My Sales Leader Carlos Xiques sent me an email on November 27, 2012, notifying me that the action "will" be taken; this email is at Van Hoek 000685. In this email, Xiques alleged as the reason: "Clint has some traction with the purchasing department (not the lab) and needs to provide a couple of prices he promised to them. That being said, we will need to change the main site bill so he can provide quotes and pricing to him." In the months before the FMC bill-to account was removed from me and given to Brady, I worked hard toward regaining FMC as a medical supply customer. I made great progress and was invited by FMC to bid on the medical supply business for the next year. Moving the account to Brady cost me (and PSS) this opportunity and potential business in the millions. I spent much time and effort objecting to removal of the account from me. On November 27, 2012, I sent a reply email to Xiques in which I said: "I have contact with the purchasing agent and I'm on the list to bid January....Please set up another account....I sell things to Gary Steele and know him very well."; this email is at Van Hoek 000684. I spoke to Xiques regarding the decision between November 27 and December 1, 2012. Xiques gave as a reason to stick with the decision that Gary Steele would be confused if I called on him. On December 1, 2012, I sent an email to Xiques informing Xiques that Gary "is VERY CONFUSED THAT CLINT IS TRYING TO WORK WITH HIM!" I also said I was shocked by Xiques' email and "very Disappointed and SURPRISED that you would just transfer the MAIN account without speaking to me first." My December 1, 2012, email is at Van Hoek 000682 to 000683. I complained to Human Resources. On or about December 11, 2012, Regional Manager Darin Sharp met with me by phone. I complained to Sharp of the FMC bill-to account being taken from me and given to Brady. When I explained that I, not Brady, had arranged for the company to be on FMC's bid list, Sharp said that this had already been accomplished by Brady, which was untrue. Sharp said the decision has been made, and Brady will have the account. I complained that I was losing business again to the "good old boy" system. Sharp then became angry and hostile and terminated the discussion. Very soon after that I filed a sex discrimination and retaliation charge with the EEOC. I signed the charge on December 19, 2012. I continued to object thereafter. Gary Steele wanted nothing to do with Brady and wanted me to notify PSS, which I did (for example, in the email shown on Van Hoek 000687 that I sent February 13, 2013, to Christina Capparelli). I believe the taking away of the FMC billing account from me and giving it to Brady was sex discrimination because this was preferential treatment of a man (Brady) over a woman (me) and was part of a repeated pattern of such treatment that I and other women were subjected to at PSS. I saw so many women come and go because it was unbearable for most to survive. Taking the FMC billing

2

account away from me and handing it on a platter to Brady was a repeat of creating barriers for women sales representatives to progress while making it easier for men (at the expense of women and their labor) to excel. This was humiliating and degrading to me. Although the FMC billing account was restored to me several months later, the damage to the customer relationship that had resulted from removing me and replacing me with Brady has had a lasting economic impact.

2.      Please set forth the factual and legal basis for your claim that each Defendant violated the FCRA as alleged in Count II of your Fourth Amended Complaint. In responding to this interrogatory, please identify each alleged act in violation of the FCRA, when the act occurred or was taken, where the act occurred or was taken, how you learned of the act, what specific damage or harm you claim to have incurred from each specific act, when the specific damage or harm occurred from each specific act, the past or present employees of Defendant involved in such alleged act, the reason given for such act, any witnesses to the alleged act, why you believe the act to be in violation of the FCRA, and any discussion, comment, statement, writing, or communication that you contend is the basis for your claim in Count II of your Fourth Amended Complaint.

**Objection:** Plaintiff objects to the first sentence of this interrogatory on grounds of oppressiveness and burdensomeness in requiring a detailed narrative response and being an improper contention interrogatory. Defendant's definitions for "setting forth" and stating "the factual basis" that are incorporated into this part of the interrogatory render the request for setting forth the factual basis of the multiple claims in Count 2 unduly burdensome and oppressive. As to each claim alleged in this count, the definitions require an extensive narrative response that would provide "in full detail" "each and every fact, name, item of information, inference, conclusion, argument, or other thing which you contend supports, or tends to indicate the trust of, the contention, answer, or allegation that is the subject of the inquiry, and as to such fact, etc., set forth each and every source thereof and/or other basis for asserting its truth or existence, and the date of each such fact, etc." The request to "set forth" the "legal basis" of the claim "in full detail" essentially requires an exhaustive legal brief on each of the claims alleged in Count 2. This intrudes on counsel's mental impressions and work product, and far exceeds the limited scope permitted by Rule 33 for contention interrogatories. The intrusiveness is heightened by the fact that discovery is ongoing. Accordingly, Plaintiff will not answer the first sentence of this interrogatory. She provides below her answer to the second sentence.

**Answer:** To the best of my knowledge, belief, and recollection, I am providing here my answers to the second sentence of Interrogatory 2. Count 2 concerns multiple actions taken after the McKesson/PSS merger that I believe are sex discrimination: the Access Health Care accounts for the east coast of Florida being taken from me in 2013 and given to a man; the refusal in 2016 to grant Access Health Care's request that I be designated the sole sales representative for all its accounts; the refusal of the requests of Florida Medical Clinic (FMC) to assign to me accounts assigned to a man; the refusal in 2014 to restore me to the Knight account and instead leaving it with a man; and my performing work on accounts assigned to men but not being paid the commissions.

3

The accounts of Access Health Care on the east coast of Florida were taken away from me in 2013 after the merger and given to Craig Williams. Before the merger, I had been a PSS employee; and Williams had been a McKesson employee. Before the merger, I was the sales representative for the Access east coast accounts (and also the Access accounts on the west coast of Florida). I developed the accounts over approximately a 15-year period. The Access east coast accounts included Access Health Care LLC, Access HCIPA LLC, and Access HC 2. The taking away of the east accounts started with the IPA account. I learned from Chris Barnabo that in late February 2013, within a day or two of consummation of the McKesson/PSS merger, Williams started competing with me by giving her a price list with slashed prices for the products I had been selling to the IPA. Williams' competing against me for the IPA's business was against policy. We were told to cease and desist going after each other's accounts. I had conversations with Carlos Xiques to complain about Williams' competing with me. But I still lost the IPA, and then the other Access east coast accounts, all of which were transferred to Williams. To the best of my recollection, Xiques notified me by email. After the Access east coast account were taken away from me and given to Williams, I was instructed to turn over to Williams all my pricing, contracts, and information that I had developed for those accounts. I was told not to communicate with Barnabo. Xiques told me he approved transferring my Access east coast accounts to Williams. Paul Jensen told me that Xiques, Steve Tonnesen, Alexander Loisey, and Jensen had a meeting where they jointly decided to take away the accounts from me and give them to Williams. Xiques said Barnabo asked to have Craig Williams as her McKesson sales representative. My objections were ignored; I have located one email I sent protesting the actions (see Van Hoek 001453 to 0001454). McKesson's rules for divvying up ship-to accounts after the merger looked to who had greater sales with an account during April 2012 to March 2013. To the best of my knowledge, Williams had no sales to the Access east accounts in the months prior to the merger. As a result of removing me from the Access east coast accounts and giving them to Williams, I lost all commissions associated with Access east coast accounts on an ongoing basis. The accounts regularly generate commissions, which had gone to me before but have gone to Williams after the accounts were moved to Williams. I also have lost commissions generated from new physicians who join the Access east coast group, including the accounts under the Access HC IPA. Essentially every paycheck I receive is affected by the commission losses. The lost commissions prevented me from qualifying for the ELITe CEO Round Table with PSS, which allowed highly successful members to set aside tax-deferred earnings, which were matched dollar for dollar, without limit. The lower compensation due losing the commissions affects my ranking and benefits in the McKesson President's Club. I have continued to perform work on the Access east coast accounts to assigned to Williams but receive no compensation for the work; Williams, not I, receives the commissions. The defendants should have all the commissions and sales data necessary to compute my monetary losses. I do not have access to that information. My lawyers are conducting discovery to obtain the documents. So far, no documents have been turned over. I believe the taking away of the east coast accounts was sex discrimination because this was preferential treatment of a man (Williams) over a woman (me) and was yet another instance of the repeated pattern of such treatment that I and other women had been subjected to. Taking away the accounts from me that I had worked so hard to develop for over a decade along with all the pricing, contracts, and

4

information that I developed and the earnings generated continually from the accounts—and handing all ready-made on a silver platter to Williams—was humiliating and degrading to me.

On March 25, 2016, Access requested that its accounts be consolidated "so that we have one rep." (See Van Hoek 000091). Paul Jensen responded that he had "started a consolidation process for all Access healthcare accounts to be under a single bill to." (See Van Hoek 000090.) But Jensen denied Access's request for one representative; he said instead that Access would have three sales representatives—Williams, Laura Carmen and me. (See Van Hoek 000090 to 000091.) On July 20, 2016, Access again requested that they be serviced by only one sales rep. (See Van Hoek 000095 to 000096). In making this request, Maria Jimenez, who was Access's Operations Manage, said that Barnabo no longer worked there; that they wanted me to be Access's sole rep; and that they did not want to keep Williams on the account. (See Van Hoek 000095 to 000096). On August 4, 2016, Access, through Access's Operations Coordinator Regina Conner, again requested that its accounts be assigned to me. Conner said that all the accounts must be switched over to me as the McKesson salesperson; and that this must be "done ASAP." (See Van Hoek 000100 to 000101). Jensen and Regional Sales Leader Darin Sharp held a phone meeting with Jimenez and Conner on August 7, 2016, from which I was excluded. Jimenez contacted me after the meeting and was upset. She said Jensen stated that switching the accounts over to me as one rep would go against the contract or agreement signed between Access and McKesson. I was unaware of and had never seen such an agreement. Jimenez asked me to obtain a copy, and I conveyed her request to Jensen. (See Van Hoek 000103). Jensen provided no agreement. He said, "Well, maybe I misstated this." (See Van Hoek 000108). The refusal to make me the sole representative of the Access accounts, which would have included removing Williams as the rep assigned to the east coast accounts and restoring me to those accounts, was sex discrimination. When a customer, Florida Hospital Physician Group, requested that a man be designated the sole representative of the customer's accounts, the customer's request was granted, causing me to lose my accounts with the customer. Similarly with Access, Barnabo's alleged request for Williams to be assigned to an east coast account was granted, yet when Barnabo left and persons of higher stature at Access insisted that I replace Williams, the request was refused. The refusal to grant the 2016 requests of Access to assign me as the exclusive sales rep for Access accounts was discouraging and humiliating to me. Moreover, despite not being assigned all Access accounts, I nonetheless perform the work on those accounts. I am the contact person for the accounts (see Van Hoek 000009) and manage the accounts for the reps assigned to the Access accounts denied to me. Yet, I'm not paid for work I perform on the Access accounts denied to me. This represents well numerous accounts denied to me. My financial losses from the decision not to assign me as the sole sales representative include the loss of commissions generated regularly from the Access accounts denied to me, which affect every paycheck of mine due to the absence of those commissions from my pay. The defendants should have all the commissions and sales data necessary to compute my monetary losses. I do not have access to that information. My lawyers are conducting discovery to obtain the documents. So far, no documents have been turned over.

