UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CASE NO.: 8:17-cv-2447-T-36AAS

HILDA VAN HOEK,

Plaintiff,

vs.

MCKESSON CORPORATION; PSS WORLD MEDICAL, INC.; MCKESSON MEDICAL-SURGICAL INC.; and MCKESSON MEDICAL-SURGICAL TOP HOLDINGS INC.,

Defendants.

___________________________________/

VIDEOTAPED DEPOSITION OF: CLINTON BRADY

DATE: WEDNESDAY, OCTOBER 17, 2018

TIME: 1:31 P.M. - 3:31 P.M.

PLACE: BARRETT COURT REPORTING
2935 FIRST AVENUE NORTH,
ST. PETERSBURG, FLORIDA 33713

STENOGRAPHICALLY REPORTED BY: JESSICA TENENBAUM, COURT REPORTER AND NOTARY PUBLIC



A P P E A R A N C E S:

KATHRYN S. PISCITELLI, ESQUIRE
-AND-
PETER F. HELWIG
OF: HARRIS & HELWIG, P.A.
6700 SOUTH FLORIDA AVENUE, SUITE 31
LAKELAND, FLORIDA 33813
(863) 648-2958, FAX-(863) 619-8901
KPISCITELLI1@CFL.RR.COM
PFHELWIG@CFL.RR.COM
APPEARING ON BEHALF OF THE PLAINTIFF

SACHA DYSON, ESQUIRE
OF: THOMPSON, SIZEMORE, GONZALEZ & HEARING, P.A.
201 N. FRANKLIN STREET, SUITE 1600
TAMPA, FLORIDA 33602
(813) 273-0050, FAX-(813) 273-0072
SDYSON@TSGHLAW.COM
APPEARING ON BEHALF OF THE DEFENDANTS

ALSO PRESENT:
JEREMY TAYLOR, VIDEOGRAPHER

I N D E X

TESTIMONY OF CLINTON BRADY
DIRECT EXAMINATION BY MS. PISCITELLI...............4
CERTIFICATE OF OATH..................................69
CERTIFICATE OF DEPOSITION TRANSCRIPT..................70

INDEX OF EXHIBITS

(NONE MARKED)

------

S T I P U L A T I O N S

It is hereby stipulated and agreed by and between the counsel for the respective parties and the deponent that the reading and signing of the deposition transcript be reserved.

------

P R O C E E D I N G S

*********

THE VIDEOGRAPHER: Here begins Volume I, Unit I of the deposition of Clinton Brady, taken at 2935 First Avenue North, St. Petersburg, Florida by the Plaintiff in the matter of Hilda Van Hoek versus McKesson Corporation, et al. This case is filed in the United State District Court, Middle District of Florida, Tampa Division, Case No. 8:17-cv-2447-T-36AAS. My name is Jeremy Taylor. Today's date is 17, October, 2018. We're going on the record at 1:31 p.m.

Will counsel please state your appearances for the record.

MS. PISCITELLI: Kathryn Piscitelli for Plaintiff, Linda Van Hoek.

MR. HELWIG: Peter Helwig for Plaintiff, Hilda Van Hoek.

MS. DYSON: Good afternoon. My name is Sacha Dyson. I'm with Thompson, Sizemore, Gonzalez and Hearing here for the Defendants.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness?

THE COURT REPORTER: Would you raise your right hand, please?

Do you solemnly swear or affirm that the testimony you're about to give in this cause is the truth, the whole truth and nothing but the truth?

THE WITNESS: Yes.

THE COURT REPORTER: Thank you.

THE VIDEOGRAPHER: We may begin.

DIRECT EXAMINATION

BY MS. PISCITELLI:

**Q.** Mr. Brady, I'm Kathryn Piscitelli. I'm representing Ms. Hilda Van Hoek. I'll be taking your deposition today.

A. All right.

**Q.** Please state your full name.

A. Clinton Stewart Brady.

**Q.** Is Stewart spelled S-T-U-A-R-T?

A. E-W-A-R-T.

**Q.** Okay. S-T-E-W-A-R-T?

A. Correct.

**Q.** And what is your address?

A. 1960 Dolphin Boulevard South, St. Petersburg, Florida 33707.

**Q.** Do you have any plans to move?

A. No.

**Q.** Have you ever been deposed before?

A. No.



**Q.** I'll go over a few ground rules with you. I'll be asking you questions. My questions and your answers will be recorded by the court reporter, Ms. Tenenbaum, sitting over here to your right.

You understand that you are under oath?

A. Yes.

**Q.** And that means you're sworn to tell the truth?

A. Yes.

**Q.** Even though we are in an informal setting here in this office, your answers have the same force and effect as if we were in a courtroom with a judge and jury. Do you understand?

A. Yes.

**Q.** You will need to speak up and answer questions orally rather than with a nod or a shake of the head. Also, I would request that you avoid terms such as uh-huh and uh-uh because those can be confused by the court reporter. They're easily confused with each other. Okay?

A. Okay.

**Q.** Please wait to -- please wait for me to finish "answering" a question before you respond. Sometimes you might anticipate what I'm going to ask and jump in with an answer which is what happens in regular conversation, but because we need to have a clear

record, I ask that you wait until you're sure I'm finished before you respond. And if I happen to interrupt you, which also happens, just let me know that I've interrupted and I'll let you finish your answer. Okay?

A. Okay.

**Q.** If I ask you a question that you do not understand, please let me know and I will do my best to rephrase it to make it clearer to you. Okay?

A. Okay.

**Q.** Okay. You have water. If you need to take a break for some reason -- we will be taking breaks occasionally. If you do need to take a break, please let me know and I will do my best to accommodate you. If a question is pending at that time, you will need to answer before we take the break. Okay?

A. Okay.

**Q.** Sometimes someone who's being deposed remembers information responsive to a question that was asked earlier in the deposition that you didn't remember at the time. If that happens, will you please let me know?

A. Yes.

**Q.** Are you taking any medications or drugs that might impair your ability to understand and answer my questions today?

A. No.

**Q.** Have you had anything alcoholic to drink within the past eight hours?

A. No.

**Q.** Are you sick at all today?

A. No.

**Q.** Is there any reason you can think of why you'll not be able to answer my questions fully and accurately?

A. No.

**Q.** What do you think this deposition is about?

A. Hilda has a lawsuit against McKesson. I don't really know a whole lot about the details.

**Q.** By "Hilda," you mean Hilda Van Hoek?

A. I do.

**Q.** Okay. And during the deposition, we -- you might be referring to her as Hilda, and I will assume that you're referring to Ms. Hilda Van Hoek. Okay?

A. Okay.

**Q.** When did you first learn that Ms. Van Hoek has a lawsuit against McKesson?

A. A few months ago when I got the first letter in the mail.

**Q.** You received a deposition notice in the mail?

A. From your firm, yeah.

**Q.** Scheduling the deposition?

A. Right.

**Q.** Had you known that Ms. Van Hoek had a lawsuit against McKesson before you received that document in the mail?

MS. DYSON: Object to the form.

THE WITNESS: No.

BY MS. PISCITELLI:

**Q.** Are you represented by counsel today?

A. Yes.

**Q.** Ms. Sacha Dyson?

A. Yes.

**Q.** When did you retain Ms. Dyson to represent you?

MS. DYSON: Object to the form.

THE WITNESS: I didn't. McKesson did. So, I don't know.

