UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

HILDA VAN HOEK,

      Plaintiff,

                    Case No.: 8:17-ev-02447-T-36AAS

v.

McKESSON CORPORATION,
a foreign corporation, PSS WORLD
MEDICAL, INC., a Florida corporation,
McKESSON MEDICAL-SURGICAL
INC., a foreign corporation, McKESSON
MEDICAL-SURGICAL TOP HOLDINGS
INC., a Florida corporation,

      Defendants,

_____

DEPOSITION OF GARY STEELE
Volume 1 of 1, Pages 1 through 43

October 11, 2019
10:10 a.m. to 11:05 a.m.
Florida Medical Clinic
17401 Commerce Park Boulevard
Suite 106
Tampa, Florida 33647

Stenographically Reported By:
SHERITA BOYLE
Court Reporter

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Sherita Boyle (301-421-849-0649)
Electronically signed by Sherita Boyle (301-421-849-0649)
Electronically signed by Sherita Boyle (301-421-849-0649)
5c36c9a0-a3a8-4dab-8148-75d53af08603

## Page 2

```
 1              APPEARANCES
 2
 3   On Behalf of Plaintiff:
 4   GrayRobinson, P.A.
     401 East Jackson Street
 5   Suite 2700
     Tampa, Florida 33602-5841
 6   813-273-5000
     Sacha.dyson@gray-robinson.com
 7
        SACHA DYSON, ESQUIRE
 8
 9
10   On Behalf of Defendant:
11   Harris & Helwig P.A.
     6700 South Florida Avenue
12   Suite 31
     Lakeland, Florida 33813-3312
13   863-648-2958
     Pfhelwig@tampabay.rr.com
14
        PETER F. HELWIG, ESQUIRE
15
16
17   P.O. Box 691166
     Orlando, Florida 32869-1166
18   407-491-0143
     Kpiscitelli1@cfl.rr.com
19
        KATHRYN S. PISCITELLI, ESQUIRE
20      (Present telephonically)
21
     Also present:
22   Hilda Van Hoek, Esquire
23              - - -
24
25
```

## Page 3

```
 1              I N D E X
 2
 3   DEPOSITION OF GARY STEELE          PAGE
 4   Direct Examination by Sacha Dyson       04
 5   Cross Examination by Peter F. Helwig      13
 6   Certificate of Oath            42
 7   Certificate of Reporter          43
 8   Errata Sheet               44
 9   Witness Notification Letter        45
10
11
12              EXHIBITS
13   Plaintiff's Exhibits
14   A  June 1st, 2013 E-mails        13
15   B  Capparelli E-mails          29
16
17   Defendants' Exhibits
18   1  Gary Steele Deposition Subpoena    05
19   2  May 30th, 2013 E-mails        08
              - - -
20
21
22
23
24
25
```

## Page 4

```
 1       Deposition taken before Sherita Boyle, Court
 2   Reporter and Notary Public in and for the State of
 3   Florida at Large in the above cause.
 4              - - - - - -
 5       COURT REPORTER:  Do you swear or affirm that
 6   the testimony you are about to give will be the
 7   truth, the whole truth and nothing but the truth?
 8       THE WITNESS:  Yes.
 9       COURT REPORTER:  Thank you.
10   THEREUPON,
11              GARY STEELE,
12   having been first duly sworn, testified as follows:
13          DIRECT EXAMINATION
14   BY MS. DYSON:
15       Q   Good morning, Mr. Steele.
16       A   Good morning.
17       Q   Can you tell us your full name for the record.
18       A   Gary Steele.
19       Q   I am Sacha Dyson.  I represent the defendants
20   in this case that have been sued by Ms. Van Hoek,
21   McKesson Medical.  You received a subpoena for your
22   deposition today; is that correct?
23       A   Yes.
24       Q   Let me go and ahead mark that is Exhibit 1 to
25   your deposition.
```

## Page 5

```
 1       (Defendants' Exhibit 1 marked for
 2       identification.)
 3   BY MS. DYSON:
 4       Q   And is Exhibit 1 a true and correct copy of the
 5   subpoena you received for your deposition here today?
 6       A   It appears to be.
 7       Q   Have you been deposed before?
 8       A   The only thing I had was a conversation with
 9   Kathy, Kathryn.
10       Q   The attorney that represents Ms. Van Hoek?
11       A   Yes.
12       Q   So let me go over a few ground rules for the
13   deposition here today.
14       A   Right.
15       Q   So the purpose of being here today is to
16   understand your knowledge regarding the issues that
17   Ms. Van Hoek has raised in this lawsuit.  For the record,
18   because we have a court reporter here taking down the
19   official record of the proceedings, we need to use first
20   and last names to the extent that you know them; to try
21   to speak clearly and one at a time -- because the
22   acoustics don't seem terrible in this room -- but so she
23   can accurately take down your testimony; and to try to
24   verbalize your answers.  Head shakes or head nods are
25   difficult --
```

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Sherita Boyle (301-421-849-0649)
Electronically signed by Sherita Boyle (301-421-849-0649)
Electronically signed by Sherita Boyle (301-421-849-0649)

5c36c9a0-a3a8-4dab-8148-75d53af08603

Page 6

1    A   To register.
2    Q   Right.  That's all for the court reporter and
3   the transcript.  If you don't understand a question I've
4   asked, ask me to rephrase it.
5    A   Okay.
6    Q   We can take a break at any time.  I don't
7   anticipate we are going to be here long, but you can take
8   a break.  We can do that.  Ms. Van Hoek's attorney,
9   Mr. Helwig, may assert an objection.  Unless he instructs
10  you not to answer, you can go ahead and answer that
11  question.  These objections are just being made for the
12  purpose of the record.
13   A   Right.
14   Q   And if you do answer a question, I am going to
15  assume you heard and understood it and are providing your
16  best recollection.  Do you understand these ground rules?
17   A   Yup.
18   Q   Can you tell me where you are currently
19  employed?
20   A   Florida Medical Clinic.
21   Q   And what's your role at Florida Medical Clinic?
22   A   Purchasing manager.
23   Q   How long have you been employed in that role?
24   A   Thirteen and-a-half years, I guess.  In May of
25  next year, in it will be 14 years.

