**HILDA VAN HOEK,**

      **Plaintiff,**

**v.**

                                        **Case No. 8:17-cv-2447-WFJ-AAS**

**MCKESSON CORPORATION, et al.**

      **Defendants.**                            **/**

**Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment**

By various intentional acts, including discriminatory assignment of new customer accounts and taking important accounts that van Hoek cultivates and giving them to males, Defendants have deprived her of thousands of dollars in income. While she was recognized by her sales manager as one of his top performers, her income is dramatically less than that of males, and is particularly dramatically less than that of Clint Brady, a male representative whom Defendants repeatedly favor over van Hoek in assignment of customers. Defendants' gender discrimination goes so far as transferring some of van Hoek's customers to males, while still requiring her to "service" the transferred accounts by helping the male reps' customers write up requisitions for supplies, putting in service orders for them, untangling billing disputes, including spending hours reviewing invoices, and making multiple telephone and email communications to follow up on their orders. According to Defendants' former Customer Service Manager, Defendants' sales operation is a "good old boys club" where males are favored over females in all aspects of employment.

Defendants Motion for Summary Judgment (Doc. 128) is due to be denied because there are genuine disputes as to material facts such that Defendants are not entitled to judgment as a matter of law. Rule 56(a), F.R.Civ.P. On such a motion, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 572 U.S.650, 651 (2014) (citation and internal quotation marks omitted). The Court's function is "not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." 572 U.S. at 656. (citation and internal quotation marks omitted).

## I.      Scope of Action Is Not Limited by Plaintiff's Deposition

Defendants assert that van Hoek's sex discrimination claim is limited to four customer assignment decisions which she described in her deposition, involving four customers: Florida Medical

Clinic, Access Health Care, Florida Hospital Physicians Group and Dr. Randolph Knight. (Dkt. 128 at 3). But in a footnote, Defendants admit that in her complaint van Hoek "generally alleged discrimination during her employment." (Dkt 128 at 3 n.3).

As to retaliation, Defendants argue that in her deposition testimony, van Hoek did not offer any "basis for or evidence to support her retaliation claim" other than the December, 2015 decision regarding the assignment of the Prime Care account. (Dkt. 128 at 3).

In her Declaration filed herewith, van Hoek alleges facts regarding discrimination and retaliation as to the above four customers and three other customers: Prime Care, an affiliate of Access Health Care; Tower Diagnostic and Neuspine. Declaration of Hilda van Hoek ("HvH Decl.") ¶¶113-120, 121-129 and 130-134). She further alleges that Defendants required her to continue to service the accounts of customers after their accounts were taken away from her, thereby infringing on time she could have spent cultivating new customers and servicing and selling to her own customers. (HvH Decl ¶¶84-86).

Binding authority from our circuit and the former Fifth Circuit holds that a party's inadvertent misstatement or failure to recall facts or instances included in her claims in a deposition is a matter going to credibility, to be assessed by the trier of fact at trial, and not by the Court on summary judgment.

In *Kennett-Murray Corp. v. Bone*, 622 F.2d 887 (5th Cir.1980), court former Fifth Circuit held that "[i]n considering a motion for summary judgment, a district court must consider all the evidence before it and cannot disregard a party's affidavit merely because it conflicts to some degree with an earlier deposition." *Id.* at 894.

 The issue turns on whether the affidavit/declaration constitutes a "sham," and "every discrepancy contained in an affidavit does not justify a district court's refusal to give credence to such evidence." *Id.* at 894, citing *Choudhry v. Jenkins*, 559 F.2d 1085, 1090 (7th Cir. 1977) (summary judgment was improper even though party's testimony was "not a paradigm of cogency or

persuasiveness," since it was not a "transparent sham"), *cert. denied sub. nom. Indiana v. Choudhry*, 434 U.S. 997 (1977). "In light of the jury's role in resolving questions of credibility, a district court should not reject the content of an affidavit even if it is at odds with statements made in an earlier deposition." *Bone*, 622 F.2d at 894.

In *Tippens v. Celotex Corp.*, 805 F.2d 949 (11th Cir.1986), the Eleventh Circuit applied *Bone* in reversing a decision which disregarded a plaintiff's affidavit as a "sham" and granted the employer's motion for summary judgment, holding that allowing "every failure of memory or variation in a witness' testimony to be disregarded as a sham would require far too much from lay witnesses and would deprive the trier of fact of the traditional opportunity to determine which point in time and with which words the witness (in this case, the affiant) was stating the truth." 805 F.2d at 954. Such defects in deposition testimony "create an issue of credibility as to which part of the testimony should be given the greatest weight if credited at all." *Id.*

The sham affidavit doctrine "is to be applied sparingly given the harsh effect it may have on a party's case." *Kilgore v. Titusville Development, Inc.*, 646 Fed.Appx. 765, 771 (11th Cir. 2016), citing *Litimer v. Roaring Toyz, Inc.* 601 F.3d 1224, 1237 (11th Cir. 2010). Specifically, its application should be limited to cases "where the conflicts between the deposition and affidavit raise only sham issues." *Lane v. Celotex Corp.*, 782 F.2d 1526, 1530 (11th Cir. 1986), citing *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1366 (8th Cir.1983). Among the common reasons which prompt permissible correction of deposition testimony by way of a declaration are that the deponent "may have been confused about what was being asked or have lacked immediate access to material documents." *Aka v. Washington Hospital Center*, 156 F.3d 1284, 1296 (n.14) (D.C. Cir. 1998) (*en banc*).

Van Hoek explains that she had never given a deposition before, was nervous and had difficulty focusing on giving complete, inclusive answers to questions such as those asking her to list all of her

claims and explain which facts went with which claim. (HvH Decl. ¶1) She struggled to focus on trying to remember everything, and did not have access to documentation which could have refreshed her recollection. *Id*.

