Hilda Klausina Maria Cornelia Van Hoek
July 12, 2019

Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

HILDA VAN HOEK,

        Plaintiff,

                                        Case No.:
-vs-                                8:17-cv-02447-T-36AAS

MCKESSON CORPORATION, a
foreign corporation, PSS
WORLD MEDICAL, INC., a
Florida corporation,
MCKESSON MEDICAL-SURGICAL
INC., a foreign corporation,
MCKESSON MEDICAL-SURGICAL
TOP HOLDINGS, INC., a
Florida corporation,

        Defendants.
_____/


DEPOSITION OF:   HILDA KLAUSINA MARIA CORNELIA VAN HOEK
DATE:            Friday, July 12, 2019
TIME:            9:05 a.m. to 11:38 a.m.
PLACE:           U.S. Legal Support
                 Suite 1775
                 201 North Franklin Street
                 Tampa, Florida 33602

REPORTED BY:     Shelly Noriega
                 Registered Professional Reporter

                 Pages 1 - 97

bfeb07dc-7a36-458f-8d44-dd5b10fc250€

Hilda Klausina Maria Cornelia Van Hoek
July 12, 2019

---

**Page 2**

1    APPEARANCES:
2    On Behalf of the Plaintiff:
3      PETER F. HELWIG, ESQUIRE
       Harris & Helwig, P.A.
4      Suite 31
       6700 South Florida Avenue
5      Lakeland, Florida 33813
       Pfhelwig@tampabay.rr.com
6
       KATHRYN S. PISCITELLI, ESQUIRE (By telephone)
7      P.O. Box 691166
       Orlando, Florida 32869
8      Kpiscitelli1@cfl.rr.com
9
10
       On Behalf of the Defendant:
11
       SACHA DYSON, ESQUIRE
12     GrayRobinson, P.A.
       Suite 2700
13     401 East Jackson Street
       Tampa, Florida 33602
14     Sacha.dyson@gray-robinson.com
15
16
17   ALSO PRESENT:
18     Paul Jensen, McKesson Corporation
19
20
21
22
23
24
25

---

**Page 3**

1              I N D E X
2    TESTIMONY OF
     HILDA KLAUSINA CORNELIA VAN HOEK
3                         PAGE
       Direct Examination by Ms. Dyson...   5
4
5
       CERTIFICATE OF OATH.....................   96
6      CERTIFICATE OF REPORTER..............   97
7
8
              E X H I B I T S
9
     Exhibit Number           Page
10   Exhibit 1
       Charge of discrimination.............   20
11
     Exhibit 2
12     Dismissal..........................   25
13   Exhibit 3
       Charge of discrimination.............   27
14
     Exhibit 4
15     9/7/18 Letter.......................   29
16   Exhibit 5
       Election of rights form.............   31
17
     Exhibit 6
18     8/31/16 Letter......................   32
19   Exhibit 7
       Determination.......................   34
20
     Exhibit 8
21     Notice of determination.............   35
22   Exhibit 9
       Dismissal and notice of rights.......   37
23
     Exhibit 10
24     USPS tracking form...................   39
25

---

**Page 4**

1
       (Exhibits continued)
2
       Exhibit 11
3        8/7/17 E-mail......................   39
4      Exhibit 12
         8/14/17 E-mail....................   40
5
       Exhibit 13
6        Third Amended Complaint.............   42
7      Exhibit 14
         9/9/16 Letter......................   46
8
       Exhibit 15
9        Confidentiality agreement...........   49
10     Exhibit 16
         12/1/12 E-mail.....................   78
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 5**

1        Deposition taken before Shelly Noriega, RPR, and
2    Notary Public, in and for the State of Florida at Large
3    in the above cause.
4          - - - - - - -
5        THE COURT REPORTER:  Do you swear or affirm
6    the testimony you're about to give is the truth, the
7    whole truth, and nothing but the truth?
8        THE WITNESS:  I do.
9        HILDA KLAUSINA MARIA CORNELIA VAN HOEK,
10   having been first duly sworn, was examined and testified
11   upon her oath as follows:
12          DIRECT EXAMINATION
13   BY MS. DYSON:
14      Q.  Good morning.  Can you state your name for the
15   record, please.
16      A.  My whole name?
17      Q.  Your whole name, yeah.
18      A.  Hilda Klausina Maria Cornelia van Hoek.
19      Q.  Okay.  You probably need to spell some of that
20   for the reporter when we're on a break.
21      A.  Okay.  Legally it's Hilda van Hoek.
22      Q.  Good morning, Ms. van Hoek.  My name is Sacha
23   Dyson.  I think you know me.  We've been in the same
24   room together before.
25      A.  We have.

U.S. LEGAL SUPPORT
www.uslegalsupport.com

bfeb07dc-7a36-458f-8d44-dd5b10fc2506

Hilda Klausina Maria Cornelia Van Hoek
July 12, 2019

Page 6

1    Q. I represent the defendants in this lawsuit that
2  you've brought. Have you been deposed before?
3    A. Never.
4    Q. So I'll go through some of the ground rules for
5  the deposition. The purpose of today is to make sure
6  that we can get a complete and accurate understanding of
7  your claims. Do you understand that?
8    A. Yes.
9    Q. Okay. So in order to do that we need to try to
10 make as clear a record as possible for the court
11 reporter. So we need to use first and last names to the
12 extent that you know last names.
13   A. Okay.
14   Q. If you don't know them, then you can just let us
15 know that you don't know them. Try to speak one at a
16 time. I know it's very difficult especially in this
17 conversational context, but that will be best for being
18 able to create a record for the court reporter. You
19 need to try to verbalize answers. So mmm-hmm and head
20 shakes and --
21   A. Yes.
22   Q. -- they don't get taken down by the court
23 reporter. So we'll try to do our best on that one. If
24 you don't understand a question that I ask, then I'd ask
25 you to tell me that, and then I'll rephrase the

Page 7

1  question.
2      We can take a break at any time that you want to
3  take a break. Just let me know. And your attorney,
4  Mr. Helwig, is welcome to object to any question that I
5  ask. Unless he instructs you not to answer the
6  question, you can go ahead and answer the question.
7    A. Okay.
8    Q. Okay. If you do answer the question, I'm going
9  to assume you have heard it, understood it, and are
10 providing your best recollection.
11   A. Yes.
12   Q. Okay. We agree on those ground rules?
13   A. Yes.
14   Q. Perfect. Are you currently under a doctor's
15 care?
16   A. I -- just a yearly checkup. That's it.
17   Q. Do you take any medications?
18   A. Blood pressure.
19   Q. Okay. And did you take every medication that you
20 are supposed to take this morning?
21   A. Yes.
22   Q. Is there anything about your physical or mental
23 condition that prevents you from providing accurate and
24 reliable testimony?
25   A. No.

Page 8

1    Q. So you gave us your full name starting in this
2  deposition and you indicated that you are typically
3  known as Hilda van Hoek. Have you been known by any
4  other names?
5    A. Hilly.
6    Q. Any other names?
7    A. No.
8    Q. What's your current address?
9    A. 1934 Heartland, H-E-A-R-T-L-A-N-D, Circle,
10 Valrico, Florida.
11   Q. And how long have you resided there?
12   A. Since 2005.
13   Q. And who do you reside with?
14   A. My husband, Michael Kogdill.
15   Q. And what does your husband do?
16   A. He is retired.
17   Q. What did he do before he was retired?
18   A. Nurse practitioner.
19   Q. Did he work in the area?
20   A. Yes.
21   Q. And where did he work?
22   A. Lakeland Regional in the Fast Track for, I think,
23 30, 35 years, and he worked for Dr. Johnson, I think was
24 the last employer he had. I believe the address is 1715
25 East Broadway Street in Bartow.

Page 9

1    Q. And how long has he been retired?
2    A. Four years.
3    Q. Do you live with anyone else?
4    A. No.
5    Q. Do you have any children?
6    A. I do.
7    Q. Adult children?
8    A. Yes.
9    Q. And how old are your children?
10   A. He was born in '72 so -- April -- I'm thinking
11 47. Yeah.
12   Q. Just one son?
13   A. One son.
14   Q. And what does he do?
15   A. He deals in real estate and investments.
16   Q. Does he work locally?
17   A. No.
18   Q. Where does he live?
19   A. Asheville, North Carolina.
20   Q. And is your son married?
21   A. Yes.
22   Q. Is his spouse employed?
23   A. They do the same thing together.
24   Q. Okay.
25   A. Yeah. Angelika, with a K.

3 (Pages 6 to 9)

bfeb07dc-7a36-458f-8d44-dd5b10fc250f

Hilda Klausina Maria Cornelia Van Hoek
July 12, 2019

Page 10

1  Q. And do they have any adult children?
2  A. Not adult.
3  Q. Okay. So none of them are employed, correct?
4  A. No, no, not yet.
5  Q. In performing your job duties or in communicating
6  about your employment, do you use any e-mail address
7  other than the McKesson e-mail address that's been
8  provided to you?
9  A. For work purposes?
10  Q. For work purposes or related to work, discussing
11  things about work.
12  A. Well, yeah. With the lawsuit I assume so, yeah.
13  There are two e-mail addresses.
14  Q. What are those e-mail addresses?
15  A. H-I-L-L-Y, my last name, van Hoek, @gmail.com.
16  And Hvanhoek@icloud.com.
17  Q. And have you used any of those e-mail addresses
18  to conduct business?
19  A. Well, my Effects goes to my personal e-mail
20  address. So, yeah, I can read it off of one computer
21  and actually key it into my work computer.
22  Q. Okay. And which e-mail does that go to? Is it
23  Gmail or iCloud?
24  A. I'm pretty sure it's the Gmail.
25  Q. Do you ever send text messages related to your

**CONFIDENTIAL**                                Page 11

1  job duties?
2  A. Yes.
3  Q. And is that a cell phone provided by the company?
4  A. No.
5  Q. What cell phone number is that?
6  A. 813-494-0882.
7  Q. And who is the provider for that cell phone?
8  A. AT&T.
9  Q. And have you had the same provider in the last
10  five to seven years or so?
11  A. Yes, yes.
12  Q. And same phone number?
13  A. Yes.
14  Q. And who do you communicate with by text message
15  as it relates to your job duties?
16  A. Well, I have some accounts that text me. For
17  instance, Holly, last name M-I-K-L-A-S.
18  Q. Is there anyone else that you communicate with?
19  A. There's a Dr. N and it's -- I'm trying to think
20  of how -- I can't pronounce it. I'd probably be able to
21  spell it better than I can pronounce it.
22  N-A-R-A-D-A-R-Y-E. Something like that. He just
23  recently started texting me.
24  Q. Do you give out your cell phone number as a way
25  of communicating with your customers?

Page 12

1  A. Everyone has my cell phone number work-related,
2  yeah. And Bay Area Cardiology, Damarie, D-A-M-A-R-I-E
3  She takes pictures of her orders and texts them to me.
4  Q. Mmm-hmm. Do you have any social media accounts?
5  A. I just -- Twitter. I have Twitter but I don't
6  have Facebook.
7  Q. Do you have LinkedIn?
8  A. Yeah, but I don't -- I don't even know how to get
9  on there. I mean, I very seldom get on there, let's
10  say.
11  Q. Do you have -- your Twitter account, what's your
12  handle?
13  A. I would have to look it up.
14  Q. Okay. How often do you use Twitter?
15  A. I just look for news reports. I don't really
16  tweet.
17  Q. Okay. Do you -- so you don't tweet with the
18  customers or anything along those lines?
19  A. No, no.
20  Q. How about any employees of McKesson or PSS, do
21  you --
22  A. Tweet, no.
23  Q. -- tweet with them?
24  A. And there's Instagram where I look at pictures,
25  but I have never posted a picture.

**CONFIDENTIAL**                                Page 13

1  Q. Okay. Are you connected with any of your
2  customers via Instagram or Twitter?
3  A. No, not to my knowledge.
4  Q. Are you connected to any former or current
5  employees of McKesson or PSS?
6  A. On Twitter? I don't think so.
7  Q. Okay.
8  A. Not on Twitter.
9  Q. How about Instagram?
10  A. Instagram, yeah. Natalie Norris --
11     MS. DYSON: Excuse me. We have to take a
12  call from the judge. Let's break.
13     (Break from 9:15 a.m. to 9:28 a.m.)
14  BY MS. DYSON:
15  Q. Is Natalie Norris a customer?
16  A. No. She was an employee of PSS. I don't know if
17  she -- I think it was right at the -- she might have
18  been for a little bit an employee of McKesson. I'm not
19  sure.
20  Q. Okay. Okay. And I think that you started to
21  answer Brooks when we got cut off. So is there any
22  other employees that you're connected with on Instagram?
23  A. I don't think so. Relatives in Holland.
24  Q. Sure.
25  A. Yeah.