The situation with FMC is another example. Despite FMC's letting it be known since at least February 2013, through FMC's purchasing agent Gary Steele, that FMC did not want Clint Brady assigned to any of FMC's accounts, FMC's wishes have not been granted. Steele often asked me to notify management that he did not trust Brady and did not want him assigned to any of FMC's accounts, as well as that Steele only wanted me assigned as the rep for medical supplies

and Cindy Vigneau for lab supplies. I did notify management of Steele's objections to Brady and preference that only I (for medical supplies) and Vigneau (for lab supplies) handle FMC's accounts. (See, for example, my February and April 2013 emails to Christina Capparelli and Carlos Xiques at Van Hoek 000692 to 000694; my October 10, 2014, email to Jensen at Van Hoek 000770 to 000771; my February 8, 2016, email to Xiques and Jensen; my March 22, 2016, email to Jensen and Brian Nehr at Van Hoek 000157 to 000158; my April 1, 2016, "risk" log entry for FMC at Van Hoek 000848.) In May 2013, Gary Steele sent Xiques an email stating: "I just wanted to clarify our need for representation, all PSS products we will deal with Hilda van Hoek and lab products we will deal with Cyndie Vigneau Info Lab only from your company. We will not entertain any other Reps from your company at this time." (Van Hoek 000159.) Xiques responded that he would honor Steele's request (Van Hoek 000 1512), but Xiques left Brady on the accounts. On or about October 10, 2014, Steele objected to keeping Brady on the FMC account and reiterated he only wanted to deal with me on medical supplies and Vigneau on lab supplies. (Van Hoek 000770 to 000771). Jensen brought the matter to Steve Tonnesen's attention. (See Van Hoek 000770). But Steele's request was refused. In March 2016, Brady requested that a new FMC account that was assigned to me be reassigned to him. Steele and Amy Boyes (also in the purchasing department at FMC) were notified. Boyes responded: "We do not want Clint on our accounts." (Van Hoek 000157 to 000158.) Yet, the account still was removed from me and assigned to Brady. All this is more sex discrimination against me. Despite the customer's repeated requests that Brady (a man) be removed from the accounts assigned to him and that his medical supply accounts be assigned to me (and the customer's lab accounts be assigned to Vigneau, a woman), Brady was given preferential treatment at my (and evidently Vigneau's) expense. Moreover, despite Brady's being assigned to FMC accounts that PSS/McKesson refused to assign to me, I nonetheless do the work on Brady's FMC accounts but receive no compensation. I am the contact person for FMC, so all customer requests and issues with Brady's accounts are handled by me. Brady receives the commissions on his FMC accounts. His commissions are losses to me because I would receive the commissions if assigned to his accounts. I receive no compensation for my work on his accounts. The defendants should have all the commissions and sales data necessary to compute my monetary losses. I do not have access to that information. My lawyers are conducting discovery to obtain the documents. So far, no documents have been turned over. The refusals to reassign Brady's FMC accounts to me in accordance with FMC's repeated requests in humiliating and degrading to me, especially given that men are not treated the way I (and other women) have been.

The new FMC account taken from me and given to Brady in or about 2016 formerly had been that of a different customer that had been serviced by Brady. However, when a similar situation arose with me, Brady was given preference over me. This was more sex discrimination against me, and was humiliating and degrading for me. That was the Dr. Randolph Knight account. Knight, an orthopedist, had been a customer of mine for approximately 15 years. Within this period, Knight joined Florida Hospital Physician Group (FHPG) but and continued to be a customer of mine. His office remained in Zephyrhills. In or about 2014, Knight left FHPG and went on his own but stayed at the same Zephyrhills location that he had before and during his affiliation with FHPG. Knight's new account after leaving FHPG was initially assigned to me, on or about March 12, 2014. (See Van Hoek 000777.) However, on April 2, 2014, Xiques reassigned

the account to Brady, without researching the past history of the account as per company policy. (See Van Hoek 000777.) Knight's office manager, Lisa DeLong, complained that I had been removed, and requested that I replace Brady. (Van Hoek 000777 to 000778.) Despite the company policy, Knight's agent's protest, and my own pleas to rectify the error, I was informed on November 6, 2014, by Jensen, that a decision was made to leave the account with Brady. (Van Hoek 000164 to 165.) As a result, I lost this long-term customer; and all the commissions from the Knight account go to Brady. The defendants should have all the commissions and sales data necessary to compute my monetary losses. I do not have access to that information. My lawyers are conducting discovery to obtain the documents. So far, no documents have been turned over.

3.      Please set forth the factual and legal basis for your claim that each Defendant violated the FCRA as alleged in Count III of your Fourth Amended Complaint. In responding to this interrogatory, please identify each alleged act in violation of the FCRA, when the act occurred or was taken, where the act occurred or was taken, how you learned of the act, what specific damage or harm you claim to have incurred from each specific act, when the specific damage or harm occurred from each specific act, the past or present employees of Defendant involved in such alleged act, the reason given for such act, any witnesses to the alleged act, why you believe the act to be in violation of the FCRA, and any discussion, comment, statement, writing, or communication that you contend is the basis for your claim in Count III of your Fourth Amended Complaint.

**Objection:** Plaintiff objects to the first sentence of this interrogatory on grounds of oppressiveness and burdensomeness in requiring a detailed narrative response and being an improper contention interrogatory. Defendant's definitions for "setting forth" and stating "the factual basis" that are incorporated into this part of the interrogatory render the request for setting forth the factual basis of the multiple claims in Count 3 unduly burdensome and oppressive. As to each claim alleged in this count, the definitions require an extensive narrative response that would provide "in full detail" "each and every fact, name, item of information, inference, conclusion, argument, or other thing which you contend supports, or tends to indicate the trust of, the contention, answer, or allegation that is the subject of the inquiry, and as to such fact, etc., set forth each and every source thereof and/or other basis for asserting its truth or existence, and the date of each such fact, etc." The request to "set forth" the "legal basis" of the claim "in full detail" essentially requires an exhaustive legal brief on each of the claims alleged in Count 3. This intrudes on counsel's mental impressions and work product, and far exceeds the limited scope permitted by Rule 33 for contention interrogatories. The intrusiveness is heightened by the fact that discovery is ongoing. Accordingly, Plaintiff will not answer the first sentence of this interrogatory. She provides below her answer to the second sentence.

**Answer:** To the best of my knowledge, belief, and recollection, I am providing here my answers to the second sentence of Interrogatory 3. Count 3 concerns multiple actions that I believe are retaliation for my complaints of sex discrimination and the legal actions I have taken against sex discrimination: the Access Health Care accounts for the east coast of Florida being taken away from me in 2013; the refusal in 2016 to grant Access Health Care's request that I be designated

7

the sole sales representative for all its accounts; the refusal of the requests of Florida Medical Clinic (FMC) that accounts assigned to Clint Brady be reassigned to me; the refusal in 2014 to restore me to the Knight account and instead leaving it with Brady; placing my accounts in jeopardy in or about December 2015; in or about December 2015, refusing to assign the Prime Care account to me and failing to award me the commission for my work on the Prime Care account; and paying other employees for work I performed.

The accounts of Access Health Care on the east coast of Florida were taken away from me in 2013 after the McKesson/PSS merger and given to Craig Williams. Before the merger, I had been a PSS employee; and Williams had been a McKesson employee. Before the merger, I was the sales representative for the Access east coast accounts (and also the Access accounts on the west coast of Florida). I developed the accounts over approximately a 15-year period. The Access east coast accounts included Access Health Care LLC, Access HCIPA LLC, and Access HC 2. The taking away of the east accounts started with the IPA account. I learned from Chris Barnabo that in late February 2013, within a day or two of consummation of the McKesson/PSS merger, Williams started competing with me by giving her a price list with slashed prices for the products I had been selling to the IPA. Williams' competing against me for the IPA's business was against policy. We were told to cease and desist going after each other's accounts. I had conversations with Carlos Xiques to complain about Williams' competing with me. But I still lost the IPA, and then the other Access east coast accounts, all of which were transferred to Williams. To the best of my recollection, Xiques notified me by email. After the Access east coast account were taken away from me and given to Williams, I was instructed to turn over to Williams all my pricing, contracts, and information that I had developed for those accounts. I was told not to communicate with Barnabo. Xiques told me he approved transferring my Access east coast accounts to Williams. Paul Jensen told me that Xiques, Steve Tonnesen, Alexander Loisey, and Jensen had a meeting where they jointly decided to take away the accounts from me and give them to Williams. Xiques said Barnabo asked to have Craig Williams as her McKesson sales representative. My objections were ignored; I have located one email I sent protesting the actions (see Van Hoek 001453 to 0001454). McKesson's rules for divvying up ship-to accounts after the merger looked to who had greater sales with an account during April 2012 to March 2013. To the best of my knowledge, Williams had no sales to the Access east accounts in the months prior to the merger. As a result of removing me from the Access east coast accounts and giving them to Williams, I lost all commissions associated with Access east coast accounts on an ongoing basis. The accounts regularly generate commissions, which had gone to me before but have gone to Williams after the accounts were moved to Williams. I also have lost commissions generated from new physicians who join the Access east coast group, including the accounts under the Access HC IPA. Essentially every paycheck I receive is affected by the commission losses. The lost commissions prevented me from qualifying for the ELITe CEO Round Table with PSS, which allowed highly successful members to set aside tax-deferred earnings, which were matched dollar for dollar, without limit. The lower compensation due losing the commissions affects my ranking and benefits in the McKesson President's Club. I have continued to perform work on the Access east coast accounts to assigned to Williams but receive no compensation for the work; Williams, not I, receives the commissions. The defendants should have all the commissions and sales data necessary to compute my monetary losses. I do not have access to that information. My lawyers are conducting discovery

to obtain the documents. So far, no documents have been turned over. I believe the taking away of the east coast accounts was retaliation against me because it was against company policy and occurred very close in time to the following:  objections that I made to Xiques and Sharp in December 2012 regarding the FMC billing account being taken from me and given to Clint Brady, including my complaining that I was losing business again to the "good old boy" system; my EEOC charge alleging sex discrimination and retaliation that was filed in late December 2012 and pending through July 2013, and to which the company responded on March 4, 2013, during the time when I started losing the Access east coast accounts (see Van Hoek 001245 to 001249); counseling on nondiscrimination requirements  that Xiques and Sharp had to undergo due to my 2012 EEOC charge (see Van Hoek 001249); and my complaints of sex discrimination that I made to HR and Xiques (see Van Hoek 001459, 000686 to 000688).  Taking away the accounts from me that I had worked so hard to develop for over a decade along with all the pricing, contracts, and information that I developed and the earnings generated continually from the accounts—and handing all ready-made on a silver platter to Williams—was humiliating and degrading to me.

On March 25, 2016, Access requested that its accounts be consolidated "so that we have one rep." (See Van Hoek 000091). Paul Jensen responded that he had "started a consolidation process for all Access healthcare accounts to be under a single bill to." (See Van Hoek 000090.) But Jensen denied Access's request for one representative; he said instead that Access would have three sales representatives—Williams, Laura Carmen and me. (See Van Hoek 000090 to 000091.) On July 20, 2016, Access again requested that they be serviced by only one sales rep. (See Van Hoek 000095 to 000096). In making this request, Maria Jimenez, who was Access's Operations Manager, said that Barnabo no longer worked there; that Access wanted me to be Access's sole rep; and that Access wanted Williams of the account. (See Van Hoek 000095 to 000096). On August 4, 2016, Access, through Access's Operations Coordinator Regina Conner, again requested that its accounts be assigned to me. Conner said that all the accounts must be switched over to me as the McKesson salesperson; and that this must be "done ASAP." (See Van Hoek 000100 to 000101). Jensen and Regional Sales Leader Darin Sharp held a phone meeting with Jimenez and Conner on August 7, 2016, from which I was excluded. Jimenez contacted me after the meeting and was upset. She said Jensen stated that switching the accounts over to me as one rep would go against the contract or agreement signed between Access and McKesson. I was unaware of and had never seen such an agreement. Jimenez asked me to obtain a copy, and I conveyed her request to Jensen. (See Van Hoek 000103). Jensen provided no agreement. He said, "Well, maybe I misstated this." (See Van Hoek 000108). When a customer of mine, Florida Hospital Physician Group, requested that Bryan Irish be designated the sole representative of the customer's accounts, the customer's request was granted, causing me to lose my accounts with the customer. Similarly with Access in 2013, Barnabo's alleged request for Williams to be assigned to an east coast account was granted. By contrast, when Barnabo left and persons of higher stature at Access insisted that I replace Williams, the request was refused. The refusal to grant the 2016 requests of Access to assign me as the exclusive sales rep for Access accounts was discouraging and humiliating to me. Moreover, despite not being assigned all Access accounts, I nonetheless perform the work on those accounts. I am the contact person for the accounts (see Van Hoek 000009) and manage the accounts for the reps assigned to the Access accounts denied to me. Yet, I'm not paid for work I perform on the Access accounts denied to me. This represents well numerous accounts denied to me. My financial losses from the decision not to assign me as the sole sales representative include the loss of commissions generated regularly from the Access accounts denied to me, which affect every

9

paycheck of mine due to the absence of those commissions from my pay. The defendants should have all the commissions and sales data necessary to compute my monetary losses. I do not have access to that information. My lawyers are conducting discovery to obtain the documents. So far, no documents have been turned over. I believe the refusal to make me the sole representative of the Access accounts, which would have included removing Williams as the rep assigned to the east coast accounts and restoring me to those accounts, is retaliation for my complaints of sex discrimination and legal actions taken against sex discrimination. Those complaints and legal actions include my discrimination lawsuit, which was filed in December 2014 and has been in litigation ever since, and in which Jensen has been helping the defendants' attorneys; the EEOC charge that I filed in July 2015, which was pending at the EEOC through May 2017; and complaints I made regarding Williams' being assigned the Access east coast accounts and the failure to grant Access's request that I be the exclusive sales representative for its accounts, including on March 26, 2016 (Van Hoek 000011 to 000012); July 20, 2016 (Van Hoek 000008 to 000009); August 2, 2016 (Van Hoek 000782 to 000783); and August 5, 2016 (Van Hoek 000003).