BY MS. PISCITELLI:

**Q.** When did you learn that Ms. Dyson was representing you?

A. Monday.

**Q.** Monday of this week?

A. That's correct.

**Q.** How did you learn that?

A. On a phone call with her.

**Q.** How long was the phone call?

A. Estimating, 30 minutes, 35 minutes.

**Q.** Had you spoken to Ms. Dyson any time before Monday?
A. No.
**Q.** Have you spoken to anybody else at Ms. Dyson's law firm before Monday?
A. No.
**Q.** Are you paying Ms. Dyson to represent you today?
A. No.
**Q.** Was anybody else on the phone with -- during your phone call with Ms. Dyson on Monday?
A. No.
**Q.** Was anybody else present with you when you were on the phone with Ms. Dyson on Monday?
A. No.
**Q.** Did you prepare for your deposition in this case?
A. No.
**Q.** Did you review any documents to prepare for this deposition?
A. No.
**Q.** Have you seen any documents related to this lawsuit other than the deposition notices that you received?
A. No.

**Q.** Who is Hilda Van Hoek?
A. Colleague, sales rep.
**Q.** Do you have knowledge of Ms. Van Hoek's employment?
MS. DYSON: Object to the form.
THE WITNESS: Do I know that she's employed by McKesson?
BY MS. PISCITELLI:
**Q.** Do you have any knowledge of her employment?
MS. DYSON: Object to the form.
THE WITNESS: I don't even know how to answer that question. I don't know what you're asking. Does she work for McKesson? As far as I know, yes, but I don't know formally, so I -- I don't know.
BY MS. PISCITELLI:
**Q.** Okay. And other than your knowing that Ms. Van Hoek works for McKesson, do you know anything else about her employment?
MS. DYSON: Object to the form.
THE WITNESS: Not really.
BY MS. PISCITELLI:
**Q.** How long have you known Ms. Van Hoek?
A. I don't know the exact dates, but probably 18 -- 18 to 20 years.
**Q.** Is that all from work?

A. Correct.
**Q.** Who is your employer currently?
A. McKesson.
**Q.** How long has McKesson been your employer?
A. Since McKesson acquired PSS.
**Q.** How did you learn that McKesson was your employer?
MS. DYSON: Object to the form.
THE WITNESS: I don't remember.
BY MS. PISCITELLI:
**Q.** So, I'm understanding from you that you -- at the -- since the acquisition -- this is what you said. Since the acquisition of PSS by McKesson, you've been an employee of McKesson?
MS. DYSON: Object to the form.
THE WITNESS: Correct.
BY MS. PISCITELLI:
**Q.** Thank you.
Who was your employer before McKesson?
A. PSS.
**Q.** Is that PSS World Medical, Inc.?
A. That is correct.
**Q.** And how long did you work for PSS?
A. Approximately 18 years.
**Q.** And that's when you came to know Ms. Van Hoek,

through your employment at PSS?
MS. DYSON: Object to the form.
THE WITNESS: Correct.
BY MS. PISCITELLI:
**Q.** When you were hired by PSS, where did you live?
A. Orlando.
**Q.** How long after you were hired by PSS did you live in Orlando?
MS. DYSON: Object to the form.
THE WITNESS: Only a few more weeks.
BY MS. PISCITELLI:
**Q.** And -- okay. And then where did you move to?
A. Birmingham, Alabama.
**Q.** Do you remember what year that was?
A. '95.
**Q.** When you were hired, was the company called PSS World Medical, Inc.?
A. I don't remember. It was PSS. It may have been PSS World Medical or that might have changed after the fact.
**Q.** Do you remember a name Physician Sales & Service?
A. Yes.
**Q.** Was that the company that hired you?
A. Correct.

Page 14

**Q.** And how long did you live in Birmingham?
A. Approximately three or four months.
**Q.** And then you moved to another city?
A. That's correct.
**Q.** Where'd you move to?
A. Tampa.
**Q.** And how long did you live in Tampa?
A. Approximately three years, two or three.
**Q.** And where did you move after you moved from Tampa?
A. St. Petersburg.
**Q.** What year was that?
A. Around '98, 1998.
**Q.** And did you -- have you lived in St. Petersburg since 1998?
A. Yes.
**Q.** At the same address that you live at now?
A. No, not initially.
**Q.** Since your move to St. Petersburg, have you resided anyplace else in addition to St. Pete?
A. No.
**Q.** Where is your current work location?
A. Work out of home.
**Q.** And has that been the case the whole time you've been employed, since the beginning of your

Page 15

employment by Physician Sales & Service?
A. Not initially. Initially in Birmingham, I worked as a trainee. So, I worked in the warehouse and made deliveries. And then when I moved to Tampa, became a sales rep. And from that point on, worked out of my home.
**Q.** What was your position before you were a sales rep?
A. Sales trainee.
**Q.** How long was your training to become a sales rep?
A. Three or four months.
**Q.** What did it consist of?
A. Working in the warehouse, driving a delivery van, making deliveries, cleaning the warehouse, cleaning the toilets, and took little classes and tests in the evening.
**Q.** When you were hired to be a sales representative, which was when -- what year approximately did you become a sales representative?
A. I was hired in March '95.
**Q.** As a sales rep?
A. Correct.
**Q.** Was sales representative your title at that time?

Page 16

A. I don't remember. I know they had a trainee program that you went through for three to six months, and then after that, you went out into the -- your sales territory. I don't remember what the official name of the job was.
**Q.** And do you have a title now?
A. I believe it's account manager.
**Q.** Are the duties of an account manager any different from a sales representative --
A. No.
**Q.** -- in your employment?
A. No.
**Q.** Who currently is your supervisor, your immediate supervisor?
A. Paul Jensen.
**Q.** How long has Mr. Jensen been your supervisor?
A. Five months.
**Q.** And your supervisor before that, before Mr. Jensen?
A. Sure, Brian Gnerre.
**Q.** And before Brian Gnerre, did you have somebody else supervise you?
A. Yes.
**Q.** Who before Mr. Gnerre?
A. Carlos Xiques.

Page 17

**Q.** Approximately when did Mr. Gnerre become your supervisor?
A. Around June 2016. That's just an approximation.
**Q.** That's fine.
And approximately when did Mr. Xiques become your supervisor?
A. I don't -- I don't know the exact date. I would guess somewhere around June 2013, maybe, but that's a guess.
**Q.** Who was your supervisor before Mr. Xiques?
A. Steven Shavlik.
**Q.** And the spelling of Shavlik is S-H-A-V-L-I-K?
A. Correct.
**Q.** How long was Mr. Shavlik your supervisor?
A. I'm guessing now. I would say three years, four years. I don't remember.
**Q.** And before Mr. Shavlik, who was your supervisor?
A. I think it was Joe Kellerher, but I don't really remember the exact order. (Phonetic spelling.)
**Q.** Why -- well, let me just scratch that.
Do you know what reason Brian Gnerre became your supervisor instead of Mr. Xiques?
A. No.

Ph: 727-580-4944 Fax: 727-735-9866
BARRETT
COURT REPORTING

**Q.** Did Mr. Xiques change a position at that time?
MS. DYSON: Object to the form.
THE WITNESS: I believe so.
BY MS. PISCITELLI:
**Q.** You're not sure?
A. I'm trying to remember why they -- because they divided our sales team up with different managers, so I'm trying to recall. I think it may have been because Mr. Xiques took another position.
**Q.** In the company?
A. That's correct.
**Q.** Approximately when was the team that you referred to divided up with different managers?
A. It's happened several times.
**Q.** Have you ever had more than one supervisor at the same time?
A. No.
**Q.** Have you received performance evaluations during your employment as a sales representative and account manager?
A. Yes.
**Q.** Are those presently done -- well, what format are they presently done, your performance evaluations?
A. I -- I don't really know. We have a meeting, I guess, and they fill out whatever they fill out.