Page 7

1    Q   Who do you report to?
2    A   Tom O'Neil.
3    Q   What's his title?
4    A   He's the director of accounting.
5    Q   Do you know who he reports to?
6    A   Our CFO, Chris Alvarez.
7    Q   And who does the CFO report to, if you know?
8    A   Obviously, the CEO which is Joe Delatorre.
9    Q   Is there anything about your physical or mental
10  condition that prevents you from providing accurate and
11  reliable testimony?
12   A   Not that I'm aware.  I'm getting old, but
13  that's about it.
14   Q   Is there -- did you do anything to prepare for
15  your deposition here today?
16   A   I looked back, and after Kathryn had mentioned
17  this e-mail that was sent back in 2013, and that's the
18  only thing I've been able to find, basically, relating to
19  her representation for McKesson.  And actually, at the
20  time, it was in the transition between PSS and McKesson.
21  I guess McKesson was buying PSS, and they hadn't changed
22  the name over yet.
23   Q   I'm going to mark as Exhibit 2, the e-mail, I
24  believe, that you're referring to.
25   A   Right.

Page 8

1    Q   And this is the e-mail that starts, dated
2   May 30th, 2013?
3    A   Correct.
4       (Defendants' Exhibit 2 marked for
5       identification.)
6   BY MS. DYSON:
7    Q   And did you talk to Ms. Piscitelli related to
8   your deposition?
9    A   You mean as far as this deposition?
10   Q   Mm-hmm.
11   A   He had called after I talked to the lady in her
12  office, and basically she wanted to have a meeting.  I
13  said no.  There's probably no -- really a reason to have
14  a meeting.  We basically were going to be meeting with
15  yourselves at the same time, so that meeting -- I think I
16  felt was inappropriate before we had everybody in the
17  same room.
18   Q   Had you met with Ms. Piscitelli before?
19   A   Yeah.  Probably -- I'm not sure what the date
20  was, but -- Kathryn can answer that, but I think it was
21  probably a month ago, two months ago.  I'm not sure.
22  That was the first I was aware of activity going on as
23  far as any suits.
24   Q   Okay.  And what did you talk about with
25  Ms. Piscitelli?

Page 9

1    A   That's when she was talking about the case and
2   everything, and basically then she mentioned this letter
3   or e-mail I had sent.  So then, I looked at it and I said
4   that's one we sent back in 2013 because it's hard to
5   remember six years ago, any conversation.  But in seeing
6   it, I realized that is something we had sent.
7    Q   So she brought the e-mail, Exhibit 2, to your
8   attention?
9    A   Yeah.
10   Q   Did you talk about anything else in that
11  meeting?
12   A   Not really, just strictly the representation.
13  You know, the fact it's, you know, Florida Medical
14  Clinic.  Obviously, we work for Florida Medical Clinic.
15  We don't work for McKesson.  We're a customer, and my
16  concern was why is a customer being brought into
17  confrontation between employer and employee.  It didn't
18  make much sense, but that's why we're here.
19       MR. HELWIG: Excuse me.  Do you have a copy of
20  Exhibit 2 for me?
21       MS. DYSON: I don't.  He provided it.
22       THE WITNESS: You can have that one.
23       (Produces document.)
24       MR. HELWIG: Thank you.
25  BY MS. DYSON:

3  (Pages 6 to 9)

Electronically signed by Sherita Boyle (301-421-849-0649)
Electronically signed by Sherita Boyle (301-421-849-0649)
Electronically signed by Sherita Boyle (301-421-849-0649)                    5c36c9a0-a3a8-4dab-8148-75d53af08603

Page 10

1    Q   Exhibit 2 is what's being provided in response
2  to the subpoena we served.
3    A   Yes.
4    Q   And you don't have any other document in
5  response to the subpoena we served?
6    A   No.  That's the only thing that relates to the
7  representation.
8    Q   And do you have any documents of communication
9  between you and Ms. Piscitelli?
10    A   No.
11    Q   The meeting you had with Ms. Piscitelli, was it
12  an in-person meeting or by phone?
13    A   It was in person.
14    Q   And as a result of that meeting, did you
15  prepare any affidavits or declaration or written
16  statements?
17    A   No.
18    Q   And when you said that you discussed the
19  representation with Ms. Piscitelli, what exactly are you
20  talking about?
21    A   As far as -- according to the e-mail, basically
22  at that time, there was, obviously, changing over of the
23  ownership of PSS, which for years, Hilda was our
24  representative for PSS, and we wanted to keep that
25  consistency going forward once McKesson took over the

Page 11

1  business.
2    Q   And you're not aware of any other e-mails other
3  than the one, Exhibit 2?
4    A   That's the one I found, correct.
5    Q   And how many times did you talk to
6  Ms. Piscitelli?
7    A   Just the once when she came to our office and
8  once on the phone.
9    Q   And the time she came to your office about a
10  month, month and-a-half ago, was the first time you
11  learned there had been a lawsuit?
12    A   Yes.
13    Q   Do you have any personal knowledge about how
14  sales --
15      (Brief interruption.)
16      MS. DYSON:  Let's take a break.
17      (Recess taken.)
18  BY MS. DYSON:
19    Q   Mr. Steele, do you have any personal knowledge
20  regarding how many sales managers at McKesson or PSS made
21  an account assignment decision?
22    A   That's really none of my business other than we
23  make a recommendation, which obviously, it's a
24  recommendation.  It's not something that's, you know --
25  it's up to, obviously, McKesson or whoever to decide how