With regard to retaliation, van Hoek did testify at her deposition that "Primecare is a perfect *example*, I feel, of retaliation." (Dkt 130 299:3-22) (emphasis added). When asked if there were other acts of retaliation, she responded, "There are a lot of things that happened. I - at the moment I just can't think of them." (Dkt.130, 319:10-16). She referenced adverse actions related to the FMC, Access Healthcare, Florida Medical Clinic and Primecare accounts. (Dkt. 130, 323:21 to 325:9). At the end of the deposition, McKesson's attorney asked whether van Hoek could provide any additional basis for or evidence of retaliation, and van Hoek answered, "not at the moment." (Dkt.–, 325:16-21).

In her declaration, van Hoek explains more fully her allegations regarding the FMC account, including retaliation by Regional Manager Darin Sharp for her complaint of discrimination as to the FMC account. (HvH Decl. ¶¶28-30). She explains that she had provided the specifics of her other retaliation claims in her responses to Defendants interrogatories (HvH Decl. ¶137), which were made an exhibit to her deposition. (Dkt. 30, Exhibit 87). These claims are addressed below.

## II.      Evidence of Discriminatory and Retaliatory Animus

In this two-page section of Defendants' brief they argue generally, without citation to the record, that they have treated van Hoek well and have not "disciplined, demoted suspended or terminated" her. (Dkt. 128 at 3-4). The evidence of what Defendants have done is taken up in detail, with citations to the record, in the pages that follow.

## III.  Plaintiff States a Claim of Discrimination

### A.      The Standard for Establishing Discrimination

McKesson argues that "in order to defeat this motion, [van Hoek] must satisfy the *McDonnell Douglas* burden-shifting analysis." (Dkt. 128 at page 5). This is incorrect. When faced with a defense motion for summary judgment, the plaintiff in an employment discrimination case "must make a sufficient factual showing to permit a reasonable jury to rule in her favor." *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, (11th Cir. 2019) (en banc)*. But "[s]he can do so in a variety of ways." *Lewis*, 918 F.3d at 1220 n.6. One way is to adduce evidence addressing the elements of the *McDonnell Douglas* framework, and another is to adduce evidence of a "'convincing mosaic' of circumstantial evidence that warrants an inference of intentional discrimination." *Id.* (citation omitted). Van Hoek establishes her prima facie case below under both theories of liability.

Once plaintiff has set out her prima facie case, the burden of production shifts to the employer to articulate its legitimate, nondiscriminatory reasons for its actions. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252 (1981). If the employer successfully makes this showing, the burden shifts back to the plaintiff to show that the articulated reason was a pretext for discrimination. *Burdine*, 450 U.S. at 256.

Defendants assert that in order to show pretext, van Hoek must show both that the McKesson's proffered reason for its action was false, and that discrimination was the real reason. (Dkt. 128 at 5-6). To the contrary, binding precedent holds that an employee can satisfy the *McDonnell Douglas* elements with just a prima facie case plus evidence that the employer's proffered reason is "unworthy of credence," such that discriminatory intent can be inferred. *Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 147( 2000), citing *Hicks v. St. Mary's Honor Center*, 509 U.S. 502, 511 (1993): "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."

Absent a finding that the employer's proffered reason is unworthy of credence, the employee may show pretext in a variety of ways, including evidence of the employer's treatment of similarly situated comparators, its treatment of the plaintiff throughout her employment, biased remarks by the decision-maker, its reaction to plaintiff's legitimate anti-discrimination activities, the employer's general policy and practice with respect to employment of members of the protected class, or evidence that its

proffered reason is "unworthy of credence." *Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 143, 152-53 (2000); *McDonnell Douglas*, 411 U.S. at 804-05.

In *Lewis, supra*, as here, the employer placed its reliance solely on the argument that the plaintiff had not shown that she had a triable claim under *McDonnell Douglas*. While sustaining the employer's argument on that point, the Court remanded the case for consideration of the plaintiff's "convincing mosaic" argument. 918 F.3d at 1231 and n.20. On remand, a panel of the Court of Appeals held that the employee had made a sufficient showing under the "convincing mosaic" approach to survive summary judgment on some of her claims. *Lewis v. City of Union City, Georgia*, 934 F.3d 1169, 1185 (11th Cir. 2019). In reaching this decision, the stated that even without similarly situated comparators, "a plaintiff will always survive summary judgment if he presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." 934 F.3d at 1185. A "convincing mosaic" may be shown by evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual. *Id.* (citations and internal quotation marks omitted).

## B. Defendants Discriminated Against van Hoek with respect to the Florida Medical Clinic Account

In 1994 van Hoek began employment with Physician Sales and Service, which was later acquired by the McKesson Defendants, as a medical supplies sales person, and is still so employed. (HvH Decl ¶¶1-2). In 2010 Carlos Xiques became her supervisor. (Dec. ¶19).

On November 27, 2012 Xiques emailed van Hoek stating that the Florida Medical Clinic (FMC) "bill-to" account will be taken away from her and given to a male rep, Clint Brady. (Dkt. 130, Exhibit 16). As Defendants state, the rep who owns the "bill-to" account of a customer is responsible for maintaining the customer relationship and managing the account. (Dkt. 128 at 10). She controls pricing and receives a share of commissions earned by "ship-to" reps who may serve some offices of the customer. *Id.* Any new office opened by the customer goes to the bill-to rep, unless it is already being served by a ship-to rep. *Id.*

Van Hoek had served FMC for over a dozen years, and had built a relationship of trust with FMC's purchasing manager, Gary Steele, who in 2012 invited her to submit a bid on behalf of Defendants for a larger share of FMC business, which was held by a competitor of Defendants. (HvH Decl. ¶¶20, 22).

The reason given by Xiques for giving the "bill to" account to Brady was that Brady "needed to provide a couple of prices that he promised them" and as a result, "Xiques informed Plaintiff that he needed to change the bill-to owner so that Brady could provide those prices." Defendants' SDF ¶23. But Xiques admitted in his deposition that he gave the account to Brady so that he could take it over and run with it; he "wanted to give another rep an opportunity to try to grow that business for the organization." (Xiques 46:2-21).