4  (Pages 10 to 13)

bfeb07dc-7a36-458f-8d44-dd5b10fc250€

Hilda Klausina Maria Cornelia Van Hoek
July 12, 2019

|  | Page 14 |
|---|---|

1   Q. I'm talking about employees of either PSS or
2   McKesson.
3   A. No, I don't think so.
4   Q. How about Leisa Meredith?
5   A. Well, actually there is -- oh, what's her name?
6   Shannon from Abbott. Shannon. Young was her name. I
7   don't know what her new name is, and I just see
8   pictures.
9   Q. Does she work at Abbott?
10   A. Yes.
11   Q. Okay.
12   A. She's one of our manufacturers.
13   Q. How about Leisa Meredith, are you connected to
14   her by Instagram?
15   A. Not that I know of, no.
16   Q. And you said that you don't have a Facebook
17   account?
18   A. (Shakes head.)
19   Q. Is that currently?
20   A. I haven't had it for quite a while. Couple
21   years.
22   Q. Okay. When was the last time you had a Facebook
23   account?
24   A. I really don't know. I'll say one, two years
25   ago, but even then I didn't do much on it.

|  | Page 15 |
|---|---|

1   Q. Do you still have access to that account?
2   A. No.
3   Q. Were you connected with any current or former
4   employees of McKesson or PSS?
5   A. Leisa might have been on that.
6   Q. And that's Leisa Meredith?
7   A. Meredith. She was Lewis. That's why I'm kind
8   of --
9   Q. That's fine. I want to make sure we use first
10   and last names.
11   A. Yeah, yeah. So Leisa Meredith Lewis. I think
12   it's Meredith now.
13   Q. And Leisa is spelled L-E-I-S-A?
14   A. Mmm-hmm.
15   Q. Anyone else that you were connected with on
16   Facebook?
17   A. Relatives in Holland.
18   Q. I'm sorry. Any employees -- current or former
19   employees of McKesson or PSS that you were connected
20   with?
21   A. I might have seen some of Jan's postings. Stach,
22   S-T-A-C-H. But nothing was work-related.
23   Q. Okay.
24   A. It was birthdays and things like that.
25   Q. Okay. The cell phone that you use, the number

|  | Page 16 |
|---|---|

1   that you told me about, the 813 number, how long have
2   you had that number?
3   A. I can't remember not having it.
4   Q. Okay.
5   A. I just -- a long time.
6   Q. And did McKesson or PSS provide you with a cell
7   phone?
8   A. No.
9   Q. Did they provide with you some sort of stipend?
10   A. They just -- PSS never did. McKesson didn't in
11   the beginning, but now they give us an allowance for gas
12   and for cell phone and for that type of thing.
13   Q. And what's your date of birth?
14   A. ▒▒▒▒▒ 1954.
15   Q. And your social security number?
16   A. ▒▒▒▒6453.
17   Q. And have you ever been arrested?
18   A. Never.
19   Q. Or threatened with arrest?
20   A. No.
21   Q. Have you ever been a party in any prior lawsuit?
22   A. Not that -- I mean, not -- other than getting
23   divorced, but no.
24   Q. Okay. And have you ever been a witness in any
25   other lawsuit? I'm not talking about your divorce.

|  | Page 17 |
|---|---|

1   A. No, no.
2   Q. Have you ever filed for bankruptcy?
3   A. No.
4   Q. In preparing for your deposition today, other
5   than conversations with your counsel which I'm not
6   interested in, who did you discuss the deposition with?
7   A. Well, my husband knows I'm having a deposition,
8   but we really didn't go into detail of what I would be
9   saying.
10   Q. Sure. Anyone else?
11   A. No.
12   Q. And other than documents that might have been
13   provided to you by counsel, have you reviewed any other
14   documents on your own in anticipation of today?
15   A. Other than what I already had? I mean, I looked
16   at the Fourth Amended Complaint; I looked at your
17   responses; I looked at my interrogatory questions and
18   answers.
19   Q. Anything else that you reviewed on your own?
20   A. A letter from Peter to the EEOC and the EEOC
21   reports.
22   Q. Okay. Anything else?
23   A. I don't think so.
24   Q. You mentioned that you were divorced. When were
25   you divorced?

5  (Pages 14 to 17)

bfeb07dc-7a36-458f-8d44-dd5b10fc250b

Hilda Klausina Maria Cornelia Van Hoek
July 12, 2019

Page 18

1    A. Oh, my goodness. I've been divorced twice.
2    Q. Okay.
3    A. I got married when I was 16 and I -- I think I
4  was married seven years.
5    Q. Okay.
6    A. But I don't know the exact date. And then the
7  second time it was in the eighties.
8    Q. And either of your ex-husbands, do you know what
9  they do?
10   A. The father of my son, he does watch and jewelry
11 repair.
12   Q. Does he live locally?
13   A. Orlando, Kissimmee.
14   Q. And what's his name?
15   A. Victor E. Drew. And the second husband died.
16   Q. Have you ever served in the military?
17   A. No.
18   Q. And where did you go to high school?
19   A. Leto in Tampa.
20   Q. Did you graduate?
21   A. Yes. Well, I took a GED.
22   Q. And did you go to college?
23   A. Yes.
24   Q. And where did you go to college?
25   A. Tampa College.

Page 19

1    Q. Tampa College?
2    A. Tampa College. It was a private college. It
3  wasn't University of Tampa.
4    Q. Okay. Okay.
5    A. Yeah.
6    Q. Did you graduate?
7    A. Yes.
8    Q. With a four-year degree?
9    A. Two. Well, three, you know.
10   Q. Associate's degree or bachelor's degree?
11   A. Associate's in marketing and sales.
12   Q. Is that the only college education that you have?
13   A. Yes.
14   Q. Do you have any degrees or certificates?
15   A. We had a course called HIDA that was pretty
16 intense, and I think it stands for Health Industry
17 Distribution Association. H-I-D-A.
18   Q. And when you say "we," who are you referring to?
19   A. Coworkers in the field.
20   Q. And how long ago was this?
21   A. That was over 20 years ago.
22   Q. So while you were working at PSS?
23   A. Before PSS.
24   Q. Okay.
25   A. It was when I was with Bergen.

Page 20

1    Q. Okay. So PSS was not your first employment in
2  the medical field?
3    A. No.
4    Q. Where were you first employed?
5    A. Durr-Fillauer.
6    Q. And how long were you employed there?
7    A. Approximately ten years. They were bought out.
8  So they were Bergen when I left. They are now referred
9  to as Cardinal.
10   Q. And did you go from there to Physician Sales &
11 Service?
12   A. Yes.
13   Q. Since December of 2012, have you applied for
14 employment anyplace else?
15   A. No.
16   Q. Do you recall filing a charge of discrimination
17 against Physician Sales & Service?
18   A. Yes.
19   Q. Let me show you what's marked as Exhibit 1 to
20 your deposition.
21      (Exhibit 1 marked for identification.)
22 BY MS. DYSON:
23   Q. Do you recognize this document?
24   A. I do.
25   Q. What is it?

Page 21

1    A. I filed with the EEOC. Peter actually filed for
2  me.
3    Q. Is it a true and correct copy of the charge of
4  discrimination that you signed on December --
5    A. Looks like the 18th.
6    Q. -- 18?
7    A. It looks like it.
8    Q. Let me state my question again since we
9  interrupted each other a little bit there.
10   A. Okay.
11   Q. Is this a true and correct copy of the charge of
12 discrimination that you signed on December 18, 2012?
13   A. Yes.
14   Q. And is this signed under the penalty of perjury?
15   A. Yes.
16   Q. Is it a true and accurate and complete copy of
17 that charge of discrimination?
18   A. Yes.
19   Q. Is this the first time you filed a charge of
20 discrimination?
21   A. Yes.
22   Q. So is it the first time you threatened to file a
23 charge of discrimination?
24   A. It's the first time I ever filed or threatened or
25 anything.

6  (Pages 18 to 21)

bfeb07dc-7a36-458f-8d44-dd5b10fc2506

Hilda Klausina Maria Cornelia Van Hoek
July 12, 2019

---

Page 22

1    Q. Okay. And in this charge of discrimination, do
2  you -- sorry --
3    A. I was just -- I was just -- I've always looked at
4  that. The address is incorrect on there.
5    Q. The address for what?
6    A. My address.
7    Q. Oh, okay. Okay. The street number --
8    A. Yeah.
9    Q. -- is incorrect?
10   A. Yes.
11   Q. Okay. Okay. Other than the street number, is
12  there anything else in this charge of discrimination
13  that you believe is inaccurate or needs to be corrected?
14   A. No, no.
15   Q. Okay. In this charge of discrimination, do you
16  identify any account specifically that you're
17  complaining about?
18   A. Florida Medical Clinic was the reason for me
19  filing the EEOC.
20   Q. And so that's the only account that's referenced
21  here, correct?
22   A. Let me make sure. Yes.
23   Q. In this charge of discrimination, in the middle
24  of the first paragraph, about the third sentence, you
25  say that "During 2012, I spent many months cultivating

---

Page 23

1  an important potential client." Do you see that?
2    A. Yes.
3    Q. And that's a reference to Florida Medical Clinic?
4    A. Yes.
5    Q. So at that time they were a potential client?
6    A. Potential -- they were a client but they -- I was
7  looking to get more business. They just bought a little
8  bit from us.
9    Q. And you say that -- you go on saying, "And
10  secured a commitment to be placed in the client's bid
11  list effective January 2013." Do you see that?
12   A. I do.
13   Q. Was that commitment provided to you in writing?
14   A. No, verbal.
15   Q. And who provided you that commitment?
16   A. Gary Steele.
17   Q. And what did he tell you?
18   A. I asked him if we would have the opportunity to
19  be on the bid list and he said yes. He said it just
20  happens that we're going to be doing that come January
21  2013 after the holidays.
22   Q. Okay. And what does it mean to be placed on a
23  bid list?
24   A. Well, that you would get their list of supplies
25  and that you would price it out.

---

Page 24

1    Q. Okay. Does it guarantee you that they're going
2  to purchase those supplies?
3    A. No. It's a bid list.
4    Q. Okay. I -- just for those that are not familiar
5  with what that means --
6    A. Okay.
7    Q. -- that's why I'm asking.
8    A. I'm sorry. Yeah.
9    Q. That's fine. So it's just -- it's essentially a
10  list where you get -- you get to know what supplies they
11  need for their business, and you have an opportunity to
12  try to win that business?
13   A. Correct.
14   Q. But it's not a guarantee that you will win that
15  business?
16   A. No.
17   Q. And you say in Section 2 that the reason for the
18  adverse action is that "The respondent states that the
19  male sales representative had made inroads with the
20  customer." Do you see that?
21   A. Where are you reading that?
22   Q. Sure. Under Section 2.
23   A. Okay. Right. Well, they said he made inroads
24  with the customer according to management.
25   Q. And who is management?

---

Page 25

1    A. At that time that would be Carlos Xiques.
2    Q. Is that who told you that information?
3    A. Yes.
4    Q. Okay. And do you have any reason to dispute that
5  Mr. Xiques didn't believe that the male sales
6  representative had, in fact, made inroads with the
7  customer?
8    A. I wouldn't know that for sure.
9    Q. Okay. Let me show you what is marked Exhibit 2
10  to your deposition.
11       (Exhibit 2 marked for identification.)
12  BY MS. DYSON:
13   Q. Do you recognize this document?
14   A. Yes.
15   Q. And what is it?
16   A. A dismissal, notice of rights.
17   Q. This is a document that you received?
18   A. Yes.
19   Q. And did you receive it on or about July 25, 2013?
20   A. I would not know exactly when. I just remember
21  seeing this.
22   Q. Did you read the document?
23   A. This document?
24   Q. Yes. When you received it.
25   A. When I received it, I'm sure I did, yes.