The situation with FMC is another example. Despite FMC's letting it be known since at least February 2013, through FMC's purchasing agent Gary Steele, that FMC did not want Clint Brady assigned to any of FMC's accounts, FMC's wishes have not been granted. Steele often asked me to notify management that he did not trust Brady and did not want him assigned to any of FMC's accounts, as well as that Steele only wanted me assigned as the rep for medical supplies and Cindy Vigneau for lab supplies. I did notify management of Steele's objections to Brady and preference that only I (for medical supplies) and Vigneau (for lab supplies) handle FMC's accounts. (See, for example, my February and April 2013 emails to Christina Capparelli and Carlos Xiques at Van Hoek 000692 to 000694; my October 10, 2014, email to Jensen at Van Hoek 000770 to 000771; my February 8, 2016, email to Xiques and Jensen; my March 22, 2016, email to Jensen and Brian Nehr at Van Hoek 000157 to 000158; my April 1, 2016, "risk" log entry for FMC at Van Hoek 000848.) In May 2013, Gary Steele sent Xiques an email stating: "I just wanted to clarify our need for representation, all PSS products we will deal with Hilda van Hoek and lab products we will deal with Cyndie Vigneau Info Lab only from your company. We will not entertain any other Reps from your company at this time." (Van Hoek 000159.) Xiques responded that he would honor Steele's request (Van Hoek 000 1512), but Xiques still left Brady on the accounts. On or about October 10, 2014, Steele objected to keeping Brady on the FMC account and reiterated he only wanted to deal with me on medical supplies and Vigneau on lab supplies. (Van Hoek 000770 to 000771). Jensen brought the matter to Steve Tonnesen's attention. (See Van Hoek 000770). But Steele's request was refused. In March 2016, Brady requested that a new FMC account that was assigned to me be reassigned to him. Steele and Amy Boyes (also in the purchasing department at FMC) were notified. Boyes responded: "We do not want Clint on our accounts." (Van Hoek 000157 to 000158.) Yet, the account still was removed from me and assigned to Brady. Moreover, despite Brady's being assigned to FMC accounts that PSS/McKesson refused to assign to me, I nonetheless do the work on Brady's FMC accounts but receive no compensation. I am the contact person for FMC, so all customer requests and issues with Brady's accounts are handled by me. Brady receives the commissions on his FMC accounts. His commissions are losses to me because I would receive the commissions if assigned to his accounts. I receive no compensation for my work on his accounts. The defendants should have all

10

the commissions and sales data necessary to compute my monetary losses. I do not have access to that information. My lawyers are conducting discovery to obtain the documents. So far, no documents have been turned over. The refusals to reassign Brady's FMC accounts to me in accordance with FMC's repeated requests in humiliating and degrading to me. I believe the refusals plus having me nonetheless do the work without compensation on Brady's accounts denied me is retaliation for my complaints of sex discrimination and my legal actions. The refusals started in or about March 2013, which was shortly after I filed my 2012 EEOC charge and around the same time that PSS was responding to my 2012 EEOC charge, and also around the time that my leaders were counseled on nondiscrimination requirements as a result of my 2012 EEOC charge. The decision to deny Steele's October 10, 2014, request was shortly after my attorney sent on September 4, 2014, a letter to McKesson Corporation's attorney regarding discrimination against me that was occurring in 2014. (See Defendants' 000122 to 000123.) The March 2016 removal of me from the new FMC account and assignment of that account to Brady, despite FMC's express protest, occurred while my 2015 EEOC charge and my lawsuit were pending and being litigated. Also, in March 2016, I sent Jensen an email complaining of the assignment of Williams to the Access east coast and pointing out inconsistency between Jensen's explanation of not assigning me Brady's FMC accounts and the failure to assign the Access east coast accounts to me. (Van Hoek 000011 to 000012.)

The new FMC account taken from me and given to Brady in or about 2016 formerly had been that of a different customer that had been serviced by Brady. However, when a similar situation arose with me, Brady was given preference over me. This was more retaliation against me, and was humiliating and degrading for me. That was the Dr. Randolph Knight account. Knight, an orthopedist, had been a customer of mine for approximately 15 years. Within this period, Knight joined Florida Hospital Physician Group (FHPG) but and continued to be a customer of mine. His office remained in Zephyrhills. In or about 2014, Knight left FHPG and went on his own but stayed at the same Zephyrhills location that he had before and during his affiliation with FHPG. Knight's new account after leaving FHPG was initially assigned to me, on or about March 12, 2014. (See Van Hoek 000777.) However, on April 2, 2014, Xiques reassigned the account to Brady, without researching the past history of the account as per company policy. (See Van Hoek 000777.) Knight's office manager, Lisa DeLong, complained that I had been removed, and requested that I replace Brady. (Van Hoek 000777 to 000778.) Despite the company policy, Knight's agent's protest, and my own pleas to rectify the error, I was informed on November 6, 2014, by Jensen, that a decision was made to leave the account with Brady. (Van Hoek 000164 to 165.) As a result, I lost this long-term customer; and all the commissions from the Knight account go to Brady. The defendants should have all the commissions and sales data necessary to compute my monetary losses. I do not have access to that information. My lawyers are conducting discovery to obtain the documents. So far, no documents have been turned over. The November 6, 2014, decision was made shortly after my lawyer sent his letter to McKesson's attorney regarding discrimination occurring in 2014; the discrimination my lawyer mentioned in this letter included the Knight account being taken from me and nothing being done despite my objection and the customer's complaint.

Starting in or about December 2015, Jensen began hyper-scrutinizing me, treating me with hostility, and taking actions that placed my accounts in jeopardy. This included requiring me to impose additional and unwarranted fees on customers, limiting reimbursements for returned products, and harassing me regarding my need to take a leave of absence due to the illness and subsequent death of my father. I believe these actions were in retaliation for my lawsuit filed in December 2014 and EEOC charge filed in July 2015, both of which were pending and being litigated at the time Jensen took these actions against me. When Jensen started taking the actions, the defendants would have been preparing their response to my EEOC charge, which was submitted to the Florida Commission on Human Relations investigator on December 18, 2015. (Van Hoek 001240 to 001243).

In December 2015, I was contacted by an affiliate of Access Health Care, Prime Care, about opening a new account. I had developed a relationship with Prime Care staff, including Maria Jimenez, who also handled purchasing for Access. Jimenez requested that I work with Cindy Borgnis at Prime Care to create a purchase order for medical equipment and supplies for setting up a new Prime Care office. (Van Hoek 001195). I worked up a detailed purchase order for equipment and supplies and submitted it to Prime Care for review. (Van Hoek 000058). In the meantime, I learned that had assigned the account to another sales rep, Laura Carmen. After learning this, I checked with Prime Care to see if Carmen had been in touch with them, or worked with them in any way on the account, and learned that she had not. (Van Hoek 000700 to 000701). I then contacted Jensen and informed him of the work I had done to date on the account and requested that it be assigned to me. Jensen refused to turn the account over to me and directed me to turn over all my work to Carmen, even though I had already done all the work for the setup. I was not paid the commission on the sale I made to Prime Care. I believe these actions were in retaliation for my lawsuit filed in December 2014 and EEOC charge filed in July 2015, both of which were pending and being litigated at the time Jensen took these actions against. They occurred near the time when the defendants submitted their December 18, 2015, response to my charge to the Florida Commission on Human Relations.

4.    Please set forth the factual and legal basis for your claim that each Defendant violated Title VII of the Civil Rights Act of 1964 ("Title VII") as alleged in Count IV of your Fourth Amended Complaint. In responding to this interrogatory, please identify each alleged act in violation of Title VII, when the act occurred or was taken, where the act occurred or was taken, how you learned of the act, what specific damage or harm you claim to have incurred from each specific act, when the specific damage or harm occurred from each specific act, the past or present employees of Defendant involved in such alleged act, the reason given for such act, any witnesses to the alleged act, why you believe the act to be in violation of Title VII, and any discussion, comment, statement, writing, or communication that you contend is the basis for your claim in Count IV of your Fourth Amended Complaint.

**Objection:** Plaintiff objects to the first sentence of this interrogatory on grounds of oppressiveness and burdensomeness in requiring a detailed narrative response and being an improper contention interrogatory. Defendant's definitions for "setting forth" and stating "the factual basis" that are incorporated into this part of the interrogatory render the request for setting forth the factual basis of the multiple claims in Count 4 unduly burdensome and oppressive. As to each claim alleged in this count, the definitions require an extensive narrative response that would

provide "in full detail" "each and every fact, name, item of information, inference, conclusion, argument, or other thing which you contend supports, or tends to indicate the trust of, the contention, answer, or allegation that is the subject of the inquiry, and as to such fact, etc., set forth each and every source thereof and/or other basis for asserting its truth or existence, and the date of each such fact, etc." The request to "set forth" the "legal basis" of the claim "in full detail" essentially requires an exhaustive legal brief on each of the claims alleged in Count 4. This intrudes on counsel's mental impressions and work product, and far exceeds the limited scope permitted by Rule 33 for contention interrogatories. The intrusiveness is heightened by the fact that discovery is ongoing. Accordingly, Plaintiff will not answer the first sentence of this interrogatory. She provides below her answer to the second sentence.

**Answer**: To the best of my knowledge, belief, and recollection, I am providing here my answers to the second sentence of Interrogatory 4. Count 4 concerns multiple actions that I believe are sex discrimination: the Access Health Care accounts for the east coast of Florida being taken from me in 2013 and given to a man; the refusal in 2016 to grant Access Health Care's request that I be designated the sole sales representative for all its accounts; the refusal of the requests of Florida Medical Clinic (FMC) to assign to me accounts assigned to a man; the taking from me and refusal to restore me to the Knight account and instead leaving it with a man; denying the 2014 request of Florida Hospital Physician Group (FHPG) that I be assigned its Pinellas County account and instead assigning the account to a man; and my performing work on accounts assigned to men but not being paid the commissions.

The accounts of Access Health Care on the east coast of Florida were taken away from me in 2013 after the merger and given to Craig Williams. Before the merger, I had been a PSS employee; and Williams had been a McKesson employee. Before the merger, I was the sales representative for the Access east coast accounts (and also the Access accounts on the west coast of Florida). I developed the accounts over approximately a 15-year period. The Access east coast accounts included Access Health Care LLC, Access HCIPA LLC, and Access HC 2. The taking away of the east accounts started with the IPA account. I learned from Chris Barnabo that in late February 2013, within a day or two of consummation of the McKesson/PSS merger, Williams started competing with me by giving her a price list with slashed prices for the products I had been selling to the IPA. Williams' competing against me for the IPA's business was against policy. We were told to cease and desist going after each other's accounts. I had conversations with Carlos Xiques to complain about Williams' competing with me. But I still lost the IPA, and then the other Access east coast accounts, all of which were transferred to Williams. To the best of my recollection, Xiques notified me by email. After the Access east coast account were taken away from me and given to Williams, I was instructed to turn over to Williams all my pricing, contracts, and information that I had developed for those accounts. I was told not to communicate with Barnabo. Xiques told me he approved transferring my Access east coast accounts to Williams. Paul Jensen told me that Xiques, Steve Tonnesen, Alexander Loisey, and Jensen had a meeting where they jointly decided to take away the accounts from me and give them to Williams. Xiques said Barnabo asked to have Craig Williams as her McKesson sales representative. My objections were ignored; I have located one email I sent protesting the actions (see Van Hoek 001453 to 0001454). McKesson's rules for divvying up ship-to accounts after the merger looked to who had

13

greater sales with an account during April 2012 to March 2013. To the best of my knowledge, Williams had no sales to the Access east accounts in the months prior to the merger. As a result of removing me from the Access east coast accounts and giving them to Williams, I lost all commissions associated with Access east coast accounts on an ongoing basis. The accounts regularly generate commissions, which had gone to me before but have gone to Williams after the accounts were moved to Williams. I also have lost commissions generated from new physicians who join the Access east coast group, including the accounts under the Access HC IPA. Essentially every paycheck I receive is affected by the commission losses. The lost commissions prevented me from qualifying for the ELITe CEO Round Table with PSS, which allowed highly successful members to set aside tax-deferred earnings, which were matched dollar for dollar, without limit. The lower compensation due losing the commissions affects my ranking and benefits in the McKesson President's Club. I have continued to perform work on the Access east coast accounts to assigned to Williams but receive no compensation for the work; Williams, not I, receives the commissions. The defendants should have all the commissions and sales data necessary to compute my monetary losses. I do not have access to that information. My lawyers are conducting discovery to obtain the documents. So far, no documents have been turned over. I believe the taking away of the east coast accounts was sex discrimination because this was preferential treatment of a man (Williams) over a woman (me) and was yet another instance of the repeated pattern of such treatment that I and other women had been subjected to. Taking away the accounts from me that I had worked so hard to develop for over a decade along with all the pricing, contracts, and information that I developed and the earnings generated continually from the accounts—and handing all ready-made on a silver platter to Williams—was humiliating and degrading to me.