**Q.** Okay. When's the last meeting that you had that was a performance evaluation?
A. I don't know if it was a performance evaluation or not. So, the last meeting I had with my manager was a quarterly meeting, and it was in August of this year, but I have no clue if that's a performance evaluation. I don't -- I don't know.
**Q.** Were you given any documentation at that quarterly meeting?
A. No.
**Q.** What was discussed that leads you to think that the meeting was a performance evaluation?
MS. DYSON: Object to the form.
THE WITNESS: I told you I didn't know if it was a performance evaluation, so...
BY MS. PISCITELLI:
**Q.** Okay. Well, what was -- what was discussed at the meeting you had in August?
A. Just talked about the company objectives and sales goals and --
**Q.** And that was with Mr. Jensen?
A. That is correct.
**Q.** How long did the meeting last?
A. Approximately an hour.
**Q.** Where was the meeting?

A. It was at the McKesson break freight office in St. Petersburg.
**Q.** Did you say break freight?
A. That's correct.
**Q.** Was anybody else present during the meeting?
A. There were other people in the building in the office, but not with us in the meeting, no. There were other people coming in and out of the room that we were in, but no one else was there for the meeting.
**Q.** Was there any discussion of Ms. Van Hoek during this August 2018 meeting you had with Mr. Jensen?
A. No.
**Q.** How are you paid?
MS. DYSON: Object to the form.
BY MS. PISCITELLI:
**Q.** Are you -- are you paid at work? Do you receive compensation for your work?
A. I do.
**Q.** And what -- what form of compensation do you receive?
A. Paid twice per month.
**Q.** And is the payment a salary?
A. No.
**Q.** What is it?
A. Commissions.

**Q.** Do you receive any other compensation in your employment currently?
A. I think we get some type of monthly allowance for car, phone, that kind of thing, but it's been a while since I looked at any of that, so I don't know for sure. The majority of it is commission, the vast majority.
**Q.** Do you submit receipts for phone and -- and travel for reimbursement to the company?
A. No.
**Q.** Have you always been paid on a commission basis in your employment that goes back to your hire by Physician Sales & Service?
A. No.
**Q.** How were you initially paid?
A. Initially, I think it was just a monthly salary that we got as a trainee. And at some point, when you became a sales rep, you transitioned from salary to commission.
**Q.** And ever since you became a sales rep, you've been paid on a commission basis?
A. That is correct.
**Q.** And who pays you currently?
A. McKesson.
**Q.** How long has McKesson paid your commissions?

Page 22

A. Since they acquired PSS.
Q. Do you receive any types of employee benefits in your employment currently?
A. Yes.
Q. What types of benefits do you receive?
A. Medical, dental, vision.
Q. Anything else?
A. Not sure. There may be long-term disability. Those kind of benefits.
Q. Are you a participant in a deferred compensation plan?
A. I am.
Q. And what is that plan called?
A. There are two. One is called SPSIP, and I don't remember the exact acronym. The other one is PSIP, so -- and there's also an employee stock program, too, all of which I participate in.
Q. The one that you referred to as SPSIP --
A. Correct.
Q. -- you don't remember what any of those letters stand for?
A. Supplemental is the first word. I don't remember exactly. The PIP is a 401K. SPSIP is an additional pretax investment plan that you're able to participate in, but, no, I don't remember what all the

Page 23

letters stand for.
Q. For the PSIP, do you know what the first letter stands for?
A. I do not.
Q. And how long have you been a participant in the SPSIP which you said is a 401K?
MS. DYSON: Object to the form.
THE WITNESS: No, the PSIP is the 401K.
BY MS. PISCITELLI:
Q. Oh. Then I got them backwards. Okay. So, PSIP -- PSIP is the 401K?
A. Right.
Q. And then the SPSIP is a supplemental deferred compensation?
A. That's correct.
Q. And how long have you been a participant in the PSIP?
A. Since it became available to us from McKesson. I don't recall if that was immediately after the acquisition or if it was a few months after.
Q. Is the PSIP available to all sales representatives at the company?
MS. DYSON: Object to the form.
THE WITNESS: I think so, but I don't know.
BY MS. PISCITELLI:

Page 24

Q. How did you become a member of the PSIP?
A. They had some kind of enrollment, said if you'd like to participate, you know, you filled out whatever and -- pretty basic.
Q. When you were employed by PSS, whether Physician Sales & Service or the other name that we had, PSS World Medical, Inc., did you participate in any deferred compensation plans?
A. I did.
Q. And what were those plans?
A. There was a 401K plan.
Q. Any others?
A. Elite Compensation Plan.
Q. Any others?
A. There were stock shares, but I don't know if those were through a plan. I don't recall.
Q. Are you still a participant in the 401K from PSS?
A. No, that was rolled into the McKesson 401K.
Q. How about the Elite Compensation Plan, are you still a participant in that?
A. That is not offered by McKesson.
Q. Are you still a participant in that plan?
A. I have funds in the plan, but I can't contribute to them.

Page 25

Q. Does anybody contribute to the Elite Compensation Plan --
MS. DYSON: Object to the form.
BY MS. PISCITELLI:
Q. -- now?
A. Not as far as I know.
Q. Let me start over. Oh.
A. As far as I know, that was discontinued entirely, but you had the option of leaving your funds in there, but it's no longer a -- McKesson never offered that program.
Q. And how was the Elite Compensation Plan -- we're going back to PSS. How was the Elite Compensation Plan different from the regular 401K plan?
MS. DYSON: Object to the form.
THE WITNESS: It was nonqualified. There was not a cap on how much you could defer to it. It was payable upon leaving the company. It had different variable growth options within it and different matching.
BY MS. PISCITELLI:
Q. How was the matching different?
A. I don't recall what the matching was on our 401K at that time. With the Elite comp, you couldn't get a 50 percent match on -- up to 10 percent of your

annual income.
**Q.** On the 401K, the PSS 401K, did you receive any matching benefit?
A. I think so, but I don't remember how much it was.
**Q.** And in your current -- you said it was rolled over when McKesson acquired PSS?
A. The 401K was.
**Q.** Right. The 401K. Is there any matching in your -- the current 401K that you're in?
A. There is.
**Q.** Okay. And how -- how does that work?
A. I don't know the exact matching.
**Q.** Did the matching percentage or amount change when the PSS plan -- 401K plan was rolled over into the McKesson 401K plan?
MS. DYSON: Object to the form.
THE WITNESS: Yes, the McKesson matching was higher than the PSS matching, but I don't remember the exact amount.
BY MS. PISCITELLI:
**Q.** Approximately when did you become a participant in the Elite Deferred Compensation Plan?
A. This would be a real guess, but around 2002 maybe.

**Q.** And approximately when did the contributions to the Elite plan end?
A. Around the same time the McKesson acquisition of PSS happened.
**Q.** Do you remember approximately when the PSS -- excuse me -- the McKesson acquisition of PSS occurred?
A. I don't remember the exact date, but I want to say around February of 2014, but that's a guess.
**Q.** But you remember it was in February?
A. That's a guess.
**Q.** Have you ever heard of a plan referred to as the CEO Round Table?
A. Yes.
**Q.** Okay. And what was that?
A. That was a program for the top 25 reps in the company based on gross profit dollars.
**Q.** And was that the top 25 reps meaning sales reps, right?
A. Correct.
**Q.** Was that the top 25 sales reps nationally?
A. That's correct.
**Q.** Were there any benefits to persons who were the top 25 reps?
A. Yes.
MS. DYSON: Object to the form.