Page 12

1  they want their representation.  All we did was strictly
2  say this is who we like, not like, you know -- it's just
3  like if someone came to Florida Medical Center and said
4  "I don't want to talk to that person.  I only want to
5  talk to that person," as far as just a recommendation.
6    Q   So you don't know why decisions were made at
7  McKesson or PSS as it relates to Florida Medical Clinic
8  account; is that correct?
9      MR. HELWIG:  Object to form.
10      THE WITNESS:  No, not really.
11  BY MS. DYSON:
12    Q   Is it correct that you don't know the reason
13  why account assignment decisions were made?
14    A   That's really none of our business.
15      MR. HELWIG:  Object to form.
16  BY MS. DYSON:
17    Q   Did you have any discussions directly with
18  Ms. Van Hoek about this lawsuit or the claims she's
19  making?
20    A   No.
21    Q   And to address Mr. Helwig's form objection on
22  the last question, I'm going to rephrase it a little bit
23  differently for you.
24      Do you know why McKesson made account --
25  certain account assignment decisions related to Florida

Page 13

1  Medical Clinic?
2    A   No.
3    Q   Do you know why PSS made account assignment
4  decisions related to Florida Medical Clinic?
5    A   No.  Because all of these years, Hilda has been
6  our representation, so why would we change -- or why
7  would they change?  We don't really know other than --
8  you know, obviously, on McKesson's side or PSS's side,
9  that's their decision, and for them to have a persons
10  come out and, basically, represent their company.  So I
11  would assume that was, you know -- that was, you know,
12  left in their hands, not ours.
13      MS. DYSON:  I have no further questions.
14      MR. HELWIG:  Let's take a break for a minute.
15      (Recess taken.)
16      MR. HELWIG:  I'll mark this as Plaintiff's
17  Exhibit A.
18      (Plaintiff's Exhibit A marked for
19  identification.)
20          CROSS EXAMINATION
21  BY MR. HELWIG:
22    Q   I'm going to hand you Plaintiff's Exhibit A and
23  ask you to review it, and I'll direct your attention to
24  the second page.
25    A   I guess, what's your question?  This is

4 (Pages 10 to 13)

Electronically signed by Sherita Boyle (301-421-849-0649)
Electronically signed by Sherita Boyle (301-421-849-0649)
Electronically signed by Sherita Boyle (301-421-849-0649)

5c36c9a0-a3a8-4dab-8148-75d53af08603

Page 14

1    something Carlos had sent me back in 2013.
2       Q   Right. My question will be, looking at the
3    second page, there's a memo -- an e-mail from Mr. Xiques
4    to you on June 1st which would be two days after
5    Exhibit 2 which is May 30th?
6       A   Mm-hmm.
7       Q   And in the long second paragraph, the 4th line
8    you see where he says, "It's not out of the question to
9    think there will be practices acquired by FMC."
10      Medical practices, I am assuming. Am I right?
11      A   Right.
12      Q   "That are currently being serviced by another
13   PSS McKesson rep in the future." And he asks, "How would
14   you like to handle these situations when they arise?"
15      Did you receive this e-mail, as far as you can
16   recall?
17      A   I don't recall when I was looking back through
18   -- this is from Carlos. But the bottom line is that the
19   representation of another person is not really what we
20   had requested. We had requested Hilda and also
21   referenced Cyndie. Cyndie used to work with InfoLab.
22   InfoLab was purchased by PSS who then was purchased by
23   McKesson.
24      We had asked for Cyndie and Hilda to be our
25   representation, and that was the end of this. In terms

Page 15

1    of anybody else, we're not aware that they were part of
2    our representation, because the only ones that used to
3    come into the office was Cyndie and Hilda. And
4    basically, those were the ones that, basically, we would
5    correspond with in terms of orders, opening up new
6    accounts, pricing and any issues we had with our
7    accounts.
8       This Clint Brady that this is referencing, I
9    believe he's one of your representations for either PSS
10   or McKesson at the time, and he was -- I know we had some
11   issues, because, basically, we have a process we go
12   through in order to basically place orders, receive them,
13   create a P.O., and then receive an invoice and pay the
14   vendor.
15      Well, in some cases, Clint Brady was going in
16   our offices and basically, all of a sudden, we would get
17   a call from our accounting department, and they would
18   say, "I got an invoice but no P.O. attached to it, so we
19   can't process it." So it would slow down the process.
20   Now we got the office, we got purchasing, we got
21   accounting, and plus we're not paying the vendors invoice
22   because there's nothing to match it up against.
23      So that's why we had requested -- because Hilda
24   and Cyndie knew the process in terms of ordering, and
25   that's the only reason why we only -- not the only

Page 16

1    reason, but that was one of the main reasons we prefer to
2    have someone familiar with our system represent us.
3       And Clint, I'm not really sure -- I may have
4    met the gentlemen once. I wouldn't recognize him. But
5    as far as, I think he had attempted to place some orders
6    on his own, and so that's what -- we wanted to stop that
7    type of process because that obviously that created
8    issues on our side and I'm sure on McKesson's side
9    because we didn't pay the bill in a timely manner because
10   we had to take time to research it.
11      Q   Continuing with Exhibit A on first page, it
12   looks like Xiques sends you a follow-up e-mail on August
13   29th. Is that what this appears to be?
14      A   If it's e-mailed to me, it's probably true.
15   When I was looking through my e-mails, I didn't see this.
16      Q   And he says he hadn't heard back from you on
17   the question he raised back on June 1st; is that right?
18      A   That's what this says, yeah.
19      Q   You see there's an indent with a paragraph that
20   begins the No. 1, and you see where that is?
21      A   Right.
22      Q   The next paragraph on the bottom it says --
23   they are talking about a Dr. Marinelli. Is that --
24      A   Marinelli, he's one of the cardiologists.
25      Q   Was acquired by FMC, but had been serviced by