Both van Hoek and Steele, the FMC purchasing manager, objected strenuously to the change. Van Hoek emailed Xiques on December 1, 2012 objecting to the change and stating that Steele had already agreed to her request to put Defendants on the bid list for 2013 and to check back with him in January. (Dkt. 135, Ex. 2). Xiques admitted that Steele objected to having Brady on the account. (Dkt. 135, 47:19-25). However, Xiques kept Brady on the account despite Steele's objections. (Dkt. 135, 47:25 to 48:4).

Van Hoek appealed to Regional Manager Darin Sharp to return the account to her, but Sharp told her he was offended by her reference to a "good old boys" system and took no action. (Sharp 11:17 to 12:20, 56:19-23).

Brady was unsuccessful in earning any new business with FMC, and the opportunity that van Hoek had obtained, to submit a bid for a larger share of FMC's business, was lost. (Dkt. 135, 47:16 to 48:23). The bill-to account was restored to van Hoek in March of 2013, but van Hoek was still not made FMC's sole rep, as FMC had emphatically requested, and Brady kept some ship-to accounts. This resulted in a loss of potential business in the millions to Defendants and corresponding commissions to van Hoek. (HvH Decl. ¶23). The commissions paid to Brady on his FMC accounts are also losses to van Hoek. (HvH Decl ¶45). In addition, van Hoek is required to fully service Brady's FMC accounts which wastes time which could be spent on generating her own new business. (HvH Decl. ¶44).

Having failed to have Brady removed, FMC's Steele met in person with Xiques to reiterate his demand, as confirmed in his May 30, 2013 email to Xiques, in which he instructed Xiques that for "all PSS products we will deal with Hilda van Hoek and lab products we will deal with Cyndie Vigneau Info Lab only from your company. We will not entertain any other reps from your company at this time." (Dkt 135, Exhibit 6). Despite Steele's insistence that he would deal only with van Hoek, Xiques allowed Brady to keep his FMC ship-to accounts. (Dkt. 135, 73:18 to 74:21).

In March of 2016 a portion a medical practice identified as "Dr. Murphy Ortho," one of Brady's customers, was acquired by FMC, and Brady asked to be allowed to continue as the practice's rep. In an e-mail from Amy Boyes in its purchasing office, FMC stated "we do not want Clint on our accounts." (Dkt 130, Ex. 23). FMC contacted van Hoek and requested that she call on them and van Hoek, aware of Brady's request, brought the problem to the attention of her supervisor, Paul Jensen. *Id.* Despite FMC's instructions, the account was carved out of van Hoek's FMC portfolio and given to Brady. (HvH Decl ¶¶50-51).

Van Hoek establishes a *McDonnell Douglas* prima facie case by showing that (1) she is a female, (2) she was subjected to the adverse actions of being removed from the bill-to account, of being denied the role of sole rep, and losing sales to FMC and to its newly-acquired Ortho practice, (3) she is qualified for the job of selling to FMC, and (4) she was replaced by a man. The male comparator is Brady, who got her bill-to account. When the qualifications of the two are compared, only van Hoek has one of the most, if not the most, important qualifications – she is the only rep that the customer wanted on the account.

Defendants' proffered legitimate non-discriminatory reason for its action is that it wanted to give another rep a chance to work the FMC account and that Brady needed to be the bill-to rep so he could give FMC prices on a couple of potential sales.

Defendants' reasons are unworthy of credence. There is no evidence that van Hoek was doing anything less than an excellent job on the account, having just made the breakthrough of being invited to submit an RFP for increased business in the coming year.

Moreover, FMC made it clear that it was very satisfied with van Hoek's services and was strenuously opposed to dealing with her replacement, Clint Brady. Darin Sharp, a decision-maker in the decision to remove van Hoek from FMC's "bill to" account and the supervising manager over Xiques, testified that customer preference was the primary consideration in decision-making: "I just want to make this clear. We are not in the business of doing opposite what the customer asks." (Sharp 80:10-12). With specific reference to FMC, Sharp admitted that "when the customer puts their foot down and says, this is what I want, we do it without question. And that's not what happened here." (Sharp 33:24 to 34:1).

If a specific showing of pretext beyond the evidence that Defendants' reasons are unworthy of credence is needed, there is a bounty of such evidence.

Defendants' past treatment of van Hoek, including denying her request to participate in what turned out to be an all-male company golf outing in 2002 (HvH Decl. ¶16); removing her from an account and telling the customer that they would not have to worry about credit problems now that a man was handling the account in 2002 (Decl ¶15); and taking away a customer, Continue Care, that she had cultivated and giving it to the same man, Clint Brady, in 2009-10 (HvH Decl ¶18) is relevant evidence of pretext.

Defendant's operating as a "good old boys" club as attested by their former Customer Service Manager, who stated based on her own first-hand knowledge that disputed accounts in service areas covered by both a male and a female sales rep were "overwhelmingly" assigned to the male, (Meredeth 27:19-23, 48:4-24), is evidence of a discriminatory policy and practice with respect to treatment of women.

Regional Manager Sharp's hostile reaction to van Hoek's "legitimate anti-discrimination activity," where he told her he was offended, ended the discussion, and took no action to address the complaint (HvH Decl. ¶28; Sharp 11:17 to 12:20) is also evidence of pretext. Finally, the evidence that Defendants' rationale is not worth of credence, even if found not sufficient to obviate the need for a showing of pretext, is still a factor to be considered as evidence of pretext. *Burdine*, 450 U.S. at 256.

A "convincing mosaic" may be shown by evidence of such things as (1) suspicious timing, ambiguous statements and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual. *Lewis*, 934 F.3d at 1185.

As to the first factor, Van Hoek has identified material statements which are at best "ambiguous." Defendants claim that they took the "bill to" account away from van Hoek and gave it to Clint Brady because Brady "needed to provide a couple of prices that he promised them" and as a result, "Xiques informed Plaintiff that he needed to change the bill-to owner so that Brady could provide those prices." Defendants' SDF ¶23. In fact, Defendants took the account and gave it to Brady so that he could take it away from her and run with it. (Xiques 46:2-21). Van Hoek appealed to Sharp to return the account to her, but Sharp told her he was offended by her reference to a "good old boys" system and took no action, forcing van Hoek to take the matter to Human Resources. (Sharp 11:17 to 12:20, 56:19-23).