7 (Pages 22 to 25)

bfeb07dc-7a36-458f-8d44-dd5b10fc2506

Hilda Klausina Maria Cornelia Van Hoek
July 12, 2019

| Page 26 | Page 28 |
|---|---|

**Page 26**

1  Q. Okay. And in this document in the paragraph
2  that's entitled "Notice of Suit Rights," do you see
3  that --
4  A. Mmm-hmm.
5  Q. -- towards the middle of the page?
6  A. Yes.
7  Q. It states, "Your lawsuit must be filed within 90
8  days of your receipt of this notice or your right to sue
9  based on this charge will be lost," end quote. Do you
10  see that?
11  A. Yes.
12  Q. And so did you understand when you received this
13  document that you had to file a lawsuit within 90 days
14  or you would not be able to sue based on this charge?
15  A. Personally, no. I don't know legal. I just left
16  it up to my attorneys.
17  Q. Okay. And your attorney is listed there as Peter
18  Helwig, correct?
19  A. That's correct.
20  Q. And did you file a lawsuit within 90 days of
21  Exhibit 2?
22  A. I'm not sure.
23  Q. You would rely on the court records that show the
24  date in which you filed that lawsuit?
25  A. Yes.

**Page 28**

1  A. You mean the difference between?
2  Q. Mmm-hmm.
3  A. Vaguely. We -- I didn't sign it. I needed to
4  sign it. I think Rosemary Richards said she needed that
5  signed, so --
6  Q. Rosemary Richards is who?
7  A. She was the representative of the EEOC.
8  Q. Okay.
9  A. I think that's when that happened.
10  Q. Other than Exhibit 3 to your deposition and
11  Exhibit 1 to your deposition, have you filed any other
12  charges of discrimination?
13  A. No.
14  Q. Have you threatened to file any other charges of
15  discrimination?
16  A. No.
17  Q. In Exhibit 3 to your deposition, you identify in
18  this charge of discrimination the Florida Medical
19  Clinic. Do you see that?
20  A. Give me a minute to read it.
21  Q. Of course.
22  A. Okay.
23  Q. So in this charge of discrimination, do you
24  identify the Florida Medical Clinic --
25  A. Yes.

| Page 27 | Page 29 |
|---|---|

**Page 27**

1  Q. I'll show you what's marked as Exhibit 3 to your
2  deposition.
3  (Exhibit 3 marked for identification.)
4  BY MS. DYSON:
5  Q. Do you recognize this document?
6  A. Yes, I do.
7  Q. And what is it?
8  A. That's the second EEOC charge.
9  Q. And it has -- these are double-sided copies. It
10  has a front and back page, correct?
11  A. Yes.
12  Q. And that's your signature on the second page?
13  A. It is.
14  Q. And you also signed this charge of discrimination
15  under the penalty of perjury?
16  A. Yes.
17  Q. And is this a true, accurate, and complete copy
18  of the charge of discrimination that you signed on July
19  22, 2015?
20  A. Yes.
21  Q. Then there's another date on the back of the
22  document that -- next to your signature that is August
23  18, 2015. Do you see that?
24  A. Yes.
25  Q. Do you know why that is?

**Page 29**

1  Q. Let me start over again. We interrupted each
2  other. In this charge of discrimination, do you
3  identify the Florida Medical Clinic as one of the
4  accounts that you're complaining about?
5  A. I do.
6  Q. Do you identify any other account in that charge
7  of discrimination?
8  A. I don't know if there was anything -- I mean, it
9  happened all the time, so Florida Medical Clinic, I
10  think, is what this one particular instance is
11  addressing, yes. It states Florida Medical Clinic.
12  Q. And there is no other account identified in this
13  charge of discrimination, correct?
14  A. Not that I see.
15  Q. Let me show you what's marked as Exhibit 4 to
16  your deposition.
17  (Exhibit 4 marked for identification.)
18  BY MS. DYSON:
19  Q. Do you recognize this document?
20  A. I do.
21  Q. What is it?
22  A. This is from Rosemary Richards.
23  Q. She's identified on the second page of the
24  document, correct?
25  A. Yes, she is.

8  (Pages 26 to 29)

bfeb07dc-7a36-458f-8d44-dd5b10fc2506

Hilda Klausina Maria Cornelia Van Hoek
July 12, 2019

| Page 30 |
|---|

1  Q. As an investigator specialist?
2  A. Yes, she is.
3  Q. This is a document from the Florida Commission on
4  Human Relations, correct?
5  A. Correct.
6  Q. And in this document is Ms. Richards informing
7  you that you have to make an election?
8  A. Well, they're asking whether or not I want to
9  continue the investigation.
10  Q. Ms. Richards informs you that it has been 180
11  days since you filed your complaint of discrimination
12  with the Florida Commission on Human Relations; is that
13  correct?
14  A. That's correct.
15  Q. And she's telling you that you have several
16  options?
17  A. Yes.
18  Q. And one of those options is to file a civil
19  action in federal or state court, correct?
20  A. Correct.
21  Q. Another option is to allow the Commission to
22  continue its investigation and issue a determination in
23  this matter, correct?
24  A. Correct.
25  Q. Or you could file a petition for relief or

| Page 31 |
|---|

1  withdraw the case?
2  A. Correct.
3  Q. Those were the four options presented to you?
4  A. Yes.
5  Q. And she also said that if you elect to have the
6  Commission continue its investigation and then later
7  decide to change your election, to notify the Commission
8  investigator at your earliest convenience. Do you see
9  that?
10  A. Yes.
11  Q. And do you recall making an election?
12  A. Well, we had a long report that we did with
13  Rosemary Richards, so I would assume that that's what
14  you're referring to.
15  Q. Okay. Let me show you what's marked as Exhibit 5
16  to your deposition.
17  (Exhibit 5 marked for identification.)
18  BY MS. DYSON:
19  Q. Do you recognize this document?
20  A. Yes.
21  Q. And what is it?
22  A. That we're electing to continue processing and
23  investigating the complaint.
24  Q. So this is the election of rights form --
25  A. Mmm-hmm.

| Page 32 |
|---|

1  Q. -- that was submitted on your behalf, correct?
2  A. Correct.
3  Q. And it --
4  A. So it was -- yeah. Okay.
5  Q. And it was signed by Mr. Helwig?
6  A. Not me.
7  Q. Do you recognize that as Mr. Helwig's signature?
8  A. I think so.
9  Q. And it says "attorney for the complainant." Did
10  you understand that was you?
11  A. Yes, that's Peter.
12  Q. And this was signed on February 19, 2016. Do you
13  see that?
14  A. I do.
15  Q. And you understood in making this election you
16  were asking the Commission to continue processing and
17  investigating the complaint and issuing a determination,
18  correct?
19  A. I do.
20  Q. I'll show you what's marked as Exhibit 6 to your
21  deposition.
22  (Exhibit 6 marked for identification.)
23  BY MS. DYSON:
24  Q. Do you recognize this document?
25  A. I do.

| Page 33 |
|---|

1  Q. And what is it?
2  A. It's a letter to Rosemary Richards explaining the
3  events of discrimination.
4  Q. This is dated August 31, 2016, correct?
5  A. Correct.
6  Q. So this is after the election form that you filed
7  on --
8  A. 2019 (sic).
9  Q. -- on February 19, 2016, correct?
10  A. Correct.
11  Q. This was part of the Florida Commission on Human
12  Relations investigation that you were requesting that
13  they conduct, correct?
14  A. That's right.
15  Q. Did you understand that they were asking for you
16  to identify the adverse actions that met certain
17  criteria?
18  A. Yes.
19  Q. And you identified in here the Access Healthcare
20  account, Florida Medical Clinic account, events that
21  happened in December of 2015, the PrimeCare account, and
22  Dr. Randolph Knight, correct?
23  A. Correct.
24  Q. You don't identify the Florida Hospital Physician
25  Group account, correct?

9 (Pages 30 to 33)

bfeb07dc-7a36-458f-8d44-dd5b10fc2506

Hilda Klausina Maria Cornelia Van Hoek
July 12, 2019

Page 34

1     A. That's in Number 3, isn't it? Maybe that's --
2   no. Sorry.
3     Q. Sure. Take your time.
4     A. I don't know if this document had Florida
5   Hospital. The abbreviation would be FHPG. I wouldn't
6   know what these exhibits are referring to here.
7     Q. Okay.
8     A. It's talking about Gary Steele, so it still would
9   be Florida Medical Clinic. I don't believe it mentions
10  Florida Hospital Physician Group in this.
11    Q. Okay. Let me show you what's marked as Exhibit 7
12  to your deposition.
13        (Exhibit 7 marked for identification.)
14  BY MS. DYSON:
15    Q. Do you recognize this document?
16    A. I do.
17    Q. And what is it?
18    A. From the Florida Commission of Human Relations
19  determination.
20    Q. Okay. And this is a determination that was made
21  on December 9, 2016?
22    A. Correct.
23    Q. So this is a determination that was made as a
24  result of your election in Exhibit 5, correct, for
25  the -- for the Florida Commission on Human Relations to

Page 35

1   continue its investigation and issue a determination?
2     A. Yes.
3     Q. And the determination they found was that there
4   was no reasonable cause to support the complaint of
5   discrimination, correct?
6     A. Correct.
7     Q. Let me show you what's marked as Exhibit 8 to
8   your deposition.
9         (Exhibit 8 marked for identification.)
10  BY MS. DYSON:
11    Q. Do you recognize this document?
12    A. Okay. This is on the same day, right?
13    Q. Appears to be dated the same date. I'm not sure
14  if you're asking me, but I'll answer it.
15    A. Yes.
16    Q. Do you recall receiving both these documents,
17  Exhibit 7 and Exhibit 8 to your deposition?
18    A. Yes.
19    Q. And Exhibit 8 is the notice of determination and
20  Exhibit 7 is the determination?
21    A. Mmm-hmm.
22    Q. Correct?
23    A. Right.
24    Q. When you received these documents, did you review
25  them?

Page 36

1     A. Yes.
2     Q. And in the notice of determination, which is
3   Exhibit 8 to your deposition, it provides you notice
4   that you may request an administrative hearing with the
5   Division of Administrative Hearings by filing a petition
6   for relief within 35 days of the date of the
7   determination that was signed by the executive director,
8   correct?
9     A. Correct.
10    Q. So you understood that you had the ability to
11  request an administrative hearing on the no-cause
12  determination, correct?
13    A. That's what it says.
14    Q. Okay. And it also provides you notice that this
15  determination of no reasonable cause will become final
16  if the complainant does not file a petition for relief
17  within 35 days and the Commission will dismiss the
18  complaint. Do you see that?
19    A. I do.
20    Q. Did you file a petition for relief with the
21  Florida Commission of Human Relations?
22    A. I left it up to Peter, so --
23    Q. So then you would rely on whatever public records
24  exist within the Florida Commission of Human Relations
25  or the Division of Administrative Hearings as to whether

Page 37

1   you filed the petition for relief?
2     A. Correct.
3     Q. I'll show you what's been marked as Exhibit 9 to
4   your deposition.
5         (Exhibit 9 marked for identification.)
6   BY MS. DYSON:
7     Q. Do you recognize this document?
8     A. I think so.
9     Q. Okay. And what is it?
10    A. Dismissal and notice of rights.
11    Q. This one is -- the top of it says it's from the
12  Equal Employment Opportunity Commission?
13    A. Correct.
14    Q. The previous determinations that we were talking
15  about, which are Exhibits 7 and 8 to your deposition,
16  are from the Florida Commission on Human Relations. Do
17  you see that?
18    A. On this?
19    Q. No. If you look at Exhibits 7 and 8.
20    A. Seven and eight.
21    Q. So we're talking about different agencies?
22    A. Yes.
23    Q. This dismissal and notice of rights, did you
24  receive a copy of it?
25    A. Probably.

10  (Pages 34 to 37)

bfeb07dc-7a36-458f-8d44-dd5b10fc2506

Hilda Klausina Maria Cornelia Van Hoek
July 12, 2019

| Page 38 | Page 40 |
|---|---|

**Page 38**

1  Q. Did you read it?
2  A. Probably.
3  Q. And it says in the first paragraph next to the
4  check marks, the boxes, that "The EEOC has adopted the
5  findings of the state or local fair employment practices
6  agency that investigated the charge." Do you see that?
7  A. Yes.
8  Q. Did you understand that the EEOC was adopting the
9  finding of the Florida Commission on Human Relations,
10  which is Exhibit 7 to your deposition?
11  A. Yes. We weren't happy with that. Yes.
12  Q. Okay. And under the notice of rights, this is
13  like the other notice of rights that you received that's
14  Exhibit 2 to your deposition, correct? The same form
15  essentially?
16  A. Yes.
17  Q. And in this notice of rights, it provides that
18  your lawsuit must be filed within 90 days of your
19  receipt of the notice or your right to sue based on this
20  charge will be lost. Do you see that?
21  A. I do.
22  Q. And did you understand that you needed to file a
23  lawsuit based on the charge within 90 days?
24  A. I'm not an attorney. No. That's why I hired an
25  attorney.