On March 25, 2016, Access requested that its accounts be consolidated "so that we have one rep." (See Van Hoek 000091). Paul Jensen responded that he had "started a consolidation process for all Access healthcare accounts to be under a single bill to." (See Van Hoek 000090.) But Jensen denied Access's request for one representative; he said instead that Access would have three sales representatives—Williams, Laura Carmen and me. (See Van Hoek 000090 to 000091.) On July 20, 2016, Access again requested that they be serviced by only one sales rep. (See Van Hoek 000095 to 000096). In making this request, Maria Jimenez, who was Access's Operations Manage, said that Barnabo no longer worked there; that they wanted me to be Access's sole rep; and that they did not want to keep Williams on the account. (See Van Hoek 000095 to 000096). On August 4, 2016, Access, through Access's Operations Coordinator Regina Conner, again requested that its accounts be assigned to me. Conner said that all the accounts must be switched over to me as the McKesson salesperson; and that this must be "done ASAP." (See Van Hoek 000100 to 000101). Jensen and Regional Sales Leader Darin Sharp held a phone meeting with Jimenez and Conner on August 7, 2016, from which I was excluded. Jimenez contacted me after the meeting and was upset. She said Jensen stated that switching the accounts over to me as one rep would go against the contract or agreement signed between Access and McKesson. I was unaware of and had never seen such an agreement. Jimenez asked me to obtain a copy, and I conveyed her request to Jensen. (See Van Hoek 000103). Jensen provided no agreement. He said, "Well, maybe I misstated this." (See Van Hoek 000108). The refusal to make me the sole representative of the Access accounts, which would have included removing Williams as the rep assigned to the east coast accounts and restoring me to those accounts, was sex discrimination. When a customer, Florida Hospital Physician Group, requested that a man be

14

designated the sole representative of the customer's accounts, the customer's request was granted, causing me to lose my accounts with the customer. Similarly with Access, Barnabo's alleged request for Williams to be assigned to an east coast account was granted, yet when Barnabo left and persons of higher stature at Access insisted that I replace Williams, the request was refused. The refusal to grant the 2016 requests of Access to assign me as the exclusive sales rep for Access accounts was discouraging and humiliating to me. Moreover, despite not being assigned all Access accounts, I nonetheless perform the work on those accounts. I am the contact person for the accounts (see Van Hoek 000009) and manage the accounts for the reps assigned to the Access accounts denied to me. Yet, I'm not paid for work I perform on the Access accounts denied to me. This represents well numerous accounts denied to me. My financial losses from the decision not to assign me as the sole sales representative include the loss of commissions generated regularly from the Access accounts denied to me, which affect every paycheck of mine due to the absence of those commissions from my pay. The defendants should have all the commissions and sales data necessary to compute my monetary losses. I do not have access to that information. My lawyers are conducting discovery to obtain the documents. So far, no documents have been turned over.

The situation with FMC is another example. Despite FMC's letting it be known since at least February 2013, through FMC's purchasing agent Gary Steele, that FMC did not want Clint Brady assigned to any of FMC's accounts, FMC's wishes have not been granted. Steele often asked me to notify management that he did not trust Brady and did not want him assigned to any of FMC's accounts, as well as that Steele only wanted me assigned as the rep for medical supplies and Cindy Vigneau for lab supplies. I did notify management of Steele's objections to Brady and preference that only I (for medical supplies) and Vigneau (for lab supplies) handle FMC's accounts. (See, for example, my February and April 2013 emails to Christina Capparelli and Carlos Xiques at Van Hoek 000692 to 000694; my October 10, 2014, email to Jensen at Van Hoek 000770 to 000771; my February 8, 2016, email to Xiques and Jensen; my March 22, 2016, email to Jensen and Brian Nehr at Van Hoek 000157 to 000158; my April 1, 2016, "risk" log entry for FMC at Van Hoek 000848.) In May 2013, Gary Steele sent Xiques an email stating: "I just wanted to clarify our need for representation, all PSS products we will deal with Hilda van Hoek and lab products we will deal with Cyndie Vigneau Info Lab only from your company. We will not entertain any other Reps from your company at this time." (Van Hoek 000159.) Xiques responded that he would honor Steele's request (Van Hoek 000 1512), but Xiques left Brady on the accounts. On or about October 10, 2014, Steele objected to keeping Brady on the FMC account and reiterated he only wanted to deal with me on medical supplies and Vigneau on lab supplies. (Van Hoek 000770 to 000771). Jensen brought the matter to Steve Tonnesen's attention. (See Van Hoek 000770). But Steele's request was refused. In March 2016, Brady requested that a new FMC account that was assigned to me be reassigned to him. Steele and Amy Boyes (also in the purchasing department at FMC) were notified. Boyes responded: "We do not want Clint on our accounts." (Van Hoek 000157 to 000158.) Yet, the account still was removed from me and assigned to Brady. All this is more sex discrimination against me. Despite the customer's repeated requests that Brady (a man) be removed from the accounts assigned to him and that his medical supply accounts be assigned to me (and the customer's lab accounts be assigned to Vigneau, a woman), Brady was given preferential treatment at my (and evidently Vigneau's) expense. Moreover, despite Brady's being assigned to FMC accounts that PSS/McKesson refused to assign

to me, I nonetheless do the work on Brady's FMC accounts but receive no compensation. I am the contact person for FMC, so all customer requests and issues with Brady's accounts are handled by me. Brady receives the commissions on his FMC accounts. His commissions are losses to me because I would receive the commissions if assigned to his accounts. I receive no compensation for my work on his accounts. The defendants should have all the commissions and sales data necessary to compute my monetary losses. I do not have access to that information. My lawyers are conducting discovery to obtain the documents. So far, no documents have been turned over. The refusals to reassign Brady's FMC accounts to me in accordance with FMC's repeated requests in humiliating and degrading to me, especially given that men are not treated the way I (and other women) have been.

The new FMC account taken from me and given to Brady in or about 2016 formerly had been that of a different customer that had been serviced by Brady. However, when a similar situation arose with me, Brady was given preference over me. This was more sex discrimination against me, and was humiliating and degrading for me. That was the Dr. Randolph Knight account. Knight, an orthopedist, had been a customer of mine for approximately 15 years. Within this period, Knight joined Florida Hospital Physician Group (FHPG) but and continued to be a customer of mine. His office remained in Zephyrhills. In or about 2014, Knight left FHPG and went on his own but stayed at the same Zephyrhills location that he had before and during his affiliation with FHPG. Knight's new account after leaving FHPG was initially assigned to me, on or about March 12, 2014. (See Van Hoek 000777.) However, on April 2, 2014, Xiques reassigned the account to Brady, without researching the past history of the account as per company policy. (See Van Hoek 000777.) Knight's office manager, Lisa DeLong, complained that I had been removed, and requested that I replace Brady. (Van Hoek 000777 to 000778.) Despite the company policy, Knight's agent's protest, and my own pleas to rectify the error, I was informed on November 6, 2014, by Jensen, that a decision was made to leave the account with Brady. (Van Hoek 000164 to 165.) As a result, I lost this long-term customer; and all the commissions from the Knight account go to Brady. The defendants should have all the commissions and sales data necessary to compute my monetary losses. I do not have access to that information. My lawyers are conducting discovery to obtain the documents. So far, no documents have been turned over.

Yet another instance of sex discrimination involving Brady's being given preference over me is that which occurred with FHPG. I had a well-established relationship with FHPG. On February 24, 2014, FHPG, through its representative Cheryl Schmidt, requested that I handle all its accounts in Hillsborough, Pasco, and Pinellas Counties. (Van Hoek 000681.) Pinellas County was a new territory for FHPG. Despite FHPG's request, FHPG's Pinellas County sites were assigned to Brady, which Jensen announced on March 7, 2014. (Van Hoek 000143 to 000144.) As a result, commissions from the FHPG Pinellas accounts went to Brady, rather than me, with an endpoint in or about April 2016, at which time all the FHPG accounts were transferred to Bryan Irish. Despite the assignment to Brady of the FHPG Pinellas account, I nonetheless performed work on Brady's account up to in or about April 2016, but Brady, not I, received the commissions. The defendants should have all the commissions and sales data necessary to compute my monetary losses. I do not have access to that information. My lawyers are conducting discovery to obtain the documents. So far, no documents have been turned over.

16

5.     Please set forth the factual and legal basis for your claim that each Defendant violated Title VII as alleged in Count V of your Fourth Amended Complaint.  In responding to this interrogatory, please identify each alleged act in violation of Title VII, when the act occurred or was taken, where the act occurred or was taken, how you learned of the act, what specific damage or harm you claim to have incurred from each specific act, when the specific damage or harm occurred from each specific act, the past or present employees of Defendant involved in such alleged act, the reason given for such act, any witnesses to the alleged act, why you believe the act to be in violation of Title VII, and any discussion, comment, statement, writing, or communication that you contend is the basis for your claim in Count V of your Fourth Amended Complaint.

**Objection:** Plaintiff objects to the first sentence of this interrogatory on grounds of oppressiveness and burdensomeness in requiring a detailed narrative response and being an improper contention interrogatory. Defendant's definitions for "setting forth" and stating "the factual basis" that are incorporated into this part of the interrogatory render the request for setting forth the factual basis of the multiple claims in Count 5 unduly burdensome and oppressive. As to each claim alleged in this count, the definitions require an extensive narrative response that would provide "in full detail" "each and every fact, name, item of information, inference, conclusion, argument, or other thing which you contend supports, or tends to indicate the trust of, the contention, answer, or allegation that is the subject of the inquiry, and as to such fact, etc., set forth each and every source thereof and/or other basis for asserting its truth or existence, and the date of each such fact, etc." The request to "set forth" the "legal basis" of the claim "in full detail" essentially requires an exhaustive legal brief on each of the claims alleged in Count 5. This intrudes on counsel's mental impressions and work product, and far exceeds the limited scope permitted by Rule 33 for contention interrogatories. The intrusiveness is heightened by the fact that discovery is ongoing. Accordingly, Plaintiff will not answer the first sentence of this interrogatory. She provides below her answer to the second sentence.

**Answer:** To the best of my knowledge, belief, and recollection, I am providing here my answers to the second sentence of Interrogatory 5.  Count 5 concerns multiple actions that I believe are retaliation for my complaints of sex discrimination and the legal actions I have taken against sex discrimination: the refusal in 2016 to grant Access Health Care's request that I be designated the sole sales representative for all its accounts; placing my accounts in jeopardy in or about December 2015; in or about December 2015, refusing to assign the Prime Care account to me and failing to award me the commission for my work on the Prime Care account; and paying other employees for work I performed.