BY MS. PISCITELLI:
**Q.** What kind of benefits were there?
A. You were able to participate in the Elite Compensation Plan. There was also typically one trip per year for you and your spouse where you met with the officers of the company.
**Q.** Were you ever a member of the CEO Round Table?
A. Yes.
**Q.** And when did you become a member?
A. About the -- around 2002, I'm guessing.
**Q.** And how long were you a member of the CEO Round Table?
A. Until the McKesson acquisition of PSS.
**Q.** You mean the acquisition of PSS by McKesson? Did I miss --
A. That's correct.
**Q.** Who acquired whom?
A. McKesson acquired PSS.
MS. DYSON: Object to the form.
BY MS. PISCITELLI:
**Q.** Right. Thank you.
Was the round table -- the CEO Round Table membership, was that rolled over into anything once McKesson acquired PSS?
A. I don't know. McKesson has their -- I don't

know if it's the same version. I don't know if it was rolled over. McKesson has something called profit producers. But I have no clue if they had that information, if the CEO Round Table was rolled into it. I don't know.
**Q.** Have you been a profit producer?
A. No.
**Q.** Do you know what that --what that criteria is to be -- excuse me -- what the criteria are to be a profit producer?
A. I do not.
**Q.** Do you know what the -- any of the benefits would be for somebody who's a profit producer?
A. I believe they have an annual trip, but I don't know much about it.
**Q.** Have you ever heard of something called The President's Club?
A. Yes.
**Q.** Is that the same thing as the profit producers that you --
A. No.
**Q.** Okay. What's The President's Club?
A. That is -- I don't know all the criteria, but a certain number of reps -- sales reps each year are able to win The President's Club trip, and it has to do with

Ph: 727-580-4944 Fax: 727-735-9866

BARRETT COURT REPORTING

growth in your territory, sales growth year over year.
**Q.** And who is the president currently?
A. The president?
**Q.** Yeah. I mean, it says The President's Club. I'm wondering who the -- if there's a person associated with that title.
MS. DYSON: Object to the form.
THE WITNESS: Yeah. I -- I believe it's Eddie Dienes, but I'm not sure.
BY MS. PISCITELLI:
**Q.** Have you ever been a member of The President's Club?
A. No.
**Q.** During your employment as a sales representative -- well, let's strike that.
Currently as a, I believe you said account -- account manager, what are your responsibilities?
A. To call on customers, take care of customers, sales.
**Q.** Anything else?
A. There's a huge list that would take us hours to go through, but normal things that you would think would apply to taking care of sales and customers.
**Q.** Okay. When you refer to a long list, is there actually a document that lists all the responsibilities

of account managers?
A. That, I don't know.
**Q.** Are your duties as an account manager any different from your -- the duties that you had previously going back to the beginning of your employment as a sales rep with PSS?
A. So, as a sales rep with PSS, no, they're not different. As a trainee, obviously, that was a whole different thing.
**Q.** Have you ever heard the terminology bill to account?
A. Yes.
**Q.** And what is that?
A. That is typically the address where statements and invoices are sent for a customer account.
**Q.** As a sales representative, do you have any responsibilities with respect to the bill to account?
A. Yes.
**Q.** And what are those responsibilities?
A. The same as they are for any of our customers. The bill to just means that's where we're going to send invoices and bills. It can also be a location where they actually have a practice and we ship product. So, it can be anything from calling on that facility, to visit with the physicians, nurses, to working with them

on accounts payable, those kind of things.
**Q.** Does -- do all sales representatives, account managers now, have the bill to responsibilities you just described?
A. Yes.
MS. DYSON: Object to the form.
BY MS. PISCITELLI:
**Q.** Do they have those bill to responsibilities with respect to each customer?
A. No.
MS. DYSON: Object to the form.
BY MS. PISCITELLI:
**Q.** And why -- why would they not with every customer?
MS. DYSON: Object to the form.
THE WITNESS: So, there are situations quite commonly where we share business with other reps. So, one rep may have the bill to and other reps may have ship to locations underneath that.
BY MS. PISCITELLI:
**Q.** Presently, are you in one of those shared situations as to any customers?
A. Yes.
**Q.** Which customers?
A. There's numerous. I couldn't name them all for

**CONFIDENTIAL**

you.
**Q.** Can you name any?
A. Sure. Lutz Surgical Partners.
**Q.** Any others?
A. Yeah, but I can't remember the exact name of the account. Oh. Hum. I don't know. I'd have to think about that, but there are others, yes.
**Q.** How about Florida Medical Clinic?
A. Yes.
**Q.** How about Florida Hospital Physician Group?
A. No.
**Q.** How about Access Health Care?
A. No.
**Q.** How about Dr. Randolph A. Knight?
A. No, that is not a shared --
**Q.** Are you the sales representative who's the person responsible for any bill to functions as to Lutz Surgical Partners?
A. Yes.
**Q.** How about Florida Medical Clinic?
A. No.
**Q.** Who's the bill to on Florida Medical Clinic?
A. Hilda.
**Q.** And how long has Hilda been the bill to on Florida Medical Clinic that you know?

Ph: 727-580-4944 Fax: 727-735-9866

BARRETT COURT REPORTING

CONFIDENTIAL

Page 34

A. I don't know. She had it before I was involved.
Q. When did you become involved with Florida Medical Clinic?
A. It's an estimation, but maybe five years ago. It could have been longer.
Q. How did you become involved with Florida Medical Clinic?
A. They acquired some of my existing customers.
Q. Do you recall who any of those customers were that FMC, Florida Medical Clinic, acquired?
A. Sure. PCPA, that's Primary Care Physicians Alliance, Marty Odom, Tampa Orthopedic. I'm sure there's many more, but I don't know them all right off the top of my head.
Q. And before you became involved with -- well, let's strike that.
Have you ever been the bill to for Florida Medical Clinic?
A. I don't think so. Not that I recall.
Q. Approximately when did -- well, let's strike that.
Which -- which company acquired -- let me strike that again.
When -- when Florida Medical Clinic acquired

Page 35

PCPA --
A. Okay.
Q. -- was that before McKesson's acquisition of PSS?
A. Oh. I think it was, but I'm not -- I'm not 100 percent.
Q. And same question as to Marty Odom.
A. I believe that was before McKesson acquired PSS.
Q. And Odom is spelled O-D-O-M?
A. That's correct.
Q. Is Marty Odom a physician?
A. Correct.
Q. How about Tampa Orthopedic?
A. That was after McKesson acquired PSS.
Q. Do you remember approximately when?
A. Again, these are guesses, but three years ago maybe. Two years ago. I don't -- I don't remember exactly when.
Q. And do you still have responsibilities for PCPA, Marty Odom, and Tampa Orthopedic?
A. Not Marty Odom. I don't know if that account's even there. It may have been absorbed. The other two, yes, the ship to's.
Q. And what are your responsibilities with respect

Page 36

to PCPA currently?
A. I'm the account manager for that location for PCPA lab.
Q. So, it's not medical supplies for PCPA?
A. The majority of what they get from us is lab supplies.
Q. And you've been the ship to sales representative on PCPA since FMC acquired it?
A. I believe so.
Q. How about with respect to Tampa Orthopedic?
A. I believe so. Now, it may have -- I don't remember exactly the beginning, but as far as I remember, I was the account manager for that location.
Q. And is Tampa Orthopedic lab supplies?
A. No.
Q. What's Tampa Orthopedic?
A. Medical supplies.
Q. And what are your current duties with -- as a ship to with respect to PCPA?
A. Just to help them with orders. Any -- the same as they would be with any other customer. Help them with ordering problems, ordering issues, just all the normal duties that come with it. Other than the accounts receivable portion, I don't have that. Well, I take that back. If they're -- if they have issues with