Page 17

1    another rep. In this case, Clint Brady?
2       A   We didn't -- every time we acquire a office or
3    whatever, we don't sit down and say, "Who's your
4    representation over the years." That's -- we bring
5    Florida Medical Clinic's, obviously, purchasing
6    department into play. Marinelli, maybe over the years he
7    may have been buying through Clint or whatever, but
8    obviously, once we take it over, purchasing takes it
9    over.
10      Hilda would be our representation, and whether
11   or not McKesson had someone else on that particular
12   account, I have no idea.
13      Q   Is that what you told Mr. Xiques in response
14   to Exhibit A?
15      A   That's what I'm telling you.
16      Q   Did you respond to Mr. Xiques?
17      A   That's -- I didn't see any response to this.
18      Q   Did you -- could you have responded in a phone
19   call or something?
20      MS. DYSON: Object to form.
21      THE WITNESS: I know we had phone conversations
22   with some representation with, you know,
23   representatives, but as far as writing anything
24   down, anything -- we're talking six years ago --
25   six, seven years ago.

5 (Pages 14 to 17)

Electronically signed by Sherita Boyle (301-421-849-0649)
Electronically signed by Sherita Boyle (301-421-849-0649)
Electronically signed by Sherita Boyle (301-421-849-0649)

5c36c9a0-a3a8-4dab-8148-75d53af08603

Page 18

1    BY MR. HELWIG:
2        Q   Did you communicate with Mr. Xiques about your
3    intention with respect to dealing with Mr. Brady?
4        A   Well, obviously, the e-mail from the 30th, I
5    would think, covers that.
6        Q   What was would that -- what were your
7    intentions with respect to dealing with Mr. Brady?
8            MS. DYSON: Object to the form.
9    BY MR. HELWIG:
10       Q   You can go ahead and answer.
11       A   My request was to have Hilda and Cyndie to be
12   our representation.  And you didn't see anybody else's
13   name on there, did you?
14       Q   So would you answer the question, please?
15           MS. DYSON:  Objection to the form of that
16       comment.
17           THE WITNESS:  I just did.  Our intent -- our
18       full intention was to have Hilda and Cyndie be our
19       representation.  And, basically, whether or not
20       McKesson or anybody else decided to do anything
21       different, that's not up us.
22   BY MR. HELWIG:
23       Q   And was your intention to have anyone else from
24   McKesson or PSS deal with --
25       A   No.  That's what we indicated here on May 30th.

Page 19

1    I'm not really sure why Carlos didn't refer back to this
2    original request.  Unless -- if he had any other
3    intention, then we didn't receive anything that things
4    were going to change other than my original request.
5        Q   Had Hilda dealt with FMC during the times she
6    was with PSS?
7        A   Yeah.  That's why I'm letting you know that
8    basically, over the years, Hilda was our representation
9    of PSS, and when things changed over, when McKesson was
10   purchasing these different companies, obviously, we
11   wanted to keep the consistency going forward.
12       Q   What's your best recollection of how long Hilda
13   dealt with FMC?
14       A   I have no idea.  I have been here 13 and-a-half
15   years, and I believe Hilda was our representative back
16   when I first started.  I think --
17           THE WITNESS:  Did you deal with Ken before me?
18       Yeah.
19   BY MR. HELWIG:
20       Q   Okay.  Was PSS or McKesson the primary provider
21   of medical supplies at FMC?
22       A   We have different suppliers, and PSS was a good
23   supplier because the one thing was that they were very
24   responsive.  They had their own trucks.  They provided,
25   you know, goods to us in a timely manner, which in the

Page 20

1    medical field, you can't wait six months to get product.
2    Obviously, they were, basically -- the same thing when
3    McKesson took them over, too.  They followed that same
4    tradition, basically, to have good response time and so
5    forth.
6            They have their own trucks, so you didn't have
7    to wait UPS or Fed Ex to make deliveries.  If you wanted
8    something rushed, they could take it from the warehouse
9    and put it on the truck and deliver it.
10       Q   At this time, did FMC maintain a bid list for
11   medical providers to provide supplies to the company?
12       A   Does that have anything to do with your suit?
13       Q   That's not for you to decide.  I need you to
14   answer the question.
15       A   A bid list, as far as we have representation.
16   We have different vendors we deal with.  As far as a bid
17   list, no.
18       Q   Does the company -- does FMC issue a request
19   for proposals for companies that want to provide medical
20   supplies?
21       A   As far as, like, the flu vaccines, once a year,
22   we basically send out a request to different companies to
23   provide us pricing.
24       Q   Did you send out requests -- during this time
25   in 2012, '13 request to PSS?

Page 21

1        A   I'm not sure if we did PSS back then.  We're
2    talking eight years ago, so I don't know.  I know that we
3    request, you know, to get -- basically with the flu
4    vaccines and so forth, it's not only price but
5    reimbursement and availability of the different vaccines
6    that are out there.  So we get requests from GSK as far
7    as pricing, Santa Fe, Henry Schein, McKesson, Besse.  And
8    probably -- I'm not sure if we got, back then, from PSS
9    any flu quotations.  That's too far back.
10       Q   Did Hilda make a request to you during this
11   time 2012, '13 for -- request for proposals or to be on
12   FMC's bid list?
13       A   Again, we're talking so many years ago.  We
14   have had thousands and thousands -- we have had
15   conversations over the years, but as far as requests at
16   that particular time, I can't answer that.
17       Q   Okay.  At any time?  At any time, did she
18   request to be on the bid list --
19           MS. DYSON:  Object to the form.
20   BY MR. HELWIG:
21       Q   -- or to receive a request for proposal?
22       A   Basically to be on a bid list, as far as I
23   know, we get requests from different, you know, salesmen
24   and so forth to basically provide a bid on particular
25   items which, over the years, we have gotten bids on

ANTHEM REPORTING, LLC
www.anthemreporting.com    |    888.909.2720    |    anthem@anthemreporting.com

Electronically signed by Sherita Boyle (301-421-849-0649)
Electronically signed by Sherita Boyle (301-421-849-0649)
Electronically signed by Sherita Boyle (301-421-849-0649)