As to the second factor, former Customer Service Manager Meredith's testimony about the "good old boys" system is powerful evidence that Defendants systematically treated similarly situated males better than females. The fact that van Hoek was forced into a classic female "helper" role by being required to service males' accounts after they were taken from her further supports this inference.

As to the third and final factor, the evidence identified above as pretext evidence under the *McDonnell Douglas* framework applies and addresses this factor for purposes of the convincing mosaic analysis.

Defendants have some minor quibbles which, at most, produce disputed questions of fact. They state that FMC expressed a preference for two representatives, not one as van Hoek contends. (Dkt 128 at 7). FMC had a sister facility, Infolab, which maintained its own account with McKesson for lab supplies, which was handled by McKesson rep Cindy Vigneau. (HvH Decl. ¶¶38-39). This account and assignment was not a point of contention between FMC and McKesson, nor between van Hoek and McKesson, and is wholly irrelevant to the present case. (Dkt. 135, Ex. 6).

Defendants assert that van Hoek's only evidence of FMC's insistence on a single rep is hearsay, (Dkt. 128 at 7), but this does not rule out evidence such as the email from Gary Steele (Dkt. 135, Ex. 6), which is a hearsay exception under Rule 803(6), F.R.Evid.

In a footnote, Defendants state that "Steele testified that he made a request in May 2013 for two representatives, but that this was a just a preference." (Dkt. 128 at 6 n.4). Steele's request was made orally and confirmed in writing in an email to Xiques, and stated that for "all PSS products we will deal with Hilda van Hoek . . . We will not entertain any other reps from your company at this time." (Dkt 135, Exhibit 6). "We will not entertain any other reps from your company" is not "just a preference." Xiques testified that he could not recall any other occasion when he ignored even a customer "preference" such as this. (Dkt.135, 74:24 to 75:6)

Defendant states that the FMC account was not the only time they declined to honor a customer preference. (Dkt. 128 at 7). Indeed, they did it to van Hoek again in 2016, when Access Health requested her as its exclusive salesperson, and McKesson refused. The only other occasion Defendants identify is regarding Tower Diagnostic. In her declaration, van Hoek states that in or about January 2018 Jensen asked her if she would give up the bill-to account to a man, Mark Renville, and she agreed. (HvH Decl ¶121). Van Hoek retained 14 Tower Diagnostic accounts, but subsequently she attended a meeting where Tower asked that she relinquish two of them to Renville, and again she agreed. (HvH Decl ¶¶124-125). She retained the rest of her ship-to accounts and was never asked to relinquish them. (HvH Decl. ¶129). Rather than asking van Hoek to relinquish her bill-to account and two ship-to accounts as van Hoek states, Jensen states that Tower asked that van Hoek relinquish all of her accounts, and that Renville be its sole representative. As such, there is a genuine dispute of material fact on what Tower requested.

Defendants also claim that they did not honor FMC's request because it had not agreed to an exclusive purchasing agreement with Defendants. (Dkt. 128 at 7). This speculation is not persuasive

because (1) when another customer, Access Health, which did have an exclusive purchasing agreement with Defendants, requested that van Hoek be its sole McKesson representative, which would have required transfer of a male rep's bill-to accounts to van Hoek, Defendant refused to honor that request.; and (2) even if the requirement of an exclusive purchasing agreement had been consistently applied, Defendants offer no reasonable explanation as to why they would assign Brady, whom FMC's purchasing agent despised and refused to deal with, to deal with FMC in any way, much less as the "bill to" rep in charge of all FMC accounts.

Sharp testified that "when the customer puts their foot down and says, this is what I want, we do it without question. And that's not what happened here." (Sharp 33:24 to 34:1). The second sentence says it all – Defendants did not follow their firm policy of honoring FMC's wishes. If they had, they would have kept the "bill to" account with van Hoek and made her the sole representative holding all accounts, including Brady's ship-to accounts, as FMC demanded.

## C. Defendants Discriminated Against van Hoek on to the Access Health Care Account

Prior to McKesson's acquisition of PSS in 2013, van Hoek was the sole representative of PSS for Access Health Care's facilities on both coasts of Florida, having worked approximately 15 years to develop them. (HvH Decl. ¶54; Jimenez Decl. ¶¶2-5, 7). In that capacity she owned all the bill-to and ship-to accounts. *Id.*

In or about July of 2013 van Hoek learned that the Access east accounts were being taken away from her and given to a man, Craig Williams. (HvH Decl. ¶60). She complained to Xiques but the decision stood. (HvH Decl. ¶62). She was instructed to turn over to Williams all her pricing, contracts and information she had developed for those accounts. (HvH Decl. ¶63). After the east coast accounts were removed from her, van Hoek continued to be responsible for servicing those accounts for Craig Williams. (HvH Decl. ¶68).

Defendants state that as the bill-to owner of the Access account, van Hoek is responsible for the customer service and the client relations for accounts. (HvH Dkt. 128 at 10). Van Hoek agrees that the

bill-to owner is responsible for ensuring that customer service is maintained but not for the day-to-day hands-on work at the locations of the other reps' ship-to accounts such as are set out in her declaration. (HvH Decl. ¶¶84-88). Moreover, on accounts where van Hoek has only ship-to accounts and not the bill-to account, van Hoek, not the bill-to owner, does all the servicing of her ship-to sites. (HvH Decl ¶88).

On March 25, 2016 Access requested that all of its accounts be consolidated in one rep. (HvH Decl. ¶72; Dkt. 130, Ex. 35). Maria Jimenez, then the Operations Manager of Access, confirmed this request, including the fact the she requested that van Hoek be the single rep. (Jimenez Decl. ¶¶13-15). Van Hoek's manager, Paul Jensen, agreed to consolidate the Access accounts under one bill-to, but did not agree to a sole rep for the accounts; instead, there would be three reps: van Hoek, Williams and Laura Carmen. (HvH Decl. ¶73; Dkt. 135, Ex. 35). Van Hoek emailed Jensen on March 26, 2016, objecting to the refusal to make her the sole rep as the customer had requested, pointing out that sole rep status had been denied her in the case of FMC, with the explanation that FMC did not have an exclusive contract with Defendants, but Access did have an exclusive sales contract with Defendants. (HvH Decl. ¶74; Dkt. 130, Ex. 74).