**Page 39**

1  Q. And so did Mr. Helwig receive a copy of this
2  Exhibit 9 to your deposition?
3  A. I'm sure he did.
4  Q. Let me show you what's marked as Exhibit 10 to
5  your deposition.
6  (Exhibit 10 marked for identification.)
7  BY MS. DYSON:
8  Q. Do you recognize this document?
9  A. No.
10  Q. It's a document that you produced to us in this
11  case.
12  A. Okay.
13  Q. So I was trying to understand what it represents.
14  MR. HELWIG: If you don't know, don't guess.
15  A. I don't know. I do not know.
16  BY MS. DYSON:
17  Q. Okay.
18  A. I can assume but I don't know.
19  Q. And what do you assume?
20  A. I assume it's delivery of some documents, but it
21  doesn't say from whom. I don't know.
22  Q. Do you know why you produced it in this case?
23  A. No.
24  Q. Let me show you what's marked as Exhibit 11 to
25  your deposition.

**Page 40**

1  (Exhibit 11 marked for identification.)
2  BY MS. DYSON:
3  Q. Do you recognize this document?
4  A. Yes.
5  Q. And this is another document you produced to us
6  in this case, correct?
7  A. Yes.
8  Q. And this is an e-mail from Ms. Piscitelli on
9  August 7, 2017?
10  A. Yes.
11  Q. And she's requesting written consent to file a
12  third amended complaint?
13  A. Yes.
14  Q. And do you know what was contained within the
15  third amended complaint?
16  A. No. I can -- no.
17  Q. Do you know if the third amended complaint had
18  the claims that were based on Exhibit 9, the charge
19  of -- it's dismissal and --
20  A. I'm sure it did. It had to do with all of my
21  claims.
22  Q. Okay. Let me show you what's marked as
23  Exhibit 12 to your deposition.
24  (Exhibit 12 marked for identification.)
25  BY MS. DYSON:

**Page 41**

1  Q. Do you recognize this document?
2  A. Give me a minute.
3  Q. Of course. Please take your time.
4  A. Yes.
5  Q. What is it?
6  A. It's correspondence between you and my attorneys.
7  Q. And this is a document you produced in this case?
8  A. It was produced in this case, yes.
9  Q. And by you -- you see at the bottom where it says
10  "van Hoek" and then the numbers?
11  A. It's presented through my attorneys.
12  Q. Okay. It's not a document that we produced to
13  you; it's a document that you produced to us?
14  A. Correct.
15  Q. That's all I want to make clear. In the top
16  e-mail that's from me on August 14, 2017, it states that
17  pursuant to Rule 1.190A, the Florida Rules of Civil
18  Procedure, we consent to the filing of the amended
19  complaint, and we intend to challenge lack of merit in
20  this amended complaint through appropriate motion
21  practice. Do you see that?
22  A. I do.
23  Q. Do you also see -- go back to Exhibit 12 -- that
24  I provided in this e-mail that "We do not believe that
25  it's prudent to waste the Court's time and resources on

11 (Pages 38 to 41)

bfeb07dc-7a36-458f-8d44-dd5b10fc250e

Hilda Klausina Maria Cornelia Van Hoek
July 12, 2019

Page 42

1   the motion to amend"?
2      A.  Yes.
3      Q.  Let me go back to Exhibit 12 one more time.
4   Sorry about that.  The date of this e-mail was August
5   14, 2017?
6      A.  Yes.
7      Q.  Is that correct?
8      A.  Yes.
9      Q.  I'll show you what's marked as Exhibit 13 to your
10   deposition.
11         (Exhibit 13 marked for identification.)
12   BY MS. DYSON:
13      Q.  Do you recognize this document?
14      A.  I do.
15      Q.  And what is it?
16      A.  Third amended complaint and demand for jury
17   trial.
18      Q.  So the e-mail consenting to the amendment was on
19   August 14, 2017, in Exhibit 12.  The third amended
20   complaint wasn't filed until September 20, 2017; is that
21   correct?
22         MR. HELWIG:  I'm not sure if I heard the
23      question right.  Did you say the e-mail was dated
24      2012 or '17?
25         MS. DYSON:  '17.  Yes.  I can restate the

Page 43

1      question.
2         MR. HELWIG:  Just to clarify.
3         MS. DYSON:  Sure.
4   BY MS. DYSON:
5      Q.  So the e-mail that's exhibit -- Exhibit 12 to
6   your deposition is dated August 14, 2017, correct?
7      A.  Correct.
8      Q.  And the third amended complaint was filed on
9   September 20, 2017; do you see that?
10      A.  I do.
11      Q.  And to your knowledge, is this the first
12   complaint that you filed that contains your complaints
13   under Title 7?
14      A.  I have no idea what you're talking about.
15      Q.  Okay.  You would rely on the public court filings
16   to reflect as to when you first raised the Title 7
17   claims in the complaint, correct?
18      A.  Title 7?  I don't -- I guess.
19      Q.  You don't have any other information?
20      A.  No.
21      Q.  So you would rely on the court filings to
22   accurately reflect when you filed the Title 7 lawsuit,
23   correct?
24      A.  That and my attorneys, yes.
25      Q.  Have you filed any other administrative claims

Page 44

1   other than these two charges of discrimination?
2      A.  What do you mean?  A lawsuit?
3      Q.  Well, we talked about lawsuits.  You told me you
4   haven't filed any other lawsuits.  I'm talking about
5   administrative claims.  So have you filed for workers'
6   compensation?
7      A.  No.
8      Q.  Have you ever filed for social security benefits?
9      A.  There was, like, one month in Maine where I did
10   get, I think, benefits.
11      Q.  Okay.  How long ago was that?
12      A.  My son was about -- about 40 years ago.
13      Q.  Okay.
14      A.  And it was just for one month.
15      Q.  Okay.
16      A.  One or two months.  I just wanted to get out of
17   there.
18      Q.  Okay.  Have you ever filed for social security
19   disability benefits?
20      A.  No.
21      Q.  Have you -- any -- filed any claim for long-term
22   or short-term disability benefits?
23      A.  No.
24      Q.  Now, you were hired at Physician Sale & Services
25   in 1994, correct?

Page 45

1      A.  Correct.
2      Q.  And you have continuously been employed since
3   that date?
4      A.  I have.
5      Q.  And you are still currently employed?
6      A.  I am.
7      Q.  And either at PSS or McKesson you have not been
8   suspended, correct?
9      A.  No.
10      Q.  Not been demoted, correct?
11      A.  No.
12      Q.  You have not been terminated, correct?
13      A.  No.
14      Q.  It's correct?
15      A.  That's correct.
16      Q.  Have you been issued any corrective disciplinary
17   action at either PSS or McKesson?
18      A.  Have I filed anything?
19      Q.  No.  Have you ever received any corrective
20   disciplinary action?
21      A.  Yes.
22      Q.  Okay.  And when did you receive corrective
23   disciplinary action?
24      A.  I didn't even know it was a correction until we
25   had one of the depositions, but something was filed with

12  (Pages 42 to 45)

Hilda Klausina Maria Cornelia Van Hoek
July 12, 2019

Page 46

1   HR in reference to e-mail "etiquacy."
2       Q. Let me show you what's marked as Exhibit 14 to
3   your deposition.
4           (Exhibit 14 marked for identification.)
5   BY MS. DYSON:
6       Q. Do you recognize this document?
7       A. I do.
8       Q. And what is it?
9       A. It's talking about the e-mails and the tone and
10  messaging and the contents.
11      Q. Is this the letter that you were just referring
12  to?
13      A. Yes, it is.
14      Q. In this letter from Mr. Jensen, at the very end
15  he explains that the failure to maintain a professional
16  and respective posture may lead to disciplinary action,
17  correct?
18      A. Yes.
19      Q. So was this disciplinary action?
20      A. Was this in itself?  I would assume so.
21      Q. Okay.  Did it have any impact on your employment?
22      A. No, not really.
23      Q. Are you aware of any other corrective discipline
24  action that you received?
25      A. I was on a -- with PSS I was on a 90-day

Page 47

1   corrective-something-or-other.  I'm not sure.  It was a
2   long time ago.
3       Q. Was that related to your performance?
4       A. Yes.
5       Q. So a performance improvement plan?
6       A. Right.
7       Q. You have 90 days to improve your performance?
8       A. That's what it was.
9       Q. How long ago was that?
10      A. Long time ago.  I remember where it was.  I think
11  it was in Starbucks or Panera Bread and with Tom
12  Fitzgerald and Steve Shaverling.
13      Q. And how many of those performance improvement
14  plans were you placed on?
15      A. One.
16      Q. And can you give me an approximate -- how many
17  years ago you received that performance improvement
18  plan?
19      A. Let's see.  Let's say maybe between 15, 17 years
20  or something.
21      Q. Okay.  And other than that performance
22  improvement plan and the letter that's Exhibit 14 to
23  your deposition, have you received any other corrective
24  disciplinary action during your employment?
25      A. Not that I know of.

Page 48

1       Q. Do you understand that you are an at-will
2   employee?
3       A. I'm what?
4       Q. An at-will employee.
5       A. No.
6       Q. You don't have an employment agreement, do you?
7       A. I have an agreement, yes.
8       Q. And does the agreement provide that you will be
9   employed for a certain period of time?
10      A. No.
11      Q. That you could be terminated at any time?
12      A. I guess I could.  I don't really know.
13      Q. Do you understand you could resign at any time?
14      A. Yes.
15      Q. Okay.
16      A. We have noncompetes.  I don't know if that's what
17  you're talking about.
18      Q. Sure.  What I'm talking about is that no one has
19  guaranteed that you that you are going to be employed for an
20  X term of years?
21      A. They don't guarantee it, but it's like if you are
22  within your numbers forecast-wise, we get evaluations
23  quarterly, so --
24      Q. But there's no promise of continued employment?
25      A. No.

Page 49

1       Q. Correct?
2       A. No.
3       Q. Is that correct?
4       A. That's correct.
5       Q. Okay.  And just like you can freely leave your
6   employment at any time you want to leave your
7   employment?
8       A. That's right.
9       Q. Do you recall signing a confidentiality agreement
10  when you worked for Physician Sales & Service?
11      A. I do.
12      Q. Let's mark this as Exhibit 15 to your deposition.
13          (Exhibit 15 marked for identification.)
14  BY MS. DYSON:
15      Q. Do you recognize this document?
16      A. Yes.
17      Q. What is it?
18      A. Confidentiality agreement.
19      Q. That you signed?
20      A. That's my signature.
21      Q. And what did you agree to do in this
22  confidentiality agreement?
23      A. That I will keep all the secrets and sales
24  information confidential.
25      Q. Okay.  Did you understand that this agreement