The accounts of Access Health Care on the east coast of Florida were taken away from me in 2013 after the McKesson/PSS merger and given to Craig Williams. Before the merger, I had been a PSS employee; and Williams had been a McKesson employee. Before the merger, I was the sales representative for the Access east coast accounts (and also the Access accounts on the west coast of Florida). I developed the accounts over approximately a 15-year period. The Access east coast accounts included Access Health Care LLC, Access HCIPA LLC, and Access HC 2. The taking away of the east accounts started with the IPA account. I learned from Chris Barnabo

17

that in late February 2013, within a day or two of consummation of the McKesson/PSS merger, Williams started competing with me by giving her a price list with slashed prices for the products I had been selling to the IPA. Williams' competing against me for the IPA's business was against policy. We were told to cease and desist going after each other's accounts. I had conversations with Carlos Xiques to complain about Williams' competing with me. But I still lost the IPA, and then the other Access east coast accounts, all of which were transferred to Williams. To the best of my recollection, Xiques notified me by email. After the Access east coast account were taken away from me and given to Williams, I was instructed to turn over to Williams all my pricing, contracts, and information that I had developed for those accounts. I was told not to communicate with Barnabo. Xiques told me he approved transferring my Access east coast accounts to Williams. Paul Jensen told me that Xiques, Steve Tonnesen, Alexander Loisey, and Jensen had a meeting where they jointly decided to take away the accounts from me and give them to Williams. Xiques said Barnabo asked to have Craig Williams as her McKesson sales representative. My objections were ignored; I have located one email I sent protesting the actions (see Van Hoek 001453 to 0001454). McKesson's rules for divvying up ship-to accounts after the merger looked to who had greater sales with an account during April 2012 to March 2013. To the best of my knowledge, Williams had no sales to the Access east accounts in the months prior to the merger. As a result of removing me from the Access east coast accounts and giving them to Williams, I lost all commissions associated with Access east coast accounts on an ongoing basis. The accounts regularly generate commissions, which had gone to me before but have gone to Williams after the accounts were moved to Williams. I also have lost commissions generated from new physicians who join the Access east coast group, including the accounts under the Access HC IPA. I believe the taking away of the east coast accounts was retaliation against me because it was against company policy and occurred very close in time to: my protests to Xiques and Sharp in December 2012 regarding the Florida Medical Clinic billing account being taken from me and given to Clint Brady, including my complaining that I was losing business again to the "good old boy" system; my EEOC charge alleging sex discrimination and retaliation that was filed in late December 2012 and pending through July 2013, and to which the company responded on March 4, 2013, during the time when I started losing the Access east coast accounts (see Van Hoek 001245 to 001249); counseling on nondiscrimination requirements that Xiques and Sharp had to undergo due to my 2012 EEOC charge (see Van Hoek 001249); and my complaints of sex discrimination that I made to HR and Xiques (see Van Hoek 001459, 000686 to 000688).

On March 25, 2016, Access requested that its accounts be consolidated "so that we have one rep." (See Van Hoek 000091). Paul Jensen responded that he had "started a consolidation process for all Access healthcare accounts to be under a single bill to." (See Van Hoek 000090.) But Jensen denied Access's request for one representative; he said instead that Access would have three sales representatives—Williams, Laura Carmen and me. (See Van Hoek 000090 to 000091.) On July 20, 2016, Access again requested that they be serviced by only one sales rep. (See Van Hoek 000095 to 000096). In making this request, Maria Jimenez, who was Access's Operations Manager, said that Barnabo no longer worked there; that Access wanted me to be Access's sole rep; and that Access did not want to keep Williams on the account. (See Van Hoek 000095 to 000096). On August 4, 2016, Access, through Access's Operations Coordinator Regina Conner, again requested that its accounts be assigned to me. Conner said that all the accounts must be switched over to me as the McKesson

salesperson; and that this must be "done ASAP." (See Van Hoek 000100 to 000101). Jensen and Regional Sales Leader Darin Sharp held a phone meeting with Jimenez and Conner on August 7, 2016, from which I was excluded. Jimenez contacted me after the meeting and was upset. She said Jensen stated that switching the accounts over to me as one rep would go against the contract or agreement signed between Access and McKesson. I was unaware of and had never seen such an agreement. Jimenez asked me to obtain a copy, and I conveyed her request to Jensen. (See Van Hoek 000103). Jensen provided no agreement. He said, "Well, maybe I misstated this." (See Van Hoek 000108). When a customer, Florida Hospital Physician Group, requested that Bryan Irish be designated the sole representative of the customer's accounts, the customer's request was granted, causing me to lose my accounts with the customer. Similarly with Access in 2013, Barnabo's alleged request for Williams to be assigned to an Access east coast account was granted. By contrast, when Barnabo left and persons of higher stature at Access insisted that I replace Williams, the request was refused. The refusal to grant the 2016 requests of Access to assign me as the exclusive sales rep for Access accounts was discouraging and humiliating to me. Moreover, despite not being assigned all Access accounts, I nonetheless perform the work on those accounts. I am the contact person for the accounts (see Van Hoek 000009) and manage the accounts for the reps assigned to the Access accounts denied to me. Yet, I'm not paid for work I perform on the Access accounts denied to me. This represents well numerous accounts denied to me. My financial losses from the decision not to assign me as the sole sales representative include the loss of commissions generated regularly from the Access accounts denied to me, which affect every paycheck of mine due to the absence of those commissions from my pay. The defendants should have all the commissions and sales data necessary to compute my monetary losses. I do not have access to that information. My lawyers are conducting discovery to obtain the documents. So far, no documents have been turned over. I believe the refusal to make me the sole representative of the Access accounts, which would have included removing Williams as the rep assigned to the east coast accounts and restoring me to those accounts, is retaliation for my complaints of sex discrimination and legal actions taken against sex discrimination. Those complaints and legal actions include my discrimination lawsuit, which was filed in December 2014 and has been in litigation ever since, and in which Jensen has been helping the defendants' attorneys; the EEOC charge that I filed in July 2015, which was pending at EEOC through May 2017; and complaints I made regarding Williams being assigned the Access east coast accounts and the failure to grant Access's request that I be the exclusive sales representative for its accounts, including on March 26, 2016 (Van Hoek 000011 to 000012); July 20, 2016 (Van Hoek 000008 to 000009); August 2, 2016 (Van Hoek 000782 to 000783); and August 5, 2016 (Van Hoek 000003).

Starting in or about December 2015, Jensen began hyper-scrutinizing me, treating me with hostility, and taking actions that placed my accounts in jeopardy. This included requiring me to impose additional and unwarranted fees on customers, limiting reimbursements for returned products, and harassing me regarding my need to take a leave of absence due to the illness and subsequent death of my father. I believe these actions were in retaliation for my lawsuit filed in December 2014 and EEOC charge filed in July 2015, both of which were pending and being litigated at the time Jensen took these actions against me. When Jensen started taking the actions, the defendants would have been preparing their response to my EEOC charge, which was submitted to the Florida Commission on Human Relations on December 18, 2015 (Van Hoek 001240 to 001243).

In December 2015, I was contacted by an affiliate of Access Health Care, Prime Care, about opening a new account. I had developed a relationship with Prime Care staff, including Maria Jimenez,

19

who also handled purchasing for Access. Jimenez requested that I work with Cindy Borgnis at Prime Care to create a purchase order for medical equipment and supplies for setting up a new Prime Care office. (Van Hoek 001195). I worked up a detailed purchase order for equipment and supplies and submitted it to Prime Care for review. (Van Hoek 000058). In the meantime, I learned that had assigned the account to another sales rep, Laura Carmen. After learning this, I checked with Prime Care to see if Carmen had been in touch with them or worked with them in any way on the account, and learned that she had not. (Van Hoek 000700 to 000701). I then contacted Jensen and informed him of the work I had done to date on the account and requested that it be assigned to me. Jensen refused to turn the account over to me and directed me to turn over all my work to Carmen, even though I had already done all the work for the setup. I was not paid the commission on the sale I made to Prime Care. I believe these actions were in retaliation for my lawsuit filed in December 2014 and EEOC charge filed in July 2015, both of which were pending and being litigated at the time Jensen took these actions against. They occurred near the time when the defendants submitted to the FCHR their December 18, 2015, response to my 2015 EEOC charge.

6. Please set forth the factual basis for your contention that "after that date, Plaintiff has performed work on the portions of the Florida Medical Clinic account remaining with Brady, but Brady, not Plaintiff, receives the commissions on those portions," as alleged in paragraph 32 of the Fourth Amended Complaint. In responding to this interrogatory, please identify the specific account(s) referenced in this paragraph, when you performed work on each account as alleged in this paragraph of the complaint, what specific work you performed, what past or present employees of Defendant were aware of the work you performed, what specific commissions were paid to Brady as alleged in this paragraph, how you learned of those commissions, when those commissions were paid, and why you believe that you were entitled to those commissions.

**Objection:** Plaintiff objects to this interrogatory because, counting the preceding interrogatories and their subparts, it exceeds the 25-interrogatory limit. Plaintiff further objects to this interrogatory on grounds of oppressiveness and burdensomeness in requiring a detailed narrative response. Defendant's definitions for "setting forth" and stating "the factual basis" that are incorporated into the interrogatory render the request for setting forth the factual basis of the quoted allegations contained in Paragraph 32 unduly burdensome and oppressive. As to each of the quoted allegations, the definitions require an extensive narrative response that would provide "in full detail" "each and every fact, name, item of information, inference, conclusion, argument, or other thing which you contend supports, or tends to indicate the trust of, the contention, answer, or allegation that is the subject of the inquiry, and as to such fact, etc., set forth each and every source thereof and/or other basis for asserting its truth or existence, and the date of each such fact, etc."

7. Please set forth the factual basis for your contention that "[t]hese discriminatory actions, as the previous discriminatory actions, have resulted in continuing substantial losses of income to Plaintiff and compensation being paid to men that should have been paid to Plaintiff," as alleged in paragraph 37 of the Fourth Amended Complaint. In responding to this interrogatory, please identify each alleged discriminatory act that you contend resulted in a substantial loss of

20

income, the alleged substantial loss of income associated with each alleged act of discrimination, when the alleged substantial loss of income occurred, the compensation paid to men, the men to whom you believe the compensation was paid, when the compensation was paid, and why you believe that the compensation should have been paid to you.

**Objection:** Plaintiff objects to this interrogatory because, counting the preceding interrogatories and their subparts, it exceeds the 25-interrogatory limit. Plaintiff further objects to this interrogatory on grounds of oppressiveness and burdensomeness in requiring a detailed narrative response. Defendant's definitions for "setting forth" and stating "the factual basis" that are incorporated into the interrogatory render the request for setting forth the factual basis of the quoted allegations contained in Paragraph 37 unduly burdensome and oppressive. As to each of the quoted allegations, the definitions require an extensive narrative response that would provide "in full detail" "each and every fact, name, item of information, inference, conclusion, argument, or other thing which you contend supports, or tends to indicate the trust of, the contention, answer, or allegation that is the subject of the inquiry, and as to such fact, etc., set forth each and every source thereof and/or other basis for asserting its truth or existence, and the date of each such fact, etc."

     8.     Please set forth the factual basis for your contention that "Plaintiff continues to perform work on the east coast Access accounts, but Williams, not Plaintiff, receives the commissions," as alleged in paragraph 38 of the Fourth Amended Complaint.  In responding to this interrogatory, please identify the specific accounts referenced in this paragraph, when you performed work on each account as alleged in this paragraph of the complaint, what specific work you performed, what past or present employees of Defendant were aware of the work you performed, what specific commissions were paid to Williams as alleged in this paragraph, how you learned of those commissions, when those commissions were paid, and why you believe that you were entitled to those commissions.

**Objection:** Plaintiff objects to this interrogatory because, counting the preceding interrogatories and their subparts, it exceeds the 25-interrogatory limit. Plaintiff further objects to this interrogatory on grounds of oppressiveness and burdensomeness in requiring a detailed narrative response. Defendant's definitions for "setting forth" and stating "the factual basis" that are incorporated into the interrogatory render the request for setting forth the factual basis of the quoted allegations contained in Paragraph 38 unduly burdensome and oppressive. As to each of the quoted allegations, the definitions require an extensive narrative response that would provide "in full detail" "each and every fact, name, item of information, inference, conclusion, argument, or other thing which you contend supports, or tends to indicate the trust of, the contention, answer, or allegation that is the subject of the inquiry, and as to such fact, etc., set forth each and every source thereof and/or other basis for asserting its truth or existence, and the date of each such fact, etc."

9.      Please set forth the factual basis for your contention that "Plaintiff nonetheless performed the work on Florida Hospital Physician Group's Pinellas County account until in or about April 2016, but Brady, not Plaintiff, received the commissions on the account," as alleged in paragraph 41 of the Fourth Amended Complaint.  In responding to this interrogatory, please identify the specific account(s) referenced in this paragraph, when you performed work on each account as alleged in this paragraph of the complaint, what specific work you performed, what past or present employees of Defendant were aware of the work you performed, what specific commissions were paid to Brady as alleged in this paragraph, how you learned of those commissions, when those commissions were paid, and why you believe that you were entitled to those commissions.