Page 37

their bill, then, yes, I would be involved with that also. So, let me change that answer.
Q. And when PCPA or that -- that part of FMCA, when they need help with orders, who is your contact person?
MS. DYSON: Object to the form.
THE WITNESS: They typically haven't had any issues, to be honest. So -- Dr. Castellano is my main contact there, but he doesn't -- I don't know. I don't really -- haven't had any issues with him. It's been pretty smooth. They order very, very little from us.
BY MS. PISCITELLI:
Q. Why is that?
MS. DYSON: Object to the form.
BY MS. PISCITELLI:
Q. Do you know why they order little?
A. Yes.
Q. Why?
A. They -- FMC primarily orders from our competitor.
Q. What -- what lab supply does -- is it -- well, let me strike that.
Is it FMC will submit the order for the --
A. It -- it's submitted --

Ph: 727-580-4944 Fax: 727-735-9866



Page 38

Q. -- PCPAs -- is it still called PCPA?
A. It is.
Q. Okay. So, how is the ordering done currently for PCPA? Is it through FMC or --
A. It's submitted online. So, I don't know if that goes to FMC first or not.
Q. How long has that been the case?
A. Since -- since FMC acquired them.
Q. Do you place the orders online?
A. No, they do.
Q. The customer?
A. That's correct.
Q. Do you know what types of lab supplies are ordered for PCP -- PCPA through -- from -- from McKesson, not the --
A. Sure.
Q. -- not the other company?
What -- what types of lab supplies?
A. Reagents and controls primarily.
Q. Did you say reagents?
A. I did.
Q. R-E-A-G-E-N-T?
A. That's correct.
Q. Reagents and controls?
A. That's correct.

Page 39

Q. Anything else?
A. That's the majority of it.
Q. And how about Tampa Orthopedic? What -- what type of medical supplies do they order from McKesson?
A. They order almost nothing from McKesson. They order from our competitor. The occasional medical supply from time to time.
THE WITNESS: Can I have a second with --
MS. DYSON: Uh-huh.
THE WITNESS: Okay.
MS. PISCITELLI: Wait. Let's --
MS. DYSON: We'll take a break.
MS. PISCITELLI: Okay. You want to take a break?
THE WITNESS: Yeah. I just need to talk to her for a second.
MS. DYSON: Yes.
THE WITNESS: Yes.
MS. DYSON: Yes, we're going to take a break.
MS. PISCITELLI: Do you need to take a break other than to confer with Ms. Dyson?
MS. DYSON: I need to take a break.
THE WITNESS: I wouldn't mind using the restroom --
MS. PISCITELLI: Okay.

Page 40

THE WITNESS: -- if that's okay.
MS. PISCITELLI: Let's go off the record and we'll -- so we can take a break.
THE VIDEOGRAPHER: We're off the record at 2:33 p.m.
(Thereupon, a short recess was had.)
(Thereupon, the Question and Answer was read back.)
THE VIDEOGRAPHER: We're on the record at 2:40 p.m.
BY MS. PISCITELLI:
Q. Mr. Brady, we were talking about orders from the -- the FMC acquired entities that you have ship to's for. And you mentioned that Tampa Orthopedic orders very little from McKesson. Is that correct? Do I have that right?
MS. DYSON: Object to the form.
THE WITNESS: That's correct.
BY MS. PISCITELLI:
Q. Okay. What does Tampa Orthopedic order from McKesson?
A. It's very, very little. They have two different businesses they run out of that office. One is an urgent care. I am the rep for that, the account manager for that, so I'm in there frequently. The other

Page 41

is orthopedic. The orthopedic portion was purchased by Florida Medical Clinic. So, I could tell you in the last 12 months, they may not have purchased anything.
Q. Did you say the last 12 months?
A. Yes.
Q. And the urgent care portion of Tampa Orthopedic is not affiliated with FMC, Florida Medical Clinic?
A. It is not, nor is it affiliated with Tampa Orthopedic. It's an entirely separate business tax ID. They just happen to share the same office space.
Q. When is the last time you had contact with the -- well, let me strike that.
With the orthopedic part of Tampa Orthopedic, is that the Dr. Castellano that you mentioned?
A. No.
Q. Oh, okay.
A. That's Primary Care Physicians Alliance. Two different practices.
Q. Oh, okay. All right. So, who -- do you have a contact person at Tampa Orthopedic?
A. I do.
Q. Who's that?
A. There are several. I deal with the physician, Dan Murphy, I deal with the practice administrator, Kelly Hurst, and several of their people that place



Page 42

orders.
Q. Do the people who -- who are the people that place orders, the other people?
A. Keisha.
Q. Anybody else?
A. Dr. Cassio.
Q. Is that C-A --
A. I believe it's C-A-S-S-I-O.
Q. Like the watch? All right.
Anybody else?
A. Anyone else that places orders --
Q. At Tampa --
A. -- for the urgent care?
Q. At Tampa Ortho.
A. Well, remember, it's the urgent care that's placing the orders. Tampa Ortho isn't really placing any orders with us.
Q. Okay. So, you don't -- so, these people, Dr. Murphy, Kelly Hurst, Keisha, Dr. Cassio, go to the urgent care, it's not FMC affiliated?
A. The urgent care is not, but I believe they all have dual roles that they may work for both. I don't know.
Q. Okay. So, just so I'm clear and the record is clear, Dr. Murphy, Kelly Hurst, Keisha, and Dr. Cassio

Page 43

are not affiliated with FMC?
MS. DYSON: Object to the form.
THE WITNESS: That is -- no, that's not what I'm saying.
BY MS. PISCITELLI:
Q. Okay. Then if you could clarify because I'm getting --
A. Dr. Murphy owned Tampa Orthopedic and he also owned the urgent care. He sold the orthopedic practice to Florida Medical Clinic, and he works for them. He also owns the urgent care. Now, I don't know if he works there as a provider or not, but he is one of the owners. The others, I don't know if they work for both, if they only work for one, I'm not sure.
Q. So, when you say the orthopedic has not purchased anything in about 12 months from McKesson, are you referring to the people that you just mentioned? Does that include the people who would be ordering for them; Murphy, Hurst, Keisha?
MS. DYSON: Object to the form.
THE WITNESS: I'm referring to the fact that the Florida Medical Clinic ship to at that location has ordered nothing or very little. Who does the ordering for that versus the urgent care exactly, I don't know. I don't know if they're employed by

Page 44

both, employed by only one.
BY MS. PISCITELLI:
Q. And where is -- where are they located -- I guess in Tampa -- the Tampa Orthopedic?
A. That's correct. They're on South Howard Avenue in Tampa.
Q. Okay. And when is the last time you visited the Tampa Orthopedic facility?
A. Today.
Q. And what was that in regard to?
A. Just regular -- I call on them every two weeks as their account manager.
Q. And is that the FMC ship to that you mentioned earlier?
A. It's really more the urgent care because they're the ones placing orders with us, but, yeah, they're one in the same -- the same facility, rather. So, if I'm there, if they have questions about an FMC issue, I'm happy to answer it, but since most of their business with me is on the urgent care side, that's typically what we're in there talking about.
Q. And just to skip topics a little bit, on -- back The President's Club. Approximately how many sales reps compete to be in the sales -- excuse me -- to be in The President's Club?