5c36c9a0-a3a8-4dab-8148-75d53af08603

Page 22

1    different items, different products, and so forth.  But
2    as far as to be on a bid list, there is not really an
3    official bid list other than the fact that we do send out
4    requests for flu vaccines, or if there is something we
5    are seeking to buy, then we will send something out as a
6    request to a specific vendor.
7        Q    And during the time -- and again, we are
8    talking about 2012, 2013 leading up to the acquisition of
9    PSS by McKesson, did FMC send requests to proposals --
10   for proposals to Hilda for services or supplies?
11       MS. DYSON:  Object to the form.
12       THE WITNESS:  Did we send an official letter or
13   something --
14   BY MR. HELWIG:
15       Q    A request for proposal, a RFP.  Is something
16   that --
17       A    No.  We didn't send an official letter out to
18   Hilda saying, "Give me a bid on specific item."  All the
19   way back to 2012, I don't know.
20       Q    How would you obtain price quotes from a
21   company?
22       A    How would we obtain price quotes?  Phone calls
23   or a rep would come in.  We talk to them and tell them
24   this is what we're looking for, and then request them to,
25   basically, send us a particular price on a particular

Page 23

1    product.
2        Q    And one of the companies you were dealing with
3    is Henry Schein, correct?
4        A    That's one of our vendors, yes.
5        Q    Is it accurate to say there were the -- did the
6    largest amount of business with the company?
7        A    Well, Henry Schein and PSS and McKesson, Besse,
8    Medline, they are basically our main suppliers over the
9    years.  We have several suppliers, so Henry Schein as
10   lion's share of the business, and there's been a
11   relationship with Henry Schein over the years to,
12   basically, be our main supplier, and they've been -- just
13   like PSS, McKesson, they have been a good supplier of
14   product that we need in a timely manner.
15       Because like I said, in the medical field, you
16   can't wait for someone to, basically, get the product to
17   you after the fact.  You have to have it for the patients
18   right away.
19       Q    Did I understand you correctly that you say
20   that Henry Schein has the lion's share of your business?
21       MS. DYSON:  Object to the form.
22       THE WITNESS:  Yes.
23   BY MR. HELWIG:
24       Q    What's your best estimate of what percentage of
25   your business that lion's share would have been?

Page 24

1        A    I can't really throw a number out there.  It's
2    not going to be an accurate number.
3        Q    I'm not -- nobody expects you to have a precise
4    number, but an accurate estimate would be helpful if you
5    could have one?
6        MS. DYSON:  Object to the form.
7        THE WITNESS:  Probably 60 percent or better.
8    We break it up between the different vendors based
9    upon what our needs are.
10   BY MR. HELWIG:
11       Q    Do you --
12       A    I don't really see where this is going in terms
13   of the representation between Hilda and ourselves.
14       Q    Well, where it's going is, we are trying to
15   ascertain to what extent Hilda may have been compromised
16   with her ability to earn income and McKesson may have
17   been compromised by the company's attempting to push
18   other salespeople on FMC.  That's why we are asking this.
19       That's not a question to answer to your
20   question.
21       A    To push other salesmen onto our -- what do you
22   mean?
23       Q    Like from --
24       A    From McKesson?
25       Q    For example, Clint Brady.

Page 25

1        A    Which, again, Hilda was our main
2    representation, and as far as someone pushing someone
3    else onto us, obviously, that was not the case.
4        Q    They certainly tried to do it, didn't they?
5        A    I don't know as far as -- again, we had issues
6    -- again, I refer back to where we had offices basically
7    calling us, accounting calling us, telling us that we had
8    invoices, basically, that didn't have a P.O. on it, and
9    that was something Clint was involved in.
10       So, basically, we contacted Hilda and we
11   assumed that put a stop to it.
12       Q    Looking at Exhibit A a moment ago, would it be
13   accurate to say Mr. Xiques inquired as to whether he
14   could have Clint Brady deal with FMC on the Marinelli
15   account?
16       A    That's what this says, but as far as we we're
17   concerned, Hilda was the person supposed to be
18   representing us for the Marinelli account.
19       Q    Okay.  And do you remember if you responded to
20   the August 29th e-mail?
21       MS. DYSON:  Object to the form.
22       THE WITNESS:  Again, I don't remember seeing
23   anything.
24   BY MR. HELWIG:
25       Q    Do you remember responding to any inquiry from

7 (Pages 22 to 25)

Electronically signed by Sherita Boyle (301-421-849-0649)
Electronically signed by Sherita Boyle (301-421-849-0649)
Electronically signed by Sherita Boyle (301-421-849-0649)

5c36c9a0-a3a8-4dab-8148-75d53af08603

Page 26

1  Mr. Xiques about having Mr. Brady --
2      A   This was my --
3      Q   I would appreciate it if you would let me
4  finish.
5      A   This is my answer to your question.  This is
6  something that -- you don't have to answer it 15 times.
7          Basically, if it's -- you provided the
8  information back in May.  I told them, basically, this is
9  what we want, and basically -- I'm not sure how many
10 times we have to say it.  Hilda is our representation and
11 Cyndie is our representation for the lab.
12     Q   That's my question as well.  How many times do
13 you have to say it?
14     MS. DYSON:  Object to the form.
15 BY MR. HELWIG:
16     Q   Let me tell you why I'm asking this.  Because
17 your letter -- your e-mail that's May 30th, 2013, I think
18 we would agree is quite clear.
19     A   Yeah.  It's -- we're in business, basically --
20 we're not in business to, basically, get involved in
21 personal, or basically, employer-employee relationships
22 with any outside company.
23         We deal with Florida Medical Clinic, and we
24 felt the best representation was Hilda because,
25 basically, she knew our FMC culture and everything.  She