Jimenez renewed her request to have van Hoek assigned to Access as its sole rep in an email to Jensen on July 20, 2016, (HvH Decl. ¶75; Dkt. 130, Ex. 37). In her declaration Jimenez confirms that she made this request to Jensen "on multiple occasions." (Jimenez Declaration ¶16). Jensen responded on July 20, 2016, stating that he would not change the current assignments, which were a bill-to rep (van Hoek) and multiple other reps, including Williams, with ship-to accounts. (HvH Decl. ¶77; Dkt. 130, Ex. 38).

On August 2, 2016 van Hoek emailed Jensen, with a copy to Defendants' HR representative, Felicia Bedford, objecting that "the unfair treatment of me as a Female Employee was continuing." (HvH Decl. ¶78; Dkt. 130, Ex. 41).

On August 4, 2016, Jimenez's Operations Coordinator, Regina Conner, requested that Access accounts be assigned to van Hoek "ASAP." (HvH Decl. ¶79; Dkt. 130,Ex. 42); Declaration of Regina Conner ¶¶1-3). She received an email response from Jensen requesting a phone conference with Conner and Jimenez. (Conner Declaration ¶4).

The conference call occurred on August 5, 2016. (Jimenez Decl. ¶17). Van Hoek was not included in the conference. (HvH Decl. ¶81). Jimenez and Conner repeated their requests that van Hoek be the sole rep for Access's east coast offices, stating that having multiple reps was inefficient and made it difficult to control costs and ensure a smooth flow of the business, that having additional reps was unnecessary and caused problems, and that van Hoek knew Access's business well and could handle all the account to their satisfaction. (Jimenez Decl. ¶18; Conner Decl. ¶¶5-6). Jensen was "very resistant and pushed back," refused to agree to make van Hoek their sole rep, and stated that having a sole rep would go against an agreement between Access and McKesson. (Conner Decl. ¶8); (Jimenez Decl. ¶¶19-20). Jimenez stated during the telephone conference and several times later that she would like to see this agreement but Jensen never produced it. (Jimenez Decl. ¶¶20-22).

After the conference call Jimenez contacted van Hoek and was upset. (HvH Decl. ¶81). She told van Hoek about Jensen's assertion that making van Hoek the sole rep would violate an agreement between Access and McKesson, but van Hoek was unaware of any such agreement. *Id.* Jimenez asked van Hoek to request a copy of the agreement, and van Hoek conveyed this request to Jensen. *Id.*; (Jimenez Decl ¶22). Jensen asked van Hoek why Jimenez wanted a copy of the contract, and she stated it was because Jensen had stated the contract prohibited van Hoek's being the sole rep. (HvH Decl. ¶82). Jensen replied, "Well maybe I misstated this." *Id.*

On August 23, 2016 Jimenez phoned van Hoek and stated that she felt her wishes were being disregarded by McKesson, and that Jensen was trying to manipulate her by saying sole representation was prohibited by some agreement. (HvH Decl. ¶ 89). Van Hoek told her that Jensen said maybe he misstated that. *Id.* Jimenez also stated that she did not trust Craig Williams and did not want him to visit any Access accounts or have contact with Access's east coast operations leader. (HvH Decl. ¶90). Van Hoek e-mailed this information to Jensen. (HvH Decl. ¶ 90 and Ex. K thereto).

On August 23, 2016 Jensen sent van Hoek a formal letter criticizing the "presentation, tone and messaging" in her above e-mail of August 23, 2016 and her e-mail of August 2, 2016, copied to HR, in which she complained of discrimination. (HvH Decl. ¶92; (Dkt. 130, Ex. 14). The letter stated that failure to "maintain a professional and respectful tone in all communications . . . may lead to disciplinary action."

(Dkt. 130, Ex. 14)

Defendants never granted Access's request to have van Hoek as its sole rep. (HvH Decl. ¶83). Van Hoek establishes a *McDonnell Douglas* prima facie case by showing that (1) she is a female, (2) she was subjected to the adverse action of Defendants' refusal to make her the sole rep for Access Health; (3) she is qualified for the job of selling to and serving as sole rep and (4) ship-to accounts that she would have held were instead given to a man.

When the qualifications for the job of handling those ship-to accounts are compared, only van Hoek has one of the most, if not the most, important qualifications – the custom wants her, and specifically does not want Williams, in the role.

The reason given by Jensen to van Hoek for refusing to make van Hoek the sole representative – that it would be contrary to an agreement between Access and McKesson – is unworthy of credence. When both van Hoek and Jimenez requested a copy of the agreement, no agreement was produced, and no such agreement has been produced in this litigation. Jensen's apparent discomfort with the question, and his admission that he may have misspoken, further supports the conclusion that there are genuine issues of material fact as to whether Jensen's proffered reason was untrue.

Defendants' assertion in its motion that it refused to make van Hoek the sole representative because, after the customer made that request on August 5, 2016, it did not make that request again (HvH Dkt. 128 at 9) is also unworthy of credence. Firstly, as shown above, Access had made numerous previous requests, on March 25, 2016, July 20 and August 4, 2016. Secondly, Regional Manager Sharp testified that he was on the August 5, 2016 conference call, but could not remember whether Jimenez was clear about wanting van Hoek to be Access's sole representative. (Sharp, 81:16 to 82:7). However, he testified that if the customer was clear, "if the customer said, We just want one rep and you're making this more complicated, there would not have been any discussion between Paul and I and Alex . . . usually when a customer wants one rep, they say, You're making it too hard for us, and so we do it." (Sharp

80:19-23, 81:9-11). The evidence is that Jimenez did clearly tell them she wanted one rep. The suggestion that Defendants did not make van Hoek the sole rep for Access because Access did not repeat its request more than four times is contradicted by Sharp's testimony and is unworthy of credence.

Thirdly, Defendants' actions with respect to Access Health are inconsistent with their rationale for refusing to make van Hoek the sole rep on FMC's medical supplies account because FMC did not have an exclusive agreement with Defendants.