13  (Pages 46 to 49)

bfeb07dc-7a36-458f-8d44-dd5b10fc250f

Hilda Klausina Maria Cornelia Van Hoek
July 12, 2019

|  | Page 50 |
|---|---|
| 1 | continued throughout your employment? |
| 2 | A. Yes. |
| 3 | Q. You understand that even today you're required to |
| 4 | keep confidential sales information? |
| 5 | A. Oh, yeah, yeah. |
| 6 | Q. And that you could be terminated for disclosing |
| 7 | sales information? |
| 8 | A. Yes. |
| 9 | Q. Did you provide to your attorney sales |
| 10 | information in this case? |
| 11 | MR. HELWIG: Object to the form. And I'm |
| 12 | going to direct you not to answer. |
| 13 | A. Okay. |
| 14 | BY MS. DYSON: |
| 15 | Q. Do you understand that your attorney provided to |
| 16 | the Florida Commission on Human Relations sales data |
| 17 | related to PSS or McKesson? |
| 18 | A. Peter? |
| 19 | MR. HELWIG: The question is do you |
| 20 | understand and that's all. |
| 21 | A. Yes. |
| 22 | MR. HELWIG: You can go ahead and answer |
| 23 | that. |
| 24 | BY MS. DYSON: |
| 25 | Q. Even though you had a confidentiality agreement, |

|  | Page 51 |
|---|---|
| 1 | there was sales information that was provided to the |
| 2 | Florida Commission on Human Relations, correct? |
| 3 | A. Yes. |
| 4 | MS. DYSON: Let's take a break. |
| 5 | (Break from 10:18 a.m. to 10:26 a.m.) |
| 6 | BY MS. DYSON: |
| 7 | Q. Ms. van Hoek, during your employment and as it |
| 8 | continues today, do you understand that you receive 100 |
| 9 | percent commissions on sales? |
| 10 | A. Yes. |
| 11 | Q. Okay. You're not salaried in any way? |
| 12 | A. No. |
| 13 | Q. And have never been a salaried sales rep? |
| 14 | A. When Physician Sales & Services first hired me, I |
| 15 | was -- had a guarantee. |
| 16 | Q. You had a guarantee? |
| 17 | A. For a year. |
| 18 | Q. Okay. That being said, it means that whatever |
| 19 | sales you bring in, that's what you're compensated on? |
| 20 | A. Correct. |
| 21 | Q. Do you have an assigned territory? |
| 22 | A. We used to have cookie-cutter territories. Now |
| 23 | we don't. It's wherever we can get business. |
| 24 | Q. And how long has that been the case that you |
| 25 | don't have an assigned territory? |

|  | Page 52 |
|---|---|
| 1 | A. Since the beginning, '94. |
| 2 | Q. You said that previously you used to have an |
| 3 | assigned territory. So was that when you worked for a |
| 4 | different company? |
| 5 | A. The only time I had, like, boundaries and kept |
| 6 | within the boundaries would have been when I was with |
| 7 | Durfulauer. |
| 8 | Q. So since 1994 you could sell wherever you could |
| 9 | find business? |
| 10 | A. Pretty much. |
| 11 | Q. And do you know whether the other commissioned |
| 12 | sales representatives who report to Mr. Jensen are paid |
| 13 | on the same formula that you're paid on? |
| 14 | A. We have Account Executives 1 and 2, and I |
| 15 | understand I'm one of them. |
| 16 | Q. Okay. |
| 17 | A. We have always referred to ourselves as account |
| 18 | managers, not account executives. |
| 19 | Q. Okay. |
| 20 | A. McKesson just recently gave us those titles. But |
| 21 | they do designate -- one set has -- we call them "wheel |
| 22 | reps," which they have a salary, car, expenses, and they |
| 23 | do get bonuses for certain things. But we're total |
| 24 | commission. |
| 25 | Q. So there's two types of representatives that |

|  | Page 53 |
|---|---|
| 1 | report up to Mr. Jensen: One is referred to |
| 2 | colloquially as wheel reps -- |
| 3 | A. Mmm-hmm. |
| 4 | Q. -- and the other is -- what are they referred to |
| 5 | as? |
| 6 | A. Full commission reps. |
| 7 | Q. Full commission reps. And the other full |
| 8 | commission reps, are they compensated based on the same |
| 9 | formula that you're compensated on? |
| 10 | A. Yes. |
| 11 | Q. Do you have a compensation plan that applies to |
| 12 | you and the other full commission reps? |
| 13 | A. Correct. |
| 14 | Q. And in terms of the accounts that you bring in, |
| 15 | are you given specific assigned accounts? |
| 16 | A. Given? |
| 17 | Q. Mmm-hmm. |
| 18 | A. We go out, we get the business, and we really |
| 19 | don't get given accounts. |
| 20 | Q. Right. So -- |
| 21 | A. If you do, it's very nice. |
| 22 | Q. Okay. So neither McKesson or PSS says you, |
| 23 | Ms. van Hoek, here's your list of accounts; go sell to |
| 24 | those businesses? |
| 25 | A. No. |

14  (Pages 50 to 53)

bfeb07dc-7a36-458f-8d44-dd5b10fc250

Hilda Klausina Maria Cornelia Van Hoek
July 12, 2019

---

Page 54

1    Q.  Okay.
2    A.  I've cultivated my own.
3    Q.  And that would be the same with the other sales
4  representatives?  They've all cultivated their own
5  business, correct?
6    A.  Correct.
7    Q.  The other full commission sales representatives?
8    A.  Right.
9    Q.  And when -- can you take me through the process
10  of cultivating an account, a new account?
11    A.  A new one?
12    Q.  Mmm-hmm.
13    A.  Well, for instance, I received a phone call from
14  a physician, and actually his wife, and they said they
15  were new in the area and they wanted to set up an
16  account with McKesson for medical supplies.
17    Q.  Okay.
18    A.  And then I go and I visit with the account and
19  find out what their needs are, and I give them a credit
20  application and they fill that out either on paper or
21  they can do it online and provide their licenses, and
22  then those accounts are set up.
23    Q.  Okay.  And is there a place on that credit
24  application for them to designate you as the
25  representative?

---

Page 55

1    A.  Yes.
2    Q.  On the online application and the paper
3  application?
4    A.  I believe the online has it too.
5    Q.  Okay.  And when the -- when you say the accounts
6  are set up, who sets up those accounts?
7    A.  Someone in corporate.
8    Q.  Okay.  And when the -- that paperwork comes in,
9  is that account your account?
10    A.  Normally.
11    Q.  Does someone have to assign it to you?
12    A.  If there is a dispute of whether maybe another
13  rep said I've already been in there, something like
14  that.
15    Q.  Then the account --
16    A.  Then it goes to -- the sales manager would make
17  that determination.
18    Q.  So if there's a dispute as to who owns that
19  account, the sales manager makes that decision?
20    A.  Correct.
21    Q.  If there is no dispute, who makes that decision?
22    A.  It's just left the way that it is.  I don't know
23  that anyone makes the decision.
24    Q.  It's automatic?
25    A.  It's automatic.

---

Page 56

1    Q.  So automatically that would be your account going
2  forward?
3    A.  Correct.
4    Q.  And if the -- can a customer who doesn't have a
5  relationship with a representative, can they get orders
6  and services through McKesson or PSS?
7    A.  Meaning if someone just calls in and wants to set
8  up an account or buy product?
9    Q.  Mmm-hmm.
10    A.  Yeah.  I mean, that happens, I think, a lot where
11  they call in and ask to have an account set up.  And at
12  that point, those accounts are referred to the sales
13  manager, and the sales manager determines who gets those
14  accounts.  I understand that the wheel reps have first
15  dibs on accounts now.
16    Q.  Okay.  So when someone calls in to customer
17  service, doesn't have a relationship with a
18  full-commissioned rep and says I need, you know,
19  supplies, and then goes it to the sales manager, and the
20  sales manager would assign it out, but they give
21  preference to the wheel reps?
22    A.  Correct.
23    Q.  Same process that existed at PSS?
24    A.  Pretty much.
25    Q.  When you say that you believe it happens a lot,

---

Page 57

1  that customers call in without having an affiliation
2  with a fully-commissioned rep, what does "a lot" mean?
3    A.  It's just a term.  I mean, I'm sure -- I'm not in
4  customer service, so I wouldn't know the amount.
5    Q.  Okay.  So you don't know what percentage of the
6  accounts are opened by a customer calling customer
7  service --
8    A.  Let's say it's not unusual for that to happen.
9    Q.  We are interrupting each other, so let me restart
10  the question.  So you don't know what percentage of
11  accounts are opened as a customer calling in to customer
12  service versus having a relationship with a commissioned
13  rep and then submitting their credit application?
14    A.  No.
15    Q.  And you said it is not unusual.  What's the basis
16  for that statement?
17    A.  Well, there's advertising online that McKesson
18  does with our phone number, and they'll call in to that
19  800 phone number.
20    Q.  Okay.  But you don't know what number of times
21  people call that?
22    A.  I have no idea.
23    Q.  Okay.  Do you recall when you started reporting
24  to Mr. Jensen?
25    A.  Let's see.  2013 we were acquired by McKesson.  I

15  (Pages 54 to 57)

bfeb07dc-7a36-458f-8d44-dd5b10fc250

Hilda Klausina Maria Cornelia Van Hoek
July 12, 2019

Page 58

1   don't know exactly the date.  Beginning part of the
2   year, I believe.
3       Q.  Okay.
4       A.  And my sales leader at the time was Carlos
5   Xiques, and he was my sales leader for a while and
6   there -- I mean, we were all -- first we were -- one day
7   we were competitors, and the next day we were, like --
8   they were family.  That's kind of a hard transition for
9   a lot of people to make.
10      Q.  Sure.
11      A.  So Paul and Carlos worked very close together,
12  and I believe that they were trying to figure out what
13  teams.  And I don't know if they were using, like, areas
14  that were more convenient for the sales leaders.  I'm
15  not sure how they did that.  But at that time, shortly
16  after, I was assigned to Paul Jensen.
17      Q.  And did you understand that Carlos Xiques -- he
18  came from PSS, correct?
19      A.  Correct.
20      Q.  And he was the sales leader over the same
21  geographic area of west Florida as Paul --
22      A.  We -- yes.
23      Q.  Wait.  Hold on.
24      A.  I'm sorry.
25      Q.  I know -- let me finish asking the question.  So

Page 59

1   Carlos Xiques at PSS before the acquisition, was over
2   the same geographic area as Paul Jensen was at McKesson?
3       A.  Yes.
4       Q.  And they were competitors?
5       A.  Yes.
6       Q.  Okay.  And so then when the acquisition happens
7   and the teams need to merge, then some people stayed
8   with Carlos and some people went to Paul Jensen and some
9   McKesson people from Paul Jensen's team went to Carlos?
10      A.  Correct.
11      Q.  So it went both ways?
12      A.  Yes.
13      Q.  And you don't know how those decisions were made,
14  correct?
15      A.  No.
16      Q.  It's correct that you don't know.
17      A.  It is correct that I don't know.
18      Q.  So then you started reporting to Mr. Jensen
19  sometime in 2013, then?
20      A.  Yes, I believe so.
21      Q.  And you don't recall the specific date?
22      A.  Hmm-mmm.
23      Q.  Would you rely on company records to reflect
24  that?
25      A.  Sure.

Page 60

1       Q.  Do you understand that the way the sales manager
2   is compensated is based on performance of the sales
3   team?
4       A.  Correct.
5       Q.  So your sales roll up to Mr. Jensen?
6       A.  Correct.
7       Q.  And when you worked for Mr. Xiques, your sales
8   rolled up to Mr. Xiques?
9       A.  Correct.
10      Q.  So if you lose an account or you lose sales,
11  Mr. Jensen losses sales and losses that account,
12  correct?
13      A.  Correct.  Well, not necessarily unless it was
14  assigned to another one of his reps.
15      Q.  Okay.  But if it's assigned to someone on a
16  different team --
17      A.  Then he would not.
18      Q.  Okay.  Do you know if Craig Williams ever
19  reported to Mr. Jensen?
20      A.  No, he did not.
21      Q.  So when the account assignment decision was made
22  on the Access account, Mr. Williams didn't report to
23  Mr. Jensen, correct?
24      A.  No.
25      Q.  So Mr. Williams' sales rolled up to his manager,

Page 61

1   correct?
2       A.  Correct.
3       Q.  And do you know who his manager was?
4       A.  Alex Loisey.
5       Q.  I think it's Loisey.
6       A.  Loisey.
7       Q.  And it's Alexandra?
8       A.  Alexandra, yeah.
9       Q.  Do you know her?
10      A.  Yes.
11      Q.  Okay.  Is she a female sales manager?
12      A.  Yes.
13      Q.  And so when the decision was made to allow
14  Mr. Williams to keep certain ship-tos under Access,
15  those accounts then rolled up to Ms. Loisey, right?
16      A.  Correct.
17      Q.  So Mr. Jensen lost those sales as well, correct?
18      A.  I believe I was still under Carlos at that point.
19  I'm not sure, but it was a transition period.
20      Q.  Okay.  I mean, if you reported to Mr. Xiques, he
21  would have lost those sales --
22      A.  Correct.
23      Q.  -- when it went to Mr. Williams and Ms. Loisey?
24      A.  Correct.
25      Q.  Now, Mr. Jensen -- as it exists today, you still

16  (Pages 58 to 61)

bfeb07dc-7a36-458f-8d44-dd5b10fc2506

Hilda Klausina Maria Cornelia Van Hoek
July 12, 2019

**CONFIDENTIAL** Page 62

1  have the Access account, correct?
2      A. I have the bill-to account.
3      Q. Okay. Do you know how many ship-to accounts are
4  under Access?
5      A. There's under 100.
6      Q. Okay. And do you know how many ship-tos
7  Mr. William has?
8      A. At this point five or six maybe.
9      Q. Okay. And is Ms. Laura Carmen, now Capriotti,
10  still involved in the Access account?
11      A. Yes.
12      Q. And do you know how many ship-to locations she
13  has?
14      A. I would assume about the same amount.
15      Q. Five to six?
16      A. Five to six.
17      Q. Okay. And is there anyone else that's involved
18  from a representative perspective?
19      A. Michelle Hosley.
20      Q. And do you know how many ship-tos Michelle Hosley
21  has?
22      A. About five or six or maybe four or five.
23      Q. Okay. So between Ms. Hosley, Ms. Carmen, now
24  Capriotti, and Mr. Williams, they have about 15
25  ship-tos?