**Objection:** Plaintiff objects to this interrogatory because, counting the preceding interrogatories and their subparts, it exceeds the 25-interrogatory limit. Plaintiff further objects to this interrogatory on grounds of oppressiveness and burdensomeness in requiring a detailed narrative response. Defendant's definitions for "setting forth" and stating "the factual basis" that are incorporated into the interrogatory render the request for setting forth the factual basis of the quoted allegations contained in Paragraph 41 unduly burdensome and oppressive. As to each of the quoted allegations, the definitions require an extensive narrative response that would provide "in full detail" "each and every fact, name, item of information, inference, conclusion, argument, or other thing which you contend supports, or tends to indicate the trust of, the contention, answer, or allegation that is the subject of the inquiry, and as to such fact, etc., set forth each and every source thereof and/or other basis for asserting its truth or existence, and the date of each such fact, etc."


10.     If you contend that Defendant has taken an adverse employment action(s) against you, please set forth the factual and legal basis for your contention, including each and every act you contend was an adverse employment action; identify who, on behalf of Defendant, took the action; any witnesses to the alleged action; explain the reason(s) you believe such action was taken; set forth when each adverse action allegedly was taken; and why you believe that the action is an adverse employment action.

**Objection:** Plaintiff objects to this interrogatory because, counting the preceding interrogatories and their subparts, it exceeds the 25-interrogatory limit. Plaintiff further objects that this is an improper contention interrogatory because it asks for a legal conclusion and intrudes into counsels' mental impressions in inquiring into Plaintiff's attorneys' position on whether the actions upon which Plaintiff's brings her claims are "adverse employment actions" within the meaning of Title VII jurisprudence. This is a pure fishing expedition to find out Plaintiff's counsels' positions and analyses on that issue. The interrogatory is further objectionable on grounds of oppressiveness and burdensomeness in requiring a detailed narrative response. Defendant's definitions for "setting forth" and stating "the factual basis" that are incorporated the interrogatory render the request for setting forth the factual basis of any contention that Defendant has taken any "adverse employment actions" unduly burdensome and oppressive. As to each such contention, the definitions require an extensive narrative response that would provide "in full detail" "each and every fact, name,

item of information, inference, conclusion, argument, or other thing which you contend supports, or tends to indicate the trust of, the contention, answer, or allegation that is the subject of the inquiry, and as to such fact, etc., set forth each and every source thereof and/or other basis for asserting its truth or existence, and the date of each such fact, etc." The request to "set forth" the "legal basis" of the claim "in full detail" essentially requires an exhaustive legal brief.

11.     Please set forth the factual and legal basis for each and every act you contend was protected activity undertaken by you and for which you contend Defendants retaliated against you, as alleged in your Fourth Amended Complaint. In response to this interrogatory, please identify the specific act taken by you; when you took the action; the manner in which you engaged in the protected activity; to whom you made the report, if any; any witnesses to alleged protected activity; the individuals with knowledge of the alleged protected activity; why you believe that the activity was protected under the FCRA and/or Title VII; and what response, communication, or action, if any, was taken or made by the Defendant in response to the alleged protected activity.

**Objection:** Plaintiff objects to this interrogatory because, counting the preceding interrogatories and their subparts, it exceeds the 25-interrogatory limit.

12. Please set forth the factual and legal basis for your contention that Defendants "acted with malice or in reckless disregard for Plaintiff's rights," as alleged in paragraphs 58, 69, 81, 94, and 106 of the Fourth Amended Complaint. In responding to this interrogatory, please set forth each act taken "with malice or in reckless disregard for Plaintiff's rights," when the act was taken, who took the act, when you learned of the act, how you learned of the act, any witnesses to the act, to whom you reported the act if at all, when you reported the act if at all, what manner you reported the act if at all, and what evidence supports your contention that the act was taken with malice or in reckless disregard of your rights.

**Objection:** Plaintiff objects to this interrogatory because, counting the preceding interrogatories and their subparts, it exceeds the 25-interrogatory limit. Plaintiff further objects that the interrogatory misstates the contentions quoted, because in the Fourth Amended Complaint, the contentions are stated on information and belief. The interrogatory is further objectionable on grounds of oppressiveness and burdensomeness in requiring a detailed narrative response. Defendant's definitions for "setting forth" and stating "the factual basis" that are incorporated the interrogatory render the request for setting forth the factual basis of the quoted contentions unduly burdensome and oppressive. As to each such contention, the definitions require an extensive narrative response that would provide "in full detail" "each and every fact, name, item of information, inference, conclusion, argument, or other thing which you contend supports, or tends to indicate the trust of, the contention, answer, or allegation that is the subject of the inquiry, and as to such fact, etc., set forth each and every source thereof and/or other basis for asserting its truth or existence, and the date of each such fact, etc." The request to "set forth" the "legal basis" of the claim "in full detail" essentially requires an exhaustive legal brief.

23

13.     Please set forth the factual basis for your contention that Defendant, "as of approximately March 2013, [paid] the man commissions on such accounts despite Plaintiff's performance of the man's work," as alleged in paragraphs 68, 91, and 93 of the Fourth Amended Complaint.  In responding to this interrogatory, please identify the accounts referenced in these allegations, when you performed work on each account as alleged in these paragraphs of the complaint, what specific work you performed on each account, what past or present employees of Defendant were aware of the work you performed, which men were paid commissions, how you learned of those commissions, what specific commissions were paid as alleged in these paragraphs, when those commissions were paid, and why you believe that you were entitled to those commissions.

**Objection:** Plaintiff objects to this interrogatory because, counting the preceding interrogatories and their subparts, it exceeds the 25-interrogatory limit. Plaintiff further objects to this interrogatory on grounds of oppressiveness and burdensomeness in requiring a detailed narrative response. Defendant's definitions for "setting forth" and stating "the factual basis" that are incorporated into the interrogatory render the request for setting forth the factual basis of the quoted allegations contained in Paragraph 68, 91, and 93 unduly burdensome and oppressive. As to each of the quoted allegations, the definitions require an extensive narrative response that would provide "in full detail" "each and every fact, name, item of information, inference, conclusion, argument, or other thing which you contend supports, or tends to indicate the trust of, the contention, answer, or allegation that is the subject of the inquiry, and as to such fact, etc., set forth each and every source thereof and/or other basis for asserting its truth or existence, and the date of each such fact, etc."

14.     Please set forth the factual basis for your contention that Defendants placed "Plaintiff's accounts in jeopardy as of in or about December 2015," as alleged in paragraphs 80 and 105 of the Fourth Amended Complaint. In responding to this interrogatory, please identify which specific accounts were placed in jeopardy as alleged in these paragraphs, when those accounts were placed in jeopardy, who placed those accounts in jeopardy, how you learned those accounts were placed in jeopardy, how those accounts were placed in jeopardy, what it means to place an account "in jeopardy" as alleged in these paragraphs, what specific damage or harm you claim to have incurred from each specific act, and when the specific damage or harm occurred from each specific act.

**Objection:** Plaintiff objects to this interrogatory because, counting the preceding interrogatories and their subparts, it exceeds the 25-interrogatory limit. Plaintiff further objects to this interrogatory on grounds of oppressiveness and burdensomeness in requiring a detailed narrative response. Defendant's definitions for "setting forth" and stating "the factual basis" that are incorporated into the interrogatory render the request for setting forth the factual basis of the quoted allegations contained in Paragraph 80 and 85 unduly burdensome and oppressive. As to each of the quoted allegations, the definitions require an extensive narrative response that would

24

provide "in full detail" "each and every fact, name, item of information, inference, conclusion, argument, or other thing which you contend supports, or tends to indicate the trust of, the contention, answer, or allegation that is the subject of the inquiry, and as to such fact, etc., set forth each and every source thereof and/or other basis for asserting its truth or existence, and the date of each such fact, etc."

15.     Please identify all similarly situated individuals who were treated differently than you. In responding to this interrogatory, please identify the individual, the position held by the individual, his or her supervisor when the individual was employed by Defendant, when the individual was employed by Defendant, how the individual was similarly situated, and how the individual was treated differently.

**Objection:** Plaintiff objects to this interrogatory because, counting the preceding interrogatories and their subparts, it exceeds the 25-interrogatory limit. Plaintiff further objects that this is an improper contention interrogatory because it asks for a legal conclusion and intrudes into counsels' mental impressions in inquiring into Plaintiff's attorneys' position and analyses of whether and how Plaintiff is proceeding on a "similarly situated" legal theory as to any of her claims. That legal theory is interpreted differently by the circuits and is a disputed issue within the Eleventh Circuit.

16.     Please identify any statement(s) made by an individual regarding the subject matter of this litigation that you contend constitutes a declaration against interest or an admission by Defendant. In answering this question, please identify the person who made the statement, the substance of the statement, when the statement was made, where the statement was made and/or the manner of the statement, and the name of any witnesses to the statement.

**Objection:** Plaintiff objects to this interrogatory because, counting the preceding interrogatories and their subparts, it exceeds the 25-interrogatory limit. Plaintiff further objects that this is an improper contention interrogatory because it asks for legal conclusions and intrudes into counsels' mental impressions and work product in inquiring into Plaintiff's attorneys' position and analyses on whether any statements constitute a declaration against interest or an admission by Defendant. Plaintiff additionally objects that the term "the subject matter of this litigation" is vague. What constitutes "the subject matter of this litigation" could be innumerable things, especially since Plaintiff has brought multiple claims.

17.     Please set forth the factual and legal basis for your contention that you have "satisfied all conditions precedent for bringing suit under the FCRA [and Title VII]" as alleged in paragraph 60, 71, 83, 96, and 108 of the Fourth Amended Complaint.

**Objection:** Plaintiff objects to this interrogatory because, counting the preceding interrogatories and their subparts, it exceeds the 25-interrogatory limit. The interrogatory is further objectionable on grounds of oppressiveness and burdensomeness in requiring a detailed narrative response.

Defendant's definitions for "setting forth" and stating "the factual basis" that are incorporated the interrogatory render the request for setting forth the factual basis of the quoted contentions at Paragraphs 60, 71, 83, 96, and 108 unduly burdensome and oppressive. As to each such contention, the definitions require an extensive narrative response that would provide "in full detail" "each and every fact, name, item of information, inference, conclusion, argument, or other thing which you contend supports, or tends to indicate the trust of, the contention, answer, or allegation that is the subject of the inquiry, and as to such fact, etc., set forth each and every source thereof and/or other basis for asserting its truth or existence, and the date of each such fact, etc." The request to "set forth" the "legal basis" of the claim "in full detail" essentially requires an exhaustive legal brief.

18.     With as much specificity as possible, please set forth all of your injuries, the exact amount of damages that you claim, whether as an affirmative claim or as a setoff, and any other relief that you seek in this action from the court. In responding to this interrogatory, please include in your answer: the count to which the item of damages relates; a statement of the elements of each claim of money damages and the amount being sought with respect to each such element; any specific non-monetary relief that you are seeking in this action; the category into which each item of damages falls, i.e., general damages, special or consequential damages (such as lost profits), interest, and any other relevant categories; the monetary value placed on each category of damage or relief; the factual basis for each item of damages or relief; and an explanation of how you computed each item of damages or relief, including any mathematical formula used.

**Objection:** Plaintiff objects to this interrogatory because, counting the preceding interrogatories and their subparts, it exceeds the 25-interrogatory limit. The interrogatory is further objectionable on grounds of oppressiveness and burdensomeness in requiring Plaintiff to "set forth," which Defendant has defined as requiring "full detail," responses to multiple questions regarding each of the multiple claims Plaintiff has brought in this case. In addition, Plaintiff objects that Defendant has thus far refused to produce in response to Plaintiff's multiple requests for production the data that Defendant has in its possession, custody, and control that Plaintiff needs to compute her damages.

19.     Please identify any and all physicians (including medical doctors, doctors of osteopathy, chiropractors, or any other health care provider); pharmacists, hospitals, psychologists, psychiatrists, or other mental health counselors or professionals; ministers, counselors, or any other person with whom you consulted or sought treatment, or whom you contacted, because of any physical or mental malady, infirmity, condition, or harm which you allege to have been caused by any act or omission of Defendant or for which you otherwise contend Defendant is liable, including, but not limited to, alleged emotional distress, mental anguish, or any other injuries arising out of or relating to your allegations in this action and/or with whom you have discussed your physical, emotional, or mental condition during the past five years. In responding to this

interrogatory for each individual, please set forth the name and business address of the individual, the dates of each contact, and the reason you contacted or met with the individual.