Page 45

A. All of the sales reps are eligible for it. I don't know how many sales reps or account managers there are -- 950 maybe -- so, all of them are eligible.
Q. And is that nationally?
A. It is.
Q. And the benefits for the top 25, do they receive any benefits other than the trip?
A. I don't know.
Q. You mentioned the two accounts that have a -- that are shared, as you described it, where there's a sales representative who has bill to responsibilities and there's also sales representatives that have ship to responsibilities. And you mentioned two that you could remember at the time, Lutz Surgical Partners and Florida Medical Clinic. Do you remember any others?
MS. DYSON: Object to the form.
THE WITNESS: So, it's actually Lutz, L-U-T-Z.
BY MS. PISCITELLI:
Q. Oh.
A. And there was --
Q. Okay.
A. And there was another one I think I gave you, right? I think you brought up Florida Medical Clinic. I had forgotten about that.
Q. Oh, okay.

Ph: 727-580-4944 BARRETT COURT REPORTING Fax: 727-735-9866

Page 46

A. So, whatever the other one I gave you was, I don't recall right now, but I thought I gave you two --
**Q.** Oh, okay. And is --
A. -- or is it -- maybe not.
**Q.** And is -- I think you said -- what about Randolph Knight, is that shared?
MS. DYSON: Object to the form.
THE WITNESS: No, it is not.
BY MS. PISCITELLI:
**Q.** And where is Randolph Knight located?
A. Zephyrhills.
**Q.** When did you become -- what is your -- if it's not bill to -- if it's not shared, what is it called? Is it called just ship to or --
A. There's -- it's a bill to --
**Q.** For Knight?
A. -- it's a bill to, ship to.
**Q.** Combined?
A. Correct. So, their billing address and their shipping address are the same.
**Q.** And when did you become the sales representative for Dr. Knight?
A. Again, this is just a guess, six or seven years ago.
**Q.** How did you become the sales representative for

Page 47

Dr. Knight?
MS. DYSON: Object to the form.
THE WITNESS: I don't remember.
BY MS. PISCITELLI:
**Q.** Were you the first sales representative on the account?
MS. DYSON: Object to the form.
THE WITNESS: Yes. On that account -- on that bill to and ship to account, I was. It was a new account.
BY MS. PISCITELLI:
**Q.** Had there been a prior account for Dr. Knight?
MS. DYSON: Object to the form.
THE WITNESS: I don't know. My understanding was after the fact possibly that he was part of a group before that, but I don't know all the specifics on that.
BY MS. PISCITELLI:
**Q.** And is Dr. Knight part of a group now?
A. He is not.
**Q.** So, did you have any -- were you a sales rep for Dr. Knight when he was part of a group?
A. No.
**Q.** Do you have any knowledge of Hilda Van Hoek being a sales representative for Dr. Knight?

Page 48

A. I believe she had told me she was with some group before that, but I don't remember all the details. This is a while ago.
**Q.** And you only know that through a conversation with Ms. Van Hoek?
A. I don't remember if it was conversation or e-mail, but one of the two.
**Q.** Do you know someone named Gary Steele?
A. Yes.
**Q.** Who's Gary Steele?
A. Gary Steele was -- now, I haven't talked to him in several years -- but was the purchasing -- I don't know what his position was -- purchasing director, purchasing agent for Florida Medical Clinic.
**Q.** And was that -- and your speaking to Mr. Steele, was that in relation to any particular ship to of Florida Medical Clinic?
A. It was in relation to practices of mine that they had acquired.
**Q.** Were -- those communications, were those in person with Mr. Steele?
A. I believe I met in person with him a few times. Also communicated by e-mail and phone.
**Q.** When was the last time you spoke to Mr. Steele, do you remember?

Page 49

MS. DYSON: Object to the form.
THE WITNESS: I don't remember, but it's been several years.
BY MS. PISCITELLI:
**Q.** Do you remember what was discussed between you and Mr. Steele during the last conversation you had with him?
A. No.
**Q.** Is there anything that would refresh your recollection on that?
A. Not sure I understand.
**Q.** Is there anything, for instance, like an e-mail, a note, a log, that would refresh your memory on what your last conversation with Mr. Steele was about?
A. Not that I know of.
**Q.** Do you keep a log of your daily activities as a sales rep?
A. No.
**Q.** How about e-mailing with Mr. Steele? Do you remember the topic of any e-mails you had with Mr. Steele?
A. I don't remember.
**Q.** Do you have -- is there anything that would refresh your recollection on that?
A. I don't know if those e-mails are saved

Ph: 727-580-4944 Fax: 727-735-9866
BARRETT
COURT REPORTING

anywhere or not, I don't know. I don't have anything saved from that far back.

**Q.** And when you communicated with Mr. Steele by e-mail, was it through the -- well, what e-mail system did you use? Was it a personal account? Was it PSS? Was it McKesson?

A. It would have been either PSS or McKesson. I think it was PSS at the time, but not -- not a personal.

**Q.** Do you remember any of your -- do you have any specific recollection of any of your verbal conversations with Gary Steele?

MS. DYSON: Object to the form.

THE WITNESS: I do remember a few things that we talked about, but I couldn't -- I don't know how specific it would be.

BY MS. PISCITELLI:

**Q.** Okay. What -- what -- what things did you talk about with Gary Steele?

A. I basically was there to ask him if it would be possible for me to continue calling on the existing customers I had that had been acquired. They had requested to keep me as their sales rep, and I was there to ask if that was possible.

**Q.** Was that a verbal conversation?

A. Yes.

**Q.** Do you remember what customer that was, the one that FMC acquired -- Florida Medical Clinic acquired?

MS. DYSON: Object to the form.

THE WITNESS: I remember that Marty Odom was one. There may have been others.

BY MS. PISCITELLI:

**Q.** Approximately when was that, that Marty Odom became -- came under F -- came under Florida Medical Clinic?

A. Again, I'm guessing. This is all kind of around the same time. I want to say six years ago maybe, seven years ago, five to seven years.

**Q.** Was it before the McKesson acquisition of PSS?

A. It was.

**Q.** And what did Mr. Steele tell you in response to your inquiry?

A. I believe he said that they were open to giving it a shot with a few customers to see how it went.

**Q.** And I believe you mentioned you still have that account with Gary Odom. Did you -- did he -- he gave -- he said he would give it a shot. I can't remember if you said Odom was still --

A. I don't even know if --

MS. DYSON: Object to the form.

THE WITNESS: -- that practice is still there,

but, no, I do not have that as a ship to.

BY MS. PISCITELLI:

**Q.** Does anybody at McKesson have Odom as a ship to?

MS. DYSON: Object to the form.

THE WITNESS: I don't know. I don't know if he's still in the same office. I have no idea.

BY MS. PISCITELLI:

**Q.** But you -- you did become the sales representative for Odom after Florida Medical Clinic acquired --

A. I don't -- I don't remember if I was -- if that actually happened. We talked about it. I talked about it with Gary Steele, and I don't remember if that actually happened or not.

**Q.** Did you -- well, were there any -- did you have any other conversations with Gary Steele like that in regard to asking if -- if you could be the sales rep on the newly acquired entities of Florida Medical Clinic?

MS. DYSON: Object to the form.

THE WITNESS: Just to be clear, it was only on practices that I was already the rep that required it. It wasn't on new entities. I think we talked about that maybe once or twice. It wasn't a lot and it wasn't over a long period of time. But it was

really just to ask if I could remain as the rep underneath the McKesson -- or PSS at the time -- bill to for practices that I currently had that were being acquired by Florida Medical Clinic.