Page 27

1  knew basically what the needs of the company, and that's
2  the end of it.
3      Q   So what I'm asking you is, having made it
4  perfectly clear on May 30th, 2013, to Mr. Xiques that you
5  wanted to deal only with Hilda and Cyndie, how did you
6  respond when Xiques came back to you a few months later
7  in August of 2013 and says, "Don't you want to deal with
8  Clint Brady?
9          MS. DYSON:  Object to form.
10         THE WITNESS:  Well --
11 BY MR. HELWIG:
12     Q   Or do you want to --
13     A   I don't remember seeing this.
14     Q   But my question is, do you recall whether
15 Xiques came back to you after May 30th, 2013, about
16 having --
17     A   No, I don't.  If he did, it may have been a
18 phone conversation, but I don't remember that.  As far as
19 was there a change, not that I'm aware of.  Hilda is
20 still our rep right now.  Is that true or false?
21     Q   I am not sworn in for the purpose of a
22 deposition.
23     A   Is it true or false?
24     Q   We're not going to -- we are here to ask you
25 questions.  We're not going to -- I'm not sworn to

Page 28

1  testify, and I know you are frustrated by this.  We are
2  trying just to get some information.
3      A   I'm just trying to make it clear --
4      Q   We are trying to make this as painless as we
5  can.
6      A   I just want to make it clear that, basically,
7  the questions you're asking relates to her
8  representation, and we felt, over all these years, that,
9  basically, she was our representative.  If there is
10 anything different, then, obviously, that's not something
11 we're aware of.
12     Q   Was there not a time when McKesson put Clint
13 Brady in charge of the FMC account?
14     A   I have no idea.  That's something you would
15 have to tell us.
16     Q   So you were not informed?
17     A   No.
18     Q   And would you have agreed with that if that's
19 what they had done?
20         MS. DYSON:  Object to the form.
21         THE WITNESS:  No, because, like I said, we had
22     relationship with Hilda over the years with PSS, and
23     it goes back even beyond me as far as servicing our
24     account.
25 BY MR. HELWIG:

Page 29

1      Q   To your knowledge did Mr. Brady have a positive
2  business relationship with anyone at FMC?
3          MS. DYSON:  Object to form.
4          THE WITNESS:  Again, my conversation with Clint
5      Brady was very limited.  I have no idea.
6  BY MR. HELWIG:
7      Q   Did you have -- do you know from any source,
8  not Mr. Brady, but from any of the physicians or other
9  people who use the services or medical supplies, whether
10 Mr. Brady had been working with anyone else at FMC in a
11 positive way?
12         MS. DYSON:  Object to the form.
13         THE WITNESS:  Not that I'm aware of.  I wasn't
14     even aware he associated Marinelli when we took him
15     on.
16         MR. HELWIG:  One more exhibit to mark.  This is
17     going to be B.
18         (Plaintiff's Exhibit B marked for
19     identification.)
20 BY MR. HELWIG:
21     Q   Take all the time you want to review this.
22 What I'm going to direct your attention to is the second
23 page.  Just so you know, I'll be asking about the
24 paragraph that begins about a third of the way down.
25     A   Which one.

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Sherita Boyle (301-421-849-0649)
Electronically signed by Sherita Boyle (301-421-849-0649)
Electronically signed by Sherita Boyle (301-421-849-0649)

5c36c9a0-a3a8-4dab-8148-75d53af08603

Page 30

1    Q   The second page, a third of the way down.  It
2  begins, "Carlos," and that's what I'm going to be asking
3  you about.
4    A   Ask your question, I guess.
5    Q   You see this is an e-mail from Hilda to
6  Mr. Xiques?
7    A   Right.
8    Q   And she says, "I met up with Gary Steele from
9  FMC last Thursday, and he said that you had called and
10  has many concerns."  And then it says, you have a right
11  to assign whomever you wish to service FMC, which is what
12  I think you testified to here today.
13    A   Right.
14    Q   And then she quoted you as saying, "However, he
15  has the right to not do business with us as long as Clint
16  Brady is involved."
17        Is that correct that she quotes you saying
18  that?
19    A   Probably didn't say it in that form, but
20  basically -- it was probably at the time when, like I
21  said, we have a process of handling our accounts in terms
22  of the paperwork in order to pay vendors in a timely
23  manner.  And probably, at that particular point in time,
24  we had an invoice that didn't have a purchaser's number
25  on it, so basically, it was ordered without the knowledge

Page 31

1  of the purchasing department or the director for that
2  particular department.
3        And probably, that's why, you know, in
4  reference to Clint, that we prefer he was not involved
5  because of the fact that he probably overstepped his
6  bounds in terms of placing orders without going through
7  the purchasing department.
8    Q   Do I understand you correctly that she may not
9  have used the exact language --
10    A   Right.
11    Q   -- but she basically said words to that affect?
12        MS. DYSON: Object to the form.
13        THE WITNESS: Yes.
14  BY MR. HELWIG:
15    Q   Did you use words to that affect?
16        MS. DYSON: Object to the form.
17        THE WITNESS:  As far as using those particular
18    words, I don't think I was that blunt.
19  BY MR. HELWIG:
20    Q   What did you --
21    A   Again, as far as we referred to the fact that
22  if there was representation of anybody else other than
23  Hilda, then obviously we preferred that not to be the
24  case.
25    Q   Did you say that reference specifically to

Page 32

1  Clint Brady?
2    A   I never -- I probably talked -- over the years,
3  I talked to Clint maybe once or twice.  I've not really
4  had any purchase contact with Clint.
5    Q   You testified -- go ahead.
6    A   Other than, basically, we sent an e-mail back
7  and forth because there was a field surcharge issue we
8  had with them at one time, but that's, you know --
9  basically, reach out to Clint to say don't -- you're not
10  our representation?  No, we've never done that.
11    Q   So, I'm sorry.  So I understand your testimony,
12  you're saying you did not say "That you have a right not
13  to do business with us as long as Clint Brady is
14  involved."
15        MS. DYSON: Object to the form.
16  BY MR. HELWIG:
17    Q   Your testimony is you did not say?
18    A   I didn't say in that form, no.  Basically, we
19  would prefer not to have any other representation.  I
20  don't believe -- again, this is six, seven years ago to
21  basically to point out just one person.  It's our
22  representation -- again, we keep going around in circles
23  -- was Hilda.  Whey would we entertain, I guess, anybody
24  else?
25        I don't know if there is anybody else involved