Defendants did not follow their high priority of honoring customers' wishes in denying the Access's request that she be their sole rep. As in the case of the FMC account, a male rep was the beneficiary of the decision. Defendants' rationale for these decisions is unworthy of credence.

To the extent that the above evidence is found insufficient to create genuine issues of fact to support an "unworthy of credence" finding, it is also evidence of pretext. Taken with the generalized evidence of pretext identified in the discussion of the FMC account, including evidence of past discrimination against van Hoek, of operating like a "good old boys" club, and of hostile reactions to van Hoek' complaints of discrimination, there are genuine disputes of fact as to pretext.

In the alternative, the above factors establish the elements of a "convincing mosaic" of evidence of discrimination. In particular, Defendants' failure to follow their strong policy of honoring customer preference, the inconsistency between Defendants' rationale for denying sole rep status in the FMC and Access matters based on whether the customer had an exclusive contract with McKesson, Defendant's hostile reaction to van Hoek's complaining of discrimination, and decision-maker Jensen's disingenuous invocation of a non-existent contract to justify his decision all support this convincing mosaic of discrimination.

## D. Defendants Discriminated Against van Hoek with respect to the FHPG Account

Van Hoek already had a well-established relationship with Florida Hospital Physicians Group

(FHPG), handling its accounts in Hillsborough and Pasco Counties, when FHPG opened offices in Pinellas County and its representative, Cheryl Schmidt, informed Defendants that FHPG wanted her to handle all of its accounts for all three counties. (HvH Decl. ¶¶93-95; Dkt. 130, Ex. 65). However, Xiques assigned the Pinellas County account to Clint Brady, and Schmidt objected on February 24, 2014, reiterating that FHPG wanted van Hoek to be its sole rep. (HvH Decl. ¶ 96; Dkt. 130, Ex. 65). Jensen and Xiques decided that Brady would keep the account and any future Pinellas accounts of FHPG. (Dkt. 130, Ex. 67).

The legal analysis and general supporting evidence set out in connection with the FMC and Access accounts above applies here as well. As in the cases of the FMC and Access accounts above, van Hoek was the more qualified of the two candidates because she met the most important qualification – the customer wanted her and did not want Brady.

**E. Defendants Discriminated Against van Hoek with respect to the Dr. Knight Account**

Van Hoek was Dr. Knight's rep for about 15 years when he had his own practice in Zephyrhills. (HvH Decl. ¶100). Then Dr. Knight joined FHPG but Van Hoek had that account as well and continued serve Dr. Knight. *Id.* Then in March of 2014, Dr. Knight left FHPG, re-established his own office in Zephyrhills, and continued to do business with McKesson through van Hoek. (HvH Decl. ¶101). Shortly thereafter, Carlos Xiques assigned a man, Clint Brady, to handle the account. Dr. Knight's representative, Lisa DeLong, told van Hoek that Xiques had told her that Brady was the only rep available to serve customers in Zephyrhills. (HvH Decl. ¶103; Dkt.130, Ex. 72). This was untrue, as van Hoek had several accounts in Zephyrhills at the time. (Decl. ¶104).

DeLong emailed van Hoek on August 20, 2014, and asked her to forward the e-mail to Xiques and Jensen. In the email DeLong objected to having Brady as her rep, stating that "we have been very unhappy with Clint since the beginning and have even had to go above him a few times to speak with his

boss, Carlos. Working with Clint has been nothing but a hassle since day one and we would like to know what we need to do for Hilda van Hoek to be assigned as our rep instead." (Dkt.130, Ex. 72). Customer Service Manager Leisa Meredith, who was responsible for distributing accounts to the sales managers, informed van Hoek that the account was set up for her on March 12, 2014 but had later been de-activated and replaced with an account for Clint Brady on April 2, 2014. (HvH Decl., Ex. L). Meredith concluded that the second account should never have been set up with Brady as the rep. and was "BS." (HvH Decl. ¶107 and attached Ex. M). Van Hoek passed this information to Jensen. (Decl. ¶108; Dkt. 130, Ex. 74). When no action was taken by Jensen, van Hoek e-mailed Xiques on September 10, 2014 asking that the account be restored to her. (HvH Decl. ¶110). Jensen replied that Xiques would call DeLong but van Hoek must have no further contact with any of Dr. Knight's representatives. (HvH Decl. ¶111 and attached Ex. N). On November 6, 2014 Jensen informed van Hoek that the account would stay with Brady. (HvH Decl. ¶112; Dkt. 130, Ex. 73).

The analysis here is the same as in the previous cases. Van Hoek was more qualified than her comparator because she alone met the most important qualification for the job – the customer wanted her and emphatically did not want the man, Brady. Even after van Hoek, the customer, and Defendants' own Customer Service Representative showed that the assignment was made in error, Defendants were so committed to favoring the man over van Hoek that they refused to correct the obvious error.

## IV. Plaintiff States a Claim of Retaliation

To establish a prima facie case of retaliation, Plaintiff must show that (1) she engaged in protected activity, (2) she suffered an action which a reasonable employee would have found to be materially adverse, in that it might well have dissuaded her from making or supporting a charge of discrimination, and (3) there is a causal connection between the two events. *Burlington Northern & Santa Fe Railway Co. v. White*, 458 U.S. 53, 68 (2006). Close temporal proximity between the protected activity and the

adverse action is strong evidence of a causal connection between the two. *Shannon v. BellSouth Communications*, 292 F.3d 712, 715 (11th Cir. 2002).

The Eleventh Circuit has held that a causal relationship will be found even after a long time period between the protected act and the adverse action where those events are temporally linked by a series of retaliatory events. *Wideman v. Wal–Mart Stores*, 141 F.3d 1453 (11th Cir.1998); *Bass v. Board of County Commissioners*, 256 F.3d 1095, 1119 (11th Cir. 2001) (causation is not defeated by a lack of temporal proximity of a particular retaliatory action, where the initial retaliatory acts began shortly after the protected activity).