**CONFIDENTIAL** Page 63

1      A. I'd say 15, maybe 20.
2      Q. Fifteen to 20 ship-tos?
3      A. Fifteen to 20.
4      Q. And you said there's 100 ship-tos?
5      A. Under. There's probably 80.
6      Q. Eighty ship-tos?
7      A. Mmm-hmm.
8      Q. And so other than the 15 or 20 that are assigned
9  to Mr. Williams, Ms. -- I'm going to call her
10  Ms. Capriotti --
11      A. Sure.
12      Q. -- and Ms. Hosley, you own the rest of the
13  ship-tos, correct?
14      A. Todd Anderson owns one of them.
15      Q. Okay. So Mr. Anderson owns one?
16      A. Mmm-hmm. And when you have a ship-to, it's just
17  so hard to say. You might have a ship-to that does
18  $2,000 a year. You might have a ship-to that does
19  $20,000 a year. So --
20      Q. Okay. But what I'm trying to understand are the
21  number of accounts.
22      A. Sure.
23      Q. Okay. So you -- so including Todd Anderson,
24  Mr. Williams, Ms. Capriotti, and Ms. Hosley, they
25  together own 15 to 20 ship-tos?

**CONFIDENTIAL** Page 64

1      A. Correct. From my knowledge, yeah.
2      Q. And from your knowledge, which is all we can ask
3  about today --
4      A. Active accounts, yeah.
5      Q. Active ship-to accounts?
6      A. Right.
7      Q. And then you own the rest of those ship-to
8  accounts, correct?
9      A. Correct.
10      Q. And you own the bill-to account, correct?
11      A. Correct.
12      Q. Does Mr. Anderson, Mr. Williams, Ms. Hosley, or
13  Ms. Capriotti own any of the bill-tos?
14      A. There is only -- well, there's two bill-tos. One
15  is the Access-owned and one is the IPA portion of their
16  business.
17      Q. Who owns those bill-to?
18      A. Me.
19      Q. Now, Mr. Jensen as the sales manager -- well, let
20  me ask you a different question first. Are you
21  considered the lead representative on the Access
22  account?
23      A. Yes.
24      Q. As the lead representative on the Access account
25  who reports to Mr. Jensen, is he the lead sales manager

**CONFIDENTIAL** Page 65

1  on the Access account?
2      A. He's the only sales manager. Well, no, you're
3  right. Craig has Loisey. We call her Alex.
4      Q. Okay. Okay. So let's call her Ms. Loisey for
5  the purpose of this deposition because that's the only
6  way I know.
7      A. Okay. Ms. Loisey.
8      Q. I don't know if that's how you say it.
9      A. I don't either.
10      Q. We're going to do it this way.
11      A. Okay.
12      Q. So Ms. Loisey is the sales leader over
13  Mr. Williams?
14      A. Right.
15      Q. But Mr. Jensen is the primary sales manager on
16  this account, correct?
17      A. Yes.
18      Q. And so he answers all of the questions as it
19  relates to those that are required to be answered by the
20  sales manager?
21      A. Yes.
22      Q. Even over those issues that Mr. Williams has as
23  it relates to the Access accounts, correct?
24      A. Yeah. We control the billing, yes.
25      Q. And Mr. Jensen doesn't receive any compensation

bfeb07dc-7a36-458f-8d44-dd5b10fc2506

Hilda Klausina Maria Cornelia Van Hoek
July 12, 2019

**CONFIDENTIAL**

Page 66

1  from the sales that Mr. Williams completes on the Access
2  account, correct?
3      A. I don't believe so.
4      Q. Okay.  And Todd Anderson, do you know who he
5  reports to?
6      A. Jensen.
7      Q. And Michelle Hosley, who does she report to?
8      A. Mr. Jensen.
9      Q. And Ms. Capriotti, who does she report to?
10     A. Mr. Jensen.
11     Q. And is Ms. Capriotti one of those wheel reps that
12  you referred to earlier?
13     A. She is.
14     Q. What about Ms. Hosley?
15     A. She's a commissioned rep.
16     Q. She's a fully-commissioned rep?
17     A. As far as I know, yes.
18     Q. When you -- before the acquisition by McKesson in
19  2013, when you were reporting to Mr. Xiques, was Clint
20  Brady on your team?
21     A. Yes.
22     Q. You and Mr. Brady both reported to Mr. Xiques?
23     A. Yes.
24     Q. And after the acquisition and after you moved to
25  Mr. Jensen's team, did Mr. Brady move with you to

Page 67

1  Mr. Jensen's team?
2      A. No, not to my knowledge.
3      Q. Do you know who he -- Mr. Brady reports to today?
4      A. Well, there was a Brian Nehr in between, but he
5  now reports to Mr. Jensen.
6      Q. And do you know when that started?
7      A. I believe he was a sales leader for a couple of
8  years.  It was shortly after.  He took Carlos's
9  position.
10     Q. And when you say "he," you're referring to Brian
11  Nehr?
12     A. Brian Nehr.
13     Q. Okay.  So do you know when Mr. Brady moved to
14  Mr. Jensen's team?
15     A. This was fairly recently.
16     Q. Okay.  Would you rely on the company records to
17  accurately reflect that date?
18     A. Yes.
19     Q. Now, the Florida Medical Clinic account, were
20  some of the account assignment decisions related to
21  Florida Medical Clinic made by Mr. Jensen?
22     A. Yes.
23     Q. And at the time that Mr. Jensen made those
24  decisions, did Mr. Brady report to Mr. Jensen?
25     A. Mr. Jensen's only been over Clint Brady a short

Page 68

1  period of time, and there really -- anything hasn't
2  happened at Florida Medical since then.
3      Q. Okay.  So at the time that Mr. Jensen made the
4  decisions of the Florida Medical Clinic, Mr. Brady did
5  not report to Mr. Jensen, correct?
6      A. Correct.
7      Q. So whatever sales Mr. Brady received as a result
8  of the Florida Medical Clinic account, Mr. Jensen did
9  not receive any compensation from those, correct?
10     A. Correct.
11     Q. The Dr. Randolph Knight account, that assignment
12  decision was made in August of 2014?
13     A. That sounds right.
14     Q. Okay.  So sometime in 2014?
15     A. Yes.
16     Q. We'll get into details with documents.
17     A. Yeah.  A lot of dates.
18     Q. Sometime in 2014 that account decision was made?
19     A. Right.
20     Q. And Mr. Brady was the one that was assigned that
21  account, correct?
22     A. When he left Florida Medical Clinic, yes.  I
23  mean, Florida Hospital Physician Group.
24     Q. Okay.  When Dr. Knight left Florida Hospital
25  Physician Group?

Page 69

1      A. Correct.
2      Q. That's the account assignment issue that we're
3  talking about in this case, right?
4      A. Yes.
5      Q. Okay.  At the time that account was assigned
6  to Mr. Brady, Mr. Brady did not report to Mr. Jensen,
7  correct?
8      A. He did not.
9      Q. So whatever sales commissions that -- or whatever
10  sales that Mr. Brady accomplished with Dr. Knight did
11  not roll up to Mr. Jensen, correct?
12     A. Correct.
13     Q. And did you understand who was responsible for
14  making that account assignment decision as it related to
15  Dr. Knight?
16     A. Paul Jensen and Carlos Xiques had conversations,
17  I understand, and I think it was a joint decision.
18     Q. Do you know that or are you getting that
19  information from someone else?
20     A. Through the e-mails, it implied that.
21     Q. Did you understand that?
22     A. And Carlos, I think, ended up making the final
23  decision, which happened much later in November, I
24  think.  It took a long time to make that decision.
25     Q. Did you understand that when -- let me back up.

18  (Pages 66 to 69)

bfeb07dc-7a36-458f-8d44-dd5b10fc250t

Hilda Klausina Maria Cornelia Van Hoek
July 12, 2019

**Page 70**

1    Did you understand that Dr. Knight's office called the
2    McKesson customer service line and asked for supplies?
3    A. I do not know that.
4    Q. Do you know who was -- who made the initial
5    account assignment decision as it relates to Dr. Knight?
6    A. I mean, it had to be Carlos Xiques, but I have no
7    proof of that.
8    Q. All I'm asking is what your knowledge is, and
9    that's all I want to know.  If you don't have that
10   knowledge, you don't have that knowledge.  It's
11   perfectly fine.
12   A. Mmm-hmm.
13   Q. Now, at the time, though, that Mr. Xiques made
14   that decision, you were not on his team, correct?
15   A. That is correct.
16   Q. Now, the Florida Hospital Physician Group
17   account, do you recall when that account assignment
18   decision was made?
19   A. For the whole group?
20   Q. Well, let's first start -- there was some
21   decision made between -- let me rephrase.
22       There was some decision made regarding the
23   Florida Hospital Physician Group in 2014; is that
24   correct?
25   A. Some decisions made?

**Page 71**

1    Q. Mmm-hmm.  Regarding the account assignment.
2    A. What specifically?  I don't know what you're
3    asking.
4    Q. Sure.  Sure.  So in 2014, was there a decision
5    made that you and Mr. Brady would be the representatives
6    who would work the Florida Hospital Physician Group
7    account --
8    A. Yes.
9    Q. -- going forward?
10   A. Yes.
11   Q. Okay.  And at the time that that decision was
12   made, was Mr. Brady on Mr. Jensen's team?
13   A. No.
14   Q. And Mr. Jensen, like you, didn't get any credit
15   for the sales that Mr. Brady made, correct?
16   A. That's correct.
17   Q. Now, since Mr. Brady has joined Mr. Jensen's
18   team, now reports to Mr. Jensen, do you challenge any
19   account assignment decision that Mr. Jensen has made
20   with respect to Mr. Brady?
21   A. I don't think so.
22   Q. Do you know who Mark Rainville is?
23   A. I do.
24   Q. Who is he?
25   A. He is a commissioned rep.

**Page 72**

1    Q. And who does he report to?
2    A. Paul Jensen.
3    Q. And when did he start reporting to Mr. Jensen?
4    A. I don't know.
5    Q. Would you rely on the company records to
6    accurately reflect that?
7    A. Yes.
8    Q. Now, I want to talk about the Access account,
9    that type of shared account just in a general sense
10   right now.  Do you understand that there are some
11   accounts within McKesson and that existed with PSS that
12   there are multiple representatives that service one
13   account?
14   A. Yes.
15   Q. And Access is an example of that account?
16   A. Yes.
17   Q. And when you have a shared account, there is one
18   lead representative for that account, correct?
19   A. Yes.
20   Q. And in the instance of Access, that would be you?
21   A. Right.
22   Q. And as a result of being the lead representative
23   or really the owner of the bill-to, if there were any
24   new accounts opened, any new ship-to locations that are
25   opened within that account, that typically would go to

**CONFIDENTIAL**        **Page 73**

1    you as the bill-to, correct?
2    A. As long as it's an account that doesn't already
3    have a rep attached to it.  I mean, there could be a
4    doctor's office that joins the group that currently is
5    in -- is a customer of McKesson and has a sales rep
6    attached to it.  That would -- they would attach to it,
7    but then they would hook up to the bill-to.
8    Q. Okay.  So Dr. Smith -- let's just give an
9    example.  Dr. Smith is out there practicing urology on
10   his own, and he's using Clint Brady as his account
11   manager for McKesson, and he's purchasing supplies.
12       Dr. Smith decides it would be better if he hooks
13   up with Access Healthcare Group.  So then Dr. Smith
14   comes into the Access Healthcare Group as a ship-to
15   location?
16   A. Correct.
17   Q. And then Clint Brady would continue to service
18   that ship-to location, correct?
19   A. That is not correct.
20   Q. Okay.  So what is the instance that you're
21   telling me about when you said that someone who is
22   already being serviced by McKesson?
23   A. Well, like Todd Anderson.  Up until recently he
24   did not have an account with Access, and one of his
25   doctors joined the group.