**Objection:** Plaintiff objects to this interrogatory because, counting the preceding interrogatories and their subparts, it exceeds the 25-interrogatory limit. Plaintiff further objects that the interrogatory is outside the scope of permissible discovery because the information requested is irrelevant to the parties' claims and defenses and unimportant in resolving the issues in this case. The interrogatory seeks disclosure of every physician with whom Plaintiff may have consulted or sought treatment during the past five years, as well as disclosure of every date and reason for contacting or consulting each physician. However, Plaintiff is not seeking medical expenses in this case; and she has not put her physical or mental condition in issue. Plaintiff has not brought a tort claim for intentional or negligent infliction of emotional distress. She has not alleged any specific mental or psychiatric injury or disorder. She has not alleged unusually severe emotional distress. She does not intend to offer expert testimony from any health care provider or expert. Further, the request is needlessly intrusive into her medical privacy.

20.     Please set forth the name and address of each and every expert who has been retained or specifically employed by you in anticipation of litigation or preparation for trial or who you intend to offer for opinion testimony at trial.  With regard to each expert or professional identified, please state the subject on which the individual would testify, if called to trial, and whether a written report has been prepared by such individual.  If a written report has been prepared, please provide the date of such report; and the name and address of the person having possession, custody, or control of such report; and the name of the person to whom such report was written.

**Objection:** Plaintiff objects to this interrogatory because, counting the preceding interrogatories and their subparts, it exceeds the 25-interrogatory limit. Plaintiff further objects that the interrogatory impermissibly seeks disclosure of experts and expert information not authorized by Rule 26(a)(2) in seeking information about "experts" who will not be testifying or offering opinions in this case. For the same reason, the interrogatory unduly invades Plaintiff's counsels' investigation and preparation for this case.

21.     Please identify each and every individual (other than an attorney) with whom you have discussed the events alleged in your Fourth Amended Complaint, including, but not limited to, your claim of discrimination or retaliation, account assignment decisions, any injuries and/or damages allegedly suffered by you for which you are seeking compensation in this action, or your charges of discrimination.  In responding to this interrogatory, for each individual identified, please provide his or her address and telephone number; the subject matter of the communication, discussion, or conversation; the date or dates when the conversation occurred; the manner of the communication, discussion, or conversation; and any witnesses to the conversation.

**Objection:** Plaintiff objects to this interrogatory because, counting the preceding interrogatories and their subparts, it exceeds the 25-interrogatory limit. Plaintiff further objects that the interrogatory seeks information outside the scope of permissible discovery. Identification of "each and every individual" with whom may have Plaintiff may have discussed any of the numerous events taking place over years that are alleged in the Fourth Amended Complaint and the additional information sought as to each identified individual is not relevant to any claim or defense in this case and is not important to the issues at stake in this case and in resolving the issues. Plaintiff additionally objects that the interrogatory is invasive of attorney work product because it seeks disclosure of Plaintiff's attorneys' discussions with persons whom Plaintiff's attorneys have interviewed in investigating the cases; and identification of persons contacted as potential witnesses.

22.     Please identify any individual or entity (other than the parties) who may have possession, custody, or control of any documents that relate in any way, directly or indirectly, to any fact, matter, act, allegation, or omission alleged in your Fourth Amended Complaint, the facts underlying the allegations, or to the factual statements made in response to any of the foregoing interrogatories, including, but not limited to, any recorded or transcribed statements of you or any other person.

**Objection:** Plaintiff objects to this interrogatory because, counting the preceding interrogatories and their subparts, it exceeds the 25-interrogatory limit.

I declare under penalty of perjury that the foregoing Answers are true and correct to the best of my knowledge, belief, and recollection.

Hilda van Hoek                                    Date  10/3/2018

As to the foregoing objections, and respectfully submitted,

Kathryn S. Piscitelli
Florida Bar No. 0368598
P.O. Box 691166
Orlando, FL 32869-1166
Phone: (407) 491-0143
Email: kpiscitelli1@cfl.rr.com

cc: Peter F. Helwig
Florida Bar No. 0588113
HARRIS & HELWIG, P.A.
6700 South Florida Avenue, Suite 31
Lakeland, Florida 33813
Phone: (863) 648-2958
Facsimile: (863) 619-8901
Email: pfhelwig@tampabay.rr.com

**Attorneys for Hilda van Hoek**

**Certificate of Service**

I hereby certify that on October 3, 2018, the foregoing was mailed via email and U.S. Mail the foregoing to Sacha Dyson, Thompson, Sizemore, Gonzalez & Hearing, P.A., 201 N. Franklin Street, Suite 1600, Tampa, Florida, 33602; and Gregory A. Hearing, Thompson, Sizemore, Gonzalez & Hearing, P.A., 201 N. Franklin Street, Suite 1600, Tampa, Florida, 33602.

Kathryn S. Piscitelli

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**HILDA VAN HOEK,**

       **Plaintiff,**

**vs.**
                       **Case No. 8:17-cv-2447-T-36AAS**

**MCKESSON CORPORATION; PSS
WORLD MEDICAL, INC.; MCKESSON
MEDICAL-SURGICAL INC.; and MCKESSON
MEDICAL-SURGICAL TOP HOLDINGS
INC.,**



             **Defendants.**          /

### PLAINTIFF'S SUPPLEMENTAL RESPONSE TO "DEFENDANT'S FIRST SET OF INTERROGATORIES TO PLAINTIFF"

    Plaintiff Hilda van Hoek hereby submits her supplemental responses to "Defendant's First Set of Interrogatories to Plaintiff."

    **6. Interrogatory 6 as modified by the Court:** "[S]pecify the work [Ms. van Hoek] performed on portions of the Florida Medical Clinic account remaining with Brady as referenced in the last sentence of paragraph 32 of the fourth amended complaint."

**Answer to Interrogatory 6 as modified by the Court:** The last sentence of paragraph 32 states that "after [March 2013], Plaintiff has performed the work on the portions of the Florida Medical Clinic account remaining with Brady, but Brady, not Plaintiff, receives the commissions on those portions." The portions of the FMC account remaining with Brady after March 2013 have been several ship-to accounts of FMC. To the best of my recollection, the work I have performed on Brady's FMC ship-to accounts after March 2013 includes the following:

- I am the contact person for FMC in regard to Brady's FMC ship-to accounts.

- I handle customer requests and issues concerning Brady's FMC ship-to accounts

- I handle orders of controls, calibrators, and reagents for a CBC (complete blood count) machine for an FMC ship-to account of Brady. This can be a time-consuming and complex process. Controls have to be ordered directly from the manufacturer (Abbott in the case of Brady's ship-to site). Each control has a specific lot number and date. I help FMC's purchasing department write up a requisition, which in turn will be made into a purchase order to McKesson. Once the order is placed, I put in the order and contact our purchasing

department. The last time, we ended up having a three-way call between our purchasing department, Abbott, and me; and there were about 20 emails back and forth.

- I have handled billing problems with Brady's FMC ship-to accounts. There have been times when I have spent several hours going over invoices for Brady's FMC ship-to accounts with FMC's accounts receivable and purchasing departments.

- I set up a new FMC ship-to account to which Brady was assigned.

- I conduct business reviews with FMC that include Brady's FMC ship-to accounts.

**7. Interrogatory 7 as modified by the Court:** "[I]dentify any accounts, not already identified elsewhere in the fourth amended complaint, [that Ms. van Hoek] asserts are included in the 'numerous accounts' referenced in paragraph 37 of the fourth amended complaint."

**Answer to Interrogatory 7 as modified by the Court:** Paragraph 37 of the fourth amended complaint states: "During and after 2013, Defendants have taken numerous accounts from Plaintiff and given them to men. These discriminatory actions . . . have resulted in continuing substantial losses of income to Plaintiff and compensation being paid to men that should have been paid to Plaintiff." To the best of my recollection, such accounts not already identified in the fourth amended complaint are Tower Habana ship-to accounts (Tower Breast Diagnostic Center – Habana and Tower Radiology Center – Habana), which were taken away from me and given to a man, Mark Rainville, after the fourth amended complaint was filed. Also occurring after the fourth amended complaint was filed, at least five or six ship-to sites to which I was formerly assigned as the McKesson sales rep were assigned to a man, Todd Anderson, when Concentra (which uses McKesson as its exclusive medical supply supplier) acquired those sites. I am still listed as the sales rep for those ship-to sites.

**8. Interrogatory 8 as modified by the Court:** "[I]dentify the work [Ms. van Hoek] performed and continues to perform on the east coast Access accounts as referenced in the last sentence of paragraph 38 of the fourth amended complaint."

**Answer to Interrogatory 8 as modified by the Court:** The last sentence Paragraph 38 states: "Plaintiff continues to perform the work on the east coast Access accounts, but Williams, not Plaintiff, receives the commissions." To the best of my recollection, the work I performed and continue to perform on the east coast Accounts includes:

- serving as the contact person for the accounts
- conducting business reviews
- consulting with Access management regarding the accounts.
- managing the accounts, including handling accounting questions and issues, putting together quotes for setups

2

- managing pricing for each location

- advising and providing information regarding return of items

- handling the ordering, setup, and delivery of medical equipment

- booking FLU vaccine

- handling the setup work on locations that have expanded their practices

- calling each ship-to location to arranging deliveries

- ensuring that the DEA, Florida State Licenses for each of the providers at each location is listed and updated (each ship-to location can have multiple providers)

- managing the GPO group that Access belongs

- performing the "maintenance work" that is necessary when physicians leave or new physicians start at the east coast ship-to locations

- arranging for, scheduling, and coordinating deliveries of medical equipment

- when defective medical equipment was delivered, I was responsible for correcting the situation, which was very time consuming

**9. Interrogatory 9 as modified by the Court:** "[I]dentify the work [Ms. van Hoek] performed on the Florida Hospital Physician Group's Pinellas County account as referenced in the last sentence of paragraph 41 of the fourth amended complaint."

**Answer to Interrogatory 9 as modified by the Court:** The last sentence of paragraph 41 states: "Plaintiff nonetheless performed the work on Florida Hospital Physician Group's Pinellas County account until in or about April 2016, but Brady, not Plaintiff, received the commissions on the account." To the best of my recollection, the work I performed on the Florida Hospital Physician Group Brady's Pinellas County accounts included the following:

- working directly with FHPG representatives Cheryl Schmidt and Kim Teel regarding the Pinellas County accounts

- Setting up the Pinellas County offices of mostly new doctors affiliated with FHPG, the many associated tasks of which included developing a medical supply list and price out the list, typically covering over 100 items that include medical equipment and supplies

- Ordering all medical equipment and supplies for the affiliated doctors' offices

- Coordinating delivery of the medical equipment and supplies

- Helping the delivery people set up the medical equipment

3

- Training the staff at the affiliated doctors' offices on how to use medical equipment purchased for those offices

- Assisting Kim Teel in stocking the rooms in the doctors' offices with supplies

**10. Interrogatory 10 as modified by the Court:** "[I]dentify any additional negative impact McKesson's actions have had on [Ms. van Hoek's] employment, other than what is already alleged in the fourth amended complaint."

**Answer to Interrogatory 10 as modified by the Court:** After the fourth amended complaint was filed, two lucrative Tower ship-to accounts (Tower Breast Diagnostic Center – Habana and Tower Radiology Center – Habana) were taken from me and given to a man, Mark Rainville, causing me to lose commissions on those accounts that I would have earned had the accounts remained with me. Also occurring after the fourth amended complaint was filed, numerous ship-to sites listed under my rep number were assigned to other McKesson sales reps when Concentra (for which McKesson was the exclusive medical supply supplier) acquired those sites. Some of these Concentra ship-to accounts were reassigned to me after I objected, but numerous others never were, causing loss of commissions I would have earned had these Concentra accounts been assigned to me.

**13. Interrogatory 13 as modified by the Court:** "[I]dentify any accounts that a man was paid commissions for her work since March 2013, as referenced in paragraphs 68, 91, and 93 of the fourth amended complaint. Ms. Van Hoek must only identify accounts not already specified in the fourth amended complaint."

**Answer to Interrogatory 13 as modified by the Court:** I'm not aware of any other such accounts.

**14. Interrogatory 14 as modified by the Court:** "[I]dentify the accounts placed in jeopardy, as referenced in paragraphs 80 and 105 of the fourth amended complaint."

**Answer to Interrogatory 14 as modified by the Court:** Paragraphs 80 and 105 of the fourth amended complaint refer to Paul Jensen's placing my accounts in jeopardy in or about December 2015. To the best of my recollection, those accounts were Access Health Care; Florida Medical Clinic; and Prime Care.