BY MS. PISCITELLI:

**Q.** Did you have any communication with Gary Steele about whether you could be the -- a sales representative for Tampa Orthopedic?

MS. DYSON: Object to the form.

THE WITNESS: No, this was well before that.

BY MS. PISCITELLI:

**Q.** Okay. So you had no conversation with -- with Mr. Steele about your being a sales rep on Tampa Orthopedic?

A. That's correct. That was -- that happened years after.

**Q.** Okay. Did you have any communications with Mr. Steele after the McKesson/PSS merger?

A. I don't think so.

**Q.** Okay. Let's -- let's talk about the time frame after the merger, starting with the merger -- the acquisition of -- McKesson of PSS. I believe you indicated before your -- there was no change in your duties as a sales representative.

MS. DYSON: Object to the form.



BY MS. PISCITELLI:
**Q.** Is that correct? Did I understand your earlier testimony correctly?
A. For the most part, there was very little change with day-to-day duties and requirements, so that would be correct.
**Q.** Was there any difference in -- in the way you conducted business or how business was conducted once McKesson became the employer?
A. I'm sure there were. I don't remember the specifics. It was very similar. I'm sure there had to have been differences, but, again, that was quite a while ago, so I don't remember. But the basic -- it was very similar, so not anything that was a big, big difference.
**Q.** With respect to any of your customers that you had before the merger, were any of those customers, pre-merger, serviced by McKesson? So, you were -- you were previously servicing them as PSS. Were there any that were -- had been serviced by McKesson so that once there was the merger, you had people who had been competitors under one umbrella?
A. Yes.
**Q.** Okay. And that happened to you?
A. Yes.

**Q.** Do you know -- can you remember any of the accounts that were affected?
A. Not off the top of my head. There was a -- a handful. I don't remember if it was 30, 40. I don't remember any specifically.
**Q.** And what -- what happened with those? Were you -- did you give up some areas or did you gain some?
A. I think both.
**Q.** Uh-huh.
A. I think my understanding was they looked at who had a larger share of the business and that person was the rep. So, I think there were a few that I ended up losing and then some that I ended up becoming the only rep in there.
**Q.** Do you know approximately how many ship to accounts you currently have?
MS. DYSON: Object to the form.
THE WITNESS: No.
BY MS. PISCITELLI:
**Q.** Approximately?
MS. DYSON: Object to the form.
THE WITNESS: Not ship to, no.
BY MS. PISCITELLI:
**Q.** Okay. Any kind of accounts? I mean, is there some with the ship to and -- and --

A. Bill to -- again, this is an estimate. It can change month to month, but 350 to 400 maybe.
**Q.** Bill to's?
A. I think so. It could be off. I haven't looked at the total number in a while, but it's probably somewhere in that range. That's why it's so hard to remember exact accounts. There's a lot, so I don't remember exactly which ones were affected by that acquisition. I remember dealing with it, but I don't remember too many specifics. But the ship to's -- one of those bill to's can have 15 ship to accounts under it. One may only have one. So, it would -- it -- I would -- it would be irresponsible even to try to guess the number of ship to's.
**Q.** Well, how does it come about that you become a bill to on an account?
A. Typically you're the person who's opening the account.
**Q.** So that would be a customer that you've -- a new customer?
A. The majority of the time, yes.
**Q.** And what about the other times, how is it that you come about to be a bill to?
A. It's possible that another account manager had left the company and they needed to assign someone.

It's possible that the account requested a different account manager. I don't know if there's other scenarios. That's what comes to mind. But those don't happen very frequently. We have very little turnover. And sometimes an existing customer will set up another bill to account also. Like Tampa Orthopedic where I had the orthopedic business for a long time, then they started an urgent care after hours in there, so now you have two totally different bill to's, two totally different tax IDs, so that's another way.
**Q.** After the merger -- the McKesson/PSS merger, was there any difference in how accounts were assigned to sales reps?
A. I don't know. I -- sales reps weren't really part of how accounts were assigned, so I -- I don't know that.
**Q.** But -- okay. You're -- you don't -- are not aware of any change as you sit here now?
MS. DYSON: Object to the form.
THE WITNESS: Not that I know of. I know there was obviously change with what you spoke about when there were -- the initial acquisition and they had to make decisions there. I have no idea about how or what and -- so, no, I don't really know of any major differences.

Ph: 727-580-4944 Fax: 727-735-9866



Page 58

BY MS. PISCITELLI:
**Q.** Have you ever lost any bill to accounts or have they been removed from you?
MS. DYSON: Object to the form.
THE WITNESS: Have I lost bill to accounts? Sure. Absolutely.
BY MS. PISCITELLI:
**Q.** What are the circumstances when you would lose a bill to account?
A. Well, the majority is through acquisition. I've lost a tremendous amount to large hospital groups and IDNs where the physician is no longer in the practice, the hospital owns the practice, and there's no bill to there anymore.
**Q.** And when that happens, there's been an acquisition of your customer by another entity, do you do anything to try and become the bill to of the new business?
A. Sometimes, but it's typically handled on a corporate level. And I guess it just depends on -- on who it is. There's different scenarios. If, for instance, a hospital group we know doesn't use us and is contracted with -- someone else acquires, well, there's really not much conversation to have. So, I guess it really just depends on the circumstances.

Page 59

**Q.** But you yourself have pursued those opportunities, haven't you?
MS. DYSON: Object to the form.
THE WITNESS: Yes.
BY MS. PISCITELLI:
**Q.** Okay. And that was -- I -- because you -- I believe that's what you were discussing earlier with Florida Medical Clinic, right?
A. Correct.
**Q.** Any others that you can recall?
A. There's -- there's been a lot over the years. I've unfortunately had a lot of accounts acquired. So, you mentioned the Florida Hospital Group, I think, and initially, we were able to still work with those customers that we acquired and that -- that changed, so -- then there's been times where a bill to is acquired by another bill to, but it's not corporate. And then I went to the account manager and asked if I could work with them and maintain that ship to level, and the majority of the time, that is the case.
**Q.** And have you ever done that with Ms. Van Hoek as to any particular account?
A. I don't remember if she and I specifically talked about Florida Medical Clinic or not. Ultimately, the decision wouldn't be either of ours. It would be a

Page 60

decision made by management. But, typically, if account managers are able to work things out on their own, then management usually adheres to whatever they come up with. But I don't remember this -- I mean, we're, again, talking about many, many years ago. So I don't remember if Hilda and I spoke about Florida Medical Clinic together before management got involved or not.
**Q.** Did you lose any accounts to Ms. Van Hoek after the merger?
A. Yes.
**Q.** And which account or accounts was that?
A. Well, let me take that back. I don't know if I lost them to Hilda. Let me back up for a second. If there were accounts that were acquired by Florida Medical Clinic, she may have acquired them. They may be doing business -- I don't know. But once they're acquired, I don't have access to what they're doing in a lot of cases. It -- I don't -- so, I don't know. The answer to that is I really -- I'm not sure. I know I've lost quite a few accounts after the acquisition of PSS by McKesson due to those accounts being acquired by another entity, so -- but was that Hilda; I don't know.
**Q.** Did Ms. Van Hoek ever lose any accounts to you --
MS. DYSON: Object to the form.