Page 33

1  other than Clint and Hilda.  Was there any other
2  representation?  I don't know.
3    Q   Is it correct that you testified you have a
4  specific problem with Clint Brady going into one of the
5  offices?
6        MS. DYSON: Object to the form.
7        THE WITNESS:  Well, as far as in terms of the
8    handling of -- slowing down our process of basically
9    placing orders without our knowledge, then yeah, I
10    guess that would be an issue.
11  BY MR. HELWIG:
12    Q   And so did you give any specific instruction
13  about or take any position with regard to dealing with
14  Clint?
15        MS. DYSON: Object to form.
16        THE WITNESS:  Any issue we may have had with
17    him would first go through Hilda, basically, to find
18    out what happened and what's going on with it.  And
19    then, I guess customer service would point to the
20    fact it was not placed by anybody other than, you
21    know, Clint Brady.
22        So we, again, not prefer to have that done.
23    It's basically is not the way we handle it, because
24    basically each office is a company to itself.  They
25    are responsible for all their expenses and income.

ANTHEM REPORTING, LLC
www.anthemreporting.com  |  888.909.2720  |  anthem@anthemreporting.com

Electronically signed by Sherita Boyle (301-421-849-0649)
Electronically signed by Sherita Boyle (301-421-849-0649)
Electronically signed by Sherita Boyle (301-421-849-0649)

5c36c9a0-a3a8-4dab-8148-75d53af08603

Page 34

1    If the expenses have not been approved, the doctor
2    would not be happy to have a charge on something he
3    has not authorized.
4  BY MR. HELWIG:
5    Q   So do I understand that correctly that the
6  first person you would go to if something came up was
7  Hilda?
8    A   Was Hilda.
9    Q   She would know what you said about the
10 situation.
11   MS. DYSON:  Object to the form.
12   THE WITNESS:  Right.
13 BY MR. HELWIG:
14   Q   Would she know about what you said?  I asked in
15 different way.
16   A   I would assume so, yeah.
17   Q   Do you have an annual budget at FMC for medical
18 supplies?
19   A   No.
20   Q   How much does FMC spend on medical supplies?
21   A   Is that part of our interrogation, here?
22   Q   Yes.
23   MS. DYSON:  Let me clarify that we have a
24 confidentiality in this case.
25   THE WITNESS:  Yeah, that's not something

Page 36

1    break to see if we can finish up.
2    THE WITNESS:  That would be great.
3    (Recess taken.)
4  BY MR. HELWIG:
5    Q   A couple more question, and we're done unless
6  Ms. Dyson has questions.
7    Is it your job to make decisions about whom to
8  purchase various supplies from?
9    A   We make recommendations, and -- based upon
10 history, based upon availability, based upon price.  And
11 anything from a medical side, as far as, like, drugs and
12 so forth, that's -- we can make recommendation but it has
13 to come directly from the offices.
14   Q   Do you compare prices between one provider and
15 others?
16   A   Provider or vendor?
17   Q   Vendor.  I'll use your terminology.  Between
18 vendors?
19   A   We try to make comparisons, yes.
20   Q   Do you do that by obtaining -- how do you do
21 that?
22   A   Basically, we get a request for a particular
23 product, and then we're able to go online and basically
24 look at different prices based upon on a particular
25 vendor's website, and we can make a comparison.

Page 35

Page 37

1    Q   Going back to 2013, was that information
2  available online at that time?
3    A   Yes.
4    Q   Did you ever request vendors to submit a price
5  list to you?
6    A   A price list?
7    Q   Pricing information?
8    A   As far as that's what the online feature is.
9    Q   Do I understand you correctly to say, that you
10 would be the one who would proactively go online?  How
11 would that work?
12   MS. DYSON:  Object to form.
13   THE WITNESS:  Well, there's other people in the
14   purchasing department.  Our job is to basically find
15   the best source, so yes.
16 BY MR. HELWIG:
17   Q   So then my question is, if you were, for
18 example, trying to make decisions on whether to purchase
19 the flu vaccine, do you purchase the flu vaccine?
20   MS. DYSON:  Object to form.
21   THE WITNESS:  Yes.
22 BY MR. HELWIG:
23   Q   Would there be any time when you would ask a
24 vendor's flu vaccine to submit pricing to you?
25   MS. DYSON:  Object to form.

10 (Pages 34 to 37)

Electronically signed by Sherita Boyle (301-421-849-0649)
Electronically signed by Sherita Boyle (301-421-849-0649)
Electronically signed by Sherita Boyle (301-421-849-0649)                    5c36c9a0-a3a8-4dab-8148-75d53af08603

Page 38

1    THE WITNESS:  That's as far as you have to have
2 your flu vaccine, basically, pre-booked in order to
3 get in line, so you get your flu vaccines right
4 away.
5    So we request basically to have the pricing and
6 everything, like, around the first part of the year,
7 and then from that information, we look at the
8 different types of flu vaccine out there.  We look
9 at price, but we also look at reimbursement and we
10 look at all the stuff to see whether or not the
11 types of flu that was occurred in previous year to
12 see different strains we need to be looking at.
13    Like, for instance right now, we've always had
14 a brand that was egg-based.  And so now, we're
15 buying a cell-based vaccine which basically -- it
16 helps some of the people who have allergy and so
17 forth.  So we made the decision, basically, to move
18 a line sheer of our normal vaccines over to the
19 cell-based to take care of those patients verses the
20 egg-based.
21 BY MR. HELWIG:
22    Q   Is there more than one vendor providing the
23 cell-based vaccine?
24    A   Basically, Seqirus is the manufacture.  So
25 they're the only one providing that.