Van Hoek engaged in protected activity via her December 11, 2012, complaint to General Manager Darin Sharp that she lost the FMC bill-to account due to the "good old boy" system; her December 27, 201,2 EEOC charge to which Defendants responded on March 4, 2013; her February 13, 2013 and April 18 2013 complaints to Human Resources that Defendants refused to make her the sole rep on the FMC account; her attorney's letter of September 4, 2014, raising complaints of discrimination regarding the FMC, Knight and FHPG accounts; the filing of this lawsuit on December 12, 2014, in Thirteenth Circuit Court; the filing of a second EEOC charge on July 31, 2015; and her August 22, 2016, email to Jensen and HR, alleging that the refusal to grant her sole rep status in the Access and FMC accounts reflects a "double standard" and is unfair to her as a woman. (Dkt. 130, Ex. 41).

Defendants' initial retaliatory action occurred in the same conference call where van Hoek told Sharp that Defendant took the FMC bill-to account from her as part of the "good old boy" system. The retaliation came swiftly, in close temporal proximity to the complaint: during the conference, Sharp blew up at her, stated he was offended by the allegation, terminated the conference and failed to take any action on the complaint. *Id.* After this, Defendants went out of their way to retaliate against van Hoek, including: Refusing to restore the FMC bill-to account to her in February of 2013. (HvH Decl. ¶¶32-33). Refusing

to make van Hoek the sole rep for FMC as requested in April of 2013 by FMC. (HvH Decl. ¶¶38, 41). Taking away her east coast Access Health Care Accounts and giving them to Craig Williams in early 2013 while requiring her to retain the burden of servicing those accounts. (HvH Decl. ¶¶52-67). Refusing FMC's renewed request on May 30, 2013 for van Hoek to be its sole representative. (Dkt. 135, Ex. 6, page 2). Refusing FMC's written request on October 10, 2014 for van Hoek to be its sole representative. (Dkt. 135, Ex. 6, pages 1-2) In December 2015 taking away the Prime Care account, on which van Hoek put in much work to generate the new account (HvH Decl. ¶¶113-120 and Dkt.130, Ex. 81), and giving it to Laura Carmen who, unlike van Hoek, had not engaged in protected activity. (Sharp 83:6-10). Refusal of FMC's renewed request in March of 2016 for van Hoek to be its sole representative and requiring her to continue to service other reps' ship-to accounts. Refusal to make van Hoek the sole representative for Access Health, as the customer requested on March 25, 2016. Taking an FMC account away from van Hoek and giving it to Clint Brady in 2016, contrary to the customer's strongly expressed directions, and requiring van Hoek to continue to service the account. Taking away the Neuspine account, which van Hoek had signed up in January of 2019, and with which she had made sales in every month until on August 1, 2019. Jensen took away her bill-to role, stating it was because another rep had opened the account more than a year previous year, even though he had made no sales on the account. (HvH Decl ¶¶130-134). Jensen's giving van Hoek a written reprimand for her August 2, 2016 email to him and HR complaining of sex discrimination in the decisions to deny her sole rep status, stating that the complaint was not made in a "respectful, professional manner," and threatening future disciplinary action. (Dkt.130, Ex. 14). This series of retaliatory events permits the inference that the string of events is causally connected to van Hoek's protected activity.

## V. Plaintiff Satisfied the Procedural Prerequisites for Her Claims

### A. Plaintiff Satisfied the Charge-Filing Requirement

Administrative exhaustion is not necessarily as rigid as Defendants argue. Acts of discrimination occurring after the filing of an administrative charge are actionable if they "can reasonably be expected to grow out of the charge of discrimination." *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir. 1970). New acts occurring during the pendency of an administrative charge would be an example. *Ward v. Florida Dep't of Juvenile Justice*, 212 F.Supp.2d 1349 (N.D. Fla. 2002) (citing *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1409 (10th Cir. 1997). Further incidents of discrimination carried out in the same manner are another example. *Butts v. City of New York Dept of Hous. Pres. & Dev.*, 990 F.2d 1397, 1402-03 (2d Cir. 1993). Post-charge retaliation also can qualify. *Gupta v. East Texas State Univ.*, 654 F.2d 411 (5th Cir. Unit A Aug. 1981) (holding that "it is unnecessary for a plaintiff to exhaust administrative remedies prior to urging a retaliation claim growing out of an earlier charge; the district court has ancillary jurisdiction to hear such a claim when it grows out of an administrative charge that is properly before the court"). *See Baker v. Buckeye Cellulose*, 856 F.2d 167 (11th Cir. 1988).

Moreover, Title VII, as amended by the Lily Ledbettter Fair Pay Act, codified at 42 U.S.C. § 2000e-5e(3)(B), provides that "an unlawful employment practice occurs . . . when an individual is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice." Consequently, "each time an employee receives compensation, such as a paycheck or benefits, that has been affected by the application of a discriminatory compensation decision, a new charging period is triggered within which the employee may file a claim with the EEOC." *Wakefield v. Cordis Corp.*, 2009 WL 10701260, at *8 (S.D. Fla. 2009). *See, e.g., Bush v. Orange County Corrections Dept.*, 597 F.Supp.2d 1293, 1296 (M.D. Fla. 2009) (claims alleging discriminatory promotion occurring 16 years earlier timely under Ledbetter Act); *Gertskis v. New York City Dept. of Health and Mental Hygiene*, 2009 WL 812263, at *4 (S.D. NY 2009) (claims alleging plaintiff received inadequate compensation due

to discriminatory promotions timely under Ledbetter Act).