19  (Pages 70 to 73)

bfeb07dc-7a36-458f-8d44-dd5b10fc250(

Hilda Klausina Maria Cornelia Van Hoek
July 12, 2019

CONFIDENTIAL    Page 74

1  Q. Okay.
2  A. So he gets credit for that particular ship-to,
3  but once they join the Access group, they've been asked
4  not to call on that particular location.
5  Q. Okay. But he still gets the sales credit for
6  that?
7  A. Correct.
8  Q. But -- so now let's go to a different example.
9  Dr. Smith, let's say, newly out of medical school is now
10  wanting to join the Access Healthcare Group. No
11  affiliation with anyone else before, new ship-to
12  locations created.
13  A. Correct.
14  Q. Those sales then go to you as the bill-to owner,
15  correct?
16  A. Correct.
17  Q. What are your -- as the bill-to owner of a lead
18  account rep on an account, a shared account, what are
19  your job duties and responsibilities?
20  A. Well, like recently they're placing their orders
21  online, so they go through our web portal. They place
22  their orders. Their orders go pending the super user,
23  which is one of the managers with Access Healthcare.
24  And right now we're setting all of the accounts
25  up with scan manager, which is a device where you scan

CONFIDENTIAL    Page 75

1  the bar codes like you see in the grocery stores. So
2  we're labeling all the shelves. So it's a very
3  time-consuming process of going in and labeling -- I
4  mean, a lot of the accounts it took a complete day to
5  just put the labels on the shelf. That has to be done
6  for all of them. We have another wave of ten more that
7  we're going to do that to.
8  So I pretty much take the lead on it. Paul
9  recently asked the reps that are being paid for those
10  ship-tos to help.
11  Q. Okay.
12  A. Okay.
13  Q. Any other job duties and responsibility that you
14  have as the lead rep or the owner of the bill-to?
15  A. Gosh, anything to do with accounting, anything to
16  do with pricing, anything to do with -- I mean, I'm in
17  constant contact with the purchasing agents.
18  Q. And as the bill-to owner and the lead
19  representative, you set the pricing on the account?
20  A. I do somewhat. They're a part of a GPO called
21  HealthTrust and those are set prices.
22  Q. But for the prices for which you would -- a
23  representative would have discretion, you have that
24  discretion?
25  A. Yes. Yes, I do.

CONFIDENTIAL    Page 76

1  Q. And your decisions impact the other
2  representatives that are on that account, correct?
3  A. That is correct.
4  Q. And this process that we have described with you
5  being the bill-to owner, is that the same process that's
6  used for all of the shared accounts, to your knowledge?
7  A. Say it again.
8  Q. Sure. Sure. There are other shared accounts
9  within McKesson, correct?
10  A. Yes.
11  Q. And this process where the bill-to owner does the
12  customer service on the account, the accounting on the
13  account, and sets the pricing, that's the same process
14  that's used for all the shared accounts, correct?
15  A. Yes. But like, for instance, with Tower
16  Diagnostic, I call on my ship-to accounts, and I'm the
17  one that's setting up the labels. I'm the contact
18  person for the administrators of those ship-to
19  communications.
20  Q. Do you know if that works the same way for any
21  other accounts?
22  A. Yes.
23  Q. Okay. And other accounts that are not assigned
24  to you?
25  A. Yes.

CONFIDENTIAL    Page 77

1  Q. And whose accounts does it work that same way
2  for?
3  A. The scenario I just told you?
4  Q. Yeah.
5  A. Tower Diagnostic, Concentra.
6  Q. Any other accounts that you can think of?
7  A. That's all I can think of.
8  Q. Okay. Do you know if the -- why the Access
9  account is set up the way it is where the ship-tos are
10  not doing all of the customer service work like you do
11  on the Tower Diagnostic account?
12  A. Say that again.
13  Q. Sure. Do you know if the customer expressed a
14  preference --
15  A. Yes.
16  Q. -- of just wanting you to handle all of the
17  customer service issues regarding the account?
18  A. Absolutely.
19  Q. And that has been agreed to by McKesson as well,
20  correct?
21  A. Yes.
22  Q. Do you know if Tower Diagnostic made that same
23  request?
24  A. No.
25  Q. So in this case, as I understand it, you're

20  (Pages 74 to 77)

bfeb07dc-7a36-458f-8d44-dd5b10fc250(

Hilda Klausina Maria Cornelia Van Hoek
July 12, 2019

---

Page 78

1   bringing two claims. One, you allege that you have been
2   discriminated against because of your gender, and, two,
3   you believe that you have been retaliated against for
4   engaging in protected activity?
5      A. Correct.
6      Q. Do I have those two claims correct?
7      A. Yes.
8      Q. Okay. So as I mentioned at the beginning, the
9   purpose of this deposition is to understand the basis
10  for those claims.
11     A. Okay.
12     Q. So I want to start first with your claim of
13  discrimination. As I understand it from reading your
14  complaint, one of the -- let me say it a different way.
15      You allege in this case that one of the instances
16  of discrimination is the assignment of the Florida
17  Medical Clinic account; is that correct?
18     A. Correct.
19     Q. Okay. When was that account-assignment decision
20  made that you contend was discriminatory?
21     A. 2012.
22     Q. Let me show you what's marked as Exhibit 16 to
23  your deposition.
24      (Exhibit 16 marked for identification.)
25  BY MS. DYSON:

Page 80

1      A. Correct.
2      Q. So you contend that the decision to assign -- or
3   the account assignment decision with respect to Florida
4   Medical Clinic was discriminatory because they --
5   because there was not a concession to the customer's
6   request for a single representative. Did I get that?
7      A. Correct.
8      Q. And you don't know whether there are any other
9   male representatives who had an account where a request
10  was made for a single representative and that was
11  denied, correct?
12     A. Not specifically, no.
13     Q. Okay. Is there any other basis for which you
14  contend the Florida Medical Clinic account assignment
15  was discriminatory?
16     A. Any other --
17     Q. Basis.
18     A. -- basis?
19     Q. Mmm-hmm.
20     A. I mean, when a customer has such a dislike for a
21  specific sales rep and specifically asks not to have
22  that person as a representative, that amazes me. Still
23  does.
24     Q. Okay.
25     A. I wouldn't want to be attached to an account

---

**CONFIDENTIAL (LINES 1-8)**     Page 79

1      Q. And before we get into this exhibit, tell me why
2   you believe that the assignment of the Florida Medical
3   Clinic account is -- was a discriminatory assignment.
4      A. Any time a customer requests -- I've heard it on
5   our sales calls; I've heard it from the managers up in
6   corporate. The customer should be able to dictate how
7   they want their account handled and who they want it
8   handled by.
9      Q. And are you aware of other instances where the
10  account has made a request to have a specific
11  representative and that request has been denied?
12     A. For me?
13     Q. For anyone.
14     A. For me, Florida Medical Clinic and Access
15  Healthcare.
16     Q. But are you aware of any other accounts that
17  applied to other people?
18     A. Not that I'm aware of.
19     Q. Okay. Do you understand that it could be
20  possible that there were other accounts that asked for a
21  single representative and the request was denied?
22     A. I don't know.
23     Q. Because you don't know how every single account
24  works, every account that reports to Mr. Jensen,
25  correct?

**CONFIDENTIAL**     Page 81

1   where someone despised me.
2      Q. And do you understand that there could be a
3   business reason for why Mr. Brady was -- continued to be
4   attached to that account?
5      A. No.
6      Q. Do you understand that Mr. Jensen communicated to
7   the client that they couldn't have a single
8   representative unless they had an exclusive agreement
9   with --
10     A. I do, yes.
11     Q. Let me finish asking my question. Do you
12  understand that Mr. Jensen made it clear to the customer
13  that they could not have a single representative unless
14  they agreed to an exclusive account with McKesson?
15     A. I don't know if he specifically said it to the
16  customer. He specifically said it to me.
17     Q. Okay. And do you understand that that could be a
18  leverage point to gain more business?
19     A. Of course.
20     Q. Is there any other reason that you contend the
21  Florida Medical Clinic account could -- was -- the
22  account assignment was discrimination?
23     A. I really don't know what you're getting at, but
24  all I know is that I know instances where an account has
25  asked for one salesperson and it has been -- and it

21 (Pages 78 to 81)

bfeb07dc-7a36-458f-8d44-dd5b10fc2506

Hilda Klausina Maria Cornelia Van Hoek
July 12, 2019

**CONFIDENTIAL**                                    Page 82

1   happened and it was honored.
2   Q.  Okay.  And what account is that?
3   A.  Florida Hospital Physician Group.
4   Q.  Okay.  Do you know how that decision was made?
5   A.  I wasn't in on those conversations, but through
6   e-mails, I was told that that's what the customer
7   wanted, and they made a decision that it be with a
8   person that was local to their home office.  And then we
9   all lost all ship-tos.  I lost a ton of ship-tos.
10  Q.  Both the male and females representatives lost
11  the ship-tos, correct?
12  A.  Mmm-hmm.
13  Q.  Okay.  And do you know who made that decision?
14  A.  I think it was -- gosh.  I can't think of his
15  name.  He was one of the -- he handles large accounts.
16  Dealvarez.
17  Q.  Mr. Jensen didn't make that decision?
18  A.  No.
19  Q.  Mr. Xiques didn't make that decision, correct?
20  A.  No.
21  Q.  Do you know whether that decision was part of a
22  broader issue related to Florida Hospital's acquisition
23  by the Adventist Health System?
24  A.  I don't know.  All I can do is assume it was for
25  reasons of saving money, having one rep.  And it's a

**CONFIDENTIAL**                                    Page 83

1   lot -- it's a lot easier to -- for a customer to have
2   just one contact person that they have to go to to ask
3   questions.  It's, like, oh, I don't know if I need to go
4   to this one because this one's owned by this one and
5   this is owned by this one.  They want one contact
6   person.
7       And in the case of Florida Hospital Physician
8   Group, they did that, and it just happened it was Brian
9   Irish, who is a male, and they did it.
10      And I look at it the same way.  I -- my customer
11  asked.  You're right; they did not sign an exclusive,
12  but Access Healthcare did.
13  Q.  Okay.
14  A.  Okay.
15  Q.  But you don't know the reason why the Florida
16  Hospital Physician Group was moved to Brian Irish,
17  correct?
18  A.  No.
19  Q.  Is that correct?
20  A.  That's correct.
21  Q.  And do you know if Tower Diagnostic made a
22  request for a single sales rep?
23  A.  They were wanting pricing and Mark Rainville was
24  working with a specific administrator who was assigned
25  the duty of pricing.  They have five to six

**CONFIDENTIAL**                                    Page 84

1   administrators.  So the request was made by one of the
2   administrators who Mark has contact with.
3   Q.  So Tower Diagnostic made a request for a single
4   representative, correct?
5   A.  A single -- no.  I mean, they didn't ask to get
6   rid of me on the ship-tos.
7   Q.  Do you -- do you know that?
8   A.  Yeah, or else I would have been gone.
9   Q.  Well, do you know if that request was denied?
10  A.  I do not.
11  Q.  Okay.  So let's go back to the Florida Medical
12  Clinic account and the document which is Exhibit 16 in
13  front of you.  If we can start at the bottom, like the
14  back page, because you know how e-mails work, right?
15      So we'll start with this e-mail on November 27,
16  2012, from Carlos Xiques to you.  Do you see that?
17  A.  Yes.
18  Q.  And in this e-mail Mr. Xiques says that "Multiple
19  folks were working Florida Medical to see if they could
20  get traction, with the exception of the lab which you
21  agreed" -- "you control as we agreed."  Do you see that?
22  A.  Yes, I do.
23  Q.  And was that accurate?  Multiple folks were
24  working Florida Medical?
25  A.  He was telling me right there, yes.