**15. Interrogatory 15 as modified by the Court:** "[I]dentify any similarly situated individuals treated differently from [Ms. van Hoek] and not already identified in the fourth amended complaint."

**Answer to Interrogatory 15 as modified by the Court:** Todd Anderson; Fritz Cox; Bryan Irish; and Mark Rainville.

4

16.    Please identify any statement(s) made by an individual regarding the subject matter of this litigation that you contend constitutes a declaration against interest or an admission by Defendant. In answering this question, please identify the person who made the statement, the substance of the statement, when the statement was made, where the statement was made and/or the manner of the statement, and the name of any witnesses to the statement.

**Modification to Interrogatory 16 by the Court:** "Ms. Van Hoek's answer need not include any declaration or admission made as a part of this litigation. Stated another way, Ms. Van Hoek's interrogatory answer need not include any statements made at a deposition or otherwise in the presence of defense counsel during this litigation."

**Answer to Interrogatory 16 as modified by the Court:** I'm not aware of any.

17.    Please set forth the factual and legal basis for your contention that you have "satisfied all conditions precedent for bringing suit under the FCRA [and Title VII]" as alleged in paragraph 60, 71, 83, 96, and 108 of the Fourth Amended Complaint.

**Interrogatory 17 as modified by the Court:** "The motion to compel as to interrogatory no. 17 is granted only to the extent it requests Ms. Van Hoek identify the conditions precedent she satisfied prior to bringing this action under the FCRA and Title VII. Otherwise, the motion to compel an answer to interrogatory no. 17 is denied."

**Answer to Interrogatory 17 as modified by the Court:** To the best of my knowledge, belief, and understanding, the conditions precedent I satisfied were

(1) Filing two EEOC charges alleging sex discrimination and retaliation in my employment—one filed December 27, 2012, which was pending with the EEOC through July 25, 2013; and another filed July 31, 2015, which was pending with the FCHR until December 9, 2016, and was pending with the EEOC until May 16, 2017. But no additional filing of charges was required for sex discrimination or retaliation that occurred after I filed the charges but while the charges were pending before the EEOC and FCHR.

(2) Filing those charges with the EEOC on time (for Title VII, within 300 days after discriminatory or retaliatory actions or 300 days of receipt of compensation resulting in whole or in part of from discrimination or retaliation; the period 365 days for the FCRA). But no additional filing of charges was required for sex discrimination or retaliation that occurred after I filed the charges but while the charges were pending before the EEOC and FCHR.

(3) Filing in court on time my FCRA sex discrimination and retaliation claims. Because my first EEOC charge was pending at the EEOC for more than 180 days, I had four years from the occurrences of discrimination and retaliation covered by the charge (including occurrences while the charge was pending) to bring a lawsuit under the FCRA. My court complaint filed on December 12, 2014, and my 2015 amendments to the court complaint were filed within the four-year period. Because my second EEOC charge was pending at the FCHR more than 180 days, I

5

had four years from the occurrences of discrimination and retaliation covered by the second charge to file in court the claims covered by the second charge. My amendments to the court complaint made in 2017 covered those occurrences.

(4) Filing in court on time my Title VII sex discrimination and retaliation claims. I had 90 days after receipt of the EEOC's right to sue notice on my second EEOC charge to file the claims in court covered by the second charge. The EEOC right to sue notice was issued May 16, 2017, and received May 19, 2017. My Title VII claims covered by the second charge, including the claims that arose while the charge was pending, were filed in court on August 14, 2017, which was within 90 days of receipt of the right to sue notice.

I declare under penalty of perjury that the foregoing Answers are true and correct to the best of my knowledge, belief, and recollection.

Hilda van Hoek                     Date   1/3/2019

Respectfully submitted,

Kathryn S. Piscitelli
Florida Bar No. 0368598
P.O. Box 691166
Orlando, FL 32869-1166
Phone: (407) 491-0143
Email: kpiscitelli1@cfl.rr.com

**Counsel for Hilda van Hoek**

**Certificate of Service**

I hereby certify that on January 4, 2019, the foregoing was mailed via email and U.S. Mail the foregoing to Sacha Dyson, Thompson, Sizemore, Gonzalez & Hearing, P.A., 201 N. Franklin Street, Suite 1600, Tampa, Florida, 33602; and Gregory A. Hearing, Thompson, Sizemore, Gonzalez & Hearing, P.A., 201 N. Franklin Street, Suite 1600, Tampa, Florida, 33602.

Kathryn S. Piscitelli

7



### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**HILDA VAN HOEK,**

     **Plaintiff,**

**v.**

                               **Case No. 8:17-cv-2447-T-36AAS**

**MCKESSON CORPORATION; PSS
WORLD MEDICAL, INC.; MCKESSON
MEDICAL-SURGICAL INC.; and
MCKESSON MEDICAL-SURGICAL TOP
HOLDINGS INC.,**

     **Defendants.**                /

### PLAINTIFF'S SIXTH SUPPLEMENTAL MANDATORY DISCLOSURE

     Plaintiff Hilda van Hoek hereby submits her sixth supplemental mandatory disclosures pursuant to Federal Rule of Civil Procedure 26(a)(1).

**Witnesses whom Plaintiff may use to support her claims**

Hilda van Hoek
1934 Heartland Circle
Valrico, FL 33594
(813) 494-0882
Subjects of information: Sex discrimination and retaliation she has suffered; damages resulting from the discrimination and retaliation

Maria Jimenez
8293 Mazette Road
Weeki Wachee, Florida 34613
(352) 650-7633
Subject of information: Access Health Care's requests that Plaintiff be the sole representative on the Access accounts

Gary Steele
Florida Medical Clinic
38135 Market Square
Zephyrhills, Florida 33542
(813)780-2643
Plaintiff does not have other contact information for Mr. Steele.
Subject of Information: Florida Medical Clinic's requests that Plaintiff be the sole representative

on Florida Medical Clinic's accounts

Jim Stout
Florida Medical Clinic
38135 Market Square
Zephyrhills, Florida 33542
(813)780-2643
Plaintiff does not have other contact information for Mr. Stout.
Subject of Information: Florida Medical Clinic's requests that Plaintiff be the sole representative
on Florida Medical Clinic's accounts

Amy Boyes
Florida Medical Clinic
38135 Market Square
Zephyrhills, Florida 33542
(813)780-2643
(352) 457-3284
Plaintiff does not have other contact information for Ms. Boyes.
Subject of information: Florida Medical Clinic's requests that Plaintiff be the sole representative
on Florida Medical Clinic's accounts

Debbie Tanner
345 Bay Shore Blvd.
Apt. 508
Tampa, Florida 33606
(813) 754-5480
Subject of information: Continue Care's request that Plaintiff be restored as the representative on
its accounts.

Cheryl Schmidt
19108 Forrest Drive
Odessa, Florida 33556
(813) 545-1499
Subject of information: Florida Hospital Physician's Group's request that Plaintiff be sales
representative for all its accounts in Hillsborough, Pasco and Pinellas Counties

Leisa Meredith
1025 Mardi Gras Dr.
Kissimmee, Florida 34759-7042
(407) 338-2807
Subjects of information: Sex discrimination of Defendants

Christiana Hill (a/k/a Christiana Hill Moseley)
1220 35th Street
Apt #216
Denver, CO 80205

3575 Ringsby Ct.
Ste. 415
Denver, CO 80216
(720) 370-7466
Subjects of information: Sex discrimination by Defendant McKesson Medical-Surgical Inc. and
Paul Jensen

Danielle Galvin
6606 Summer Haven Dr
Riverview, FL 33578
(813) 340-6473
Subjects of information: Sex discrimination by Defendants and Paul Jensen

Any persons identified in Defendants' mandatory disclosures and in discovery.

**Documents that Plaintiff may use to support her claims**

Plaintiff is producing with this disclosure via ShareFile Bates documents Bates stamped Van Hoek
001537 to 0001578. Plaintiff previously produced documents Bates stamped Van Hoek 000001 to
001536.

**Damages and other relief**

*Back pay*

Plaintiff continues to conduct discovery to determine all types and amounts of compensation that
she would have earned in the absence of Defendants' discrimination and retaliation against her.
Such losses include any commissions that were paid to men that should have been paid to Plaintiff;
commissions that would have been paid to Plaintiff or reasonably would have been earned by
Plaintiff absent Defendants' discriminatory failure to accede to customers' and Plaintiff's requests
to assign Plaintiff as the customers' sales representative; and the PrimeCare commission that
Plaintiff earned but that Defendants failed to pay Plaintiff, estimated to be $40,000. Defendants
have alleged that they have no documents specifying the amount of commissions earned by sales
representatives on the at-issue accounts. Plaintiff has received from Defendants 29 massive Excel
spreadsheets containing sales information for certain periods of time. The documents do not cover
all relevant periods of time. Plaintiff is conducting analyses of these massive files. Defendants also
turned over payout summaries for October 2014 to part of December 2018. As between Plaintiff
and Clint Brady, those documents show Brady earned $1,675,401.79 more than Plaintiff during
that period: $2,604,865.26 (the total payout for Brady shown on Defendants' Bates 000610 to
000611) minus $929,463.47 (the total payout for Plaintiff shown on Defendants' Bates 000597 to
000598). As between Plaintiff and Craig Williams, those documents show Craig Williams earned
$1,360,382.53 more than Plaintiff during that period: $2,289,846.00 (the total payout for Williams
shown on Defendants' Bates 000624 to 000625) minus $929,463.47 (the total payout for Plaintiff
shown on Defendants' Bates 000597 to 000598).

Plaintiff also is conducting discovery to determine all types of benefits that she would have earned in the absence of Defendants' discrimination against her. Such losses include lost CEO Roundtable benefits and lost employer matching contributions to 401(k) or similar retirement benefit plans. Plaintiff will seek recovery of any such benefits and an order requiring Defendants to fund any affected retirement benefit plan to make Plaintiff whole as to benefits she will receive when she retires. Thus far, Plaintiff has received no documents in response to her discovery requests on these issues.

*Prejudgment interest*

Plaintiff will seek prejudgment interest on the amount of back pay awarded. A simple methodology for computing prejudgment interest that has been used by the Middle District of Florida is the average IRS interest rate for underpayment of taxes during the period of the violation up through the date of judgment. *See Armstrong v. Charlotte County Bd. of County Comm'rs*, 273 F. Supp. 2d 1312, 1319 (M.D. Fla. 2003).

*Compensatory damages*

Plaintiff is seeking "noneconomic" compensatory damages for indignity, humiliation, and inconvenience. The amount will be left to the jury. She is not seeking damages for emotional distress.

*Punitive damages*

Plaintiff will conduct discovery to determine a reasonable amount to seek as punitive damages.

*Tax offset*

Plaintiff will seek an additional amount as make-whole relief to offset her tax liability resulting if the back pay awarded to Plaintiff would push her into a higher tax bracket.

*Injunctive relief*

Plaintiff will seek injunctive relief barring discrimination in the future against Plaintiff and other women in their compensation, terms, conditions and privileges of employment and ordering Defendants to assign to Plaintiff any accounts that have been unlawfully taken from her or denied to her in violation of Title VII or the FCRA.

*Costs and fees*

Plaintiff will seek litigation expenses and attorney and expert fees if she prevails, as permitted by law.

**Insurance**

None

Respectfully submitted,

**/s/ Kathryn S. Piscitelli**
Kathryn S. Piscitelli
Florida Bar No. 0368598
P.O. Box 691166
Orlando, FL 32869-1166
Phone: (407) 491-0143
Email: kpiscitelli1@cfl.rr.com

Peter F. Helwig
Florida Bar No. 0588113
HARRIS & HELWIG, P.A.
6700 South Florida Avenue, Suite 31
Lakeland, Florida 33813
Phone: (863) 648-2958
Facsimile: (863) 619-8901
Email: pfhelwig@tampabay.rr.com

**Attorneys for Hilda van Hoek**

**Certificate of Service**

I hereby certify that on March 18, 2019, I sent via email and U.S. Mail the foregoing to Sacha Dyson, Thompson, Sizemore, Gonzalez & Hearing, P.A., 201 N. Franklin Street, Suite 1600, Tampa, Florida, 33602, and Gregory A. Hearing, Thompson, Sizemore, Gonzalez & Hearing, P.A., 201 N. Franklin Street, Suite 1600, Tampa, Florida, 33602.

**/s/ Kathryn S. Piscitelli**
Kathryn S. Piscitelli