Page 61

BY MS. PISCITELLI:
**Q.** -- after the merger?
A. I don't think so, but I don't know. I mean, not that I can recall.
**Q.** Did Ms. Van Hoek lose any accounts to you before the merger?
MS. DYSON: Object to the form.
BY MS. PISCITELLI:
**Q.** And, of course, by the merger, we're talking about McKesson and PSS.
A. Right.
MS. DYSON: Object to the form.
THE WITNESS: Not that I can recall.
BY MS. PISCITELLI:
**Q.** Is there anything that would refresh your memory?
A. Not that I know of.
**Q.** Are you currently a sales representative on the Florida Physicians -- excuse me -- the Florida Physician Health Group account?
A. I'm not sure if -- the Florida Physician Health Group, is that a --
**Q.** No, no, no. I'm -- this is -- well, Florida Physicians -- did I get the name right? Florida --
MS. VAN HOEK: Hospital.

Ph: 727-580-4944 Fax: 727-735-9866



Page 62

BY MS. PISCITELLI:
**Q.** Oh, Florida Hospital Physician Group. Sorry.
A. Oh, no.
**Q.** Have you ever had accounts with Florida Hospital Physician Group?
A. Yes.
**Q.** And when was that?
A. I -- again, I don't recall the exact dates, but I want to say it was up until maybe 18 months or two years ago.
**Q.** And what happened to cause you to lose those accounts for Florida Hospital Physician Group 18 months to two years ago?
A. Sure. McKesson ended up moving those accounts from all reps as far as I know to have a corporate-to-corporate relationship where we were no longer involved.
**Q.** And did you have Florida Hospital Physician Group accounts before the McKesson acquisition of PSS?
A. Yes.
**Q.** And where were those located?
A. And, again, I don't recall exactly when they became part of that physician group. One on North Dale Mabry in Tampa.
Do you want -- what are you looking for, an

Page 63

area of town or --
**Q.** If you can remember the area -- if you can remember -- the cities would be easier, yeah.
A. Tampa, probably Lutz.
**Q.** Is Lutz --
A. Wesley Chapel.
**Q.** Is Lutz in Hillsborough County?
A. It is, yes. Pasco -- Hillsborough/Pasco line. Wesley Chapel. That's Pasco County more. I'm sure there's more, but that's what I -- I know for -- comes to mind.
**Q.** And before the merger, did you have any Florida Hospital Physician Group accounts in Pinellas County?
A. I don't recall. I don't think so, but I don't recall.
**Q.** And have you had accounts in Pinellas County -- well, Florida Hospital Physician Group accounts in Pinellas County?
MS. DYSON: Object to the form.
THE WITNESS: I don't think so. I'm not 100 percent sure, but I don't think I did.
BY MS. PISCITELLI:
**Q.** Did you ever seek to become a sales representative for Florida Hospital Physician Group in Pinellas County?

Page 64

A. No.
**Q.** Do you currently have any accounts in Zephyrhills?
A. Yes.
MS. DYSON: Object to the form.
BY MS. PISCITELLI:
**Q.** And what are those accounts?
A. Dr. Knight is in Zephyrhills and -- I don't know. I'm sure I have other ones out there. They're ship to's.
**Q.** But you can't think of any others?
MS. DYSON: Object to the form.
THE WITNESS: No, not off the top of my head.
BY MS. PISCITELLI:
**Q.** Did you have any Zephyrhills accounts before you became the representative on the Dr. Knight account?
A. Possibly. I don't -- I don't recall.
**Q.** This is going back to the -- the time of the acquisition of PSS by McKesson. I think you said the orders were done on -- have been done online by the customers since then. Is that --
MS. DYSON: Object to the form.
THE WITNESS: No.
BY MS. PISCITELLI:
**Q.** -- your customers? No?

Page 65

A. No.
**Q.** Okay. Are there orders -- how else are orders placed? There's online which the customer can do, right?
A. That's correct.
**Q.** Okay. What else?
A. That's been the case since before. That hasn't really changed. They can call customer service, sales reps can take the order when we're there visiting, they can call us, fax, well, pretty much any way they want to do it.
**Q.** So going back -- going back to like right before the merger, did -- was there a specific order form that you would use if you were going to take an order from a customer?
A. No. No. I typically try to get them to order online, but there were -- there's a lot that -- and still won't. We would just take their order from them and having been doing it for so long, we typically knew what they needed when they said certain things and we'd place the order for them.
**Q.** Online?
A. Well, online or on our laptop and sent it in, so...
**Q.** Do you know of someone named Amy Boyes,

Ph: 727-580-4944 Fax: 727-735-9866
BARRETT
COURT REPORTING

Page 66

B-O-Y-E-S?
A. B-O-Y-E-S?
**Q.** Yes.
A. That does not ring a bell.
**Q.** Have you ever participated in a town hall meeting for sales representatives?
A. Probably.
**Q.** Do you remember any of those town hall meetings?
A. No, not really.
**Q.** I would like to take a break and speak to co-counsel, my client, and see if we have any further areas of questioning. We're all -- I think we're almost done. Okay?
A. Okay.
**Q.** Okay. Thank you. So be sure and take off your --
THE VIDEOGRAPHER: We're off the record at 3:24 p.m.
(Thereupon, a short recess was had.)
THE VIDEOGRAPHER: We're on the record at 3:30 p.m.
MS. PISCITELLI: Okay. Mr. Brady, I don't have any further questions right now.
Ms. Dyson, do you?

Page 67

MS. DYSON: You're done with questions.
MS. PISCITELLI: Right now unless there's -- if you --
MS. DYSON: What do you mean, "right now"?
MS. PISCITELLI: What do I mean right now?
MS. DYSON: Yes.
MS. PISCITELLI: I don't know if you're going to do any cross-examination, but if you do, then I -- you know, I might have more questions.
MS. DYSON: Okay. So you have no further questions on direct exam?
MS. PISCITELLI: Right now, right. On direct, yes, that's correct.
MS. DYSON: Okay. You're saying right now. I don't know what that means.
MS. PISCITELLI: I don't have any -- my direct is done.
MS. DYSON: Okay. Because you --
MS. PISCITELLI: So, if you have any questions, if you want to do cross, this is your opportunity.
MS. DYSON: Sure it is. And I have none. We'll read.
MS. PISCITELLI: Okay. Thank you for your time today.
THE WITNESS: All right.

Page 68

MS. PISCITELLI: And we will conclude the deposition.
THE VIDEOGRAPHER: This concludes the video-recorded deposition of Clinton Brady on 17, October, 2018. And we're off the record at 3:31 p.m.
(Thereupon, the following was off the video record.)
THE COURT REPORTER: Would you like to order this one or hold off?
MS. PISCITELLI: Not yet.
THE COURT REPORTER: Okay.
MS. DYSON: We'll take a copy if they order it.
THE COURT REPORTER: Okay. I.
(Thereupon, the videotaped deposition was concluded at 3:31 p.m.)

Page 69

CERTIFICATE OF OATH

STATE OF FLORIDA:
COUNTY OF PINELLAS:

I, JESSICA TENENBAUM, Notary Public, State of Florida, do hereby certify that CLINTON BRADY personally appeared before me on October 17, 2018 and was duly sworn and produced a driver's license as identification.

Signed this 22nd day of November, 2018.

____________________________
JESSICA TENENBAUM

Notary Public, State of Florida
My Commission No.: GG061119
Expires: January 9, 2021



CERTIFICATE OF REPORTER

STATE OF FLORIDA:
COUNTY OF PINELLAS:

I, JESSICA TENENBAUM, Notary Public, State of Florida, certify that I was authorized to and did stenographically report the deposition of CLINTON BRADY; that a review of the transcript was requested; and that the foregoing transcript, pages 4 through 68, is a true and accurate record of my stenographic notes.

I further certify that I am not a relative, employee, or attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

DATED this 22nd day of November, 2018.

________________________________

JESSICA TENENBAUM