Page 39

1    Q   So with medical supplies such as tongue
2 depressors or anything like that, how do you make
3 decisions where the purchase those things?
4    MS. DYSON:  Object to the form.
5    THE WITNESS:  Well, again, we make the
6 comparison to see who has the best price for that
7 particular item.  And we belong to different buying
8 groups, which right now, Vizient is our main buying
9 group we belong to.  Their pricing is better than if
10 you went -- if you went online, yourself, and
11 basically looking at a particular product and didn't
12 belong to the buying group, your price would
13 probably be higher than what ours is.
14    So basically, that's another criteria that we
15 look at, whether or not they are part of the buying
16 group.
17 BY MR. HELWIG:
18    Q   So what does Vizient do for you?
19    A   They basically -- it's a -- they go to the
20 different manufacturers and also distributors, basically,
21 and provide a way for them to sell their product at a
22 discount price.  Because they're looking at presenting
23 volume to the manufacturers and in buying, and in turn,
24 the manufacturers give them a better price if they belong
25 to that particular group.

Page 40

1    Q   To your best recollection, how long has FMC
2 belonged to a buying group?
3    A   We were part of this buying group when I first
4 came.  And over the years, just like PSS, they have been
5 bought out by different buying groups over the years.
6    It's now Vizient.  When I first started it was
7 Broadlane and then it was MedAssets and now it's Vizient.
8    Q   Do you do all of your medical supply through
9 the buying group?
10    A   We try to, yes.  As long as it's listed as a
11 buying group's list.
12    Q   And is the list comprehensive of everything you
13 need?
14    A   In some cases, it is; some cases, you have to
15 search other sources.  But most of it is, yes.
16    Q   So is there occasions when you still go to
17 vendors to find out prices?
18    A   We basically have to go to vendors if it looks
19 like it's a price where we're going to be make any money
20 on it.  If it's something unique, we have to go to the
21 vendors and basically have them provide us further
22 details.
23    Q   And who makes the decision which vendors to
24 consider?
25    A   That's -- again, that's through the purchasing

Page 41

1 department.  We make that decision, yes.
2    Q   That is the department you're in charge of?
3    A   Yes.
4    MR. HELWIG:  Okay.  Thank you.
5    That's all I have.
6    MS. DYSON:  No further questions.
7    You have the opportunity, if the transcript is
8 typed up, to read it, to make any corrections to it.
9 Would you like the opportunity to reserve that
10 opportunity to do that?
11    THE WITNESS:  That would be good, yeah.
12    MS. DYSON:  We will take the transcript.
13    MR. HELWIG:  I will order a copy.
14    MS. PISCITELLI:  I would like a copy via
15 e-mail, please, Madam Court Reporter.
16    (Deposition concluded at 11:05 a.m.)
17    ---
18
19
20
21
22
23
24
25

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Sherita Boyle (301-421-849-0649)
Electronically signed by Sherita Boyle (301-421-849-0649)
Electronically signed by Sherita Boyle (301-421-849-0649)
5c36c9a0-a3a8-4dab-8148-75d53af08603

Page 42

CERTIFICATE OF OATH

STATE OF FLORIDA
COUNTY OF HILLSBOROUGH

I, SHERITA BOYLE, Court Reporter, Notary Public, State of Florida, certify that GARY STEELE personally appeared before me on October 11th, 2019, and was duly sworn.

Signed this 11th day of October, 2019.

_____
Sherita Boyle
Notary Public, State of Florida
Commission No: GG321251
Commission Expires: 04/08/2023

---

Page 44

ERRATA SHEET
DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES ON THIS PAGE
IN RE: Hilda VAN HOEK v McKESSON CORPORATION
DATE TAKEN: October 11, 2019
DEPONENT: GARY STEELE

PAGE    LINE    SHOULD BE:

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

DATE            GARY STEELE

---

Page 43

CERTIFICATE OF REPORTER

STATE OF FLORIDA
COUNTY OF HILLSBOROUGH

I, SHERITA BOYLE, Court Reporter, certify that I was authorized to and did stenographically report the examination under oath of GARY STEELE, Pages 1 through 41; that a review of the transcript was requested; and that the transcript is a true and accurate record of my stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

Dated this 16th day of October, 2019.

_____
Sherita Boyle
Court Reporter

---

Page 45

WITNESS NOTIFICATION LETTER
October 16, 2019
Gary Steele
c/o Sacha Dyson, Esq.
GrayRobinson, P.A.
401 East Jackson Street
Suite 2700
Tampa, Florida 33602
Sacha.dyson@gray-robinson.com
Re: Hilda Van Hoek v McKesson Corporation
    Deposition taken October 11th, 2019
    Anthem Job No.40053

The transcript in the above-referenced proceeding has been prepared and is now ready for your review. Please call to schedule an appointment between the hours of 9:00 a.m. and 5:00 p.m. Monday through Friday, at Anthem Reporting Services office located nearest you. If you are a party in this action and your attorney has ordered a transcript, you may wish to read his/her copy of the transcript. In that event, please execute the Errata Sheet, found at the back of the transcript, and return it to us for distribution. A self-addressed envelope is enclosed for your convenience.

Please complete your review within 30 days.

Very truly yours,

_____
Sherita Boyle
Court Reporter
Anthem Reporting Services
(888) 909-2720

CC via transcript:
Sacha Dyson, Esq.
Peter F. Helwig, Esq.
Kathryn Piscitelli, Esq.

12 (Pages 42 to 45)

Electronically signed by Sherita Boyle (301-421-849-0649)
Electronically signed by Sherita Boyle (301-421-849-0649)
Electronically signed by Sherita Boyle (301-421-849-0649)

5c36c9a0-a3a8-4dab-8148-75d53af08603