Here, there is no dispute regarding the filing of a charge on the December 2012 decision to take the FMC billing account and give it to Brady. As to the refusal to comply with FMC's demand made in May 2013 that Plaintiff, rather than Brady, service its account was a new act of discrimination (and retaliation) that during the pendency of Plaintiff's EEOC charge, plus since then, with each paycheck, results in lost compensation for Plaintiff. The compensation loss is redoubled in that Plaintiff performs the work on Brady's FMC ship-to accounts, but is not credited for commissions. Plaintiff included the failure to comply with FMC's requests (which continued) was included in Plaintiff's second EEOC charge (*See* HvH Decl. Depo. Ex. S; Statement of Disputed Facts ("SDF") ¶ 107), and thus was timely, not only as to the November refusal to comply with FMC's request but, also, as to the refusals starting in 2013. The same holds true as to the taking away in 2013 of Plaintiff's Access east-coast accounts and giving them to Williams: this was a new act of discrimination similar to that alleged in the 2012 EEOC charge that occurred during the pendency of the charge; it has affected Plaintiff's compensation since then, redoubled by Plaintiff's performance of the work without compensation on Williams' Access ship-to accounts; and Plaintiff included it in her second EEOC charge. (*Id.*) Regarding the failure to grant FHPG's request for Plaintiff to be the sole representative, this too resulted in a continuing compensation loss for Plaintiff (up until April 2016), redoubled with Plaintiff's performing the work on Brady's FHPG accounts denied to Plaintiff; and Plaintiff included this in her second EEOC charge. (*Id.*) With respect to the taking of the Knight account from Plaintiff and giving it to Brady, Plaintiff did not learn about it until approximately August 19, 2014; and the decision to let Brady keep the account was made in November 2014. Plaintiff's second EEOC charge included the loss of the Knight account (*id.*); and the charge was filed with the EEOC within 300 days of the November 2014 decision.

### B. Plaintiff's FCRA Claims Are Not Barred

As explained above, Plaintiff filed charges of discrimination on all her claims. Defendants' err in contending that Plaintiff's FCRA claims must be dismissed because some of the allegations included in her charges appeared in Plaintiff's court pleadings in the lawsuit prior to the filing of the charges. It is well established that premature filing of FCRA claims does not divest the FCHR of authority to process charges alleging the claims nor require dismissal by the court in which the claims have been prematurely filed. *See Webb v. Worldwide Flight Service, Inc.,* 407 F.3d 1192, 1194-5 (11th 2005) (citing and quoting *Jackson v. Worldwide Flight Services, Inc.*, 960 So.2d 3 (Fla. 3d DCA 2005)); *Sheridan v. State, Dept. of Health*, 182 So.3d 787, 795 (Fla. 1st DCA 2016) (passage of time cured premature filing of FCRA lawsuit).

Defendants are wrong that the December 2016 no-cause determination bars Plaintiff's claims. With the exception of the August 2016 denial of Access's demands that Plaintiff be the sole representative for its accounts, Plaintiff expressly included in her second charge all of the post-2012 instances of discrimination she is alleging in this lawsuit more than 180 days before the no-cause determination. (HvH Decl. Depo. Ex. S; SDF ¶ 107.) The August 2016 discrimination regarding Access, however, arose out of and was another facet of the Access discrimination that started in 2013 and was before the FCHR more than 180 days before the no-cause determination. The Florida Supreme Court has determined that whenever the FCHR issues such a no-cause determination more than 180 days after the claimant filed his or her discrimination charge, the claimant may proceed to file a lawsuit and thus need not request an administrative hearing. *Woodham v. Blue Cross & Blue Shield of Florida, Inc.*, 829 So. 2d 891, 897–99 (Fla. 2002); *Bach v. United Parcel Serv., Inc.*, 837 So. 2d 395 (Fla. 2002). Moreover, the FCHR had no authority under the FCRA to rescind its cause finding after issuing and reopen the case.

Contrary to Defendants' representations, Plaintiff did not conceal her lawsuit from the FCHR. (Ex. 20.) Nor did she make any representation that she did not wish to file a lawsuit on her claims by

signing the 180-day "election" notice. Nor did she make a claim inconsistent with a claim in a previous proceeding. Furthermore, the FCHR had no authority under the Act to submit the election notice to Plaintiff. Indeed, if Plaintiff had not signed, FCHR would have been obliged to complete its investigation.

### C. Plaintiff's Title VII Claims Are Not Barred

Defendants' err in asserting that Plaintiff failed to file her Title VII claims within 90 days of receiving the right to sue notice. Plaintiff filed 87 days after receiving the notice, she filed her unopposed motion to amend her complaint to include claims under Title VII and she filed and served with it her third amended complaint. (SDF ¶ 120.) Defense counsel cooperated with the undersigned in preparing an agreed proposed order. (*Id.*) The court granted Plaintiff's motion on September 18, 2017. Under Florida law, if a motion to amend a complaint is granted, the date of filing the motion to amend is the date of filing the amended complaint for statutes of limitations purposes. *Totura & Co. v. Williams*, 754 So.2d 671 (Fla.2000). "This is true even when the statute of limitation has run in the interim." *Leavitt Communs. v. Quality Comms. of Amer., Inc.*, 939 So.2d 257 (Fla. 1st DCA 2006). In any event, Plaintiff literally filed pleading on Aug. 14, 2017, and, as shown in the certificate of service and electronic filing stamp, served on the two defendants already under the court's jurisdiction. Moreover, there was nothing improper in Plaintiff's moving to amend her pleading. Florida R. Civ. P. 1.190(a) provides that may "a party may amend a pleading only by leave of court or by written consent of the adverse party." Plaintiff had both; the rule does not require a party to make an election. Further, Rule 1.190(d) indicates that a motion is required to file supplemental pleadings. The third amended complaint added events occurring after the second amended complaint and thus was a supplemental pleading. It also added two defendants.

Contrary to Defendants' contentions, FHPG was identified in Plaintiff's charge. (SDF ¶ 116.)

### D. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment should be denied.

Dated: December 10, 2019                       Respectfully submitted,

**/s/ Kathryn S. Piscitelli**
Kathryn S. Piscitelli
Florida Bar No. 368598
P.O. Box 691166
Orlando, FL 32869-1166
Phone: (407) 491-0143
Email: kpiscitelli1@cfl.rr.com
Secondary email: kpiscitelli2@gmail.com

**/s/ Peter F. Helwig**
Peter F. Helwig
Florida Bar No. 0588113
HARRIS & HELWIG, P.A.
6700 South Florida Avenue, Suite 31
Lakeland, Florida 33813
Phone: (863) 648-2958
Email: pfhelwig@tampabay.rr.com

**Attorneys for Plaintiff**