**CONFIDENTIAL**                                    Page 85

1   Q.  And do you know who those folks were?
2   A.  I knew one was Clint Brady.  Michelle Hosley
3   maybe.  I don't know.  But she doesn't have any ship-tos
4   at the moment.
5   Q.  So prior to November 27, 2012, did Clint Brady
6   have ship-tos in the Florida Medical Clinic account?
7   A.  Yes.
8   Q.  And do you know how many ship-tos he had?
9   A.  Not exactly.
10  Q.  Do you have a guess?
11  A.  Maybe three.  Three, four.
12  Q.  Do you know how many ship-tos he has today?
13  A.  Same number.
14  Q.  In this e-mail, Mr. Xiques goes on to say that
15  "Clint has some traction with the purchasing department,
16  not the lab, and needs to provide a couple of prices he
17  promised to them."  Do you see that?
18  A.  I do.
19  Q.  Do you know whether Mr. Xiques believed that
20  Mr. Brady had some traction?
21  A.  I don't -- I can't read someone's mind.
22  Q.  So you don't have anything to dispute that
23  Mr. Xiques believed that, correct?
24  A.  I just know that we found out that that was not
25  the case.  But that Carlos Xiques believed it?  He

22  (Pages 82 to 85)

bfeb07dc-7a36-458f-8d44-dd5b10fc2506

Hilda Klausina Maria Cornelia Van Hoek
July 12, 2019

## CONFIDENTIAL — Page 86

1  probably did.
2  Q. And he believed that in order for Mr. Brady to
3  continue with that traction he had to change the main
4  site bill-to, correct?
5  A. I do not understand that at all.
6  Q. Well, he says in here "We will need to change the
7  main site bill-to," correct?
8  A. He's saying that but I don't understand why.
9  Q. Okay. Do you have anything to dispute that
10  Mr. Xiques, in fact, believed that he needed to change
11  that bill-to?
12  A. He had no basis for doing -- for believing that.
13  Q. And how do you know that?
14  A. Because I was the one working with the purchasing
15  department, not Clint Brady, and Carlos Xiques knew
16  that. Clint Brady had contact with one physician at one
17  ship-to location and that -- the doctors that are owned
18  by Florida Medical Clinic do not dictate purchasing.
19  Q. Mr. Xiques says here that they need -- "He needs
20  to change the bill-to so Mr. Brady can provide quotes
21  and pricing." Do you see that?
22  A. I do.
23  Q. In order for Mr. Brady to provide pricing, he has
24  to have the bill-to, correct?
25  A. No. He could have asked me.

## CONFIDENTIAL — Page 87

1  Q. Okay. Then you would have been providing the
2  pricing, not Mr. Brady, correct?
3  A. That's correct.
4  Q. So Mr. Brady could not provide pricing unless he
5  was the bill-to owner, correct?
6  A. We do this all the time. It's like if he would
7  have had a list -- which I don't even think he had a
8  list -- if he had a list of five items, why take away
9  the whole bill-to when I'm the one specifically or
10  mostly dealing with the purchasing department.
11  Q. And my question to you, Ms. van Hoek, was
12  Mr. Brady couldn't quote the bill-to pricing to the
13  customer without being the bill-to owner, correct?
14  A. Correct.
15  Q. And Mr. Xiques goes on to say that "The lab
16  account or accounts, if you have them, all remain under
17  you and are not impacted;" is that correct?
18  A. That's what he says.
19  Q. And is that correct --
20  A. Yes.
21  Q. -- that they were not impacted?
22  A. Yes.
23  Q. There weren't any ship-tos that were taken away
24  from you as a part of that, correct?
25  A. That's correct.

## Page 88

1  Q. And you respond back to Mr. Xiques saying that
2  you're on the bid list -- you're on the list to bid in
3  January?
4  A. Correct.
5  Q. And that is that you were going to be provided a
6  list of supplies in January for which then you could
7  bid?
8  A. Correct.
9  Q. That's what that's in reference to?
10  A. On the purchasing part.
11  Q. Okay. And you end this by saying, "Like you
12  said, not just one person for the entire account."
13  A. Where are you reading that?
14  Q. Sure. The last fragment, sentence.
15  A. Of what page?
16  Q. Oh, sorry. It's the second e-mail up, so it's on
17  Page 684. Bates Number 684. Do you see that?
18  A. Yeah, I do. Yes.
19  Q. At this point in time, on November 27, 2012,
20  Mr. Steele was not demanding one representative,
21  correct?
22  A. He always was.
23  Q. Okay. Throughout the entire time that you dealt
24  with him?
25  A. Yes.

## Page 89

1  Q. And that request was never granted, correct?
2  A. That's correct.
3  Q. And Mr. Steele continued to buy from you either
4  at PSS or McKesson, correct?
5  A. Just using us as a backup. I mean, we get very
6  little business from him because of this.
7  Q. Because of what?
8  A. Because of the lawsuit and because of the way
9  that I've been treated by McKesson.
10  Q. What does the lawsuit have to do with the
11  purchasing decisions made by Mr. Steele?
12  A. Ask me a specific question.
13  Q. Well, you just said that Mr. Steele doesn't
14  purchase -- doesn't use McKesson as a sole supplier
15  because of the lawsuit. What does the lawsuit have to
16  do with Mr. Steele?
17  A. Well, Mr. Steele did not know anything about the
18  lawsuit until just recently when he was talked to.
19  Q. Who was he talked to by?
20  A. Kathi.
21  Q. And what did Mr. Steele say?
22      MR. HELWIG: Objection. Privileged
23  information.
24  BY MS. DYSON:
25  Q. Were you present?

23 (Pages 86 to 89)

bfeb07dc-7a36-458f-8d44-dd5b10fc250f

Hilda Klausina Maria Cornelia Van Hoek
July 12, 2019

**CONFIDENTIAL**    Page 90

1   A. No.
2   Q. Did Mr. Steele provide an affidavit?
3   A. I don't know.
4   Q. Okay. So, again, the -- what does the lawsuit
5  have to do with Mr. Steele's --
6   A. I --
7   Q. What does the lawsuit have to do with
8  Mr. Steele's purchasing decisions?
9   A. Nothing.
10   Q. So when did you first start working with
11  Mr. Steele?
12   A. It says here 18 years. Before 2012, so it's a
13  long time ago.
14   Q. And since that time Mr. Steele had requested one
15  sales representative?
16   A. Yes.
17   Q. And that request wasn't granted?
18   A. That's right.
19   Q. Okay. And you acknowledge in this e-mail of
20  November 27, 2012, that there are multiple people in the
21  account?
22   A. Yes.
23   Q. You also understood from Mr. Jensen that if
24  Mr. Steele signed an exclusive agreement he could have a
25  single representative, correct?

**CONFIDENTIAL**    Page 91

1   A. Correct.
2   Q. And Mr. Steele never signed an exclusive
3  agreement, correct?
4   A. Correct.
5   Q. So the next e-mail comes back from Mr. Xiques
6  still on the same date of November 27, 2012?
7   A. Mmm-hmm.
8   Q. And he reaffirms that none of the business you
9  had was taken away, correct?
10   A. That's correct.
11   Q. And Mr. Xiques says that Mr. Brady will work with
12  his contact to see if he can move the business forward
13  for PSS, correct?
14   A. Correct.
15   Q. Do you know whether Mr. Brady has any contact
16  with Florida Medical Clinic today?
17   A. I don't think so.
18   Q. And do you know the last time he had any contact
19  with Florida Medical Clinic?
20   A. Last time Gary Steele mentioned it -- it's been a
21  long time ago.
22   Q. And do you know the last time Mr. Brady actually
23  had contact with Florida Medical Clinic?
24   A. I just remember him going in there and I had
25  visited -- I was visiting the purchasing department

**CONFIDENTIAL**    Page 92

1  afterwards. I mean, a day or week after. And he just
2  said he did not want to see Clint Brady in there again.
3   Q. But you don't know whether Mr. Brady was, in
4  fact, in there, correct?
5   A. Gary Steele told me he was.
6   Q. Okay. But you didn't see Mr. Brady there, did
7  you?
8   A. No.
9   Q. Is Mr. Steele the only one that makes purchasing
10  decisions for the Florida Medical Clinic account?
11   A. No.
12   Q. How many other people make decisions for the
13  Florida Medical Clinic account?
14   A. He is the purchasing agent, so when it comes to
15  the laboratory, the lab staff, they fill out a
16  requisition and those have to be submitted to Gary
17  Steele for approval.
18   Q. Are there other purchasing agents within Florida
19  Medical Clinic?
20   A. He has an assistant, Amy Boyes. B-O-Y-E-S.
21   Q. Is there -- are there other purchasing agents
22  that work for Florida Medical Clinic?
23   A. Not that I know of.
24   Q. Do you know who Mr. Steele reports to?
25   A. I think it's someone named Alvarez.

**CONFIDENTIAL**    Page 93

1   Q. Do you know what his title is?
2   A. No.
3   Q. Do you know who Mr. Alvarez reports to?
4   A. Delatorre is the CEO. Joe.
5   Q. Do you know if Mr. Delatorre or Mr. Alvarez also
6  have purchasing powers within Florida Medical Clinic?
7   A. They are the ones that tell Gary Steele to shop
8  it and get the best price that he can for the item, and
9  they leave that decision up to Gary Steele, unless it
10  has to do with a large piece of equipment and then they
11  get involved directly.
12   Q. And the competitor who has the business of
13  Florida Medical Clinic -- the majority of business for
14  Florida Medical Clinic, who is that?
15   A. Henry Schein.
16   Q. And how long has Henry Schein had the majority of
17  the Florida Medical Clinic business?
18   A. I would say -- I don't know.
19   Q. And do you know who the representative is for
20  Henry Schein that has the connection to Florida Medical
21  Clinic?
22   A. Michael Cole.
23   Q. And does Michael Cole have some connection to
24  Florida Medical Clinic other than being a
25  representative?

24 (Pages 90 to 93)

bfeb07dc-7a36-458f-8d44-dd5b10fc2506

Hilda Klausina Maria Cornelia Van Hoek
July 12, 2019

Page 94

1      A.  I don't know.
2      Q.  In this e-mail that's Exhibit 16, the first
3  e-mail that's written by you dated December 1, you
4  reference that -- this is the fourth paragraph.  "Gary
5  P. reminded me of the relationship between Colleen and
6  Henry Schein."  Do you see that?
7      A.  Mmm-hmm.
8      Q.  What's that a reference to?
9      A.  Let me see.  It wasn't actually the relationship
10 between Colleen and Henry Schein.  It was in reference
11 to a company that Henry Schein acquired.  Colleen and
12 the owner of that company had gone to school together
13 and Colleen was the CFO.  So she did have a lot of
14 influence at the time.
15     Q.  Is she still the CFO?
16     A.  No.  She got let go.
17         MS. DYSON:  Can we take a break?
18         (Break from 11:26 a.m. to 11:38 a.m.)
19         MS. DYSON:  So this morning, I think it was
20 around 11 a.m., the Court entered an order
21 temporarily staying the deposition.  Therefore we
22 will stay the deposition pursuant to the Court's
23 order and reconvene later.
24         MR. HELWIG:  Agreed.
25         MS. DYSON:  I would like to order what's

Page 95

1  been done so far.
2          MR. HELWIG:  We'll order a copy.
3          (Deposition concluded at 11:38 a.m.)

Page 96

1                  CERTIFICATE OF OATH
2
3
4  STATE OF FLORIDA)
5  COUNTY OF HILLSBOROUGH)
6
7
8
9      I, SHELLY NORIEGA, RPR, Notary Public, State of
10 Florida, certify that the witness, HILDA KLAUSINA MARIA
11 CORNELIA VAN HOEK, personally appeared before me on July
12 12, 2019, and was duly sworn.
13
14     WITNESS my hand and official seal July 22, 2019.
15
16
17     _____
18     SHELLY NORIEGA, RPR
       Notary Public, State of Florida

Page 97

1                CERTIFICATE OF REPORTER
2
3  STATE OF FLORIDA)
4  COUNTY OF HILLSBOROUGH)
5
6      I, SHELLY NORIEGA, RPR, Notary Public, do hereby
7  certify that I was authorized to and did
8  stenographically report the foregoing deposition of
9  HILDA KLAUSINA MARIA CORNELIA VAN HOEK; that a review of
10 the transcript was not requested; and that the foregoing
11 transcript, pages 1 through 95 is a true record of my
12 stenographic notes.
13
14     I FURTHER CERTIFY that I am not a relative, employee,
15 or attorney, or counsel of any of the parties' attorneys
16 or counsel connected with the action, nor am I
17 financially interested in the action.
18
19     DATED July 22, 2019, at Tampa, Hillsborough County,
20 Florida.
21
22
23     _____
       SHELLY NORIEGA, RPR
24     Notary Public
25

25  (Pages 94 to 97)

bfeb07dc-7a36-458f-8d44-dd5b10fc250&